**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| TATI ABU KING, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-408-JAG |
| | ) | |
| GLENN YOUNGKIN, in his official | ) | |
| capacity as Governor of the Commonwealth | ) | |
| of Virginia, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE COMPLAINT UNDER**
**FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

---

Jason S. Miyares
   *Attorney General*

Steven G. Popps (VSB #80817)
   *Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
AFerguson@oag.state.va.us

Andrew N. Ferguson (VSB #86583)
   *Solicitor General*

Erika L. Maley (VSB #97533)
   *Principal Deputy Solicitor General*

Kevin M. Gallagher (VSB #87548)
   *Deputy Solicitor General*

Travis S. Andrews (VSB #90520)
   *Assistant Attorney General*

*Counsel for Defendants Glenn Youngkin, Kay Coles James, John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, Matthew Weinstein, Susan Beals, Taylor Yowell, and Shannon Williams*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

LEGAL STANDARD .......................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

    I.    The Court lacks jurisdiction to adjudicate Plaintiffs' claims ................................... 8

        A.    Sovereign immunity bars Plaintiffs' claims ............................................... 8

            1.    *Pennhurst* bars Plaintiffs' claims ................................................. 10

            2.    At the very least, the Governor and Secretary of the Commonwealth are immune because they do not enforce the challenged provision ................. 11

        B.    Plaintiffs Wingate, Johnson, and Bridging the Gap lack standing ................. 13

            1.    Wingate lacks standing because his right to vote was restored ................. 13

            2.    Johnson lacks standing because she was convicted of a felony at common law ................................................................................................. 13

            3.    Bridging the Gap lacks standing ................................................. 14

        C.    Plaintiffs' claims present a nonjusticiable political question ......................... 15

    II.    Plaintiffs' claims lack merit ..................................................................... 18

        A.    The Virginia Constitution does not violate the Virginia Readmission Act ..... 18

        B.    No private right of action exists under the Virginia Readmission Act ........... 21

        C.    The canon of constitutional avoidance precludes Plaintiffs' interpretation of the Virginia Readmission Act ..................................................................... 24

CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Shimari v. CACI Premier Tech., Inc.*,
840 F.3d 147 (4th Cir. 2016) ..................................................................16

*Alden v. Maine*,
527 U.S. 706 (1999)......................................................................................8

*Alexander v. Sandoval*,
532 U.S. 275 (2001).................................................................................21, 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................7, 8

*Association for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health &
Mental Retardation Ctr. Bd. of Trs.*,
19 F.3d 241 (5th Cir. 1994) ....................................................................15

*Atlas Underwriters, Ltd. v. State Corp. Com'n*,
237 Va. 45 (1989) .......................................................................................3

*Baker v. Carr*,
369 U.S. 186 (1962).............................................................................17, 18, 28

*Bateman v. Commonwealth*,
205 Va. 595 (1964) ...................................................................................4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................7

*Biggs v. North Carolina Dep't of Pub. Safety*,
953 F.3d 236 (4th Cir. 2020) ....................................................................9

*Bland v. Roberts*,
730 F.3d 368 (4th Cir. 2013) ....................................................................9

*Blessing v. Freestone*,
520 U.S. 329 (1997).................................................................................23

*Booth v. State of Maryland*,
112 F.3d 139 (4th Cir. 1997) ....................................................................9

*Bragg v. West Va. Coal Ass'n*,
248 F.3d 275 (4th Cir. 2001) ..............................................................10, 11

*Butler v. Thompson,*
    97 F. Supp. 17 (E.D. Va. 1951) ...............................................................17, 18, 29

*Canada v. Commonwealth,*
    63 Va. 899 (1872) ...............................................................................................20

*Carey v. Throwe,*
    957 F.3d 468 (4th Cir. 2020) ...........................................................21, 23, 24

*CGM, LLC v. BellSouth Telcoms., Inc.,*
    664 F.3d 46 (4th Cir. 2011) .............................................................................9

*City of Boerne v. Flores,*
    521 U.S. 507 (1997).........................................................................................26

*City of Rancho Palos Verdes v. Abrams,*
    544 U.S. 113 (2005).........................................................................................23

*City of Rome v. United States,*
    446 U.S. 156 (1980).........................................................................................16

*Clark v. Martinez,*
    543 U.S. 371 (2005).........................................................................................24

*Coyle v. Smith,*
    221 U.S. 559 (1911).....................................................................................2, 29

*Disability Rights S.C. v. McMaster,*
    24 F.4th 893 (4th Cir. 2022) ....................................................................12, 13

*Escanaba Co. v. Chicago,*
    107 U.S. 678 (1883).........................................................................................29

*Ford Motor Co. v. Department of Treasury of State of Ind.,*
    323 U.S. 459 (1945)...........................................................................................8

*Fusaro v. Cogan,*
    930 F.3d 241 (4th Cir. 2019) .........................................................................27

*Garey v. James S. Farrin, P.C.,*
    35 F.4th 917 (4th Cir. 2022) ..........................................................................13

*Georgia v. Stanton,*
    73 U.S. (6 Wall.) 50 (1867) ............................................................................18

*Gonzaga Univ. v. Doe,*
    536 U.S. 273 (2002)..................................................................................23, 24

*Hardy v. Commonwealth*,
  58 Va. 592 (1867) ...................................................................................................20

*Harvey v. Brewer*,
  605 F.3d 1067 (9th Cir. 2010) .........................................................................20, 25

*Hayden v. Pataki*,
  449 F.3d 305 (2d Cir. 2006)................................................................................26

*Heap v. Carter*,
  112 F. Supp. 3d 402 (E.D. Va. 2015) ................................................................15

*Hoepfl v. Barlow*,
  906 F. Supp. 317 (E.D. Va. 1995) .....................................................................13

*Howell v. McAuliffe*,
  292 Va. 320 (2016) ...............................................................................................3

*Hunter v. Underwood*,
  471 U.S. 222 (1985).............................................................................................26

*Japan Whaling Ass'n v. American Cetacean Soc'y*,
  478 U.S. 221 (1986)............................................................................................16

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018)......................................................................................24, 28

*Johnson v. Governor of Fla.*,
  405 F.3d 1214 (11th Cir. 2005) ..........................................................................26

*Jones v. Governor of Fla.*,
  950 F.3d 795 (11th Cir. 2020) ..............................................................................3

*Kenny v. Wilson*,
  885 F.3d 280 (4th Cir. 2018) ..............................................................................13

*Lane v. Holder*,
  703 F.3d 668 (4th Cir. 2012) ..............................................................................15

*Largess v. Supreme Judicial Ct. for State of Mass.*,
  373 F.3d 219 (1st Cir. 2004)...............................................................................28

*Lee v. Commonwealth*,
  144 Va. 594 (1926) .............................................................................................20

*Litman v. George Mason Univ.*,
  186 F.3d 544 (4th Cir. 1999) ................................................................................9

iv

*Luther v. Borden*,
    48 U.S. (7 How.) 1 (1849) ......................................................................2, 16, 22, 28

*Lytle v. Griffith*,
    240 F.3d 404 (4th Cir. 2001) ...............................................................................9

*McBurney v. Cuccinelli*,
    616 F.3d 393 (4th Cir. 2010) .............................................................................11

*McConnell v. Adams*,
    829 F.2d 1319 (4th Cir. 1987) .............................................................................9

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819)......................................................................24, 25

*Merritt v. Jones*,
    259 Ark. 380 (1976)................................................................................17, 20, 22

*Michigan Corr. Org. v. Michigan Dep't of Corr.*,
    774 F.3d 895 (6th Cir. 2014) .............................................................................10

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018)......................................................................................25, 30

*Nanni v. Aberdeen Marketplace, Inc.*,
    878 F.3d 447 (4th Cir. 2017) .............................................................................13

*Nat'l Fed. of Independent Business v. Sebelius*,
    567 U.S. 519 (2012)..........................................................................................24

*New York v. United States*,
    505 U.S. 144 (1992) .........................................................................................30

*North Carolina State Conf. of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) .............................................................................14

*Pacific States Telephone & Telegraph Co. v. Oregon*,
    223 U.S. 118 (1912)..........................................................................................17

*Parrish v. Commonwealth*,
    81 Va. 1 (1884) ................................................................................................20

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984)....................................................................................2, 10, 11

*Perry v. Beamer*,
    933 F. Supp. 556 (E.D. Va. 1996) ................................................................ *passim*

*Planned Parenthood S. Atl. v. Baker*,
  941 F.3d 687 (4th Cir. 2019) ........................................................................23, 24

*Pollard's Lessee v. Hagan*,
  44 U.S. (3 How.) 212 (1845) ...............................................................................29

*Regents of the Univ. of Cal. v. Doe*,
  519 U.S. 425 (1997)................................................................................................8

*Richardson v. Ramirez*,
  418 U.S. 24 (1974)......................................................................................1, 25, 27

*Richmond, Fredericksburg & Potomac R. Co. v. United States*,
  945 F.2d 765 (4th Cir. 1991) .................................................................................7

*In re Sec'y of the Dep't of Crime Control & Pub. Safety*,
  7 F.3d 1140 (4th Cir. 1993) ...................................................................................9

*Shelby Cnty. v. Holder*,
  570 U.S. 529 (2013)..............................................................................................26

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976)................................................................................................15

*South Carolina Wildlife Fed'n v. Limehouse*,
  549 F.3d 324 (4th Cir. 2008) ...............................................................................12

*Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at
  Broadlands, LLC*,
  713 F.3d 175 (4th Cir. 2013) ...............................................................................14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  143 S. Ct. 2141 (2023)..........................................................................................15

*Taubman Realty Grp. v. Mineta*,
  320 F.3d 475 (4th Cir. 2003) .................................................................................7

*Texas v. White*,
  74 U.S. 700 (1868), *overruled on other grounds by Morgan v. United States*,
  113 U.S. 476 (1885)........................................................................................16, 27

*United States v. Poole*,
  531 F.3d 263 (4th Cir. 2008) .................................................................................7

*United States v. States of La., Tex., Miss., Ala., & Fla.*,
  363 U.S. 1 (1960)..............................................................................................6, 16

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*,
   429 U.S. 252 (1977) ................................................................................27

*Virginia Office for Protection & Advocacy v. Stewart*,
   563 U.S. 247 (2011) ..................................................................................9

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
   252 F.3d 316 (4th Cir. 2001) ..................................................................11

*Will v. Michigan Dep't of State Police*,
   491 U.S. 58 (1989) ....................................................................................8

*Wright v. City of Roanoke Redevelopment and Housing Authority*,
   479 U.S. 418 (1987) ................................................................................23

*Ex parte Young*,
   209 U.S. 123 (1908) .......................................................................... *passim*

**Statutes**

52 U.S.C. § 10301(a) (Voting Rights Act) ......................................................26

Act. of Apr. 2, 1877, ch. 271, *reprinted in* The Code of Virginia: with the
   Declaration of Independence and the Constitution of the United States and the
   Constitution of Virginia, Tit. 5, § 79 (Goode 1887) ................................21

Act of Feb. 23, 1870, c. 19, 16 Stat. 67 ............................................................6

Act of July 15, 1870 ..........................................................................................6

Act of June 22, 1868, c. 69, 15 Stat. 72 ............................................................6

Act of June 25, 1868, c. 70, 15 Stat. 73 ............................................................6

Act of Mar. 20, 1870, c. 39, 16 Stat. 80 ...........................................................6

Va. Code § 24.2-409 ........................................................................................12

Va. Code § 24.2-417 ........................................................................................12

Va. Code § 24.2-427 ........................................................................................12

Virginia Readmission Act, 16 Stat. 62 (1870) ............................................ *passim*

**Other Authorities**

*A Descriptive List of Persons Convicted of Felony, or Other Infamous Offences,
   in the Corporation Court of Alexandria, Virginia Since November 2d, 1870*,
   Richmond, Va.: Library of Virginia ........................................................21

A.E. Dick Howard & William Antholis, *The Virginia Constitution of 1971*, 129
    Virg. Mag. of Hist. & Bio. 346 (2021) ...................................................................27

A.E. Dick Howard, *Who Belongs: The Constitution of Virginia and the Political
    Community*, 37 J. L. & Politics 99 (2022) .............................................................27

Eric Biber, *The Price of Admission: Causes, Effects, and Patterns of Conditions
    Imposed on States Entering the Union*, 46 Am. J. Legal Hist. 119 (2004)............................29

James Q. Dealey, *Growth of American State Constitutions* 70 (1915).........................................30

S. Rep. No. 89-162 (1965) ..............................................................................26

U.S. Const. amend. XIV, § 2 .......................................................................1, 25

U.S. Const. amend. XIV, § 5 ..........................................................................26

U.S. Const. art. IV, § 4..................................................................2, 16, 27, 29

Va. Const. art. II, § 1.................................................................................3, 19, 21

Va. Const. art. III, § 1 (1869)..................................................................6, 19, 20

Va. Const. art. III, § 14 (1830)...............................................................................3

## INTRODUCTION

Plaintiffs' novel claim that the Virginia Constitution's felon disenfranchisement provision violates the Virginia Readmission Act, 16 Stat. 62 (1870), fails on its face. Plaintiffs argue that the Court must adopt their unprecedented theory to prevent racial discrimination in voting. But the Fourteenth and Fifteenth Amendments unequivocally prohibit denying the right to vote based on race. Despite Plaintiffs' frequent insinuations that the current Virginia Constitution's disenfranchisement of felons is racially discriminatory, they bring no such claim.

Nor could they. Virginia's Constitution was ratified in 1971 without a shred of discriminatory intent, and Plaintiffs do not even allege otherwise. And it is well settled that the Fourteenth Amendment permits States to "exclude from the franchise convicted felons who have completed their sentences and paroles." *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974); U.S. Const. amend. XIV, § 2 (sanctioning States that restrict the franchise, "*except* for participation in rebellion, or other crime" (emphasis added)). Virginia's constitutional provision serves the Commonwealth's important "interest in preserving the integrity of her electoral process by removing from the process those persons with proven anti-social behavior whose behavior can be said to be destructive of society's aims." *Perry v. Beamer*, 933 F. Supp. 556, 558 (E.D. Va. 1996).

In the face of this clear precedent, Plaintiffs resort to a theory that they have touted publicly as the "first-of-its-kind": that the Virginia Readmission Act of 1870 grants judicially enforceable private rights, and that the Act prohibits Virginia from disenfranchising felons except for those who committed nine "common law" crimes. No court has interpreted the Virginia Readmission Act that way in the 153 years since Congress adopted it. Plaintiffs' interpretation would be a radical change in the law and would render the Virginia Readmission Act unconstitutional. This Court should reject it.

The Virginia Readmission Act does not create any judicially enforceable private rights. Congress passed the Act under the Guarantee Clause, U.S. Const. art. IV, § 4, and it imposes conditions on the readmission of the Commonwealth's congressional delegation following the Civil War. These conditions are enforceable, if at all, only by Congress through its authority to ensure that Virginia's government is republican in form. Congress cannot, through conditions on readmission, expand the scope of its legislative authority over States. *Coyle v. Smith*, 221 U.S. 559 (1911). And the Supreme Court held definitively nearly 175 years ago that the Guarantee Clause is not a source of justiciable private rights. *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849). Indeed, Plaintiffs cite no case—and the Commonwealth is aware of none—that has ever held that Congress has power under the Guarantee Clause to create new private rights that are judicially enforceable against the States. Plaintiffs' theory would be a vast and unprecedented expansion of Congressional power, wholly inconsistent with the Constitution.

Further, the doctrine of sovereign immunity bars Plaintiffs' claims, which at bottom ask this Court to tell Virginia what its Constitution meant in 1869. The *Ex parte Young* doctrine provides no authority for federal courts to enforce state law against state officials. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). And Plaintiffs' claims would fail on the merits as well. They rest on the premise that the 1971 Virginia Constitution restricts the franchise more severely than the 1869 Virginia Constitution that Congress approved in the Virginia Readmission Act. But the 1869 Constitution permanently barred *all* felons from voting—not, as Plaintiffs assert, only "common-law" felons. The current 1971 Constitution considerably expanded the franchise, not restricted it. This Court accordingly should dismiss Plaintiffs' complaint for want of jurisdiction or because it is meritless.

2

## BACKGROUND

Virginia's current Constitution was ratified in 1971. See *Atlas Underwriters, Ltd. v. State Corp. Com'n*, 237 Va. 45, 48 (1989). It extends the franchise to citizens of the United States who are 18 years of age, meet certain residency requirements, and are registered to vote. Va. Const. art. II, § 1. It further provides that "[n]o person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." *Ibid.* The Virginia Constitution has had a similar provision dating back to at least 1830. *Perry*, 933 F. Supp. at 559; see Va. Const. art. III, § 14 (1830). The vast majority of other States likewise have longstanding provisions disenfranchising felons. See, *e.g.*, *Jones v. Governor of Fla.*, 950 F.3d 795, 801 n.3 (11th Cir. 2020) (noting that 48 States and the District of Columbia "impose some restrictions on felons' access to the franchise").

Governor Youngkin has instituted an individualized, case-by-case review for re-enfranchisement applications by felons, consistent with the Virginia Supreme Court's interpretation of Article II, Section 1. See *Howell v. McAuliffe*, 292 Va. 320, 327 (2016). That process begins with the submission of an application through the Secretary of the Commonwealth's website. Ex. A, Declaration of Kay Coles James (James Decl.) ¶ 2. The felon discloses the nature of his or her conviction, whether the conviction was for a violent crime, whether he or she has finished serving all terms of incarceration, whether he or she is serving on probation, parole, or other state supervision (and, if so, the expected end date), and whether he or she has paid or currently is paying "all fines, fees, and restitution" pertaining to the conviction. *Ibid*. The Secretary reviews each application and "works with other various state agencies to consider who may be eligible to have their rights restored." *Ibid*. Upon approval of an application, the Governor, through the Secretary, issues a personalized restoration order via the United States

Postal Service. *Id.* ¶ 3. This process has resulted in the re-enfranchisement of 6,162 felons since Governor Youngkin took office. *Id.* ¶ 4.

Plaintiff Tati Abu King alleges that he was convicted of a drug possession felony in Fairfax County, Virginia in December 2018; that he served 11 months in prison and was released in June 2019; and that he "has applied for his voting rights to be restored." See Compl. ¶¶ 13–17 (ECF No. 1). Based on those allegations, Defendants were able to locate more information about King in the Commonwealth's records. See James Decl. ¶ 8. In 1988, King was convicted of felony robbery, and sentenced to 10 years in prison. *Id.* ¶ 9. In 2000, King violated his probation, and his sentence for felony robbery was reimposed. *Id.* ¶ 10. King was again released from custody in 2011, and the Governor granted his re-enfranchisement application in 2016. *Id.* ¶ 11. King committed another felony in 2018 and was convicted of possession of marijuana with intent to distribute. *Id.* ¶ 12. In 2019, King was released from custody. *Id.* ¶ 13. He submitted a re-enfranchisement application almost four years later, on April 5, 2023. *Id.* ¶ 7. Since May 2023, the Secretary of the Commonwealth's office has been attempting to reach Plaintiff King about additional information needed to complete his application. *Ibid.*

Plaintiff Melvin Wingate alleges that he is a Virginia resident who lost his right to vote after being convicted in the mid-1990s for uttering (passing or using a forged document). Compl. ¶¶ 19, 20, 76; see also *Bateman v. Commonwealth*, 205 Va. 595, 600 (1964) (defining "uttering" under Virginia law as "an assertion by word or action that a writing known to be forged is good and valid"). Based on those allegations, Defendants were able to locate more information about Wingate in the Commonwealth's records. Wingate was convicted of felony forgery and uttering in 1996, for which he was sentenced to 1 year and 3 months in prison. James Decl. ¶ 17. Twenty-six years later, in November 2022, Wingate applied for re-enfranchisement. *Id.* ¶ 16. About seven

months after Wingate submitted his application, the Governor issued an order restoring Wingate's voting rights on June 23, 2023—before Wingate filed this lawsuit. *Id.* ¶ 18.

Plaintiff Toni Heath Johnson alleges that she was convicted of felony "drug possession and distribution crimes, as well as child endangerment" in Washington County in 2021; that she was released from incarceration in 2022; that she is currently on probation; that she applied for re-enfranchisement; and that she learned in June 2023 that her application had been denied. Compl. ¶¶ 22–25, 78. Based on those allegations, Defendants were able to locate more information about Johnson in the Commonwealth's records. Johnson has been convicted of the following felonies: felony uttering in 1984, felony forgery in 1988, felony attempt to utter a forged check in 1988, felony credit card theft in 1991, felony bigamy in 1999, felony identity fraud in 2002, and felony grand larceny in 2003. James Decl. ¶ 23. In 2021, she was also convicted of two counts of felony abuse and neglect of a child with reckless disregard for life, and three counts of felony drug possession. *Id.* ¶ 24. For those five 2021 felonies, she received suspended sentences and supervised probation. *Ibid*.

Plaintiff Bridging the Gap alleges that it is a 501(c)(3) non-profit organization that assists formerly incarcerated individuals. Compl. ¶ 26. Bridging the Gap alleges that Virginia's felon disenfranchisement provision has caused it "to divert its limited resources away from its core programming and instead towards combating the widespread disenfranchisement resulting from this policy." *Id.* ¶ 81. Bridging the Gap also alleges that it has had to divert additional funds for re-enfranchisement applications after Governor Youngkin was inaugurated and reverted to the discretionary re-enfranchisement process that existed under both Republican and Democratic administrations before 2010. *Id.* ¶ 84. Bridging the Gap does not allege that it has any members.

5

On June 26, 2023, King, Wingate, Johnson, and Bridging the Gap (collectively, "Plaintiffs") filed this complaint, contending that the felon disenfranchisement provision of Virginia's Constitution violates the Virginia Readmission Act. See Compl. ¶ 12; An Act to Admit the State of Virginia to Representation in the Congress of the United States, 16 Stat. 62 (Jan. 26, 1870) (the "Virginia Readmission Act"). The Act was one of a series of laws Congress passed requiring the States formerly in rebellion to adopt certain provisions in their state constitutions before their congressional delegations would be seated. See *Perry*, 933 F. Supp. at 559 (citing Act of June 22, 1868, c. 69, 15 Stat. 72; Act of June 25, 1868, c. 70, 15 Stat. 73; Act of Feb. 1, 1870, c. 12, 16 Stat. 63; Act of Feb. 23, 1870, c. 19, 16 Stat. 67; Act of Mar. 20, 1870, c. 39, 16 Stat. 80; Act of July 15, 1870). The acts required the States to submit their newly adopted constitutions "'to Congress for examination and approval,' after which approval by Congress and after ratification of the Fourteenth Amendment by each State, each should be 'declared entitled to representation in Congress.'" *United States v. States of La., Tex., Miss., Ala., & Fla.*, 363 U.S. 1, 124 (1960).

Virginia adopted its post-war Constitution in 1869 and excluded from the franchise "[p]ersons convicted of . . . felony," Va. Const. art. III, § I (1869), as it had in previous constitutions. Shortly thereafter, Congress enacted the Virginia Readmission Act, which approved the 1869 Constitution as "republican" and declared that Virginia was again "entitled to representation in the Congress of the United States." 16 Stat. 62. The Act stated that "Virginia is admitted to representation in Congress" upon three "fundamental conditions," including that "the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law." 16 Stat. 63.

Plaintiffs claim that Virginia's current 1971 Constitution violates the Virginia Readmission Act because it disenfranchises felons who were convicted of crimes that were not "felonies at common law." Compl. ¶ 96. They contend that this claim is actionable under 42 U.S.C. § 1983, Compl. ¶¶ 89–102, and under principles of federal equity and *Ex parte Young*, *id.* ¶¶ 103–117. The complaint names as defendants Governor Glenn Youngkin; Secretary of the Commonwealth Kay Coles James; and numerous election officials, including the Commissioner of the Department of Elections, members of the State Board of Elections, and the General Registrars of the counties where the individual plaintiffs reside (collectively, Defendants). Plaintiffs ask this Court to issue a declaratory judgment holding that Defendants' enforcement of Article II, Section 1 of the 1971 Constitution violates the Virginia Readmission Act, as well as injunctive relief enjoining Defendants from enforcing the Virginia Constitution with respect to citizens convicted of crimes that were not felonies at common law in 1870. *Id.* at Prayer for Relief.

## LEGAL STANDARD

The plaintiff has the burden of establishing subject-matter jurisdiction and standing. *Taubman Realty Grp. v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003). "A court is to presume . . . that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper." *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008). In considering a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, a court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.*

## ARGUMENT

### I.   The Court lacks jurisdiction to adjudicate Plaintiffs' claims

Congress passed the Virginia Readmission Act in 1870, approving Virginia's 1869 Constitution as "republican," and declaring that the Commonwealth was "entitled to representation in the Congress of the United States." 16 Stat. 62. Plaintiffs claim that Virginia's operative 1971 Constitution violates a condition of the Act, that "the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law." 16 Stat. 63. This claim is nonjusticiable. First, the Commonwealth's sovereign immunity bars the claim, both because Plaintiffs improperly ask this Court to enforce state law against state officials, and because the Governor and Secretary lack any special relation to the challenged conduct. Second, Plaintiffs Wingate, Johnson, and Bridging the Gap lack standing. Finally, Plaintiffs' claims present a nonjusticiable political question.

### A.  Sovereign immunity bars Plaintiffs' claims

This Court lacks jurisdiction because sovereign immunity bars Plaintiffs' suit. The Constitution preserved the States' pre-existing sovereign immunity. See *Alden v. Maine*, 527 U.S. 706, 712–13 (1999). This immunity "denies to the federal courts authority to entertain a suit brought by private parties against a state without its consent." *Ford Motor Co. v. Department of Treasury of State of Ind.*, 323 U.S. 459, 464 (1945). Sovereign immunity extends not just to States, but also to their "agents and [] instrumentalities," *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997), including officials sued in their official capacities, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, state officers sued in their official capacities are "entitled to

Eleventh Amendment protection." *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001); see also *McConnell v. Adams*, 829 F.2d 1319 (4th Cir. 1987) (Virginia county registrars are state employees under Virginia law and thus cannot be sued in their official capacities). Here, Plaintiffs have sued all Defendants in their official capacities. See Compl. ¶¶ 28–44. Each Defendant is entitled to sovereign immunity.

Sovereign immunity can be overcome only if Congress has validly abrogated the State's immunity, if the State has voluntarily waived its immunity, or if the *Ex parte Young* exception applies. See *Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 253–54 (2011); accord *Litman v. George Mason Univ.*, 186 F.3d 544, 549–50 (4th Cir. 1999). Plaintiffs do not— and could not—allege that Virginia has waived its immunity or consented to be sued, and Congress "has not abrogated sovereign immunity for § 1983 suits."[1] *Biggs v. North Carolina Dep't of Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020). Plaintiffs' claims are therefore barred unless they fall within the limited exception to state sovereign immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908).

*Ex parte Young* permits a federal court, in limited circumstances, "to issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law." *Bland v. Roberts*, 730 F.3d 368, 390–91 (4th Cir. 2013).[2] The *Ex parte Young* exception is not "expansive,"

---

[1] Insofar as Plaintiffs' request for a "declaratory judgment," see Compl. ¶¶ 102, 117, is made pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, it is likewise barred because that act "is remedial only," *CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 55 (4th Cir. 2011), and does not abrogate a state's sovereign immunity, *Booth v. State of Maryland*, 112 F.3d 139, 146 (4th Cir. 1997).

[2] Plaintiffs assert two causes of action, both stemming from alleged violations of the Virginia Readmission Act: one under 42 U.S.C. § 1983, Compl. ¶¶ 89–102, and one under general principles of equity and *Ex parte Young*, *id.* ¶¶ 103–17. No matter how these causes of action are characterized, their analysis ultimately collapses into one theory. It has long been settled that Congress did not abrogate the States' sovereign immunity under § 1983. See *In re Sec'y of the Dep't of Crime Control & Pub. Safety*, 7 F.3d 1140, 1149 (4th Cir. 1993). So, to proceed under

however, and the Supreme Court has carefully limited its application. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). *Ex parte Young* is inapplicable here because Plaintiffs improperly seek a federal court order instructing state officials on how to conform their conduct to state law, and, in addition, the Governor and Secretary have no special relation with the challenged conduct.

### 1. *Pennhurst* bars Plaintiffs' claims

Sovereign immunity bars Plaintiffs' claims because they would impermissibly require this Court to adjudicate whether state officials violated state law. *Ex parte Young* does not apply where private parties seek relief amounting to a federal court order instructing "state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. In such a case, "the entire basis for the doctrine of" *Ex parte Young* "disappears" because a "federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law." *Ibid.* A State's "sovereign dignity reserves to its own institutions the task of keeping its officers in line with [state] law." *Bragg v. West Va. Coal Ass'n*, 248 F.3d 275, 297 (4th Cir. 2001). Indeed, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106.

---

§ 1983, Plaintiffs need to show that their claim falls within the limited exception to sovereign immunity recognized in *Ex parte Young*, which is the same analysis the Court would use for a standalone *Ex parte Young* claim. That said, *Ex parte Young* does not create a cause of action; rather, "*Ex parte Young* provides a path around sovereign immunity *if* the plaintiff already has a cause of action somewhere else." *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 905 (6th Cir. 2014). Plaintiffs' claim should thus be considered as a single cause of action under § 1983 that must meet the requirements of § 1983 and the *Ex parte Young* exception to sovereign immunity.

Here, although Plaintiffs characterize their claims as premised on a violation of federal law—the Virginia Readmission Act—they are state-law claims in substance. The Act merely provides that the 1869 Constitution of Virginia "shall never be so amended or changed as to deprive any citizen or class of citizens . . . of the right to vote who are entitled to vote by the Constitution herein recognized." 16 Stat. 63. Thus, Plaintiffs could prevail on their purported federal claims only if this Court were to hold that Virginia deprived citizens of voting rights granted exclusively by Virginia's own 1869 Constitution. See pp.18–21, *infra*. In essence, Plaintiffs ask this Court to order Defendants to comply with the 1869 Virginia Constitution. Such an order would run afoul of *Pennhurst*. See *Bragg*, 248 F.3d at 295–96 (where federal law "establishes minimum standards" for State law, "any violation of [a] standard involves State law, not federal law," and an "injunction against State officials to enforce" the federal provision would "command them to comport with the State's own law" in violation of *Pennhurst*).

### 2. At the very least, the Governor and Secretary of the Commonwealth are immune because they do not enforce the challenged provision

*Ex parte Young* is inapplicable to the Governor and the Secretary for another reason: they are not directly involved in the enforcement of the challenged provision of the Virginia Constitution. "The purpose of allowing suit against state officials to enjoin their enforcement of an unconstitutional statute is not aided by enjoining the actions of a state official not directly involved in enforcing the subject statute." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001). Therefore, to invoke *Ex parte Young*, Plaintiffs must show (1) a "'special relation' between the officer being sued and the challenged" provision; and (2) that the officer has "acted or threatened" to enforce the provision. *McBurney v. Cuccinelli*, 616 F.3d 393, 399, 402 (4th Cir. 2010). These requirements ensure that the federal court does not "interfere with the lawful discretion of state officials," and that "a federal injunction will be effective with respect to the

11

underlying claim." *South Carolina Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332–33 (4th Cir. 2008). These requirements are not met here as to the Governor and the Secretary.

Again, Plaintiffs claim that the provision of the Virginia Constitution disenfranchising felons violates the Virginia Readmission Act. Compl. ¶ 12. But the Governor and the Secretary bear no "special relation" to the *disenfranchisement* of felons, as opposed to their re-enfranchisement. Rather, the Virginia State Police's Central Criminal Records Exchange sends a monthly report of all felony convictions to the Department of Elections (ELECT). Ex. B, Declaration of Susan Beals (Beals Decl.) ¶ 4; see also Va. Code § 24.2-409. ELECT uses that report to update the Virginia voter registration system. Beals Decl. ¶ 5; see also Va. Code § 24.2-409. General registrars receive this information and cancel felons' voter registrations. Beals Decl. ¶ 5; see also Va. Code § 24.2-427(B). If a felon who was not previously registered to vote attempts to register, the voter registration system will prevent the general registrar from processing the application. Beals Decl. ¶ 7; see also Va. Code § 24.2-417.

Neither the Governor nor the Secretary of the Commonwealth play any role in enforcing Virginia's disenfranchisement of convicted felons. Rather, and as Plaintiffs' allegations make clear, the Governor and Secretary play a role only in the re-enfranchisement of felons. Compl. ¶¶ 8, 27, 29. But Plaintiffs challenge the disenfranchisement of felons, not Virginia's procedures for re-enfranchising them. *Id.* ¶ 96. Indeed, the re-enfranchisement process is entirely irrelevant to Plaintiffs' claims. The Governor and Secretary have no special relation to the enforcement of the constitutional provision disenfranchising felons. They are therefore immune from suit here.[3]

---

[3] Nor do Plaintiffs have standing to pursue claims against the Governor and Secretary because individual Plaintiffs' disenfranchisement under Virginia's Constitution is not traceable to their acts. See *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 900–02 (4th Cir. 2022).

### B. Plaintiffs Wingate, Johnson, and Bridging the Gap lack standing

#### 1. Wingate lacks standing because his right to vote was restored

When plaintiffs seek injunctive relief, "they must establish an ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018); see also *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022) (same). A plaintiff may not obtain injunctive relief "based only on events that occurred in the past, even if the past events amounted to a violation of federal law." *Hoepfl v. Barlow*, 906 F. Supp. 317, 320 (E.D. Va. 1995). A "past injury, without more, is not a sufficient basis for the issuance of injunctive relief" because "an injunction cannot remedy [the plaintiff's] past injury." *Id.* at 321. The same is true of declaratory relief. *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 454 (4th Cir. 2017).

Plaintiff Wingate alleges that he is "currently disenfranchised," Compl. ¶ 76, and he seeks declaratory and injunctive relief prohibiting Defendants from preventing him from "register[ing] to vote or vot[ing] in elections in Virginia," *id.* ¶¶ 99, 102, 113, 117. But the Governor in fact restored Wingate's right to vote on June 23, 2023—shortly before his filing of this lawsuit. See James Decl. ¶ 18. Defendants are thus not preventing Wingate from voting in Virginia elections. Wingate's claims should therefore be dismissed for lack of standing.

Defendant Taylor Yowell, General Registrar of Charlottesville, should also be dismissed. Her only connection to this suit is that Wingate allegedly resides in Charlottesville, see Compl. ¶¶ 18, 42; upon Wingate's dismissal, Registrar Yowell will lack any special relation to the enforcement of the challenged provision against the Plaintiffs. See pp.11–12, *supra*.

#### 2. Johnson lacks standing because she was convicted of a felony at common law

A plaintiff lacks standing, despite alleging a cognizable injury, if the requested remedy will not redress that injury. See *Disability Rights S.C.*, 24 F.4th at 900. To redress her alleged injury,

Johnson seeks an injunction barring Defendants from enforcing the Virginia Constitution's felon disenfranchisement provision "with respect to citizens of the Commonwealth of Virginia convicted of crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870." Compl. Prayer for Relief. Johnson, however, was convicted of larceny, James Decl. ¶ 23, and larceny was a felony at common law in 1870, Compl. ¶ 68. Even if Plaintiffs are correct about the meaning of the Virginia Readmission Act, then, Johnson's disenfranchisement is proper, and the remedy she seeks will not bar Defendants from enforcing the Constitution's felon disenfranchisement provision against her.

Defendant Shannon Williams, General Registrar of Smyth County, should also be dismissed. Her only connection to this suit is that Johnson allegedly resides in Smyth County, see Compl. ¶¶ 22, 43; upon Johnson's dismissal, Registrar Williams will lack any special relation to the enforcement of the challenged provision against the Plaintiffs. See pp.11–12, *supra*.

### 3.  Bridging the Gap lacks standing

Plaintiff Bridging the Gap lacks standing either in its own right or as a representative of its members. See *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). First, Bridging the Gap does not have standing in its own right because it has not alleged facts showing that it has suffered a cognizable injury. While an organization may establish standing by demonstrating that the defendants' actions "perceptibly impair" its ability "to carry out its mission" and "consequently drain [its] resources," this "standard is not met simply because an organization makes a unilateral and uncompelled choice to shift its resources . . . to address a government action." *North Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (quotation marks omitted). Indeed, holding that an organization suffers a cognizable injury when it voluntarily decides to spend its money on advocacy and outreach efforts "would be to imply standing for organizations with merely 'abstract

14

concerns with a subject that could be affected by an adjudication.'" *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976) (brackets omitted)); see also *Association for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) (noting that finding standing on such grounds would "impl[y] that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another"). Yet these are precisely the types of injuries that Bridging the Gap alleges. See Compl. ¶¶ 83–85.

Bridging the Gap also fails to meet the requirements of associational standing. An organization may establish that it has associational standing to sue on behalf of its members by alleging facts showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023). Bridging the Gap has not alleged *anything* about its members. Indeed, it does not even allege that it has members, much less allege facts demonstrating that its members would have standing to sue in their own right. See, *e.g.*, Compl. ¶¶ 80–88; see also *Heap v. Carter*, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015) (finding no associational standing where the complaint "provided no details about who the membership is or whether [the organization] truly can be considered a voluntary membership organization or a functional equivalent"). Bridging the Gap should therefore be dismissed.

### C.  Plaintiffs' claims present a nonjusticiable political question

The political question doctrine "derives from the principle of separation of powers, and deprives courts of jurisdiction over 'controversies which revolve around policy choices and value determinations constitutionally committed' to Congress." *Al Shimari v. CACI Premier Tech., Inc.*,

840 F.3d 147, 154 (4th Cir. 2016) (quoting *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). The question whether a State government is republican in form is the paradigmatic political question because the Guarantee Clause commits it to Congress alone. *City of Rome v. United States*, 446 U.S. 156, 182 n.17 (1980); *Luther*, 48 U.S. (7 How.) at 42.

"Following the Confederacy's unsuccessful attempt to secede from the Union," the congressional seats of the States formerly in rebellion were vacant, leaving those States without representation in Congress. *Perry*, 933 F. Supp. at 559. As a legal matter, the attempts of the rebel States to secede "were absolutely null" and "utterly without operation in law." *Texas v. White*, 74 U.S. 700, 701–02 (1868), *overruled on other grounds by Morgan v. United States*, 113 U.S. 476 (1885). Thus, during and immediately following the Civil War, Virginia "did not cease to be a State, nor her citizens to be citizens of the Union." *Id*. at 726. Virginia, however, lacked a "State government, competent to represent the State in its relations with the National government." *Id* at 701. Immediately after the Civil War, the former rebel States "were divided into military districts and subject to strict military authority," "all under the supervision and control of commanding [federal] generals." *States of La., et al*, 363 U.S. at 124. Congress then passed the Readmission Acts, "re-establishing the broken relations of the State with the Union." *Texas*, 74 U.S. at 727. Congress's "authority" to pass the Readmission Acts "was derived from the obligation of the United States to guarantee to every State in the Union a republican form of government." *Ibid*.; U.S. Const. art. IV, § 4.

Congress passed the Virginia Readmission Act in 1870, approving Virginia's 1869 Constitution as "republican," and declaring that the Commonwealth was "entitled to representation in the Congress of the United States." 16 Stat. 62. It conditioned Virginia's readmission to representation in Congress on Virginia maintaining in substance the features of its constitution that

16

supported Congress's determination. *Ibid*. Whether Virginia's 1971 Constitution satisfies those conditions is therefore inextricably bound up in Congress's exercise of its Guarantee Clause power to decide whether a government is republican. See *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 139 (1912) (claim that "provision in the Oregon Constitution . . . violates the provisions of the act of Congress admitting Oregon to the Union" may be "reduced" to a claim that "the prior lawful state Government [is] bereft of its lawful character" under the Guarantee Clause). It follows that Congress is the sole arbiter of whether Virginia has satisfied the Act's conditions, and the exclusive enforcer of those conditions. See *Butler v. Thompson*, 97 F. Supp. 17, 20 (E.D. Va. 1951) ("Such a matter is one peculiarly within the domain of Congress itself, since it only purports to set up a condition governing Virginia's right to admission to representation in Congress."); *Merritt v. Jones*, 259 Ark. 380, 389 (1976) ("Even if we assume that the [Arkansas Readmission] Act has some force and effect, its enforcement is in the exclusive domain of Congress.").

In addition to presenting a question that has been committed to Congress, Plaintiffs' claims implicate numerous other factors the Supreme Court has held make questions political. See *Baker v. Carr*, 369 U.S. 186, 216 (1962). To allow Plaintiffs' case to proceed would require wading into political decisions that ended the Civil War and restored the rebel States to the Union after more than 150 years have passed. It would be impossible for this Court to resolve Plaintiffs' claims without "expressing lack of the respect due" Congress's continuing determination that Virginia has a republican government and is entitled to representation. *Id* at 217.; see also *Butler*, 97 F. Supp. at 20 (conditions of the Readmission Act "might well be considered as waived by Congress in view of the fact that Virginia has continued to be admitted to representation in Congress"). The unique nature of the Reconstruction-era determinations surrounding readmission of the former

17

rebel States' congressional delegations also presents "an unusual need for unquestioning adherence to [Congress's] political decision." *Baker*, 369 U.S. at 217; see, *e.g.*, *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50 (1867) (refusing to consider challenge to the Reconstruction Acts of 1867 because it involved a nonjusticiable political question). And the "potentiality of embarrassment from multifarious pronouncements" is palpable if this Court were to hold that Virginia is in violation of the Virginia Readmission Act, while Congress continued to consider Virginia as in compliance with the Act and deserving of continued representation. *Baker*, 369 U.S. at 217. For all these reasons, this Court does not have jurisdiction. See *Butler*, 97 F. Supp. at 20 ("It is extremely doubtful, even if Virginia has violated the conditions of [the Readmission Act] . . . whether this presents a question justiciable in the courts.").

## II.       Plaintiffs' claims lack merit

Plaintiffs' claims also fail on the merits. First, Virginia has not violated the Readmission Act, for it has not changed its Constitution to restrict the voting rights conferred by the 1869 Constitution that Congress approved through the Act. Second, no private right of action exists under the Virginia Readmission Act. Finally, the canon of constitutional avoidance forecloses Plaintiffs' interpretation of the Act, both because Virginia is constitutionally authorized to disenfranchise *all felons*, not just those convicted of common-law felonies, and because Congress lacks authority to create an individual, judicially enforceable right of felons in Virginia against disenfranchisement.

### A.  The Virginia Constitution does not violate the Virginia Readmission Act

The 1971 Virginia Constitution does not violate the Act because it imposes no restrictions on the franchise beyond those imposed by the 1869 Constitution. By its plain terms, the Virginia Readmission Act states only that Virginia may not "amend[] or change[]" its Constitution "to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to

18

vote by the [1869] Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law." 16 Stat. 63. Plaintiffs fixate on the "except" clause and contend that the 1971 Virginia Constitution violates the Act "because it disenfranchises Virginia citizens convicted of numerous crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870." Compl. ¶ 96. But this argument ignores the governing command of the Act: that Virginia may not *amend* or *change* its Constitution to exclude from the franchise a class of citizens admitted to the franchise by the 1869 Constitution. Virginia did not do so in the 1971 Constitution because *all* felons were excluded from the franchise in the 1869 Constitution that Congress approved.

In passing the Virginia Readmission Act, Congress expressly found that the 1869 Constitution was "republican" in nature and had satisfied all of the "condition[s] precedent" that Congress placed on the Commonwealth's readmission to Congressional representation. 16 Stat. 62. The 1869 Constitution guaranteed the franchise for "[e]very male citizen of the United States, twenty-one years old, who shall have been a resident of this State twelve months, and of the county, city or town in which he shall offer to vote three months next preceding any election." Va. Const. art. III, § 1 (1869). It specifically "excluded from voting . . . [p]ersons convicted of bribery in any election, embezzlement of public funds, treason *or felony*." *Ibid.* (emphasis added). The 1971 Constitution dramatically expanded the franchise by comparison. It now extends to all citizens of the United States who are 18 years of age, and are residents of the Commonwealth and precinct. Va. Const. art. II, § 1. And it excludes a "person who has been convicted of a felony . . . unless his civil rights have been restored." *Ibid.*

As in the 1971 Constitution, nothing in the 1869 constitutional provision limited disenfranchisement to "felonies at common law," and it was never so interpreted. The 1869

19

Constitution disenfranchised anyone convicted of a "felony"—not only those convicted of a "felony at common law." Va. Const., art. III, § 1 (1869); see *Merritt*, 259 Ark. at 387 (holding that "'felony at common law' is far too restrictive and could not realistically be read into the word 'felonies' as used" in the Arkansas Constitution); *Harvey v. Brewer*, 605 F.3d 1067, 1075 (9th Cir. 2010) ("[P]laintiffs provide absolutely no support for the proposition that the word 'crimes' meant 'common-law felonies' at the time of the Fourteenth Amendment's ratification."). And in 1870, Virginia criminalized both felonies at common law *and* other statutory felonies. See Compl. ¶ 68 ("In 1870, 'common law' felonies were widely understood to be a distinct category of crime from 'statutory' felonies."); *Parrish v. Commonwealth*, 81 Va. 1, 14 (1884) (discussing whether an "offence intended by the assailant" was either "a felony at common law, or only created so by statute"). For instance, "attempt to commit a felony" was "by statute made a felony or misdemeanor, according to the nature of the felony attempted to be committed." *Hardy v. Commonwealth*, 58 Va. 592, 596 (1867); see also *Lee v. Commonwealth*, 144 Va. 594, 607 (1926) ("Attempt to commit a felony (including murder), at common law, is a misdemeanor."). The Virginia General Assembly had also created other statutory felonies. Compare *Canada v. Commonwealth*, 63 Va. 899, 906 (1872) ("While the Code, chapter 191, section 9, creates two offences, to wit: 'malicious' and 'unlawful' wounding with intent to kill, &c., both of which are felonies . . . ."), with Compl. ¶ 68 ("The nine 'common law' felonies were murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny.").

Moreover, registries of felons disenfranchised under the 1869 Constitution demonstrate that the provision was not limited to "common law" felonies; rather, individuals were also disenfranchised for committing statutory felonies such as forgery, attempted rape, assault, and malicious wounding. See *A Descriptive List of Persons Convicted of Felony, or Other Infamous*

*Offences, in the Corporation Court of Alexandria, Virginia Since November 2d, 1870*, Richmond, Va.: Library of Virginia (excerpts attached as Ex. C); Act. of Apr. 2, 1877, ch. 271, *reprinted in* The Code of Virginia: with the Declaration of Independence and the Constitution of the United States and the Constitution of Virginia, Tit. 5, § 79 at 84 (Goode 1887) (ordering the clerk to "deliver to each registrar in his county or city[] a list of all voters … who have been convicted of bribery in any election, embezzlement of public funds, treason, felony, or petit larceny since the last registration" and ordering the registrar to "strike from the list of voters the name of any person so convicted").

Because no felons were "entitled to vote" under the 1869 Constitution, the 1971 Constitution does not "deprive" any felons of a "right to vote" that existed under the 1869 Constitution. 18 Stat. 63. In fact, Virginia has expanded the franchise considerably since 1869, including for felons: whereas the 1869 Constitution contained a permanent, categorical bar for all felons, the 1971 Constitution allows felons to vote if their "civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1. And Virginia's governors since 1971 have re-enfranchised over 330,000 felons. See James Decl. ¶ 4. Virginia's 1971 Constitution therefore fully complies with the Virginia Readmission Act's plain terms because it has expanded, rather than contracted, the franchise compared to 1869.

### B.  No private right of action exists under the Virginia Readmission Act

Plaintiffs' suit should also be dismissed because the Virginia Readmission Act creates no private right of action. See *Carey v. Throwe*, 957 F.3d 468 (4th Cir. 2020) (affirming Rule 12(b)(6) dismissal of 42 U.S.C. § 1983 claim for lack of private right of action). Only Congress can enforce the Act.

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). To determine whether a statute creates a private right,

21

courts look to the statutory text for "rights-creating language." *Id.* at 288 (quotation marks omitted). The Virginia Readmission Act contains no such language. "Far from displaying congressional intent to create new rights," the Virginia Readmission Act merely speaks to Virginia's treatment of "rights already created" by its 1869 Constitution. *Id.* at 289. The Act operates not by conferring rights on individuals, but instead by imposing a "condition" upon which "Virginia is admitted to representation in Congress as one of the States of the Union." 16 Stat. 63; see *Sandoval*, 532 U.S. at 289.

The Virginia Readmission Act's enforcement scheme also contradicts any inference that Congress created a private right of action. See *Sandoval*, 532 U.S. at 289 (no right of action where enforcement scheme is incompatible with a private right of action). Congress enforces the Act by determining whether Virginia is entitled to representation in Congress. 16 Stat. 62; *Merritt*, 259 Ark. at 389 (interpreting Arkansas Readmission Act). It is flatly implausible that a Congress engaged in the delicate business of reuniting a nation torn by Civil War would create a right of action that could set up an interbranch conflict on the question whether Virginia is entitled to a seat in Congress.

The remedial problem is especially acute because Congress passed the Act pursuant to the Guarantee Clause.  See pp.27–28, *infra*. The Supreme Court has held that the Guarantee Clause is not the source of judicially enforceable rights because "it rests with Congress to decide what government is the established one in a State," and whether that government qualifies as "republican." *Luther*, 48 U.S. (7 How.) at 42; see also *ibid.* ("[T]he right to decide is placed [with Congress], and not in the courts."). To interpret a law passed under the Guarantee Clause to create an *individual*, judicially enforceable right would transfer that function to the courts and would

present serious constitutional concerns. See pp.27–28, *infra*. It would also set up an untenable conflict between the judiciary and Congress. See pp.15–18, *supra*.

Nor does 42 U.S.C. § 1983 supply a right of action here. Section 1983 "does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005). Rather, § 1983 provides redress only for a plaintiff who asserts a "violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). Thus, § 1983 "creates a cause of action to enforce a federal statute only when the underlying statute itself unambiguously 'confers an individual right' on the plaintiff." *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 695 (4th Cir. 2019) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002)). This is a "purposefully demanding inquiry," *Carey*, 957 F.3d at 479, and for the reasons discussed above, the Readmission Act cannot meet it.

The same result would obtain under *Blessing*'s tripartite test for determining whether a federal statute may be enforced by a § 1983 cause of action. Under that test, "[t]hree factors guide [the Court] in determining whether a statute creates a private right enforceable under § 1983." *Planned Parenthood S. Atl.*, 941 F.3d at 696. First, "Congress must have intended that the provision in question benefit the plaintiff." *Blessing*, 520 U.S. at 340. Second, "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Id.* at 340–41 (quoting *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 431 (1987). Third, "the statute must unambiguously impose a binding obligation on the States" by speaking in "mandatory, rather than precatory, terms." *Id.* at 341. The Supreme Court has clarified that the three *Blessing* factors do not support recognizing a right of action in the absence of "unambiguously conferred right[s]." *Gonzaga Univ.*, 536 U.S. at 282; see also *Carey*, 957 F.3d at 479.

23

Plaintiffs cannot surmount this "high bar." *Carey*, 957 F.3d at 479. To satisfy the first factor, Plaintiffs must demonstrate that Congress intended to create a federal "individual right." *Planned Parenthood*, 941 F.3d at 697. It is not sufficient that "the plaintiff falls within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U.S. at 283; see *Planned Parenthood*, 941 F.3d at 709 (same). Nor does the Act satisfy the third factor, for it does not impose binding obligations on Virginia, but instead merely sets conditions for Virginia's readmission to Congress. See p.6, *supra*. Accordingly, the case should be dismissed.

### C. The canon of constitutional avoidance precludes Plaintiffs' interpretation of the Virginia Readmission Act

Plaintiffs' interpretation of the Virginia Readmission Act would render the Act unconstitutional, and the canon of constitutional avoidance therefore forecloses it. Under the canon, "when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). The canon applies merely in the presence of constitutional doubt and does not require a definite constitutional violation. *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005).

Under Plaintiffs' interpretation, Congress purported to create a judicially enforceable private right for certain felons in Virginia to vote, and permanently prohibited Virginia from amending its state constitution to the contrary. But Congress has no such power, and Plaintiffs' interpretation would therefore render the Act unconstitutional, or at the very least, raise grave constitutional problems. "The Federal Government 'is acknowledged by all to be one of enumerated powers.'" *Nat'l Fed. of Independent Business v. Sebelius*, 567 U.S. 519, 534 (2012) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819)). "The enumeration of powers is also a limitation of powers"—the "Federal Government 'can exercise only the

24

powers granted to it'" under the U.S. Constitution. *Id* at 534–35 (citing *McCulloch*, 17 U.S. (4 Wheat.) at 405). The Tenth Amendment reserves for the States all power that is not otherwise conferred on Congress. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018).

Congress lacks the power to prohibit States from disenfranchising felons under the Fourteenth Amendment. Section 2 of the Fourteenth Amendment affirmatively provides that States may permanently disenfranchise *all* felons, not just those convicted of felonies at common law. U.S. Const. amend. XIV, § 2 (imposing sanctions on States for denying "the right to vote" *except* "for participation in rebellion, or other crime"). Both before and after the passage of the Fourteenth Amendment, most States did disenfranchise felons, concluding that removing "persons with proven anti-social behavior" and lack of respect for the law would serve their vital "interest in preserving the integrity of [the] electoral process." *Perry*, 933 F. Supp. at 558; see also *Ramirez*, 418 U.S. at 48 & n.14 (listing the 29 States that had felon disenfranchisement provisions in their constitutions at the time of the adoption of the Fourteenth Amendment). None "limited disenfranchisement to persons convicted of common-law felonies." *Harvey*, 605 F.3d at 1076. And in *Richardson v. Ramirez*, the Supreme Court held that the Fourteenth Amendment permits "disenfranchisement grounded on prior conviction of a felony," as "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment." 418 U.S. at 43, 54. The Supreme Court has thus recognized "the constitutionality of provisions disenfranchising felons." *Id.* at 53; see *Perry*, 933 F. Supp. at 559 ("If the Framers of the Fourteenth Amendment had intended to preclude states like Virginia from disenfranchising their convicted felons, they remained silent."). Because the Fourteenth Amendment expressly permits state laws disenfranchising felons, Congress may not prohibit the practice.

25

Congress also has no power to regulate Virginia's nondiscriminatory voting practices. To be sure, Congress has the power under Section 5 of the Fourteenth Amendment to "enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment. U.S. Const. amend. XIV, § 5. Congress cannot, however, "decree the substance of the Fourteenth Amendment's restrictions on the States." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997); see also *ibid.* (Congress cannot "alter[] the meaning," "chang[e] what the right is," or "make a substantive change in the governing law" through its Section 5 power). Because, as noted, the Fourteenth Amendment authorizes States to deny the right to vote to those who commit crimes, prohibiting States from disenfranchising felons would work a "substantive change" in the governing law. See *Johnson v. Governor of Fla.*, 405 F.3d 1214 (11th Cir. 2005) (felon-disenfranchisement claims are beyond Congress's Section 5 enforcement power).

Congress of course can—and has—prohibited the States from enacting voting laws that discriminate on the basis of race. See 52 U.S.C. § 10301(a) (Voting Rights Act). But even though felon disenfranchisement laws were widespread when Congress enacted the Voting Rights Act, Congress made no attempt to prohibit them; "indeed, [Congress] affirmatively stated that such [felon disenfranchisement] laws were *not* implicated by provisions of" the Voting Rights Act. *Hayden v. Pataki*, 449 F.3d 305, 318 (2d Cir. 2006) (citing S. Rep. No. 89-162, at 24 (1965)).[4] And the Equal Protection Clause ensures that "states cannot use disenfranchisement provisions to discriminate intentionally on the basis of race." *Johnson*, 405 F.3d at 1230 (citing *Hunter v. Underwood*, 471 U.S. 222, 233 (1985)). That is true of every facially race-neutral law. See *Village*

---

[4] Congress cannot prohibit a facially neutral state regulatory act merely because it *could* be used to discriminate on the basis of race. To support Plaintiffs' version of the Readmission Act as an exercise of Congress's Section 5 power, there would need to be evidence that congressional action was and *remains* needed today. See *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013).

*of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977). But despite their repeated references to race, Plaintiffs make no claim that the current 1971 Virginia Constitution was infected with racially discriminatory intent, nor could they. See, *e.g.*, A.E. Dick Howard, *Who Belongs: The Constitution of Virginia and the Political Community*, 37 J. L. & Politics 99, 113 (2022) ("Both by mandates and aspirations, today's Virginia Constitution seeks to define the political community to make fairness, justice, and inclusiveness signposts on the path to achieving a government 'for the common benefit.'"); A.E. Dick Howard & William Antholis, *The Virginia Constitution of 1971*, 129 Virg. Mag. of Hist. & Bio. 346, 356 (2021) (The 1971 Constitution's "aim was to put . . . opposition to civil rights behind us as Virginians."). The Fourteenth and Fifteenth Amendments thus give Congress no power to invalidate a provision of Virginia's Constitution that the Fourteenth Amendment expressly permits.

No other provisions of the U.S. Constitution provide Congress such authority either. It would be highly anomalous to conclude that another constitutional provision prohibits what the Fourteenth Amendment expressly allows. Indeed, the Supreme Court has "strongly suggested in dicta that exclusion of convicted felons from the franchise violates *no constitutional provision*." *Ramirez*, 418 U.S. at 53; see also *Fusaro v. Cogan*, 930 F.3d 241, 254–55 (4th Cir. 2019) (holding that lower courts are "obliged to afford great weight to Supreme Court dicta," particularly when those dicta were endorsed by a majority of Justices) (quotation marks omitted)).

Congress passed the Virginia Readmission Act under the Guarantee Clause, to "re-establish[] the broken relations of the State with the Union." *Texas*, 74 U.S. at 727. Congress's "authority" to pass the Readmission Acts thus "was derived from the obligation of the United States to guarantee to every State in the Union a republican form of government." *Ibid.*; U.S. Const. art. IV, § 4. But, as Plaintiffs interpret the Act—as an individual, judicially enforceable right of

felons in Virginia against disenfranchisement—the Act would also fall outside Congress's authority under the Guarantee Clause. Beyond the peculiarity of contending that Congress can prohibit under the Guarantee Clause what the Fourteenth Amendment affirmatively permits, any Guarantee Clause argument suffers from an even more fundamental problem. Plaintiffs have cited no precedent—and Defendants are aware of none—holding that the Guarantee Clause grants Congress authority to create individual, judicially-enforceable federal rights at all. To the contrary, the Supreme Court has held that the Guarantee Clause is not "the source of a constitutional standard for invalidating state action." *Baker*, 369 U.S. at 223. Rather than giving rise to individual judicially-enforceable rights, the Clause provides that the "United States shall guarantee to *every State*" a republican government. U.S. Const. art. IV, § 4. Accordingly, the Guarantee Clause gives Congress authority "to decide what government is the established one in a State," "whether it is republican or not," and whether it is entitled to representation in Congress. *Baker*, 369 U.S. at 220 (quoting *Luther*, 42 U.S. (7 How.) at 42–44). That is precisely what the Virginia Readmission Act purports to do: it recognized the government of Virginia following the Civil War, entitling Virginia to renewed representation in Congress. See p.6, *supra*. Under Plaintiffs' interpretation, the Guarantee Clause would instead be an independent font of authority to create any privately enforceable right that Congress considers conducive to promoting a republican form of government. This view lacks any precedential support and would be a vast and ill-defined expansion of federal power. See, *e.g.*, *Largess v. Supreme Judicial Ct. for State of Mass.*, 373 F.3d 219, 226 (1st Cir. 2004) ("[T]he Supreme Court's caselaw interpreting the Guarantee Clause rejects the plaintiffs' expansive reading of the provision."). At the very least, Plaintiffs' radical claim raises grave constitutional questions. *Jennings*, 138 S. Ct. at 836.

Plaintiffs' theory also presents serious constitutional problems under the "equal footing" doctrine, because it would impose restrictions on Virginia that do not apply equally to all its sister States. "[W]hen a new State is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original States, and . . . such powers may not be constitutionally diminished, impaired, or shorn away by any conditions, compacts, or stipulations embraced in the act under which the new State came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission." *Coyle v. Smith*, 221 U.S. 559, 573 (1911). Each State "was admitted, and could be admitted, only on the same footing" as all of its sister States. *Escanaba Co. v. Chicago*, 107 U.S. 678, 689 (1883).

On these grounds, the Supreme Court has consistently held that conditions on admission that are not otherwise "plainly within the regulating power of Congress" are invalid. *Coyle*, 221 U.S. at 574. The Court held unenforceable, for instance, conditions purporting to prohibit a State from moving the location of its state capital, or attempting to strip a State of title to land beneath its navigable waters. *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212 (1845). Under Plaintiffs' interpretation, the Virginia Readmission Act would similarly be unconstitutional.  "All states, after their admission into the Federal Union, stand upon equal footing and the constitutional duty of guaranteeing each state a republican form of government gives Congress no power in admitting a state to impose restriction which would operate to deprive that state of equality with other states." *Butler*, 97 F. Supp. at 20–21. Indeed, courts and commentators have long "dismissed the [Reconstruction-era] conditions as unenforceable infringements of state sovereignty" to the extent they are viewed as an attempt to create judicially enforceable private rights or restrict a State's authority to alter state law. Eric Biber, *The Price of Admission: Causes, Effects, and Patterns of Conditions Imposed on States Entering the Union*, 46 Am. J. Legal Hist. 119, 190 (2004); *see also*

James Q. Dealey, *Growth of American State Constitutions* 70 (1915) (discussing the readmission acts, and reasoning that "once the state becomes a full fledged member of the Union, such conditions and compacts may remain as moral obligations but would hardly be enforcible [sic] at law").

Finally, Plaintiffs' interpretation of the Virginia Readmission Act raises serious constitutional questions under the anticommandeering doctrine. On Plaintiffs' theory, the Act permanently prohibits Virginia from amending its Constitution in certain ways. But Congress has no power to force States to pass new laws, *New York v. United States*, 505 U.S. 144, 175–76 (1992), or to bar them from altering old ones, *Murphy*, 138 S. Ct. at 1478. "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id.* at 1476. Indeed, the Framers "explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York*, 505 U.S. at 166. Plaintiffs' interpretation of the Virginia Readmission Act violates "this limit on congressional authority" as well. *Murphy*, 138 S. Ct. at 1476. Their claims should be dismissed.

## CONCLUSION

The Court should dismiss this lawsuit for want of jurisdiction or for failure to state a claim.

30

Dated: August 17, 2023

Respectfully submitted,

GLENN YOUNGKIN
KAY COLES JAMES
JOHN O'BANNON
ROSALYN R. DANCE
GEORGIA ALVIS-LONG
DONALD W. MERRICKS
MATTHEW WEINSTEIN
SUSAN BEALS
TAYLOR YOWELL
SHANNON WILLIAMS

By:   */s/ Andrew N. Ferguson*
    Andrew N. Ferguson (VSB #86583)
     *Solicitor General*

Jason S. Miyares
   *Attorney General*

Steven G. Popps (VSB #80817)
   *Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
AFerguson@oag.state.va.us

    Erika L. Maley (VSB #97533)
     *Principal Deputy Solicitor General*

    Kevin M. Gallagher (VSB #87548)
     *Deputy Solicitor General*

    Travis S. Andrews (VSB #90520)
     *Assistant Attorney General*

    *Counsel for Defendants Glenn Youngkin, Kay Coles James, John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, Matthew Weinstein, Susan Beals, Taylor Yowell, and Shannon Williams*

31

**<u>CERTIFICATE OF SERVICE</u>**

THIS IS TO CERTIFY that on August 17, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

*/s/ Andrew N. Ferguson*
Andrew N. Ferguson (VSB #86583)
*Solicitor General*
