# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### RICHMOND DIVISION

| | |
|---|---|
| TATI ABU KING, TONI HEATH JOHNSON, and BRIDGING THE GAP IN VIRGINIA, | |
| Plaintiffs, | |
| v. | |
| GLENN YOUNGKIN, in his official capacity as Governor of the Commonwealth of Virginia; KELLY GEE, in her official capacity as Secretary of the Commonwealth of Virginia; JOHN O'BANNON, in his official capacity as Chairman of the State Board of Elections for the Commonwealth of Virginia; ROSALYN R. DANCE, in her official capacity as Vice Chair of the State Board of Elections for the Commonwealth of Virginia; GEORGIA ALVIS-LONG, in her official capacity as Secretary of the State Board of Elections for the Commonwealth of Virginia; DONALD W. MERRICKS, in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia; MATTHEW WEINSTEIN, in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia; SUSAN BEALS, in her official capacity as Commissioner of the Department of Elections for the Commonwealth of Virginia; ERIC SPICER, in his official capacity as the General Registrar of Fairfax County, Virginia; and SHANNON WILLIAMS, in his official capacity as the General Registrar of Smyth County, Virginia, | Case No. 3:23-cv-00408 |
| Defendants. | |

## **FIRST AMENDED COMPLAINT**

## INTRODUCTION

1.      The right to vote is fundamental—it is the bedrock of American democracy.  Voting is the basic means by which citizens participate in the democratic process and the primary mechanism by which citizens hold their government accountable.  Voting is also critical to guaranteeing a republican form of government, whereby citizens are governed by leaders who are representative of the citizenry.

2.      Despite its preeminence, the right of all citizens to vote has been more of an ideal than a reality since our country was founded.  Certain segments of the population—most notably Black citizens—have been the target of continuous voter suppression efforts throughout American history.

3.      Some of the most pernicious attempts to suppress the voting rights of Black citizens originated in the former Confederate states after the Civil War—with consequences that persist to the present day.  One such effort involved exploiting the criminal laws to strip Black citizens of their voting rights.   Because conviction for crimes punishable by whipping led to disenfranchisement, former Confederate states made certain petty crimes punishable by whipping and then subjected Black citizens to sham trials where a conviction was all but guaranteed.  As a Major in the Union Army observed:  "[T]here is a deliberate and a general purpose . . . to seize negroes, procure convictions for petty offenses punishable at the whipping post, and thus disqualify them forever from voting."[1]  These efforts were not disguised or concealed.  As one white state legislator in a former Confederate state openly admitted, the goal was to limit Black

---

[1] Letter from Major Rob't. Avery to Brevet Major General Jno. C. Robinson (Dec. 17, 1866) (in Records of U.S. Army Continental Commands, National Archives of the United States, Department of the South, Letters Received, file A-99 1866).

electoral power:  "We are licking them in our part of the State and if we keep on we can lick them all by next year, and none of them can vote."[2]

4.      Following the Civil War, Congress passed a series of statutes—known as the Readmission Acts—setting the conditions under which former Confederate states could have their representatives readmitted to Congress.  These statutes included ongoing requirements to ensure equal protection of the laws—including requiring each former Confederate state to ratify the Fourteenth Amendment and guarantee voting rights for newly emancipated Black citizens living in those states.  Recognizing that former Confederate states were manipulating their criminal laws with the specific intent to disenfranchise Black citizens, the Readmission Acts explicitly prohibited former Confederate states from including within their constitutions any provision that disenfranchises their citizens for committing crimes that were not "***now felonies at common law***."[3]

5.      The Virginia Readmission Act, passed into law in 1870, includes such language.  It states:

> That the State of Virginia is admitted to representation in Congress as one of the States of the Union upon the following fundamental conditions:  First, That the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, ***except as a punishment for such crimes as are now felonies at common law***, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State.[4]

---

[2] *Id.*

[3] *E.g.*, An Act to Admit the State of Virginia to Representation in the Congress of the United States, 16 stat. 62 (Jan. 26, 1870) (the "Virginia Readmission Act") (emphasis added) (attached hereto as Exhibit A); An Act to Admit the State of Arkansas to Representation in Congress, 15 Stat. 72 (1868); An Act to Admit the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida, to Representation in Congress, 15 Stat. 73 (1868).

[4] Virginia Readmission Act (emphasis added).

In other words, the Virginia Readmission Act explicitly prohibits the Commonwealth of Virginia from adopting constitutional provisions that disenfranchise citizens other than those convicted of crimes that were felonies at common law in 1870.

6.      The Virginia Readmission Act remains good law.  It has never been repealed or otherwise dismantled.  Virginia accordingly remains subject to all of its requirements, including the prohibition against stripping citizens of the right to vote "***except as a punishment for such crimes as [were] felonies at common law***" in 1870.[5]

7.      Despite the Virginia Readmission Act's clear prohibition against depriving citizens of the right to vote for crimes that were not felonies at common law in 1870, Virginia later amended its Constitution to disenfranchise citizens for conduct that was not a "felon[y] at common law," in 1870.  Indeed, Virginia's current Constitution automatically disenfranchises citizens with ***any*** felony conviction.[6]

8.      There is now a national consensus against permanent disenfranchisement due to a prior felony conviction.  As the U.S. Court of Appeals for the Fifth Circuit recently found, today, the vast majority of states and the District of Columbia do not permanently disenfranchise citizens as a punishment for felony offenses unrelated to corrupt practices in elections or governance.[7]

9.      The Virginia Constitution's lifetime deprivation of the right to vote is a form of punishment that is cruel and unusual under contemporary standards of decency.  Virginia is one of only three states whose constitution permanently strips citizens with any felony conviction of

---

[5] *Id*. (emphasis added).

[6] Va. CONST. art. II, § 1 ("No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority.").

[7] *Hopkins v. Sec'y of State Delbert Hosemann*, No. 19-60662, 2023 WL 4990543, at *16 (5th Cir. Aug. 4, 2023).  Because *Hopkins* held that Mississippi's lifetime ban on voting violates the Eighth Amendment, Mississippi will soon join this vast majority.  *See generally id.*

their right to vote absent the governor's restoration of voting rights.  And of those three states, Virginia is the *only* state that does not currently have any automatic process for restoring voting rights.

10.    As a result, an estimated 312,540 Virginians are disenfranchised, rendering Virginia the state with the fifth highest number of citizens disenfranchised for felony convictions, and the sixth highest rate of disenfranchisement.

11.    Critically, this impact has fallen disproportionately on Black Virginians—the very population Congress sought to protect when it passed the Virginia Readmission Act more than 150 years ago.  Although Black Virginians comprise less than 20% of Virginia's voting age population, they account for nearly half of all Virginians disenfranchised due to a felony conviction.  Felony disenfranchisement among Black voting-age Virginians is nearly two-and-a-half times as high as the rest of Virginia's voting-age population.  And, perhaps most significantly, the rate of felony disenfranchisement among Black voting-age Virginians is more than *twice as high* as the rate of felony disenfranchisement among the entire United States Black voting-age population.

12.    The dire impact of Virginia's sweeping disenfranchisement provision has been exacerbated by Governor Glenn Youngkin's recent actions.  While Virginia's prior three governors restored voting rights to disenfranchised citizens with felony convictions based on specific criteria, Governor Youngkin has ended his predecessors' restoration programs and resurrected an opaque and arbitrary rights restoration policy without any objective criteria or set timeframe for rendering restoration decisions.

13.    This lawsuit seeks to redress these wrongs by restoring the voting rights that Congress guaranteed to Virginia's citizens in 1870 and ending the imposition of a cruel and unusual punishment banned by the U.S. Constitution.  Plaintiffs respectfully request that this Court

declare that the Virginia Constitution violates the Virginia Readmission Act and enjoin Defendants from denying the fundamental right to vote to Virginia citizens who have been convicted of crimes that were not common law felonies at the time the Virginia Readmission Act was passed in 1870. Plaintiffs further respectfully request that this Court declare that the Virginia Constitution violates the Eighth Amendment of the U.S. Constitution[8] and enjoin Defendants from inflicting cruel and unusual punishment by denying the fundamental right to vote to Virginia citizens who have been convicted of any felony.

## PARTIES

14.     Plaintiff Tati Abu King is a 52-year-old Virginia resident who is currently disenfranchised based on a December 2018 felony conviction in Fairfax County, Virginia.  Mr. King lives in Alexandria, Virginia with his fiancé and two stepchildren.

15.     In December 2018, Mr. King was convicted of a drug possession crime.  After being incarcerated for 11 months, he was released in June 2019 and has completed his term of probation. Mr. King is no longer under any probation or parole and does not owe any fines to Virginia.

16.     Although Mr. King was registered to vote prior to his December 2018 felony conviction, upon information and belief, Mr. King is currently disenfranchised as a result of his December 2018 conviction and his rights have not been restored.

17.     As a result of his disenfranchisement, Mr. King was unable to vote in the 2018 midterm elections, the 2020 presidential election, the 2021 Virginia gubernatorial election, and the 2022 midterm elections.  Had Mr. King not been disenfranchised, he would have voted in each of those elections.  Moreover, as a result of his disenfranchisement, Mr. King will be unable to vote in the upcoming November 2023 Virginia elections.

---

[8] The Eighth Amendment is applicable to the States through the Fourteenth Amendment.

18.     Mr. King has applied for his voting rights to be restored.  Were he eligible to do so, Mr. King would register and exercise his right to vote.

19.     Plaintiff Toni Heath Johnson is a 60-year-old Virginia resident who is currently disenfranchised based on 2021 felony convictions in Washington County, Virginia.  She lives in Marion in Smyth County, Virginia where she cares for her ill wife at home.

20.     Ms. Johnson was convicted of drug possession and distribution crimes, as well as child endangerment.  She was released from incarceration in 2022 and currently is on probation.

21.     Prior to these most recent convictions, Ms. Johnson had been convicted of other offenses, but she had her voting rights restored following those prior convictions and therefore was able to vote before her most recent 2021 convictions.  Therefore, Ms. Johnson is currently disenfranchised *only* as a result of her 2021 convictions—none of which constituted felonies at common law at the time the Virginia Readmission Act was passed.  Consequently, since her release, Ms. Johnson has been unable to vote in the 2022 midterm election.  Had Ms. Johnson not been disenfranchised, she would have voted in that election.  Moreover, as a result of her disenfranchisement, she will be unable to vote in the upcoming November 2023 Virginia elections.

22.     Ms. Johnson has applied for her voting rights to be restored and has followed up on multiple occasions with the Office of the Secretary of the Commonwealth of Virginia ("Secretary of the Commonwealth") regarding her application.  Ms. Johnson learned in June 2023 that her restoration application had been denied.  Were she eligible to do so, Ms. Johnson would register and would exercise her right to vote.

23.     Plaintiff Bridging The Gap In Virginia ("Bridging the Gap") is a 501(c)(3) non-profit organization committed to providing a bridge to success for individuals struggling with substance use disorder, chronic homelessness, and lack of employability, with a particular focus

on previously-incarcerated individuals.  Its mission is to empower formerly incarcerated persons and to help these individuals overcome barriers that hinder their effective transition into mainstream society following incarceration, with positive outlooks towards sustained success.  As a central component of that work, Bridging the Gap assists previously incarcerated Virginians who have been disenfranchised—including Virginians disenfranchised because of convictions for crimes that were not felonies at common law in 1870, and Virginians who have been convicted of felonies more generally—in having their voting rights restored.

24.     The Virginia Constitution authorizes the Governor of the Commonwealth of Virginia to restore voting rights to Virginians who have lost that right because of a felony conviction.  Individuals who have had their civil rights taken away due to a felony conviction may apply to have their rights restored by the Governor.  The Governor has discretion as to whether to approve or deny an application to restore voting rights.  By denying an application to restore voting rights, the Governor ensures that individuals who have been disenfranchised pursuant to Article II, Section 1 of the Virginia Constitution remain permanently disenfranchised.

25.     Defendant Glenn Youngkin is the Governor of the Commonwealth of Virginia.  Defendant Youngkin is sued in his official capacity.  Upon information and belief, Defendant Youngkin resides in Richmond, Virginia, which is located in the Richmond Division of this Court.

26.     The Secretary of the Commonwealth is appointed by the Governor, subject to confirmation by the General Assembly.  The Secretary of the Commonwealth administers the process for the restoration of civil rights, including the right to vote.  If the Governor, through the Secretary of the Commonwealth, denies an application to restore voting rights, the Secretary of the Commonwealth informs the individual seeking to have their voting rights restored that

restoration has been denied, thus ensuring that individuals who have been disenfranchised pursuant to Article II, Section 1 of the Virginia Constitution remain permanently disenfranchised.

27.     Defendant Kelly Gee is the Secretary of the Commonwealth.  Defendant Gee is sued in her official capacity.  Upon information and belief, Defendant Gee resides in Mechanicsville, Virginia, which is located in the Richmond Division of this Court.

28.     The State Board of Elections for the Commonwealth of Virginia (the "Board of Elections") is authorized to prescribe standard forms for voter registration and elections, and to supervise, coordinate, and adopt regulations governing the work of local electoral boards, registrars, and officers of election.  The members of the Board of Elections are appointed by the Governor, subject to confirmation by the General Assembly.  The Board of Elections submits an annual report to the Governor on the activities of the Board of Elections and Department of Elections in the previous year.

29.     Defendant John O'Bannon is the Chairman of the Board of Elections.  Defendant O'Bannon is sued in his official capacity.  Upon information and belief, Defendant O'Bannon resides in Henrico County, Virginia, which is located in the Richmond Division of this Court.

30.     Defendant Rosalyn R. Dance is the Vice Chair of the Board of Elections.  Defendant Dance is sued in her official capacity.  Upon information and belief, Defendant Dance resides in the City of Petersburg, Virginia, which is located in the Richmond Division of this Court.

31.     Defendant Georgia Alvis-Long is the Secretary of the Board of Elections.  Defendant Alvis-Long is sued in her official capacity.  Upon information and belief, Defendant Alvis-Long resides in Augusta County, Virginia.

32.     Defendant Donald W. Merricks is a member of the Board of Elections.  Defendant Merricks is sued in his official capacity.  Upon information and belief, Defendant Merricks resides in Pittsylvania County, Virginia.

33.     Defendant Matthew Weinstein is a member of the Board of Elections.  Defendant Weinstein is sued in his official capacity.  Upon information and belief, Defendant Weinstein resides in Arlington County, Virginia.

34.     The Department of Elections for the Commonwealth of Virginia (the "Department of Elections") conducts the Board of Elections' administrative and programmatic operations and discharges the Board's duties consistent with delegated authority.  The Department of Elections is authorized to establish and maintain a statewide automated voter registration system to include procedures for ascertaining current addresses of registrants; to require cancellation of records for registrants no longer qualified; to provide electronic applications for voter registration and absentee ballots; and to provide electronic delivery of absentee ballots to eligible military and overseas voters.

35.     Consistent with Virginia's current Constitution, the Department of Elections requires the general registrars to delete from the record of registered voters the name of any voter who has been convicted of any felony.

36.     Defendant Susan Beals is the Commissioner of the Department of Elections.  Defendant Beals is sued in her official capacity.  Upon information and belief, Defendant Beals resides in Chesterfield County, Virginia, which is located in the Richmond Division of this Court.

37.     Each city or county in Virginia has a general registrar.  The general registrars process voter registration applications for residents in their particular locality.  This process includes determining whether an applicant has ever been convicted of a felony, and if so, under

what circumstances the applicant's right to vote has been restored.  The general registrars must promptly notify each applicant of the acceptance or denial of their registration or transfer request. In addition, as discussed above, the Department of Elections requires the general registrars to delete from the record of registered voters the name of any voter who has been convicted of a felony.  The general registrars must comply within 30 days of receiving a notification from the Department of Elections.

38.     Defendant Eric Spicer is the General Registrar of Fairfax County, Virginia, where Plaintiff King resides.  Defendant Spicer is sued in his official capacity.  Upon information and belief, Defendant Spicer resides in Fairfax County, Virginia.

39.     Defendant Shannon Williams is the General Registrar of Smyth County, Virginia, where Plaintiff Johnson resides.  Defendant Williams is sued in his official capacity.  Upon information and belief, Defendant Williams resides in Smyth County, Virginia.

40.     Defendants, at all times relevant to this action, were acting under the color of state law, in their official capacities as the Governor, the Secretary of the Commonwealth, members of the Board of Elections, the Commissioner of the Department of Elections, and General Registrars, in overseeing, managing, and administering the voter registration system and elections for Virginia.

## JURISDICTION AND VENUE

41.     This action arises under the Virginia Readmission Act (Act of Congress of 1870, 16 Stat. 62), 42 U.S.C. § 1983, the Eighth Amendment of the U.S. Constitution, principles of federal equity, and *Ex parte Young*.  This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343.

42.     Venue in the United States District Court for the Eastern District of Virginia, Richmond Division, is proper pursuant to 28 U.S.C. § 1391 because Defendants are residents of Virginia, and at least one Defendant resides in the Eastern District of Virginia, Richmond Division.

## FACTS

**I.     The Reconstruction Congress Intended to Prevent the Former Confederate States from Manipulating Their Criminal Laws to Disenfranchise Black Citizens**

43.     In the decades preceding the Civil War, Virginia used its criminal laws to effectively remove all free Black citizens from the Commonwealth, including by enslavement, expulsion, or worse.  As early as 1824, Virginia law provided that when any free person of Black descent was convicted of a crime punishable by imprisonment for more than two years, instead of being imprisoned, that person would be enslaved (among other punishments).

44.     In April 1865, the Civil War ended, along with Virginia's and the other Confederate states' attempt at secession.  The passage of the Thirteenth Amendment in December of that year ended slavery, but it did not address whether formerly enslaved people had the full rights of citizenship—including the right to vote.

45.     As a result, the voting rights of Black citizens were especially vulnerable in former Confederate states like Virginia.  These former Confederate states had governments comprised of past members of the Confederate military and supporters of slavery.  These governments immediately set about placing statutory restrictions on the rights of Black citizens, with the goal of restricting Black voting power.  These laws—commonly referred to as "Black Codes"—significantly increased incarceration rates among Black citizens and, as a result, disenfranchised many Black citizens.

46.     For example, one state's "Black Code" provided that all Black people found without employment on the second Monday of January 1866 would be deemed vagrants, fined,

and jailed.[9]  That state also levied a poll tax of one dollar a year on all Black people, and anyone unable to pay would be deemed a vagrant and subject to fines, sentencing, and hiring out—often to their former slaveowner.[10]  Under another state's "Black Code," anyone accused of being a loiterer or a "stubborn and refractory" servant might be fined fifty dollars and hired out for six months.[11]  Similarly, the Virginia Vagrancy Act of 1866 forced into servile "employment" any person who appeared to be unemployed or experiencing homelessness.[12]  This prompted the United States Commanding General in Virginia to issue a proclamation that the law would reinstitute "slavery in all but its name."[13]

47.  Many states also enacted laws that reclassified many forms of petty theft from misdemeanors to felonies, and often explicitly embraced disenfranchisement as a punishment.  For example, those laws often specified that courts could punish felonies with disenfranchisement for ten or twenty years.[14]  As explained by one of the chairmen of the South Carolina Constitutional Convention in 1868:  "The intent of those laws was to deprive every colored man of their right to citizenship" by making "the most trivial offense a felony."[15]  These efforts nearly doubled the percentage of nonwhite people in prisons in many former Confederate states between 1850 and

---

[9] *See* Mississippi Black Codes, "Act to Amend the Vagrant Laws of the State," § 2 (Nov. 25, 1865).

[10] *See id.* § 6.

[11] *See* Alabama Black Codes, "An Act Concerning Vagrants and Vagrancy," §§ 2-3 (Jan. 20, 1866).

[12] *See* Va. Vagrancy Law, Ch. 28., *An ACT providing for the punishment of Vagrants* (passed Jan. 15, 1866).

[13] *See* Order by Major General A.H. Terry, Dep. of Virginia (issued Jan. 24, 1866).

[14] *See Acts of the General Assembly of the State of South Carolina, Passed at the Sessions of 1864–1865* 271-73 (Columbia, S.C.: Julian A. Selby 1866).

[15] *See Proceedings of the Constitutional Convention of South Carolina, 1868* 540 (Charleston: Denny and Perry, 1868) (quoting Thomas J. Robertson).

1870, substantially restricting the ability of Black citizens to vote throughout the former Confederacy.

48.     In 1866, Congress sought to prevent this widespread disenfranchisement of Black citizens in the former Confederate states by adopting the Fourteenth Amendment.  Ultimately ratified in 1868, the Fourteenth Amendment provided that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."[16]  And it specified that representatives would be apportioned among the states in accordance with the number of citizens in each state—with one key exception: that states in which "the right to vote at any election" was denied or in any way abridged "except for participation in rebellion, or other crime" had their Congressional representation reduced in proportion to the extent of that abridgment.[17]  Accordingly, once ratified, the Fourteenth Amendment prohibited state governments from disenfranchising their citizens unless those citizens had participated in "rebellion, or other crime."

49.     Virginia and other former Confederate states immediately began enacting laws that would deny Black citizens the right to vote while still preserving their degree of Congressional representation—namely, by manipulating the parameters of the Fourteenth Amendment's "other crime" language.[18]  Specifically, states expanded the scope of crimes that resulted in disenfranchisement to include less serious crimes.  Several states changed their laws to upgrade misdemeanor property crimes to felonies for which they could disenfranchise citizens, for example by redefining grand larceny to include the theft of any items with a value of more than two

---

[16] U.S. Const. amend. XIV, § 1.

[17] U.S. Const. amend. XIV, § 2.

[18] *Id.*

dollars.[19]   Another mechanism was to impose public whippings for petty crimes, which gave rise

to disenfranchisement.[20] These efforts were so prevalent that representatives of the federal

government observed and commented on them as well.  One agent of the Freedmen's Bureau in

Lynchburg, Virginia wrote:  "There seems to be a growing spirit among the whites of resolve to

keep the freed people 'in their proper place' as they term it, or in other words to keep them as

nearly as possible to their former state of servitude."[21]

      50.      States also imposed criminal convictions on Black citizens using sham trials that

afforded few—if any—meaningful procedural protections.  Many courts in the former Confederate

states failed to keep formal records, had a local citizen with no legal training serving as a judge,

and had no venue requirements.  Often, not even a trial was necessary:  "If a colored man struck a

white man, all [the latter] had to do was go before an officer of the law and declare that the colored

man struck him with intent to kill, and that offense, according to the law of 1865, constituted a

felony."[22]  The result of these efforts was clear.  As one delegate to Virginia's 1868 constitutional

convention stated:  It was "well known that there is a large class of prisoners now committed

unjustly" by the courts of Virginia's secession government.[23]   Those same sham convictions

unjustly deprived Black Virginians of their right to vote.  The situation in Virginia was so dire that

---

[19] *See* Acts of the General Assembly of the State of Arkansas (Little Rock Gazette Book and Job Printing, 1874), 112.

[20] *See* Letter from Major Rob't. Avery to Brevet Major General Jno. C. Robinson (Dec. 17, 1866) (in Records of U.S. Army Continental Commands, National Archives of the United States, Department of the South, Letters Received, file A-99 1866).

[21] Freedmen's Bureau Records: George T. Cook to R. S. Lacey, July 31, 1866, https://valley.lib.virginia.edu/papers/B1003.

[22] *See Proceedings of the Constitutional Convention of South Carolina, 1868* 540 (Charleston: Denny and Perry, 1868) (quoting Thomas J. Robertson).

[23] *Journal of the Constitutional Convention of the State of Virginia* 99-100 (Richmond: Office of the New Nation 1867) (quoting William H. Andrews).

it prompted one Freedmen's Bureau agent to state:  "The most intense hostility is manifested toward the exercise of either civil or political rights by the Freedmen and from what reaches my ears daily one would imagine the people here were further away from [reconstruction] than in any portion of the South."[24]

51.    With ratification of the Fourteenth Amendment pending, Congress took action by passing the Military Reconstruction Acts in 1867 to restrict the ability of Virginia and other former Confederate states to expand disenfranchisement.  Premised on the conclusion that the governments of Virginia and nine other states were not "loyal and republican State governments," the first Military Reconstruction Act required each state to call a constitutional convention to rewrite its constitution.[25]  Moreover, the first Military Reconstruction Act prohibited state constitutions from disenfranchising any adult man except for "participation in the rebellion or for felony at common law."[26]

52.    After the Fourteenth Amendment was ratified in 1868, Virginia sought and was granted readmission of their representatives in Congress pursuant to the Virginia Readmission Act of 1870.  The Virginia Readmission Act built on the Military Reconstruction Act's requirement that Virginia adopt a revised constitution that enfranchised all adult men except those who had been convicted of participating in the rebellion or a "felony at common law" by placing a continuing prohibition on modifying the Virginia Constitution in any way that would violate that condition.  The Virginia Readmission Act's enfranchisement provision therefore requires:

> That the Constitution of Virginia **shall never be so amended or changed** as to deprive any citizen or class of citizens of the United States of the right to vote

---

[24] Freedmen's Bureau Records: John W. Jordan to Orlando Brown, May 31, 1868, https://valley.lib.virginia.edu/papers/B1024 (emphasis removed).

[25] First Reconstr. Act, Preamble (Mar. 2, 1867).

[26] *Id.* § 5.

who are entitled to vote by the Constitution herein recognized, ***except as a punishment for such crimes as are now felonies at common law***, whereof they shall have been duly convicted, under laws equally applicable to all of the inhabitants. [27]

53.     The Virginia Readmission Act's enfranchisement provision was intended to ensure that all citizens, regardless of the color of their skin, are entitled to equal application of the voting eligibility standard.  As succinctly stated by Senator Drake of Missouri, the sponsor of the enfranchisement language that exists in every former Confederate state's Readmission Act, including Virginia's:  "It is a very easy thing in a State to make one set of laws applicable to white men, and another set of laws applicable to colored men."[28]

54.     The Virginia Readmission Act thus sought to foreclose this double standard by restricting disenfranchisement to convictions for crimes that were felonies at common law ***when the Act was passed in 1870***, and that were the result of criminal procedures that applied laws equally to all citizens.  This enfranchisement provision was so essential to Congress's efforts to guarantee a republican government within Virginia that Congress referred to it in the Virginia Readmission Act as a "fundamental condition[]" of the readmission of Virginia's representatives into Congress.[29]

55.     The Virginia Readmission Act remains good law.  It has never been repealed or otherwise dismantled, and therefore Virginia must comply with its mandate.

---

[27] Virginia Readmission Act (emphasis added).

[28] Cong. Globe, 40th Cong., 2d Sess. 2600 (1868).

[29] Virginia Readmission Act.

## II. Virginia Subsequently Criminalized Certain Conduct to Disenfranchise Its Black Citizens in Violation of the Virginia Readmission Act

56. Despite the explicit mandate of the Virginia Readmission Act, Virginia continued to manipulate the criminal laws to disenfranchise its Black citizens. In 1875, the Alexandria Gazette reported that "[t]he Conservative Legislative caucus . . . has decided to recommend . . . the conviction of petty larceny to disqualify the party from voting."[30] The Virginia legislature followed through on that plan the following year, amending its Constitution to disenfranchise individuals convicted of petty larceny.

57. This change to Virginia's Constitution was specifically intended to target Black citizens. In a November 1876 edition of the Richmond Daily Dispatch, for example, Elizabeth L. Van Lew (an advocate for the rights of Black citizens) discussed the legislature's efforts "to amend the Constitution so that the theft of a chicken shall disqualify forever a man as a voter," noting that it was "easy to see at whom this is aimed" because "colored men and women are not admitted into the almshouse if [not] able to work" and, "pressed by hunger, cold, and starving children, they may yield to temptation and steal, and for small offences the penitentiary receives them, and a voter is lost."[31]

58. Virginia and other former Confederate states also systematically began enacting laws that were designed to disenfranchise what were considered "Black" crimes, such as theft or housebreaking, but not those considered to be "white" crimes, such as fighting. In Virginia (as across the other former Confederate states), these statutes were then used to target Black citizens.

---

[30] *Alexandria Gazette. (Alexandria, D.C.), 08 Feb. 1875,* in *Chronicling America: Historic American Newspapers. Lib. of Congress*,
https://chroniclingamerica.loc.gov/lccn/sn85025007/1875-02-08/ed-1/seq-2/.

[31] *Elizabeth L. Van Lew, "To Northern Democrats," The Daily Dispatch, November 1, 1876,* in *Chronicling America: Historic American Newspapers, Library of Congress*,
https://chroniclingamerica.loc.gov/lccn/sn84024738/1876-11-01/ed-1/seq-2/.

For example, a November 1883 copy of the Richmond Daily Dispatch published "a list of ***negroes*** convicted of petit larceny in the Police Court of the city of Richmond," but did not publish such a list for Virginians of other races convicted of the same crime.[32]  The paper urged that "Democratic challengers should examine [the list] carefully"—confirming that the list was published for one reason, and one reason only: to prevent the identified Black Virginians from voting.[33]

59.      In 1902, Virginia held a constitutional convention to further amend its Constitution with the express goal of suppressing the voting rights of Black citizens.  John Goode, president of the 1902 constitutional convention and former colonel in the Confederate Army, started off the convention by expressing a widely-held sentiment that Congress committed "a crime against civilization and Christianity, when, against the advice of their wisest leaders, they required the people of Virginia and the South, under the rule of bayonet, to submit to universal negro suffrage."[34]  This statement was met with applause.[35]

60.      Aware that the Fifteenth Amendment prohibited denying or abridging the right to vote on account of race, color, or previous servitude, Virginia legislators looked for more creative ways to suppress the voting rights of Black citizens.  In addition to imposing a poll tax and literacy requirements, Virginia legislators ignored the clear mandate of the Virginia Readmission Act and amended the state Constitution to strip citizens of the right to vote if they had been convicted of

---

[32] *The Daily Dispatch, Nov. 4, 1883*, in *Chronicling America: Historic American Newspapers, Library of Congress*, http://chroniclingamerica. loc.gov/lccn/sn84024738/1883-11-04/ed-1/seq-6/ (emphasis added).

[33] *Id.*

[34] Report of the Proceedings and Debates of the Constitutional Convention, State of Virginia (Held in the City of Richmond June 12, 1901 to June 26, 1902), at 20.

[35] *Id.*

"treason, or of *any* felony, bribery, petit larceny, obtaining money or property under false pretenses, embezzlement, forgery, or perjury."[36]  Carter Glass, a Virginia State Senator, explained:

> This . . . will eliminate the darkey as a political factor in this State in less than five years, so that in no single county of the Commonwealth will there be the least concern felt for the complete supremacy of the white race in the affairs of government. . . . Discrimination!  Why, that is precisely what we propose; that, exactly, is what this Convention was elected for—to discriminate to the very extremity of permissible action under the limitations of the Federal Constitution, with a view to the elimination of every negro voter who can be gotten rid of, legally, without materially impairing the numerical strength of the white electorate. [37]

61.     The 1902 constitutional amendments were so successful in their goal, that they functionally eliminated Black voting power in the state.  Between 1901 and 1905 alone, the number of eligible Black voters in Virginia dropped from approximately 147,000 to 10,000.   Indeed, up until the 1960s, these discriminatory restrictions so severely limited the number of eligible Black voters that those who wanted to suppress Black voting power did not view Black voters as possessing any real political influence.

62.     By 1970, however, the Supreme Court had established that poll taxes were unconstitutional and the Voting Rights Act of 1965 had outlawed literacy tests as a precondition to voting.  So when Virginia amended its Constitution in 1970, although it could no longer require poll taxes or literacy tests, it nonetheless retained a provision that contravenes the Virginia Readmission Act.  That provision disenfranchises anyone convicted of *any* felony, regardless of whether the crime was a felony at common law in 1870.  In other words, although "[t]he generic term 'felony' [was] substituted for the list of crimes" that appeared in the 1902 constitution,[38] "the

---

[36] Va. CONST. 1902 art. II, § 23 (emphasis added).

[37] Report of the Proceedings and Debates of the Constitutional Convention, State of Virginia (Held in the City of Richmond, June 12, 1901, to June 26, 1902), Vol. 2 at 3076.

[38] Proceedings and Debates of the House of Delegates [Senate of Virginia] pertaining to Amendment of the Constitution: extra session 1969, regular session 1970, at 5.

essence of the [1902] constitutional disqualifications [was] retained."[39]  That 1902

disenfranchisement provision, retained in 1970 amendments, remains in place today.

### III. The Virginia Constitution's Permanent Disenfranchisement Provision Inflicts Cruel and Unusual Punishment On Virginia Citizens in Violation of the Eighth Amendment

63.    Article II, Section 1 of the Virginia Constitution provides that "[n]o person who has

been convicted of a felony shall be qualified to vote unless his civil rights have been restored by

the Governor or other appropriate authority."  Defendants have used this provision to implement

a lifetime ban on voting for those convicted of any felony.

64.    The Virginia Readmission Act prohibits Virginia from modifying its constitution

to disenfranchise any citizen "except as a ***punishment*** for such crimes as are now felonies at

common law."[40]  "Under the plain language of the Readmission Act, [Virginia] may only alter its

constitution to authorize disenfranchisement if it does so *as a punishment* for a common law felony

offense."[41]  As a post-Readmission Act disenfranchisement provision, Article II, Section 1 of the

Virginia Constitution imposes disenfranchisement as a punishment for felony convictions.

65.    The felony disenfranchisement provision of the Virginia Constitution conflicts with

a national consensus against imposing permanent disenfranchisement as punishment for a felony

conviction.  As the Fifth Circuit recently acknowledged, the national consensus is evidenced by

"the aggregate number of jurisdictions rejecting the punishment," as well as "consistent legislative

trends in that direction."[42]  Indeed, the vast majority of states and the District of Columbia do not

punish felony offenses unrelated to corrupt practices in elections or governance with a lifetime ban

---

[39] *Id.* at iii.

[40] Virginia Readmission Act (emphasis added).

[41] *Hopkins*, 2023 WL 4990543, at *13 (emphasis in original).

[42] *Id.* at *16.

on voting.[43]  Virginia, by contrast, is one of only three states with a constitution that permanently strips citizens convicted of any felony of their right to vote absent the governor's restoration of voting rights.  And of those three states, Virginia is the only state that does not currently have any automatic process for restoring voting rights.

66.   The national consensus against imposing permanent disenfranchisement as punishment for a felony conviction is "further evidenced by a clear and consistent trend in state legislatures to abandon the punishment."[44]  Over the last five decades, there has been a "steady rejection of permanent felon disenfranchisement."[45]  For example, in 2016, Maryland passed legislation restoring voting rights to people who have been convicted of a felony, including those who are still on probation or parole.[46]  By contrast, in Virginia, citizens with felony convictions will continue to be disenfranchised for the rest of their lives absent intervention by the Governor.

67.   Permanent disenfranchisement is a disproportionate punishment for Virginians who have been convicted of a felony.  As the Fifth Circuit recently found:

> [V]oting is the lifeblood of our democracy and . . . the deprivation of the right to vote saps citizens of their essential right to have a say in how and by whom they are governed.  Permanent denial of the franchise, then, is an exceptionally severe penalty, constituting nothing short of the denial of the democratic core of American citizenship.  It is an especially cruel penalty as applied to those whom the justice system has already deemed to have completed all terms of their sentences.  These individuals, despite having satisfied their debt to society, are precluded from ever fully participating in civic life.  Indeed, they are excluded from the most essential feature and expression of citizenship in a democracy—voting.[47]

68.   Accordingly, Article II, Section 1 of the Virginia Constitution exacts a cruel and unusual punishment of lifetime disenfranchisement against individuals with felony convictions in

---

[43] *Id.* at *16.
[44] *Id.* at *16.
[45] *Id.* at *17.
[46] H.B. 980, 2015 Gen. Assemb., Reg. Sess. (Md. 2016).
[47] *Hopkins*, 2023 WL 4990543 at *19.

violation of the Eighth Amendment, as applicable to the States pursuant to the Fourteenth Amendment.

## IV.   The Disenfranchisement Provision of Virginia's Constitution Disproportionately Affects Its Black Citizens

69.    Article II, Section 1 of the Virginia Constitution currently provides: "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority."  Importantly, Virginia classifies as "felonies" numerous crimes that were not common law felonies when the Virginia Readmission Act was passed in 1870.

70.    In 1870, "common law" felonies were widely understood to be a distinct category of crime from "statutory" felonies.  The nine "common law" felonies were murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny.

71.    Today, Virginia's criminal code designates as felonies numerous crimes beyond the nine that were understood to be felonies at common law in 1870.  Among the numerous crimes currently defined as "felonies" by Virginia that were not felonies at common law in 1870 are controlled substance offenses.  Indeed, criminalization of controlled substance offenses did not exist at the time the Virginia Readmission Act was passed; rather, controlled substances offenses were not criminalized until the regulation of opium in the late 1870s and early 1880s.  And it was not until the early 1900s that Virginia began prohibiting the use, sale, or possession of opium, cocaine, or other modern controlled substances.  In fact, Virginia first criminalized drug sales in 1904, punishing as a misdemeanor certain sales of opium, and then made possession of cocaine with intent to distribute a statutory felony in 1908.  Virginia did not make possession of marijuana a misdemeanor until 1936, and did not elevate penalties for that crime to be commensurate with those for drugs such as heroin, morphine, and cocaine until 1952.

72. Virginia's disenfranchisement of citizens with felony convictions for crimes other than those that were felonies at common law in 1870 has resulted in the disproportionate disenfranchisement of Black Virginians.

73. Black citizens in Virginia are more heavily policed and thus more likely to be arrested, charged, and convicted of crimes than other citizens. For example, Black drivers in Virginia are almost two times more likely than white drivers to be pulled over by the police, and are more likely to have their vehicles searched once stopped. And in 2020, even though Black residents constituted approximately 20% of Virginians, Black residents accounted for 40% of arrests, 43% of the jail population, and 53% of the prison population. In Richmond, for instance, Black residents are three times more likely to be arrested for low-level offenses than white residents. These disparities apply to arrests for drug crimes in particular: In 2020, 72% of all drug-related arrests in Virginia were of Black citizens.

74. As a result of this disproportionate policing of Black citizens and resulting disproportionate felony convictions, Black citizens in Virginia are also more likely to be disenfranchised than other Virginia citizens. More than 12% of Black voting-age Virginians are disenfranchised due to a felony conviction, a rate nearly two-and-a-half times that of all voting-age Virginians disenfranchised due to a felony conviction. The rate of felony disenfranchisement of Black Virginians (12.16%) is also more than twice the national average for Black citizens (5.28%). And Black citizens make up nearly half of all citizens who are disenfranchised due to a felony conviction in Virginia, despite making up less than a quarter of the total voting age population.

75. This disproportionate and widespread disenfranchisement of Black citizens in Virginia ensures that its voting population is not representative of the citizen body. This is

precisely the kind of abrogation of the republican form of government that the Virginia Readmission Act was designed to prevent and a violation of a "fundamental condition" of the readmission of its Congressional representatives.[48]

## V.    Plaintiffs Are Injured By Virginia's Illegal Disenfranchisement Regime

76.    Plaintiffs have been personally injured by Virginia's unlawful disenfranchisement regime.

77.    Plaintiff King is currently disenfranchised based on a December 2018 felony conviction in Fairfax County, Virginia.  Specifically, Mr. King was convicted of possession of a controlled drug with intent to distribute.  Possession of a controlled drug with intent to distribute was not a felony at common law in 1870.  If Mr. King were eligible, he would register and exercise his right to vote.  He believes that just like any other citizen, he should be able to express his opinion about who represents him as an elected official.  He wants to use his vote to set an example for his children and grandchildren, to advocate for everyone's rights, and to make sure his voice is heard, regardless of the outcome.  As a formerly incarcerated Black man, he feels a duty to share his unique perspective and to secure the rights of future generations of Black citizens.

78.    Plaintiff Johnson is currently disenfranchised based on 2021 felony convictions in Washington County, Virginia.   Ms. Johnson was convicted of certain drug-related crimes, including the possession and distribution of controlled substances, and related child endangerment charges due to her child being present in connection with the drug offenses.   None of these underlying crimes constituted felonies at common law in 1870.

79.    Ms. Johnson initially registered to vote as a young adult because her grandfather was adamant that she exercise her voting rights.  If Ms. Johnson were eligible, she would register

---

[48] Virginia Readmission Act.

and exercise her right to vote.  Voting has always been important to her, and she believes strongly in securing rights restorations for others who face voting bans.  Ms. Johnson lives in a rural area of Virginia, and believes it's important that low-income, rural Virginians have the opportunity to have their voices heard through their votes.

80.     Plaintiff Bridging the Gap works to reintegrate Virginia citizens who are returning from incarceration into society.  Defendants' illegal disenfranchisement of Virginians has actively frustrated Bridging the Gap's organizational mission and caused it to divert its scarce resources to address the resulting mass disenfranchisement.  Bridging the Gap's mission is to empower formerly incarcerated persons by supporting their reintegration as full participants in society.  Virginia's impermissible disenfranchisement policies directly hinder Bridging the Gap's mission to support the successful transition of formerly incarcerated persons to active citizenship by denying their fundamental right to vote and thus their full participation in society.  Virginia's lifetime voting ban disempowers the community that Bridging the Gap seeks to serve and support, and therefore directly harms Bridging the Gap by impeding the organization's core mission and goals.

81.     Not only has Defendants' violations of the Virginia Readmission Act and Eighth Amendment frustrated Bridging the Gap's mission to support the re-integration of formerly incarcerated people in Virginia, but Defendants have also caused Bridging the Gap to divert its limited resources away from its core programming and instead towards combating the widespread disenfranchisement resulting from this policy.

82.     Bridging the Gap's organizational mission includes a focus on three main areas: career training, civil rights/criminal justice advocacy, and housing resources, all in service of a community at high risk of experiencing homelessness and unemployment.  Bridging the Gap is

dedicated to supporting career opportunities and housing stability for the individuals it serves, but it has been compelled to invest substantial staff time and expenses towards advocacy and programming to support the restoration of voting rights.

83.      Bridging the Gap's efforts at ameliorating the effects of Defendants' conduct include (but are not limited to) organizing rallies to educate people about their ability to have their rights restored, encouraging people to check the status of their voting rights, counseling those who may not be aware that their rights were restored, holding "rights restoration fairs" to help people fill out restoration applications and understand their voting rights status, and running an educational "mobile justice tour" to conduct outreach and support individuals in restoring their rights.

84.      Bridging the Gap's diversion of resources to respond to Virginia's unlawful disenfranchisement regime is even greater after the changes that Governor Youngkin has made to the discretionary rights restoration process.   Now that the restoration process is no longer transparent, the organization spends even more time and resources assisting people in completing applications for rights restoration and navigating the ensuing bureaucratic process.   To date, Bridging the Gap has assisted over 10,000 people with understanding the rights restoration process, determining whether their rights have been restored, and applying for rights restoration, in the over 10 years since its founding.

85.      In addition to providing individualized support, Bridging the Gap has also diverted significant resources toward advocating for a systemic solution to Virginia's unlawful disenfranchisement regime (namely, a constitutional amendment to change Virginia's approach to disenfranchisement), and has engaged in regular community outreach and education regarding the impact of Virginia's felony voting rights ban and opportunities for rights restoration.

86.     Due to the time and effort it has expended supporting thousands of individuals with rights restoration as a result of Defendants' conduct, Bridging the Gap has foregone investment into other core areas of its organizational goals and services, and even delayed or suspended other projects and programs vitally important to its mission.  Moreover, because it is more difficult for Bridging the Gap's clients to obtain employment when they cannot represent to potential employers that their rights have been restored, the organization has needed to spend more time assisting each individual client with obtaining employment.  For example, as part of its career services and commitment to environmental justice, Bridging the Gap has led trainings in solar panel installation to prepare formerly incarcerated individuals to secure jobs in the solar industry. The frequency of these trainings and the organization's capacity to perform outreach for them has been severely diminished due to the time and resources spent on rights restoration work.  In fact, beginning in 2023, Bridging the Gap needed to reduce the frequency of its trainings from every six weeks to every eight weeks, as a direct consequence of spending additional time on rights restoration efforts.

87.     Similarly, Bridging the Gap has been unable to devote as many resources to another core aspect of its mission, namely, supporting the housing needs of formerly incarcerated persons, due to time spent on rights restoration work.  Bridging the Gap operates as a facilitator that connects people leaving incarceration to transitional housing, at the request of the Virginia Department of Corrections.  From 2020 through the end of 2022, Bridging the Gap assisted approximately 25 people leaving incarceration in finding transitional housing.  However, since the beginning of 2023, Bridging the Gap has substantially reduced the time and resources it puts toward connecting people leaving incarceration with transitional housing due to the time and

resources the organization instead has needed to devote to rights restoration in the face of Virginia's unlawful disenfranchisement regime.

88.     In addition, Bridging the Gap's lean staff and critical mission goals are supported by a minimal operating budget, and the organization's ability to apply for grants is hampered by the resources it dedicates to counteract Virginia's unlawful disenfranchisement regime.   For example, there are at least three grants that Bridging the Gap chose not to apply to because of the time the organization has needed to spend countering Virginia's unlawful disenfranchisement regime.

## FIRST CAUSE OF ACTION

### Violation of the Virginia Readmission Act, Actionable Under 42 U.S.C. § 1983

89.     Plaintiffs hereby reallege and incorporate the foregoing paragraphs as if fully set forth herein.

90.     Defendants, at all times relevant to this action, were acting under the color of state law in overseeing, managing, and administering the voter registration system and elections for Virginia.

91.     Article II, Section 1 of the Virginia Constitution states:  "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority."

92.     Defendants have enforced and continue to enforce Article II, Section 1 of the Virginia Constitution in connection with their ongoing oversight, management, and administration of the voter registration system and elections for Virginia.

93.     As a result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution, Plaintiffs King and Johnson have been disqualified from voting in Virginia because

they were convicted of crimes that were not felonies at common law in 1870 and their voting rights have not been restored.

94.     As an additional result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution, Plaintiff Bridging the Gap has been impeded in its mission to help previously incarcerated people overcome barriers that hinder their effective transition into mainstream society.  As a result, Bridging the Gap has expended significant resources to help restore voting rights to Virginians who have been unlawfully disenfranchised because of convictions of crimes that were not felonies at common law in 1870, and diverted its scarce organizational resources away from its core mission, as detailed above.

95.     The Virginia Readmission Act forbids Defendants from enforcing Article II, Section 1, of the Virginia Constitution, to the extent that it disenfranchises any citizens for crimes that were not "felonies at common law" in 1870.

96.     Article II, Section 1 of the Virginia Constitution violates the Virginia Readmission Act because it disenfranchises Virginia citizens convicted of numerous crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870—including those felonies for which Plaintiffs King and Johnson were convicted and stripped of their voting rights.

97.     Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has disqualified Plaintiffs King and Johnson from voting in Virginia because they were convicted of felonies, despite the fact that those underlying felonies were not felonies at common law when the Virginia Readmission Act was enacted in 1870.

98.     Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has therefore unlawfully deprived and continues to deprive Plaintiffs King and Johnson of their right

to vote as established in the Virginia Constitution of 1870 and protected by the enfranchisement provision of the Virginia Readmission Act.

99.     As a direct and proximate result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution, Plaintiffs King and Johnson have been and continue to be injured because they are unable to register to vote or vote in elections in Virginia.

100.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has also frustrated Plaintiff Bridging the Gap's mission to help previously incarcerated individuals overcome barriers that hinder their effective transition into mainstream society.  Voting is the basic means by which citizens participate in the democratic process and, without the right to vote, such individuals are barred from full participation in mainstream society.

101.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has therefore caused Plaintiff Bridging the Gap to divert significant resources on rights restoration efforts for Virginians who have been impermissibly disenfranchised because of convictions for crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870, as described above.

102.    Under 42 U.S.C. § 1983, Plaintiffs are entitled to (1) prospective injunctive relief prohibiting Defendants from enforcing Article II, Section 1 of the Virginia Constitution with respect to citizens of the Commonwealth of Virginia convicted of crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870, including Plaintiffs King and Johnson, and (2) a declaratory judgment that Defendants' enforcement of Article II, Section 1 of the Virginia Constitution violates the Virginia Readmission Act, in order to address Defendants' ongoing violation of the Virginia Readmission Act.

**SECOND CAUSE OF ACTION**

**Violation of Virginia Readmission Act, Actionable Under Principles of Federal Equity
and *Ex parte Young***

103.    Plaintiffs hereby reallege and incorporate the foregoing paragraphs as if fully set forth herein.

104.    The Supremacy Clause of the U.S. Constitution states that the "Laws of the United States . . . shall be the supreme Law of the Land."[49]

105.    Defendants, at all times relevant to this action, were acting under the color of state law in overseeing, managing, and administering the voter registration system and elections for Virginia.

106.    Article II, Section 1 of the Virginia Constitution provides:  "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority."

107.    Defendants have enforced and continue to enforce Article II, Section 1 of the Virginia Constitution in connection with their ongoing oversight, management, and administration of the voter registration system and elections for Virginia.

108.    As a result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution in violation of the Virginia Readmission Act, Plaintiffs King and Johnson have been disqualified from voting in Virginia because they were convicted of crimes that were not felonies at common law in 1870 and their voting rights have not been restored.

109.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has also frustrated Plaintiff Bridging the Gap's mission to help previously incarcerated individuals

---

[49] U.S. CONST. art. VI, cl. 2.

overcome barriers that hinder their effective transition into mainstream society.  As a result, Bridging the Gap has expended significant resources to help restore voting rights to Virginians who have been unlawfully disenfranchised because of convictions of crimes that were not felonies at common law in 1870, and diverted its scarce organizational resources away from its core mission.  Voting is the basic means by which citizens participate in the democratic process and, without the right to vote, such individuals are barred from full participation in mainstream society.

110.    The Virginia Readmission Act explicitly and unambiguously forbids Defendants from enforcing Article II, Section 1 of the Virginia Constitution, to the extent that it disenfranchises any citizens for crimes that were not felonies at common law in 1870.

111.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has disenfranchised Plaintiffs King and Johnson from voting in Virginia because they were previously convicted of felonies, despite the fact that those underlying felonies were not felonies at common law when the Virginia Readmission Act was enacted in 1870.

112.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has therefore unlawfully deprived and continues to deprive Plaintiffs King and Johnson of their right to vote in violation of the enfranchisement provision of the Virginia Readmission Act.

113.    As a direct and proximate result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution, Plaintiffs King and Johnson have been and continue to be injured because they are unable to register to vote or vote in elections in Virginia.

114.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has also caused Plaintiff Bridging the Gap to expend and divert significant resources on rights restoration efforts for Virginians who have been impermissibly disenfranchised because of

convictions of crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870, as described above.

115.   Plaintiffs have suffered and will continue to suffer irreparable injury if this violation of federal law is not declared unlawful and enjoined, and Plaintiffs have no adequate remedy at law.

116.   As a court of equity, this Court has the inherent power to review and enjoin violations of federal law by state officials.  Congress has not evidenced an intent to limit equitable relief for violating the enfranchisement provision of the Virginia Readmission Act.

117.   Plaintiffs are entitled to (1) prospective injunctive relief prohibiting Defendants from enforcing Article II, Section 1 of the Virginia Constitution with respect to citizens of the Commonwealth of Virginia convicted of crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870 in violation of the Virginia Readmission Act, including Plaintiffs King and Johnson, and (2) a declaratory judgment that Defendants' enforcement of Article II, Section 1 of the Virginia Constitution violates the Virginia Readmission Act, in order to address Defendants' ongoing violation of the Virginia Readmission Act.

## THIRD CAUSE OF ACTION

### Violation of the Eighth Amendment, Actionable Under 42 U.S.C. § 1983

118.   Plaintiffs hereby reallege and incorporate the foregoing paragraphs as if fully set forth herein.

119.   Defendants, at all times relevant to this action, were acting under the color of state law in overseeing, managing, and administering the voter registration system and elections for Virginia.

120.     Article II, Section 1 of the Virginia Constitution states:  "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority."

121.     Defendants have enforced and continue to enforce Article II, Section 1 of the Virginia Constitution in connection with their ongoing oversight, management, and administration of the voter registration system and elections for Virginia.

122.     As a result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution in violation of the Eighth Amendment, Plaintiffs King and Johnson were disqualified from voting in Virginia because they were convicted of felonies.

123.     As an additional result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution, Plaintiff Bridging the Gap has been impeded in its mission to help previously incarcerated people overcome barriers that hinder their effective transition into mainstream society.  As a result, Bridging the Gap has expended significant resources to help restore voting rights to Virginians who have been permanently disenfranchised because of felony convictions, and diverted its scarce organizational resources away from its core mission, as detailed above.

124.     The Eighth Amendment of the U.S. Constitution prohibits "cruel and unusual punishments."   The Eighth Amendment is applicable to Virginia through the Fourteenth Amendment.

125.     Article II, Section 1 of the Virginia Constitution violates the Eighth Amendment because it permanently disenfranchises Virginia citizens with felony convictions.  This is cruel and unusual punishment under contemporary standards of decency.

126.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution disqualified Plaintiffs King and Johnson from voting in Virginia because they were convicted of felonies.

127.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has therefore inflicted and continues to inflict cruel and unusual punishment on Plaintiffs King and Johnson in violation of the Eighth Amendment.

128.    As a direct and proximate result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution, Plaintiffs King and Johnson have been and continue to be injured because they are unable to register to vote or vote in elections in Virginia.

129.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has also frustrated Plaintiff Bridging the Gap's mission to help previously incarcerated individuals overcome barriers that hinder their effective transition into mainstream society.  Voting is the basic means by which citizens participate in the democratic process and, without the right to vote, such individuals are barred from full participation in mainstream society.

130.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has therefore caused Plaintiff Bridging the Gap to divert significant resources on rights restoration efforts for Virginians who have been disenfranchised because of felony convictions, as described above.

131.    Under 42 U.S.C. § 1983, Plaintiffs are entitled to (1) prospective injunctive relief prohibiting Defendants from enforcing Article II, Section 1 of the Virginia Constitution with respect to citizens of the Commonwealth of Virginia convicted of any felony, including Plaintiffs King and Johnson, and (2) a declaratory judgment that Defendants' enforcement of Article II, Section 1 of the Virginia Constitution violates the Eighth Amendment with respect to citizens of

the Commonwealth of Virginia convicted of any felony, in order to address Defendants' ongoing violation of the Eighth Amendment.

## FOURTH CAUSE OF ACTION

**Violation of the Eighth Amendment, Actionable Under Principles of Federal Equity and *Ex parte Young***

132.   Plaintiffs hereby reallege and incorporate the foregoing paragraphs as if fully set forth herein.

133.   The Supremacy Clause of the U.S. Constitution states that the "Laws of the United States . . . shall be the supreme Law of the Land."[50]

134.   Defendants, at all times relevant to this action, were acting under the color of state law in overseeing, managing, and administering the voter registration system and elections for Virginia.

135.   Article II, Section 1 of the Virginia Constitution provides:  "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority."

136.   Defendants have enforced and continue to enforce Article II, Section 1 of the Virginia Constitution in connection with their ongoing oversight, management, and administration of the voter registration system and elections for Virginia.

137.   As a result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution in violation of the Virginia Readmission Act, Plaintiffs King and Johnson have been disqualified from voting in Virginia because they were convicted of felonies and their voting rights have not been restored.

---

[50] U.S. CONST. art. VI, cl. 2.

138.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has also frustrated Plaintiff Bridging the Gap's mission to help previously incarcerated individuals overcome barriers that hinder their effective transition into mainstream society.  As a result, Bridging the Gap has expended significant resources to help restore voting rights to Virginians who continue to be permanently disenfranchised due to a felony conviction, and diverted its scarce organizational resources away from its core mission.  Voting is the basic means by which citizens participate in the democratic process and, without the right to vote, such individuals are barred from full participation in mainstream society.

139.    The Eighth Amendment of the U.S. Constitution prohibits "cruel and unusual punishments."   The Eighth Amendment is applicable to Virginia through the Fourteenth Amendment.

140.    Article II, Section 1 of the Virginia Constitution violates the Eighth Amendment because it permanently disenfranchises Virginia citizens with felony convictions.  This is cruel and unusual punishment under contemporary standards of decency.

141.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has disenfranchised Plaintiffs King and Johnson from voting in Virginia because they were previously convicted of felonies.

142.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has therefore unlawfully deprived and continues to deprive Plaintiffs King and Johnson of their right to vote in violation of the Eighth Amendment.

143.    As a direct and proximate result of Defendants' enforcement of Article II, Section 1 of the Virginia Constitution, Plaintiffs King and Johnson have been and continue to be injured because they are unable to register to vote or vote in elections in Virginia.

144.    Defendants' enforcement of Article II, Section 1 of the Virginia Constitution has also caused Plaintiff Bridging the Gap to expend and divert significant resources on rights restoration efforts for Virginians who remain permanently disenfranchised because of felony convictions.

145.    Plaintiffs have suffered and will continue to suffer irreparable injury if this violation of federal law is not declared unlawful and enjoined, and Plaintiffs have no adequate remedy at law.

146.    As a court of equity, this Court has the inherent power to review and enjoin violations of federal law by state officials.  Congress has not evidenced an intent to limit equitable relief for violating the Eighth Amendment.

147.    Plaintiffs are entitled to (1) prospective injunctive relief prohibiting Defendants from enforcing Article II, Section 1 of the Virginia Constitution with respect to citizens of the Commonwealth of Virginia convicted of any felony, including Plaintiffs King and Johnson, and (2) a declaratory judgment that Defendants' enforcement of Article II, Section 1 of the Virginia Constitution violates the Eighth Amendment with respect to citizens of the Commonwealth of Virginia convicted of any felony, in order to address Defendants' ongoing violation of the Eighth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Issue a declaratory judgment finding that Defendants' enforcement of Article II, Section 1 of the Virginia Constitution violates the Virginia Readmission Act;

B.    Issue injunctive relief enjoining Defendants from enforcing Article II, Section 1 of the Virginia Constitution with respect to citizens of the Commonwealth of

Virginia convicted of crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870;

     C.    Issue a declaratory judgment finding that Defendants' enforcement of Article II, Section 1 of the Virginia Constitution violates the Eighth Amendment with respect to citizens of the Commonwealth of Virginia convicted of any felony;

     D.    Issue injunctive relief enjoining Defendants from enforcing Article II, Section 1 of the Virginia Constitution with respect to citizens of the Commonwealth of Virginia convicted of any felony;

     E.    Award Plaintiffs' attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1983; and

     F.    Grant any such other relief as this Court deems just and proper.

Dated: August 31, 2023

Respectfully submitted,

/s/ Brittany Blueitt Amadi

Vishal Agraharkar (VSB No. 93265)
Eden Heilman (VSB No. 93554)
Andrea Fenster* (D.C. Bar No. 1736549)
ACLU Foundation of Virginia
701 E. Franklin Street, Ste. 1412
Richmond, VA 23219
(804) 523-2151
vagraharkar@acluva.org
eheilman@acluva.org
afenster@acluva.org

Brittany Blueitt Amadi (VSB No. 80078)
L. Alyssa Chen*
Aryn A. Frazier*
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
(202) 663-6000
brittany.amadi@wilmerhale.com
l.alyssa.chen@wilmerhale.com
aryn.frazier@wilmerhale.com

Jared Fletcher Davidson*
Protect Democracy Project
3014 Dauphine Street, Suite J
New Orleans, LA 70117
(202) 579-4582
jared.davidson@protectdemocracy.org

Robert Kingsley Smith*
Jason H. Liss*
Robert Donoghue*
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000
robert.smith@wilmerhale.com
jason.liss@wilmerhale.com
robert.donoghue@wilmerhale.com

Benjamin L. Berwick*
Protect Democracy Project
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Matthew Wollin*
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
matthew.wollin@wilmerhale.com

**Counsel for Plaintiffs**
*admitted pro hac vice*