# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| TATI ABU KING, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-408-JAG |
| | ) | |
| GLENN YOUNGKIN, in his official | ) | |
| capacity as Governor of the Commonwealth | ) | |
| of Virginia, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT UNDER <u>FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)</u>

Jason S. Miyares
*Attorney General*

Andrew N. Ferguson (VSB #86583)
*Solicitor General*

Charles J. Cooper (*Pro Hac Vice*)
Haley N. Proctor (VSB #84272)
Joseph O. Masterman (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

Steven G. Popps (VSB #80817)
*Deputy Attorney General*

Erika L. Maley (VSB #97533)
*Principal Deputy Solicitor General*

Kevin M. Gallagher (VSB #87548)
*Deputy Solicitor General*

Travis S. Andrews (VSB #90520)
*Assistant Attorney General*

*Counsel for Defendants Glenn Youngkin, Kelly Gee, John O'Bannon, Rosalyn R. Dance, Georgia Alvis-Long, Donald W. Merricks, Matthew Weinstein, Susan Beals, Eric Spicer, and Shannon Williams*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
AFerguson@oag.state.va.us

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 2

LEGAL STANDARD......................................................................................... 6

ARGUMENT .................................................................................................... 7

    I.    The Court lacks jurisdiction to adjudicate several of Plaintiffs' claims .................... 7

        A.    Sovereign immunity bars many of Plaintiffs' claims ......................................... 7

            1.    *Pennhurst* bars Plaintiffs' Virginia Readmission Act claims ....................... 8

            2.    The Governor and Secretary of the Commonwealth are immune from all claims because they do not enforce the challenged provision ...................... 9

        B.    Plaintiff Bridging the Gap lacks standing......................................................... 10

        C.    Plaintiffs' Virginia Readmission Act claims raise nonjusticiable political questions ............................................................................................................. 11

    II.    Plaintiffs' Virginia Readmission Act claims lack merit ......................................... 13

        A.    The Virginia Constitution does not violate the Virginia Readmission Act..... 13

        B.    No private right of action exists under the Virginia Readmission Act............ 16

        C.    The canon of constitutional avoidance precludes Plaintiffs' interpretation of the Virginia Readmission Act ........................................................................... 17

    III.    Plaintiffs' cruel and unusual punishment claims lack merit .................................... 22

        A.    Supreme Court precedent forecloses the claims............................................... 22

        B.    Article II, Section 1 of Virginia's Constitution does not inflict punishment .. 23

        C.    Felon disenfranchisement is not cruel and unusual .......................................... 27

CONCLUSION................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Shimari v. CACI Premier Tech., Inc.*,
    840 F.3d 147 (4th Cir. 2016) ..............................................................12

*Alden v. Maine*,
    527 U.S. 706 (1999) ............................................................................7

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ..........................................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................6

*Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*,
    19 F.3d 241 (5th Cir. 1994) ..............................................................11

*Atkins v. Virginia*,
    536 U.S. 304 (2002) ..........................................................................28

*Atlas Underwriters, Ltd. v. State Corp. Com'n*,
    237 Va. 45 (1989) ................................................................................2

*Baker v. Carr*,
    369 U.S. 186 (1962) ....................................................................13, 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................7

*Biggs v. North Carolina Dep't of Pub. Safety*,
    953 F.3d 236 (4th Cir. 2020) ..............................................................8

*Bland v. Roberts*,
    730 F.3d 368 (4th Cir. 2013) ..............................................................8

*Blessing v. Freestone*,
    520 U.S. 329 (1997) ..........................................................................17

*Booth v. State of Maryland*,
    112 F.3d 139 (4th Cir. 1997) ..............................................................8

*Bragg v. West Va. Coal Ass'n*,
    248 F.3d 275 (4th Cir. 2001) ..............................................................9

*Bucklew v. Precythe,*
    139 S. Ct. 1112 (2019) ................................................................................27

*Butler v. Thompson,*
    97 F. Supp. 17 (E.D. Va. 1951) ...................................................12, 13, 22

*Canada v. Commonwealth,*
    63 Va. 899 (1872) .......................................................................................15

*Carey v. Throwe,*
    957 F.3d 468 (4th Cir. 2020) .................................................................16, 17

*CGM, LLC v. BellSouth Telcoms., Inc.,*
    664 F.3d 46 (4th Cir. 2011) ..........................................................................8

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ...................................................................................19

*City of Rancho Palos Verdes v. Abrams,*
    544 U.S. 113 (2005) ...................................................................................17

*City of Rome v. United States,*
    446 U.S. 156 (1980) ...................................................................................12

*Coyle v. Smith,*
    221 U.S. 559 (1911) ...................................................................................21

*Disability Rights S.C. v. McMaster,*
    24 F.4th 893 (4th Cir. 2022) ......................................................................10

*Doe v. Settle,*
    24 F.4th 932 (4th Cir. 2022) .........................................................24, 25, 26

*Escanaba Co. v. Chicago,*
    107 U.S. 678 (1883) ...................................................................................21

*Ford Motor Co. v. Department of Treasury of State of Ind.,*
    323 U.S. 459 (1945) .....................................................................................7

*Georgia v. Stanton,*
    73 U.S. (6 Wall.) 50 (1867) ........................................................................13

*Gonzaga Univ. v. Doe,*
    536 U.S. 273 (2002) ...................................................................................17

*Graham v. Florida,*
    560 U.S. 48 (2010) ..........................................................................28, 29, 30

*Green v. Board of Elecs. of City of N.Y.*,
    380 F.2d 445 (2d. Cir. 1967)......................................................................24

*Gregg v. Georgia*,
    428 U.S. 153 (1976)...................................................................................23

*Hardy v. Commonwealth*,
    58 Va. 592 (1867) ......................................................................................15

*Harvey v. Brewer*,
    605 F.3d 1067 (9th Cir. 2010) ...........................................................14, 18

*Hayden v. Pataki*,
    449 F.3d 305 (2d Cir. 2006).......................................................................19

*Heap v. Carter*,
    112 F. Supp. 3d 402 (E.D. Va. 2015) ........................................................11

*Hopkins v. Secretary of State Delbert Hosemann*,
    76 F.4th 378 (5th Cir. 2023) ..........................................................25, 27, 29

*Howell v. McAuliffe*,
    292 Va. 320 (2016) ......................................................................................2

*Hudson v. United States*,
    522 U.S. 93 (1997).....................................................................................26

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018).............................................................................18, 21

*Johnson v. Bredesen*,
    624 F.3d 742 (6th Cir. 2020) .....................................................................24

*Johnson v. Governor of Fla.*,
    405 F.3d 1214 (11th Cir. 2005) .................................................................19

*Jones v. Governor of Fla.*,
    950 F.3d 795 (11th Cir. 2020) ........................................................2, 28, 29

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) .....................................................................11

*Largess v. Supreme Judicial Ct. for State of Mass.*,
    373 F.3d 219 (1st Cir. 2004).......................................................................21

*Lassiter v. Northampton Cnty. Bd. of Elections*,
    360 U.S. 45 (1959)......................................................................................26

*Lee v. Commonwealth*,
144 Va. 594 (1926) ...........................................................................................15

*Litman v. George Mason Univ.*,
186 F.3d 544 (4th Cir. 1999) .............................................................................7

*Luther v. Borden*,
48 U.S. (7 How.) 1 (1849) ...........................................................................12, 20

*Lytle v. Griffith*,
240 F.3d 404 (4th Cir. 2001) .............................................................................7

*McBurney v. Cuccinelli*,
616 F.3d 393 (4th Cir. 2010) .............................................................................9

*McConnell v. Adams*,
829 F.2d 1319 (4th Cir. 1987) ...........................................................................7

*Merritt v. Jones*,
259 Ark. 380 (1976) ...............................................................................12, 14, 16

*Michigan Corr. Org. v. Michigan Dep't of Corr.*,
774 F.3d 895 (6th Cir. 2014) .............................................................................8

*Murphy v. National Collegiate Athletic Ass'n*,
138 S. Ct. 1461 (2018) ....................................................................................22

*New York v. United States*,
505 U.S. 144 (1992) .......................................................................................22

*North Carolina State Conf. of the NAACP v. Raymond*,
981 F.3d 295 (4th Cir. 2020) ...........................................................................11

*Pacific States Telephone & Telegraph Co. v. Oregon*,
223 U.S. 118 (1912) .......................................................................................12

*Parrish v. Commonwealth*,
81 Va. 1 (1884) .............................................................................................14

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) .......................................................................................8, 9

*Perry v. Beamer*,
933 F. Supp. 556 (E.D. Va. 1996) ............................................................... *passim*

*Planned Parenthood S. Atl. v. Baker*,
941 F.3d 687 (4th Cir. 2019) ...........................................................................17

v

*Pollard's Lessee v. Hagan,*
   44 U.S. (3 How.) 212 (1845) .......................................................21

*Regents of the Univ. of Cal. v. Doe,*
   519 U.S. 425 (1997)........................................................................7

*Richardson v. Ramirez,*
   418 U.S. 24 (1974)......................................................1, 18, 23, 29

*Richmond, Fredericksburg & Potomac R. Co. v. United States,*
   945 F.2d 765 (4th Cir. 1991) .......................................................6

*Robinson v. California,*
   370 U.S. 660 (1962)................................................................23, 24

*Roper v. Simmons,*
   543 U.S. 551 (2005)....................................................................30

*Shelby Cnty. v. Holder,*
   570 U.S. 529 (2013)....................................................................19

*Simmons v. Galvin,*
   575 F.3d 24 (1st Cir. 2009) ...........................................24, 25, 26

*Smith v. Doe,*
   538 U.S. 84 (2003)................................................................25, 27

*South Carolina Wildlife Fed'n v. Limehouse,*
   549 F.3d 324 (4th Cir. 2008) .....................................................10

*Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,*
   713 F.3d 175 (4th Cir. 2013) .....................................................11

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
   143 S. Ct. 2141 (2023)................................................................11

*Taubman Realty Grp. v. Mineta,*
   320 F.3d 475 (4th Cir. 2003) .......................................................6

*Texas v. White,*
   74 U.S. 700 (1868), *overruled on other grounds by Morgan v. United States,*
   113 U.S. 476 (1885).............................................................12, 20

*Thompson v. Alabama,*
   65 F.4th 1288 (11th Cir. 2023) ...........................24, 25, 26, 27

*Thompson v. Oklahoma*,
   487 U.S. 815 (1988) ................................................................................29

*Trop v. Dulles*,
   356 U.S. 86 (1958) .......................................................................... *passim*

*United States v. Cobler*,
   748 F.3d 570 (4th Cir. 2014) ....................................................................28

*United States v. Poole*,
   531 F.3d 263 (4th Cir. 2008) ......................................................................6

*United States v. States of La., Tex., Miss., Ala., & Fla.*,
   363 U.S. 1 (1960) ........................................................................................5

*Virginia Office for Protection & Advocacy v. Stewart*,
   563 U.S. 247 (2011) ...................................................................................7

*Washington v. State*,
   75 Ala. 582 (1884) ...................................................................................25

*Waste Mgmt. Holdings, Inc. v. Gilmore*,
   252 F.3d 316 (4th Cir. 2001) ......................................................................9

*Will v. Michigan Dep't of State Police*,
   491 U.S. 58 (1989) .....................................................................................7

*Ex parte Young*,
   209 U.S. 123 (1908) ......................................................................... *passim*

**Statutes**

52 U.S.C. § 10301 ...........................................................................................19

Act of June 22, 1868, c. 69, 15 Stat. 72 ...........................................................5

Act of June 25, 1868, c. 70, 15 Stat. 73 ...........................................................5

Act of Feb. 1, 1870, c. 12, 16 Stat. 63 .............................................................5

Act of Feb. 23, 1870, c. 19, 16 Stat. 67 ...........................................................5

Act of Mar. 20, 1870, c. 39, 16 Stat. 80 ...........................................................5

Act of July 15, 1870 .........................................................................................5

Act. of Apr. 2, 1877, ch. 271, *reprinted in* The Code of Virginia: with the
   Declaration of Independence and the Constitution of the United States and the
   Constitution of Virginia, Tit. 5, § 79 (Goode 1887) ..................................15

Va. Code § 24.2-409 ...............................................................................................10

Va. Code § 24.2-417 ...............................................................................................10

Va. Code § 24.2-427 ...............................................................................................10

Virginia Readmission Act, 16 Stat. 62 (1970) ................................................ *passim*

**Other Authorities**

*A Descriptive List of Persons Convicted of Felony, or Other Infamous Offences, in the Corporation Court of Alexandria, Virginia Since November 2d, 1870,* Richmond, Va.: Library of Virginia ...............................................................15

A.E. Dick Howard & William Antholis, *The Virginia Constitution of 1971*, 129 Virg. Mag. of Hist. & Bio. 346 (2021) .................................................................20

A.E. Dick Howard, *Who Belongs: The Constitution of Virginia and the Political Community*, 37 J. L. & Politics 99 (2022) ...............................................................19

Eric Biber, *The Price of Admission: Causes, Effects, and Patterns of Conditions Imposed on States Entering the Union*, 46 Am. J. Legal Hist. 119 (2004) ............................22

James Q. Dealey, *Growth of American State Constitutions* 70 (1915) ........................................22

National Conf. of State Legislatures, *Felon Voting Rights* (Apr. 6, 2023), https://bit.ly/3Rv7LPU ...............................................................28

S. Rep. No. 89-162 (1965) ...............................................................19

U.S. Const. amend. VIII ................................................................ *passim*

U.S. Const. amend. XIV ................................................................ *passim*

U.S. Const. art. IV, § 4 ...............................................................12, 20

Va. Const. art. II, § 1 ...............................................................2, 16, 24, 27

Va. Const. art. III, § 14 (1830) ...............................................................2

Va. Const. art. III, § 1 (1869) ...............................................................5, 14

## INTRODUCTION

Plaintiffs' amended complaint claims that the Virginia Constitution's felon disenfranchisement provision, Article II, Section 1, violates the Virginia Readmission Act, 16 Stat. 62 (1870), and inflicts cruel and unusual punishment in violation of the Eighth Amendment.[1] Both claims fail on their face.

Plaintiffs suggest that the Court must invalidate Article II, Section 1 to prevent racial discrimination in voting. But the Fourteenth and Fifteenth Amendments unequivocally prohibit denying the right to vote based on race. Despite Plaintiffs' frequent insinuations that the current Virginia Constitution's disenfranchisement of felons is racially discriminatory, they bring no such claim. Nor could they. Virginia's Constitution was ratified in 1971 without a shred of discriminatory intent, and Plaintiffs do not even allege otherwise. And it is well settled that the Fourteenth Amendment permits States to "exclude from the franchise convicted felons who have completed their sentences and paroles." *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974); see U.S. Const. amend. XIV, § 2. Virginia's constitutional provision serves the Commonwealth's important "interest in preserving the integrity of her electoral process by removing from the process those persons with proven anti-social behavior whose behavior can be said to be destructive of society's aims." *Perry v. Beamer*, 933 F. Supp. 556, 558 (E.D. Va. 1996).

In the face of this clear precedent, Plaintiffs' original complaint advanced a theory that they have touted publicly as the "first-of-its-kind": that the Virginia Readmission Act of 1870 grants judicially enforceable private rights, and that the Act prohibits Virginia from disenfranchising felons except for those who committed nine "common law" crimes. This theory is indeed novel.

---

[1] The original complaint had no Eighth Amendment claim. The new complaint also drops a previously named plaintiff, Melvin Wingate, who lacked standing because his voting rights were restored before this suit was filed. See Mem. in Supp. of Mot. to Dismiss 4–5, 13 (ECF No. 54).

No court has interpreted the Act that way in the 153 years since Congress adopted it. Plaintiffs' interpretation would be a radical change in the law and would render the Virginia Readmission Act unconstitutional. This Court should reject it.

Plaintiffs' amended complaint now advances an additional theory—one so radical that it did not merit inclusion in Plaintiffs' original "first-of-its-kind" complaint—that a provision regulating the franchise based on criminal history imposes a punishment that is cruel and unusual. The tradition of regulating the franchise by excluding felons is so longstanding and so widespread that no lesser authorities than the U.S. Constitution and the Supreme Court expressly recognize its legitimacy. The Court should reject this claim, too.

## BACKGROUND

Virginia's current Constitution was ratified in 1971. See *Atlas Underwriters, Ltd. v. State Corp. Com'n*, 237 Va. 45, 48 (1989). It extends the franchise to citizens of the United States who are 18 years of age, meet certain residency requirements, and are registered to vote. Va. Const. art. II, § 1. It further provides that "[n]o person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." *Ibid.* The Virginia Constitution has had a similar provision dating back to at least 1830. *Perry*, 933 F. Supp. at 559; see Va. Const. art. III, § 14 (1830). The vast majority of other States likewise have longstanding provisions disenfranchising felons. See, *e.g.*, *Jones v. Governor of Fla.*, 950 F.3d 795, 801 n.3 (11th Cir. 2020) (noting that 48 States and the District of Columbia "impose some restrictions on felons' access to the franchise").

Governor Youngkin has instituted an individualized, case-by-case review for felons' re-enfranchisement applications, consistent with the Virginia Supreme Court's interpretation of Article II, Section 1. See *Howell v. McAuliffe*, 292 Va. 320, 327 (2016). That process begins with the submission of an application through the Secretary of the Commonwealth's website. Ex. A,

Declaration of Kelly Gee (Gee Decl.) ¶ 2. The felon discloses the nature of his or her conviction, whether it was for a violent crime, whether he or she has finished serving all terms of incarceration, whether he or she is serving on probation or other state supervision, and whether he or she has paid "all fines, fees, and restitution" pertaining to the conviction. *Ibid*. The Secretary reviews each application and "works with other various state agencies to consider who may be eligible to have their rights restored." *Ibid*. Upon approval of an application, the Governor, through the Secretary, issues a personalized restoration order. *Id.* ¶ 3. This process has resulted in the re-enfranchisement of 6,277 felons since Governor Youngkin took office. *Id.* ¶ 4.

Plaintiff Tati Abu King alleges that he was convicted of a drug possession felony in Fairfax County, Virginia in December 2018; that he served 11 months in prison and was released in June 2019; and that he "has applied for his voting rights to be restored." See Am. Compl. ¶¶ 14–18 (ECF No. 58). Based on those allegations, Defendants were able to locate more information about King in the Commonwealth's records. See Gee Decl. ¶ 8. In 1988, King was convicted of felony robbery. *Id.* ¶ 9. In 2000, King violated his probation, and his sentence for felony robbery was reimposed. *Id.* ¶ 10. King was again released from custody in 2011, and the Governor granted his re-enfranchisement application in 2016. *Id.* ¶ 11. King committed another felony and was convicted of possession of marijuana with intent to distribute in 2018. *Id.* ¶ 12. In 2019, King was released from custody. *Id.* ¶ 13. He submitted a re-enfranchisement application almost four years later, on April 5, 2023. *Id.* ¶ 7. Since May 2023, the Secretary of the Commonwealth's office has been communicating with King about additional information needed to complete his application. *Ibid.*

Plaintiff Toni Heath Johnson alleges that she was convicted of felony "drug possession and distribution crimes, as well as child endangerment" in Washington County in 2021; that she was

released from incarceration in 2022; that she is currently on probation; that she applied for re-enfranchisement; and that she learned in June 2023 that her application had been denied. Am. Compl. ¶¶ 19–22, 78. Based on those allegations, Defendants were able to locate more information about Johnson in the Commonwealth's records. Johnson has been convicted of the following felonies: felony uttering in 1984, felony forgery in 1988, felony attempt to utter a forged check in 1988, felony credit card theft in 1991, felony bigamy in 1999, felony identity fraud in 2002, and felony grand larceny in 2003. Gee Decl. ¶ 18. At some point after these convictions, she alleges that her voting rights were restored. Am. Compl. ¶ 21. In 2021, she was also convicted of two counts of felony abuse and neglect of a child with reckless disregard for life, and three counts of felony drug possession. Gee Decl. ¶ 19. For those five 2021 felonies, she received suspended sentences and supervised probation. *Ibid*.

Plaintiff Bridging the Gap alleges that it is a 501(c)(3) non-profit organization that assists formerly incarcerated individuals. Am. Compl. ¶ 23. Bridging the Gap alleges that Virginia's felon disenfranchisement provision has caused it "to divert its limited resources away from its core programming and instead towards combating the widespread disenfranchisement resulting from this policy." *Id.* ¶ 81. Bridging the Gap also alleges that it has had to divert additional funds for re-enfranchisement applications after Governor Youngkin was inaugurated and reverted to the discretionary re-enfranchisement process that existed under both Republican and Democratic administrations before 2010. *Id.* ¶ 84. Bridging the Gap does not allege that it has any members.

On August 31, 2023, King, Johnson, and Bridging the Gap (collectively, Plaintiffs) filed the operative first amended complaint contending that the felon disenfranchisement provision of Virginia's Constitution violates the Virginia Readmission Act, *see* An Act to Admit the State of Virginia to Representation in the Congress of the United States, 16 Stat. 62 (Jan. 26, 1870), and

the Eighth Amendment to the U.S. Constitution. The Virginia Readmission Act was one of a series of laws Congress passed requiring the States formerly in rebellion to adopt certain provisions in their state constitutions before their congressional delegations would be seated. See *Perry*, 933 F. Supp. at 559 (citing Act of June 22, 1868, c. 69, 15 Stat. 72; Act of June 25, 1868, c. 70, 15 Stat. 73; Act of Feb. 1, 1870, c. 12, 16 Stat. 63; Act of Feb. 23, 1870, c. 19, 16 Stat. 67; Act of Mar. 20, 1870, c. 39, 16 Stat. 80; Act of July 15, 1870). The acts required the States to submit their newly adopted constitutions "'to Congress for examination and approval,' after which approval by Congress and after ratification of the Fourteenth Amendment by each State, each should be 'declared entitled to representation in Congress.'" *United States v. States of La., Tex., Miss., Ala., & Fla.*, 363 U.S. 1, 124 (1960).

Virginia adopted its post-war Constitution in 1869 and, as in previous constitutions, excluded from the franchise "[p]ersons convicted of . . . felony." Va. Const. art. III, § I (1869). Shortly thereafter, Congress enacted the Virginia Readmission Act, which approved the 1869 Constitution as "republican" and declared that Virginia was again "entitled to representation in the Congress of the United States." 16 Stat. 62. The Act stated that "Virginia is admitted to representation in Congress" upon three "fundamental conditions," including that "the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law." 16 Stat. 63.

Plaintiffs claim that Virginia's current 1971 Constitution violates the Virginia Readmission Act because it disenfranchises felons who were convicted of crimes that were not "felonies at common law." Am. Compl. ¶ 96. They contend that this claim is actionable under 42 U.S.C. § 1983, Am. Compl. ¶¶ 89–102, and under principles of federal equity and *Ex parte Young*, *id.*

¶¶ 103–117. The complaint names as defendants Governor Glenn Youngkin; Secretary of the Commonwealth Kelly Gee; and numerous election officials, including the Commissioner of the Department of Elections, members of the State Board of Elections, and the General Registrars of the counties where the individual plaintiffs reside (collectively, Defendants). Plaintiffs ask this Court to issue a declaratory judgment holding that Defendants' enforcement of Article II, Section 1 of the 1971 Constitution violates the Virginia Readmission Act, as well as injunctive relief enjoining Defendants from enforcing the Virginia Constitution with respect to citizens convicted of crimes that were not felonies at common law in 1870. *Id.* at Prayer for Relief.

Plaintiffs also claim that Virginia's Constitution violates the Eighth Amendment because, they say, "it permanently disenfranchises Virginia citizens with felony convictions." Am. Compl. ¶ 125. Plaintiffs ask this Court to issue a declaratory judgment holding that Defendants' enforcement of Article II, Section 1 of the 1971 Constitution against any Virginia citizen convicted of any felony violates the Eighth Amendment, as well as injunctive relief enjoining Defendants from enforcing the Virginia Constitution with respect to such citizens. *Id*. at Prayer for Relief.

### LEGAL STANDARD

The plaintiff has the burden of establishing subject-matter jurisdiction and standing. *Taubman Realty Grp. v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003). "A court is to presume . . . that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper." *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008). In considering a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, a court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

 "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

## I. The Court lacks jurisdiction to adjudicate several of Plaintiffs' claims

Many of Plaintiffs' claims are nonjusticiable. First, the Commonwealth's sovereign immunity bars several claims. Second, Plaintiff Bridging the Gap lacks standing. Finally, Plaintiffs' Readmission Act claims present a nonjusticiable political question.

### A. Sovereign immunity bars many of Plaintiffs' claims

This Court lacks jurisdiction to the extent that sovereign immunity bars Plaintiffs' suit. The Constitution preserved the States' pre-existing sovereign immunity. See *Alden v. Maine*, 527 U.S. 706, 712–13 (1999). This immunity "denies to the federal courts authority to entertain a suit brought by private parties against a state without its consent." *Ford Motor Co. v. Department of Treasury of State of Ind.*, 323 U.S. 459, 464 (1945). Sovereign immunity extends not just to States, but also to their "agents and [] instrumentalities," *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997), including officials sued in their official capacities, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); see also *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001); *McConnell v. Adams*, 829 F.2d 1319 (4th Cir. 1987) (Virginia county registrars). Here, Plaintiffs have sued all Defendants in their official capacities. See Am. Compl. ¶¶ 25–40. Each Defendant is entitled to sovereign immunity in some capacity.

Sovereign immunity can be overcome only if Congress has validly abrogated the State's immunity, if the State has voluntarily waived its immunity, or if the *Ex parte Young* exception applies. See *Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 253–54 (2011); *Litman v. George Mason Univ.*, 186 F.3d 544, 549–50 (4th Cir. 1999). Plaintiffs do not—and could not—allege that Virginia has waived its immunity or consented to be sued, and Congress "has not

abrogated sovereign immunity for § 1983 suits."[2] *Biggs v. North Carolina Dep't of Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020). Plaintiffs' claims are thus barred unless they fall within the limited exception to state sovereign immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908).

*Ex parte Young* permits a federal court, in limited circumstances, "to issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law." *Bland v. Roberts*, 730 F.3d 368, 390–91 (4th Cir. 2013).[3] The *Ex parte Young* exception is not "expansive," and the Supreme Court has carefully limited its application. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). *Ex parte Young* is inapplicable to Plaintiffs' Virginia Readmission Act claims because Plaintiffs improperly seek a federal court order instructing state officials on how to conform their conduct to state law. In addition, the Governor and Secretary have no special relation with the challenged conduct and are immune from all Plaintiffs' claims.

### 1. *Pennhurst* bars Plaintiffs' Virginia Readmission Act claims

*Ex parte Young* does not apply where private parties seek relief amounting to a federal court order instructing "state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. In such a case, "the entire basis for the doctrine of" *Ex parte Young* "disappears"

---

[2] Insofar as Plaintiffs' request for a "declaratory judgment," see Am. Compl. ¶¶ 102, 117, is made pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, it is likewise barred because that act "is remedial only," *CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 55 (4th Cir. 2011), and does not abrogate a state's sovereign immunity, *Booth v. State of Maryland*, 112 F.3d 139, 146 (4th Cir. 1997).

[3] Plaintiffs assert two causes of action stemming from alleged violations of the Virginia Readmission Act: one under 42 U.S.C. § 1983, and one under general principles of federal equity and *Ex parte Young*. Both causes of action ultimately collapse into one theory. Because § 1983 did not abrogate sovereign immunity, Plaintiffs need to show that their § 1983 claim falls within the limited exception to sovereign immunity recognized in *Ex parte Young*, which is the same analysis the Court would use for a standalone *Ex parte Young* claim. Moreover, *Ex parte Young* does not create a cause of action; rather, "*Ex parte Young* provides a path around sovereign immunity *if* the plaintiff already has a cause of action from somewhere else." *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 905 (6th Cir. 2014). Plaintiffs' claim should thus be considered as a single cause of action under § 1983 that must meet the requirements of § 1983 and *Ex parte Young*.

because a "federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law." *Ibid.* A State's "sovereign dignity reserves to its own institutions the task of keeping its officers in line with [state] law." *Bragg v. West Va. Coal Ass'n*, 248 F.3d 275, 297 (4th Cir. 2001).

Here, although Plaintiffs characterize their claims as premised on a violation of federal law—the Virginia Readmission Act—they are state-law claims in substance. The Act merely provides that the 1869 Constitution of Virginia "shall never be so amended or changed as to deprive any citizen or class of citizens . . . of the right to vote who are entitled to vote by the Constitution herein recognized." 16 Stat. 63. Thus, Plaintiffs could prevail on their purported federal claims only if this Court were to hold that Virginia deprived citizens of voting rights granted exclusively by Virginia's own 1869 Constitution. See pp.13–16, *infra*. In essence, Plaintiffs ask this Court to order Defendants to comply with the 1869 Virginia Constitution. Such an order would run afoul of *Pennhurst*. See *Bragg*, 248 F.3d at 295–96 (where federal law "establishes minimum standards" for State law, "any violation of [a] standard involves State law, not federal law," and an "injunction against State officials to enforce" the federal provision would "command them to comport with the State's own law" in violation of *Pennhurst*).

## 2. The Governor and Secretary of the Commonwealth are immune from all claims because they do not enforce the challenged provision

*Ex parte Young* is inapplicable to the Governor and the Secretary for another reason: they are not directly involved in the enforcement of Article II, Section 1. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001). To invoke *Ex parte Young*, Plaintiffs must show (1) a "'special relation' between the officer being sued and the challenged" provision; and (2) that the officer has "acted or threatened" to enforce the provision. *McBurney v. Cuccinelli*, 616 F.3d 393, 399, 402 (4th Cir. 2010). These requirements ensure that the federal court does not "interfere

with the lawful discretion of state officials," and that "a federal injunction will be effective with respect to the underlying claim." *South Carolina Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332–33 (4th Cir. 2008). These requirements are not met here as to the Governor and the Secretary.

Plaintiffs claim that Article II, Section 1 violates the Virginia Readmission Act and the Eighth Amendment by disenfranchising felons. Am. Compl. ¶¶ 13, 68. But the Governor and the Secretary bear no "special relation" to the *disenfranchisement* of felons, as opposed to their re-enfranchisement. The Virginia State Police's Central Criminal Records Exchange sends a monthly report of all felony convictions to the Department of Elections (ELECT). Ex. B, Declaration of Susan Beals (Beals Decl.) ¶ 4; see also Va. Code § 24.2-409. ELECT uses that report to update the Virginia voter registration system. Beals Decl. ¶ 5; see also Va. Code § 24.2-409. General registrars receive this information and cancel felons' voter registrations. Beals Decl. ¶ 6; see also Va. Code § 24.2-427(B). If a felon who has never registered to vote attempts to register, the voter registration system will prevent the general registrar from processing the application. Beals Decl. ¶ 7; see also Va. Code § 24.2-417.

Neither the Governor nor the Secretary of the Commonwealth play any role in enforcing Virginia's disenfranchisement of convicted felons. Rather, as Plaintiffs' allegations make clear, the Governor and Secretary play a role only in the re-enfranchisement of felons. Am. Compl. ¶¶ 9, 24, 26. But Plaintiffs challenge the disenfranchisement of felons, not Virginia's procedures for re-enfranchising them. *Id.* ¶¶ 96, 125. The Governor and Secretary are therefore immune from suit.[4]

**B.  Plaintiff Bridging the Gap lacks standing**

Plaintiff Bridging the Gap lacks standing either in its own right or as a representative of its

---

[4] Nor do Plaintiffs have standing to pursue claims against the Governor and Secretary because individual Plaintiffs' disenfranchisement under Virginia's Constitution is not traceable to their acts. See *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 900–02 (4th Cir. 2022).

members. See *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). First, Bridging the Gap does not have standing in its own right because it has not alleged facts showing that it has suffered a cognizable injury. While an organization may establish standing by demonstrating that the defendants' actions "perceptibly impair" its ability "to carry out its mission" and "consequently drain [its] resources," this "standard is not met simply because an organization makes a unilateral and uncompelled choice to shift its resources . . . to address a government action." *North Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (quotation marks omitted). Indeed, holding that an organization suffers a cognizable injury when it voluntarily decides to spend money on advocacy and outreach efforts "would be to imply standing for organizations with merely 'abstract concerns with a subject that could be affected by an adjudication.'" *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (quotation marks omitted); see also *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994). Yet these are precisely the types of injuries that Bridging the Gap alleges. See Am. Compl. ¶¶ 83–85.

Bridging the Gap also lacks associational standing. An organization may establish that it has associational standing to sue on behalf of its members by alleging, among other things, that "its members would otherwise have standing to sue in their own right." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023). Bridging the Gap has not alleged *anything* about its members. Indeed, it does not even allege that it has members, much less allege facts demonstrating that its members would have standing to sue in their own right. See, *e.g.*, Am. Compl. ¶¶ 80–88; see also *Heap v. Carter*, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015). Bridging the Gap should therefore be dismissed.

### C.  Plaintiffs' Virginia Readmission Act claims raise nonjusticiable political questions

The political question doctrine "derives from the principle of separation of powers, and

deprives courts of jurisdiction over controversies which revolve around policy choices and value determinations constitutionally committed to Congress." *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 154 (4th Cir. 2016) (quotation marks omitted). The question whether a State government is republican in form is the paradigmatic political question because the Guarantee Clause commits it to Congress alone. *City of Rome v. United States*, 446 U.S. 156, 182 n.17 (1980); *Luther v. Borden*, 48 U.S. (7 How.) 1, 42 (1849).

Congress's "authority" to pass the Readmission Acts "was derived from the obligation of the United States to guarantee to every State in the Union a republican form of government." *Texas v. White*, 74 U.S. 700, 727 (1868), *overruled on other grounds by Morgan v. United States*, 113 U.S. 476 (1885); U.S. Const. art. IV, § 4. Congress passed the Virginia Readmission Act in 1870, approving Virginia's 1869 Constitution as "republican," and declaring that the Commonwealth was "entitled to representation in the Congress of the United States." 16 Stat. 62. It conditioned Virginia's readmission to representation in Congress on Virginia's maintaining in substance the features of its constitution that supported Congress's determination. *Ibid*. Whether Virginia's 1971 Constitution satisfies those conditions is therefore inextricably bound up in Congress's exercise of its Guarantee Clause power to decide whether a government is republican. See *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118, 137, 139 (1912) (claim that "provision in the Oregon Constitution . . . violates the provisions of the act of Congress admitting Oregon to the Union" may be "reduced" to a claim that "the prior lawful state Government [is] bereft of its lawful character" under the Guarantee Clause). Congress is the sole arbiter of whether Virginia has satisfied the Act's conditions, and the exclusive enforcer of those conditions. See *Butler v. Thompson*, 97 F. Supp. 17, 20 (E.D. Va. 1951); *Merritt v. Jones*, 259 Ark. 380, 389 (1976).

Plaintiffs' claims also implicate numerous other factors the Supreme Court has held make

questions political. See *Baker v. Carr*, 369 U.S. 186, 216 (1962). Adjudicating those claims would require wading into political decisions that ended the Civil War and restored the rebel States to the Union more than 150 years after they were made. It would be impossible for this Court to resolve Plaintiffs' claims without "expressing lack of the respect due" Congress's continuing determination that Virginia has a republican government and is entitled to representation. *Id* at 217; see also *Butler*, 97 F. Supp. at 20 (conditions of the Readmission Act "might well be considered as waived by Congress in view of the fact that Virginia has continued to be admitted to representation in Congress"). The unique nature of the Reconstruction-era determinations surrounding readmission of the former rebel States' congressional delegations also presents "an unusual need for unquestioning adherence to [Congress's] political decision." *Baker*, 369 U.S. at 217; see, *e.g.*, *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50 (1867) (refusing to consider challenge to the Reconstruction Acts of 1867 because it involved a nonjusticiable political question). And the "potentiality of embarrassment from multifarious pronouncements" is palpable if this Court were to hold that Virginia is in violation of the Virginia Readmission Act, while Congress continued to consider Virginia as in compliance with the Act and deserving of continued representation. *Baker*, 369 U.S. at 217. For all these reasons, this Court lacks jurisdiction. See *Butler*, 97 F. Supp. at 20.

## II.     Plaintiffs' Virginia Readmission Act claims lack merit

### A.  The Virginia Constitution does not violate the Virginia Readmission Act

The 1971 Virginia Constitution does not violate the Virginia Readmission Act because it imposes no restrictions on the franchise beyond those imposed by the 1869 Constitution. By its plain terms, the Act states only that Virginia may not "amend[] or change[]" its Constitution "to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the [1869] Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law." 16 Stat. 63. Plaintiffs fixate on the "except" clause and contend that

the 1971 Constitution violates the Act "because it disenfranchises Virginia citizens convicted of numerous crimes that were not felonies at common law when the Virginia Readmission Act was enacted in 1870." Am. Compl. ¶ 96. But this argument ignores the Act's governing command: that Virginia may not *amend* or *change* its Constitution to disenfranchise a class of citizens admitted to the franchise by the 1869 Constitution. Virginia did not do so in the 1971 Constitution because *all* felons were excluded from the franchise in the 1869 Constitution that Congress approved.

In passing the Virginia Readmission Act, Congress expressly found that the 1869 Constitution was "republican" in nature and had satisfied all of the "condition[s] precedent" that Congress placed on the Commonwealth's readmission to Congressional representation. 16 Stat. 62. The 1869 Constitution specifically "excluded from voting . . . [p]ersons convicted of bribery in any election, embezzlement of public funds, treason *or felony*." Va. Const. art. III, § 1 (1869) (emphasis added). As in the 1971 Constitution, nothing in the 1869 constitutional provision limited disenfranchisement to "felonies at common law," and it was never so interpreted. The 1869 Constitution disenfranchised anyone convicted of a "felony"—not only those convicted of a "felony at common law." Va. Const., art. III, § 1 (1869); see *Merritt*, 259 Ark. at 387 (holding that "'felony at common law' is far too restrictive and could not realistically be read into the word 'felonies' as used" in the Arkansas Constitution); *Harvey v. Brewer*, 605 F.3d 1067, 1075 (9th Cir. 2010) ("[P]laintiffs provide absolutely no support for the proposition that the word 'crimes' meant 'common-law felonies' at the time of the Fourteenth Amendment's ratification."). And in 1870, Virginia criminalized both felonies at common law *and* other statutory felonies. See Am. Compl. ¶ 70 ("In 1870, 'common law' felonies were widely understood to be a distinct category of crime from 'statutory' felonies."); *Parrish v. Commonwealth*, 81 Va. 1, 14 (1884) (discussing whether an "offence intended by the assailant" was either "a felony at common law, or only created so by

14

statute"). For instance, "attempt to commit a felony" was "by statute made a felony or misdemeanor, according to the nature of the felony attempted to be committed." *Hardy v. Commonwealth*, 58 Va. 592, 596 (1867); see also *Lee v. Commonwealth*, 144 Va. 594, 607 (1926) ("Attempt to commit a felony (including murder), at common law, is a misdemeanor."). The Virginia General Assembly had also created other statutory felonies. Compare *Canada v. Commonwealth*, 63 Va. 899, 906 (1872) ("While the Code, chapter 191, section 9, creates two offences, to wit: 'malicious' and 'unlawful' wounding with intent to kill, &c., both of which are felonies . . . ."), with Am. Compl. ¶ 70 ("The nine 'common law' felonies were murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny.").

Registries of disenfranchised felons demonstrate that the provision was not limited to "common law" felonies; rather, individuals were also disenfranchised for committing statutory felonies such as forgery, attempted rape, assault, and malicious wounding. See *A Descriptive List of Persons Convicted of Felony, or Other Infamous Offences, in the Corporation Court of Alexandria, Virginia Since November 2d, 1870*, Richmond, Va.: Library of Virginia (excerpts attached as Ex. C); Act. of Apr. 2, 1877, ch. 271, *reprinted in* The Code of Virginia, Tit. 5, § 79 at 84 (Goode 1887) (ordering the clerk to "deliver to each registrar in his county or city[] a list of all voters . . . who have been convicted of . . . felony" or other disqualifying crimes, and ordering the registrar to "strike from the list of voters the name of any person so convicted").

Because no felons were "entitled to vote" under the 1869 Constitution, the 1971 Constitution does not "deprive" any felons of a "right to vote" that existed under the 1869 Constitution. 16 Stat. 63. In fact, Virginia has expanded the franchise considerably since 1869, including for felons: whereas the 1869 Constitution contained a permanent, categorical bar for all felons, the 1971 Constitution allows felons to vote if their "civil rights have been restored by the

15

Governor or other appropriate authority." Va. Const. art. II, § 1. And Virginia's governors since 1971 have re-enfranchised over 330,000 felons. See Gee Decl. ¶ 4. Virginia's 1971 Constitution therefore fully complies with the Virginia Readmission Act's plain terms because it has expanded, rather than contracted, the franchise compared to 1869.

### B.  No private right of action exists under the Virginia Readmission Act

The Readmission Act claims should be dismissed because the Act creates no private right of action. See *Carey v. Throwe*, 957 F.3d 468 (4th Cir. 2020). Only Congress can enforce the Act.

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). To determine whether a statute creates a private right, courts look to the statute for "rights-creating language." *Id.* at 288 (quotation marks omitted). The Virginia Readmission Act contains no such language. "Far from displaying congressional intent to create new rights," the Act merely speaks to Virginia's treatment of "rights already created" by its 1869 Constitution. *Id.* at 289. The Act operates not by conferring rights on individuals, but instead by imposing a "condition" upon which "Virginia is admitted to representation in Congress as one of the States of the Union." 16 Stat. 63; see *Sandoval*, 532 U.S. at 289.

The Act's enforcement scheme also contradicts any inference that Congress created a private right of action. See *Sandoval*, 532 U.S. at 289. Congress enforces the Act by determining whether Virginia is entitled to representation in Congress. 16 Stat. 62; *Merritt*, 259 Ark. at 389. It is flatly implausible that a Congress engaged in the delicate business of reuniting a nation torn by Civil War would create a right of action that could set up an interbranch conflict on the question whether Virginia is entitled to a seat in Congress. The remedial problem is especially acute because Congress passed the Act pursuant to the Guarantee Clause. See pp.20–21, *infra*. To interpret a law passed under the Guarantee Clause to create an *individual*, judicially enforceable right would set up an untenable conflict between the judiciary and Congress. See pp.11–13, *supra*.

16

Nor does 42 U.S.C. § 1983 supply a right of action here. Section 1983 "does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005). Rather, § 1983 provides redress only for a plaintiff who asserts a "violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). Thus, § 1983 "creates a cause of action to enforce a federal statute only when the underlying statute itself unambiguously 'confers an individual right' on the plaintiff." *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 695 (4th Cir. 2019) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002)). This is a "purposefully demanding inquiry," *Carey*, 957 F.3d at 479, and for the reasons discussed above, the Readmission Act cannot meet it.

The same result would obtain under *Blessing*'s test for determining whether a federal statute may be enforced by a § 1983 cause of action. The Supreme Court has clarified that the *Blessing* factors do not support recognizing a right of action in the absence of "unambiguously conferred right[s]." *Gonzaga Univ.*, 536 U.S. at 282; see also *Carey*, 957 F.3d at 479. Plaintiffs cannot surmount this "high bar." *Carey*, 957 F.3d at 479. To satisfy the first *Blessing* factor, Plaintiffs must demonstrate that Congress intended to create a federal "individual right." *Planned Parenthood*, 941 F.3d at 697. It is not sufficient that "the plaintiff falls within the general zone of interest that the statute is intended to protect." *Gonzaga Univ.*, 536 U.S. at 283; see *Planned Parenthood*, 941 F.3d at 709 (same). Plaintiffs cannot make this showing. Nor does the Act satisfy the third factor, for it does not impose binding obligations on Virginia, but merely sets conditions for Virginia's readmission to Congress. Accordingly, these claims should be dismissed.

### C. The canon of constitutional avoidance precludes Plaintiffs' interpretation of the Virginia Readmission Act

Plaintiffs' interpretation of the Virginia Readmission Act would render the Act unconstitutional, and the canon of constitutional avoidance therefore forecloses it. Under the

canon, "when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).

Under Plaintiffs' interpretation, Congress purported to create a judicially enforceable private right for certain felons in Virginia to vote, and permanently prohibited Virginia from amending its state constitution to the contrary. But Congress has no such power, and Plaintiffs' interpretation would therefore render the Act unconstitutional. To begin, Congress lacks the power to prohibit States from disenfranchising felons under the Fourteenth Amendment. Section 2 of the Fourteenth Amendment affirmatively provides that States may permanently disenfranchise *all* felons, not just those convicted of felonies at common law. U.S. Const. amend. XIV, § 2 (imposing sanctions on States for denying "the right to vote" *except* "for participation in rebellion, or other crime"). Both before and after the passage of the Fourteenth Amendment, most States disenfranchised felons, concluding that removing "persons with proven anti-social behavior" and lack of respect for the law would serve their vital "interest in preserving the integrity of [the] electoral process." *Perry*, 933 F. Supp. at 558; see also *Richardson*, 418 U.S. at 48 & n.14 (listing the 29 States that had felon disenfranchisement provisions in their constitutions at the time of the adoption of the Fourteenth Amendment). None "limited disenfranchisement to persons convicted of common-law felonies." *Harvey*, 605 F.3d at 1076. And in *Richardson v. Ramirez*, the Supreme Court held that the Fourteenth Amendment permits "disenfranchisement grounded on prior conviction of a felony," as "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment." 418 U.S. at 43, 54.

To be sure, Congress has the power under Section 5 of the Fourteenth Amendment to "enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment. U.S. Const.

amend. XIV, § 5. Congress cannot, however, "decree the substance of the Fourteenth Amendment's restrictions on the States." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997); see also *ibid.* (Congress cannot "alter[] the meaning," "chang[e] what the right is," or "make a substantive change in the governing law" through Section 5). Because the Fourteenth Amendment authorizes States to deny the right to vote to those who commit crimes, prohibiting States from disenfranchising felons would work a "substantive change" in the governing law and is therefore beyond Congress's Section 5 power. See *Johnson v. Governor of Fla.*, 405 F.3d 1214 (11th Cir. 2005) (felon-disenfranchisement claims are beyond Congress's Section 5 power).

Congress of course can—and has—prohibited the States from enacting voting laws that discriminate on the basis of race. See 52 U.S.C. § 10301(a) (Voting Rights Act). But this fact cuts against Plaintiffs' claims. Although felon disenfranchisement laws were widespread when Congress enacted the Voting Rights Act, Congress made no attempt to prohibit them; "indeed, [Congress] affirmatively stated that such [felon disenfranchisement] laws were *not* implicated by provisions of" the Voting Rights Act. *Hayden v. Pataki*, 449 F.3d 305, 318 (2d Cir. 2006) (citing S. Rep. No. 89-162, at 24 (1965)).[5] And despite their repeated references to race, Plaintiffs make no claim that the current 1971 Virginia Constitution was infected with racially discriminatory intent, nor could they. See, *e.g.*, A.E. Dick Howard, *Who Belongs: The Constitution of Virginia and the Political Community*, 37 J. L. & Politics 99, 113 (2022) ("Both by mandates and aspirations, today's Virginia Constitution seeks to define the political community to make fairness, justice, and inclusiveness signposts on the path to achieving a government 'for the common

---

[5] Congress cannot prohibit a facially neutral state regulatory act merely because it *could* be used to discriminate on the basis of race. To support Plaintiffs' version of the Readmission Act as an exercise of Congress's Section 5 power, there would need to be evidence that congressional action was and *remains* needed today. See *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013).

benefit.'"); A.E. Dick Howard & William Antholis, *The Virginia Constitution of 1971*, 129 Virg. Mag. of Hist. & Bio. 346, 356 (2021) (The 1971 Constitution's "aim was to put . . . opposition to civil rights behind us as Virginians."). The Fourteenth and Fifteenth Amendments thus give Congress no power to invalidate a provision of Virginia's Constitution that the Fourteenth Amendment expressly permits.

Congress passed the Virginia Readmission Act under the Guarantee Clause, to "re-establish[] the broken relations of the State with the Union." *Texas*, 74 U.S. at 727. Congress's "authority" to pass the Readmission Acts thus "was derived from the obligation of the United States to guarantee to every State in the Union a republican form of government." *Ibid*.; U.S. Const. art. IV, § 4. But, as Plaintiffs interpret the Act—as an individual, judicially enforceable right of felons in Virginia against disenfranchisement—the Act would also fall outside Congress's authority under the Guarantee Clause. Beyond the peculiarity of contending that Congress can prohibit under the Guarantee Clause what the Fourteenth Amendment affirmatively permits, Plaintiffs have cited no precedent—and Defendants are aware of none—holding that the Guarantee Clause grants Congress authority to create individual, judicially-enforceable federal rights at all. To the contrary, the Supreme Court has held that the Guarantee Clause is not "the source of a constitutional standard for invalidating state action." *Baker*, 369 U.S. at 223. Rather than giving rise to individual, judicially enforceable rights, the Clause provides that the "United States shall guarantee to *every State*" a republican government. U.S. Const. art. IV, § 4. Accordingly, the Guarantee Clause gives Congress authority "to decide what government is the established one in a State," "whether it is republican or not," and whether it is entitled to representation in Congress. *Baker*, 369 U.S. at 220 (quoting *Luther*, 42 U.S. (7 How.) at 42–44). That is precisely what the Virginia Readmission Act purports to do: it recognized the government of Virginia following the

Civil War, entitling Virginia to renewed representation in Congress. See p.5, *supra*. Under Plaintiffs' interpretation, the Guarantee Clause would instead be an independent font of authority to create any privately enforceable right that Congress considers conducive to promoting a republican form of government. This view lacks any precedential support and would be a vast and ill-defined expansion of federal power. See, *e.g.*, *Largess v. Supreme Judicial Ct. for State of Mass.*, 373 F.3d 219, 226 (1st Cir. 2004) ("[T]he Supreme Court's caselaw interpreting the Guarantee Clause rejects the plaintiffs' expansive reading of the provision."). At the very least, Plaintiffs' radical claim raises grave constitutional questions. *Jennings*, 138 S. Ct. at 836.

Plaintiffs' theory also presents serious constitutional problems under the "equal footing" doctrine, because it would impose restrictions on Virginia that do not apply equally to all its sister States. "[W]hen a new State is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original States, and . . . such powers may not be constitutionally diminished, impaired, or shorn away by any conditions, compacts, or stipulations embraced in the act under which the new State came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission." *Coyle v. Smith*, 221 U.S. 559, 573 (1911). Each State "was admitted, and could be admitted, only on the same footing" as all of its sister States. *Escanaba Co. v. Chicago*, 107 U.S. 678, 689 (1883). On these grounds, the Supreme Court has consistently held that conditions on admission that are not otherwise "plainly within the regulating power of Congress" are invalid. *Coyle*, 221 U.S. at 574. The Court held unenforceable, for instance, conditions purporting to prohibit a State from moving the location of its state capital, or attempting to strip a State of title to land beneath its navigable waters. *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212 (1845).

Under Plaintiffs' interpretation, the Virginia Readmission Act would similarly be

unconstitutional. "All states, after their admission into the Federal Union, stand upon equal footing and the constitutional duty of guaranteeing each state a republican form of government gives Congress no power in admitting a state to impose restriction which would operate to deprive that state of equality with other states." *Butler*, 97 F. Supp. at 20–21. Indeed, courts and commentators have long "dismissed the [Reconstruction-era] conditions as unenforceable infringements of state sovereignty" to the extent they attempted to create judicially enforceable private rights or restrict a State's authority to alter state law. Eric Biber, *The Price of Admission: Causes, Effects, and Patterns of Conditions Imposed on States Entering the Union*, 46 Am. J. Legal Hist. 119, 190 (2004); see also James Q. Dealey, *Growth of American State Constitutions* 70 (1915) (readmission acts "may remain as moral obligations but would hardly be enforcible [sic] at law").

Finally, Plaintiffs' interpretation of the Readmission Act raises serious constitutional questions under the anticommandeering doctrine. On Plaintiffs' theory, the Act permanently prohibits Virginia from amending its Constitution in certain ways. But Congress has no power to force States to pass new laws, *New York v. United States*, 505 U.S. 144, 175–76 (1992), or to bar them from altering old ones, *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018). "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id.* at 1476. Indeed, the Framers "explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York*, 505 U.S. at 166. Plaintiffs' interpretation of the Virginia Readmission Act violates "this limit on congressional authority" as well. *Murphy*, 138 S. Ct. at 1476. Their claims should be dismissed.

## III.     Plaintiffs' cruel and unusual punishment claims lack merit

### A.  Supreme Court precedent forecloses the claims

Plaintiffs' theory is that Virginia's "permanent" disenfranchisement of felons violates the Eighth Amendment's guarantee against cruel and unusual punishments, which applies to the States

under the Due Process Clause of Section 1 of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 667 (1962).[6] But in *Richardson*, the Supreme Court held that Section 1 of the Fourteenth Amendment could not be interpreted to prohibit felon disenfranchisement because Section 2 expressly permits it. *Richardson* rejected an argument that Section 1's Equal Protection Clause forbade laws disenfranchising felons who have completed their sentences. 418 U.S. at 54. Its reasoning for rejecting that claim, however, swept more broadly than the Equal Protection Clause and covers Plaintiffs' Due Process Clause claims, too: "[W]e may rest on the demonstrably sound proposition that § 1, in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which § 2 imposed for other forms of disenfranchisement." *Id.* at 55. Plaintiffs' theory cannot be squared with this binding construction of Section 1. *Cf. Gregg v. Georgia*, 428 U.S. 153, 176 (1976) (joint op. of Stewart, Powell, and Stevens, JJ.) (rejecting argument that death penalty "is a *per se* violation of the Eighth and Fourteenth Amendments" in light of contemporaneous amendments contemplating that State may deprive a person of "life").

### B.  Article II, Section 1 of Virginia's Constitution does not inflict punishment

States may not inflict cruel and unusual *punishments*. See *Robinson*, 370 U.S. at 667. A threshold defect in Plaintiffs' claim is that disenfranchisement is not a punishment but rather a regulation of the franchise. Indeed, in interpreting the word "punishment" in the Constitution, the Supreme Court has identified felon disenfranchisement as the paradigmatic example of "nonpenal" regulations. *Trop v. Dulles*, 356 U.S. 86, 96–97 (1958) (plurality op.). Three Circuits have thus

---

[6] Plaintiffs incorrectly characterize their disenfranchisement as "permanent," when in fact the Governor may restore their rights, as his predecessor has already once done for Mr. King and Ms. Johnson. Am. Compl. ¶ 24; Gee Decl. ¶ 11. In any event, the Supreme Court has recognized that States may disenfranchise felons even after they have completed their sentences. See *Richardson*, 418 U.S. at 26–27 (state laws at issue disenfranchised felons subject only to discretionary restoration).

held that voter disenfranchisement is categorically nonpenal. *Johnson v. Bredesen*, 624 F.3d 742, 753 (6th Cir. 2020); *Simmons v. Galvin*, 575 F.3d 24, 43 (1st Cir. 2009); *Green v. Board of Elecs. of City of N.Y.*, 380 F.2d 445, 450 (2d. Cir. 1967). This Court should do the same.

But even an individualized examination of Virginia's felon disenfranchisement provision makes clear that it does not inflict a punishment. See *Thompson v. Alabama*, 65 F.4th 1288, 1304 (11th Cir. 2023) (finding Alabama's felon disenfranchisement provision nonpenal). To determine whether a regulation imposes a punishment, the Court first "must ask if the legislature [here, the People of Virginia] intended to inflict a punishment." *Doe v. Settle*, 24 F.4th 932, 945 (4th Cir. 2022). It must then consider "the effects of the law," for "[i]f the effects are punitive, they may override the [People's] intent." *Ibid.* But the Court "must give deference to the [People] on this point" and "require the clearest proof to overturn those intentions." *Ibid.*

That Virginia did not intend disenfranchisement as a punishment is evident on the face of the Virginia Constitution. The relevant provision offers no hint of sanction when it provides that "[n]o person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored . . . ." Va. Const. art. II, § 1. This provision lists a qualification of voters, not a punishment for crimes. Felon disenfranchisement appears alongside other nonpunitive provisions regulating the franchise, including a parallel provision that attaches disenfranchisement to a status—mental incompetence—that is (and was known to be in 1971) an impermissible basis for punishment. *Robinson*, 370 U.S. at 667. It is also telling that the authorities charged with implementing Virginia's disenfranchisement provision—local registrars—lie outside of its criminal justice system. Am. Compl. ¶¶ 34–37. Virginia's felon disenfranchisement provision is thus consistent with the Supreme Court's observation in *Trop* that "the purpose of [felon disenfranchisement] is to designate a reasonable ground of eligibility for voting." 356 U.S. at 96–

24

97; see generally *Thompson*, 65 F.4th at 1304–05 (concluding that similar features of Alabama's felon disenfranchisement regime signaled a regulatory rather than punitive intent).

Plaintiffs point to the sole appellate court that has held, in defiance of *Trop,* that felon disenfranchisement is a "punishment" under the Constitution, see *Hopkins v. Secretary of State Delbert Hosemann*, 76 F.4th 378, 402 (5th Cir. 2023), an opinion that the Fifth Circuit has subsequently vacated to rehear the case en banc, see *Hopkins v. Secretary of State Delbert Hosemann*, No. 19-60662, ECF No. 196-2 (5th Cir. Sept. 28, 2023). They rely upon language from the Virginia Readmission Act allowing Virginia to disenfranchise citizens "as a punishment" for certain felonies. Am. Compl. ¶ 64. This word choice is, at most, evidence of *Congress's* state of mind in the 1870s—not of Virginians' intent in 1971 when they ratified the disenfranchisement provision. The Readmission Act applies to the *ways* in which Virginia regulates the franchise, not the reasons for which it may act. But even if the Act could plausibly be read to limit the purposes for which Virginians in 1971 could deprive additional citizens of the right to vote, *Hopkins*, 76 F.4th at 402, that limitation is inoperative here because the 1971 Constitution does not deprive of the franchise any citizen whom the 1869 Constitution permitted to vote. See pp.13–16, *supra*.

Neither does the provision have a punitive effect. Courts consider a range of factors to discern punitive effect. *Doe*, 24 F.4th at 947. Far from providing the "clearest proof" needed to override Virginians' evident non-punitive intent, these factors foreclose a finding of punitive effect here. First, felon disenfranchisement has, on balance, *not* "been regarded in our history and traditions as punishment." *Ibid*; see *Simmons*, 575 F.3d at 45. Despite some references to felon disenfranchisement as punishment, the weight of authority treats it as "a mere disqualification, imposed for protection, and not for punishment." *Washington v. State*, 75 Ala. 582, 585 (1884); see also *Smith*, 538 U.S. 84, 97–99 (2003) (despite some historical use of public disclosure as

punishment, finding sex offender registration requirements to be protective regulatory measures). This is why the Supreme Court has used disenfranchisement as an example of an "adversity" that flows from criminal conduct but has "nonpenal effect." *Trop*, 356 U.S. at 96.

Second, Virginia's Constitution imposes no "affirmative disability or restraint." *Doe*, 24 F.4th at 947; see *Thompson*, 65 F.4th at 1306 (disenfranchisement is not an affirmative disability or restraint); *Simmons*, 575 F.3d at 45 (same). It more closely resembles occupational debarment, which is not an affirmative disability or restraint, than it does imprisonment, which is. *Hudson v. United States*, 522 U.S. 93, 104 (1997).

Third, even if disenfranchisement "promotes the traditional aims of punishment," it has a strong "rational connection to a nonpunitive purpose," *Doe*, 24 F.4th at 947, namely to regulate the franchise by excluding individuals who have shown a disregard for the law—the very output of the political process in which they would otherwise be participating. See *Simmons*, 575 F.3d at 45; see also *Thompson*, 65 F.4th at 1307; *Perry*, 933 F. Supp. at 558. "Residence requirements, age, [and] previous criminal record are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters." *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51 (1959). Criminal record is such a well-recognized rational basis for regulating the franchise that it is enshrined in the Constitution. U.S. Const. amend. XIV, § 2. What is more, disenfranchisement subject to discretionary restoration is not "excessive with respect to" the purpose of excluding from the franchise individuals who have proven disrespect for the law. *Doe*, 24 F.4th at 947; see *Thompson*, 65 F.4th at 1307. The Constitution's bar on cruel and unusual punishment "does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences," even "without any corresponding [individualized] risk assessment" of the sort provided by the

Governor's discretionary restoration process. *Smith*, 538 U.S. at 103–04. The remaining factors—whether disenfranchisement follows "a finding of scienter" and "whether the behavior to which it applies is already a crime"—are of less significance, but also "weigh in favor of felon disenfranchisement being nonpunitive." *Thompson*, 65 F.4th at 1305–07.

### C.  Felon disenfranchisement is not cruel and unusual

Even if felon disenfranchisement constituted a "punishment," it is neither "cruel" nor "unusual." U.S. Const. amends. VIII, XIV. See *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019) ("[W]hat unites the punishments the Eighth Amendment was understood to forbid, and distinguishes them from those it was understood to allow, is that the former were long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." (cleaned up)). And it remains true under the "evolving standards of decency" that courts have applied to cruel and unusual punishment claims. *Trop*, 356 U.S. at 101.

Plaintiffs seek a categorical rule against the "permanent" disenfranchisement of any convicted felons. See Am. Compl. ¶¶ 125, 140. Again, Article II, Section 1 does not mandate permanent disenfranchisement. See p.23 n.6, *supra*. Felons' voting rights may be "restored by the Governor or other appropriate authority." Va. Const. art. II, § 1. And unlike in *Hopkins*—where the law required a two-thirds vote of both houses of the Mississippi Legislature to restore voting rights, see *Hopkins*, 76 F.4th at 389—Virginia frequently restores voting rights, as it has for 6,277 felons since Governor Youngkin took office last year—including for a previous plaintiff in this very case. Compare Gee Decl. ¶ 4, with *Hopkins*, 76 F.4th at 390 (noting that "between 2013 and 2018, the Mississippi Legislature restored the right to vote to only eighteen individuals").

The rule against cruel and unusual punishments provides no basis for a categorical rule against Article II, Section 1. As an initial matter, this standard is wholly inapplicable here. Categorical rules exist only against the severest punishments and only in two contexts. As the

Fourth Circuit noted in rejecting a categorical rule against an effective life sentence for child-abuse convictions: "The present case involves neither a sentence of death nor a sentence of life imprisonment without parole for a juvenile offender, the *only two contexts* in which the Supreme Court categorically has deemed sentences unconstitutionally disproportionate." *United States v. Cobler*, 748 F.3d 570, 580–81 (4th Cir. 2014) (emphasis added). Cases from those limited contexts are thus no support for categorically prohibiting felon disenfranchisement. Indeed, the "judicial exercise of independent judgment" as to proportionality—which "requires consideration of," among other things, "the culpability of the offenders at issue in light of their crimes and characteristics"—is impossible where Plaintiffs seek to prohibit a purported punishment for *all* offenders, no matter their crime, culpability, and other characteristics. *Graham v. Florida*, 560 U.S. 48, 67 (2010). Such a rule would also have illogical results. In all but two States and the District of Columbia, felons lose the right to vote while incarcerated. See *Jones*, 950 F.3d at 801 n.3; see also National Conf. of State Legislatures, *Felon Voting Rights* (Apr. 6, 2023), https://bit.ly/3Rv7LPU (compiling statutes). There is thus broad consensus that certain felons *may* be permanently disenfranchised, as felons are while serving life sentences in almost every State. If a life sentence is itself sufficiently proportionate, it follows that the far milder "penalty" of disenfranchisement is not unconstitutional. It would thus be deeply illogical to hold that felons who might be eligible for life sentences could not be eligible for disenfranchisement upon release.

Even if a categorical rule were theoretically available in this context, it supports no such rule against felon disenfranchisement generally and certainly not against Article II, Section 1. The inquiry "should be informed by objective factors to the maximum possible extent," and "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (quotation marks omitted).

28

Contemporary legislation shows a national consensus *in favor* of felon disenfranchisement, which exists in forty-eight States. See *Jones*, 950 F.3d at 801 n.3.

There is some variation among States as to how and when felons' voting rights are restored. In some States, restoration occurs upon release from prison; in others, upon completion of probation or parole; and in others, at the States' discretion. But just last month, the Fifth Circuit listed eleven States that purportedly mandate permanent disenfranchisement for all felony offenses, and four more that do so for some felony offenses. See *Hopkins*, 76 F.4th at 411–12 (Appendix). That list is incorrect insofar as it includes States, like Virginia, that provide a path to re-enfranchisement and thus do not "permanently" disenfranchise convicted felons. Even accepting that mischaracterization, however, there is no "national consensus against" a practice that continues to exist in some form in fifteen States. *Graham*, 560 U.S. at 61; see also *Thompson v. Oklahoma*, 487 U.S. 815, 849 (1988) (O'Connor, J., concurring in the judgment) (emphasizing, as evidence of a national consensus against capital punishment for 15-year-old defendants, that "a large majority of the state legislatures have unambiguously outlawed" the practice, while "*no legislature in this country* has affirmatively and unequivocally endorsed such a practice" (emphasis added)). Nor is it possible to locate any national consensus on any appropriate length of felon disenfranchisement when the restoration process varies so widely across the States.

To be sure, fewer States provide for "permanent" felon disenfranchisement today than when *Richardson* authorized the practice in 1974. But any discernible "trend in state legislatures to abandon the punishment," *Hopkins*, 76 F.4th at 406, cannot support the categorical rule that Plaintiffs request here. As noted, States have not in fact "abandon[ed] the punishment." *Ibid*. Felons with life sentences are "permanently" disenfranchised in all States but two. Regardless, the "permanent" label does no actual work under Plaintiffs' theory of the case. To have standing to

assert their Eighth Amendment claim, as Plaintiffs tacitly concede, their position must be that felon disenfranchisement is *always* cruel and unusual. If Plaintiffs' claims were valid, therefore, felon disenfranchisement during incarceration would violate the Eighth Amendment as well. Yet an overwhelming national consensus supports that practice. Plaintiffs' requested rule also cannot logically be limited to felons awaiting restoration of their voting rights upon release from prison or completion of their sentences. There is no plausible argument that effectively disenfranchising a felon by imposing a life sentence or the death penalty is somehow less cruel or unusual than disenfranchising a felon without incarcerating him until his voting rights are restored.

Finally, if a national consensus supported—rather than directly contradicted—Plaintiffs' effective claim against all felon disenfranchisement, then the Court would be left to exercise its "own independent judgment." *Roper v. Simmons*, 543 U.S. 551, 564 (2005). In doing so, courts consider "the severity of the punishment in question," "the culpability of the offenders at issue," and whether the punishment "serves legitimate penological goals." *Graham*, 560 U.S. at 67. Since felon disenfranchisement under Article II, Section 1 *is not a punishment*, see pp.23–27, *supra*, the provision has no penological goals, and any such goals are thus impossible to weigh against any defendant's culpability. That aside, Plaintiffs cannot prove that the severity of felon disenfranchisement until restoration is disproportionate to the valid penological goals, such as deterrence and rehabilitation, that it might collaterally serve. See *Graham*, 560 U.S. at 71–74. Plaintiffs cannot coherently argue that felon disenfranchisement is severe enough to constitute cruel and unusual punishment but not enough to have a deterrent effect. Nor can they show, in the face of the thousands of Virginia felons who have sought and regained their voting rights, that the State's disenfranchisement and restoration regime has no rehabilitative effect.

## CONCLUSION

The Court should dismiss this lawsuit for want of jurisdiction or for failure to state a claim.

Dated: September 28, 2023

Respectfully submitted,

GLENN YOUNGKIN
KELLY GEE
JOHN O'BANNON
ROSALYN R. DANCE
GEORGIA ALVIS-LONG
DONALD W. MERRICKS
MATTHEW WEINSTEIN
SUSAN BEALS
ERIC SPICER
SHANNON WILLIAMS

By: ___/s/ Andrew N. Ferguson_____
    Andrew N. Ferguson (VSB #86583)
     *Solicitor General*

    Jason S. Miyares
     *Attorney General*

Charles J. Cooper (*Pro Hac Vice*)
Haley N. Proctor (VSB #84272)
Joseph O. Masterman (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

    Steven G. Popps (VSB #80817)
     *Deputy Attorney General*

    Erika L. Maley (VSB #97533)
     *Principal Deputy Solicitor General*

    Kevin M. Gallagher (VSB #87548)
     *Deputy Solicitor General*

    Travis S. Andrews (VSB #90520)
     *Assistant Attorney General*

*Counsel for Defendants Glenn Youngkin,
Kelly Gee, John O'Bannon, Rosalyn R.
Dance, Georgia Alvis-Long, Donald W.
Merricks, Matthew Weinstein, Susan Beals,
Eric Spicer, and Shannon Williams*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
AFerguson@oag.state.va.us

31

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on September 28, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

*Andrew N. Ferguson*
Andrew N. Ferguson (VSB #86583)
*Solicitor General*