**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

TATI ABU KING, et al.,

                     Plaintiffs,

    v.

GLENN YOUNGKIN, in his official
capacity as Governor of the Commonwealth
of Virginia, et al.,

                    Defendants.

No. 3:23-cv-408-JAG

Hon. John A. Gibney

---

**<ins>BRIEF OF AMICI CURIAE GREGORY P. DOWNS AND KATE MASUR IN SUPPORT OF PLAINTIFFS AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</ins>**

STEVEN A. HIRSCH
Calif. Bar No. 171825
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
shirsch@keker.com

STEPHEN B. PERSHING
Virginia Bar No. 31012
KALIJARVI, CHUZI, NEWMAN
& FITCH, P.C.
818 Connecticut Ave., N.W., Suite 1000
Washington, D.C. 20006
(202) 331-9260
spershing@kcnlaw.com

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

SOURCE ABBREVIATIONS USED IN THIS BRIEF .............................................................. VI

I.  STATEMENT OF INTEREST ......................................................................................1

II.  INTRODUCTION ........................................................................................................2

III.  DISCUSSION ..............................................................................................................3

    A.  Historical context of the felon-disenfranchisement provision ................................3

        1.  Black enfranchisement during the early Reconstruction. ...........................4

        2.  The Great Rollback, Phase One (1866–early 1870s): White terror tactics and Northern exhaustion effectively terminate Reconstruction reforms ................................................................................6

        3.  The Great Rollback, Phase Two (mid-1870s to mid-1890s): Suffrage restriction through election-day fraud and intimidation ...............7

        4.  The Great Rollback, Phase Three (1890–1908): "Lawful" constitutional disenfranchisement by preventing the registration of Black voters .................................................................................................9

        5.  The constitutional disenfranchisement process in Virginia (1901–1902) ..........................................................................................................12

        6.  The effects of constitutional disenfranchisement on Black and white voter participation .............................................................................15

    B.  Felon disenfranchisement ....................................................................................17

        1.  Attempts by Congressional Republicans to restrict crime-based disenfranchisement in the former Confederate states .................................17

        2.  Felon disenfranchisement after the Readmission Acts .............................22

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Giles v. Harris*,
    189 U.S. 475 (1903)................................................................16

*Hopkins v. Sec'y of State*,
    76 F.4th 378 (5th Cir. 2023) ................................................26

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932)................................................................7

*Williams v. Mississippi*,
    18 S.Ct. 583 (1898)................................................................9

**Federal Statutes**

Act of January 26, 1870, 16 Stat. 63 (1871) ..............................20

An Act to Provide for the More Efficient Government of the Rebel States, 14 Stat.
    428, §5 (1868)........................................................................18

An Act to Readmit the State of Arkansas to Representation in Congress, 15 Stat.
    72 (1868)................................................................................19

**State Statutes**

VA. CODE § 18.2-96 ....................................................................22

**Constitutional Provisions**

U.S. CONST. Amendment XIII, § 1 ............................................20

U.S. CONST., Article IV, § 4........................................................20

VA. CONST. (1870, amended 1876) ............................................23

VA. CONST., Article II, § 1 ..................................................1, 3, 25

VA. CONST., Article II, § 20 (1902) ..........................................13

VA. CONST., Article II, § 23 (1902) ..........................................24

VA. CONST., Article II, § 36 (1902) ..........................................25

## Other Authorities

WRIGHT & MILLER, 10B FED. PRAC. & PROC. CIV. § 2752 (4th ed. 2023) ...................................16

Borchard, *The Next Step Beyond Equity—The Declaratory Action*, 13 U. CHICAGO
L. REV. 145 (1946)...............................................................................................................16

Christopher Uggen, Ryan Larson, Sarah Shannon & Robert Stewart, *Locked Out
2022: Estimates of People Denied Voting Rights*, THE SENTENCING PROJECT
(Oct. 25, 2022), *available at*
https://www.sentencingproject.org/reports/locked-out-2022-estimates-of-
people-denied-voting-rights/.....................................................................................................3

CONG. GLOBE, 41st Cong., 2d Sess. 432 (1870) ...........................................................................20

*Constitutional Convention (1901-1902)*, ENCYCLOPEDIA VIRGINIA, *available at*
https://encyclopediavirginia.org/entries/constitutional-convention-virginia-
1901-1902/ ................................................................................................................... *passim*

*Disfranchisement*, ENCYCLOPEDIA VIRGINIA, *available at*
https://encyclopediavirginia.org/entries/disfranchisement/ ...........................................7, 8, 15

Drug Policy Alliance, *The Drug War, Mass Incarceration and Race* (June 2015),
*available at*
https://www.unodc.org/documents/ungass2016/Contributions/Civil/DrugPolic
yAlliance/DPA_Fact_Sheet_Drug_War_Mass_Incarceration_and_Race_June
2015.pdf ...............................................................................................................................24

GREGORY P. DOWNS, AFTER APPOMATTOX: MILITARY OCCUPATION AND THE
ENDS OF WAR (2015) .............................................................................................................5

Gregory P. Downs & Kate Masur, *The Era of Reconstruction, 1861–1900: A
National Historical Landmarks Theme Study* (2017), *available at*
http://www.npshistory.com/publications/nhl/theme-studies/reconstruction-
era.pdf ......................................................................................................................... *passim*

Helen A. Gibson, *Felons and the Right to Vote in Virginia: a Historical
Overview*, 91 THE VIRGINIA NEWS LETTER 1 (2015), *available at*
https://vig.coopercenter.org/sites/vig/files/VirginiaNewsLetter_2015_V91-
N1.pdf .............................................................................................................2, 22, 23, 25

History.com, *War on Drugs* (updated Dec. 17, 2019), *available at*
https://www.history.com/topics/crime/the-war-on-drugs.......................................................24

J. DOUGLAS SMITH, MANAGING WHITE SUPREMACY: RACE, POLITICS, AND
CITIZENSHIP IN JIM CROW VIRGINIA (2002) .................................................................5, 11, 16

J. MORGAN KOUSSER, THE SHAPING OF SOUTHERN POLITICS: SUFFRAGE RESTRICTION AND THE ESTABLISHMENT OF THE ONE-PARTY SOUTH, 1880–1910 (1974) ........................................................................................ *passim*

JANE DAILEY, BEFORE JIM CROW: THE POLITICS OF RACE IN POSTEMANCIPATION VIRGINIA (2000) ................................................................................ 7, 8, 11

JEFF MANZA & CHRISTOPHER UGGEN, LOCKED OUT: FELON DISENFRANCHISEMENT AND AMERICAN DEMOCRACY (2006) ................................... 23

John McIver, *Voter Turnout*, *in* HISTORICAL STATISTICS OF THE UNITED STATES, MILLENNIAL EDITION ON LINE (Susan B. Carter, Scott Sigmund Gartner, Michael R. Haines, Alan L. Olmstead, Richard Sutch & Gavin Wright, eds., 2006) ................................................................................................... 8

Joseph Nunn, *The Posse Comitatus Act Explained*, BRENNAN CENTER FOR JUSTICE, available at https://www.brennancenter.org/our-work/research-reports/posse-comitatus-act-explained ...................................................... 7

KIDADA E. WILLIAMS, THEY LEFT GREAT MARKS ON ME: AFRICAN AMERICAN TESTIMONIES OF RACIAL VIOLENCE FROM EMANCIPATION TO WORLD WAR I (2012) ................................................................................................... 6

Matt Ford, *The Racist Roots of Virginia's Felon Disenfranchisement*, THE ATLANTIC (Apr. 27, 2016), *available at* https://www.theatlantic.com/politics/archive/2016/04/virginia-felon-disenfranchisement/480072/ ....................................................... 24

MICHAEL PERMAN, STRUGGLE FOR MASTERY: DISFRANCHISEMENT IN THE SOUTH, 1888–1908 (2001) ......................................................................... *passim*

*No White Man to Lose His Vote in Virginia*, ENCYCLOPEDIA VIRGINIA, *available at* https://encyclopediavirginia.org/no-white-man/ ................................ 12, 13

PIPPA HOLLOWAY, LIVING IN INFAMY: FELON DISENFRANCHISEMENT AND THE HISTORY OF AMERICAN CITIZENSHIP (2014) ........................................ *passim*

R. VOLNEY RISER, DEFYING DISFRANCHISEMENT: BLACK VOTING RIGHTS ACTIVISM IN THE JIM CROW SOUTH, 1890–1908 (2010) .............................. 16

Richard H. Pildes, *Democracy, Anti-Democracy, and the Canon*, 17 CONSTITUTIONAL COMMENTARY 295 (2000) ................................... 9, 10, 15, 16

V.O. KEY, JR., SOUTHERN POLITICS IN STATE AND NATION (1984) ........................ 16

*The Virginia Constitution of 1971*, ENCYCLOPEDIA VIRGINIA, *available at*
https://encyclopediavirginia.org/entries/the-virginia-constitution-of-
1971/#:~:text=Among%20other%20changes%2C%20the%20Constitution,add
ed%20an%20article%20on%20conservation ........................................................................25

### SOURCE ABBREVIATIONS USED IN THIS BRIEF

CC = *Constitutional Convention (1901-1902)*, ENCYCLOPEDIA VIRGINIA, *available at* https://encyclopediavirginia.org/entries/constitutional-convention-virginia-1901-1902/

Dailey = JANE DAILEY, BEFORE JIM CROW: THE POLITICS OF RACE IN POSTEMANCIPATION VIRGINIA (2000)

D&M = Gregory P. Downs & Kate Masur, *The Era of Reconstruction, 1861–1900: A National Historical Landmarks Theme Study* (2017), *available at* http://www.npshistory.com/publications/nhl/theme-studies/reconstruction-era.pdf.

*Disfranchisement* = *Disfranchisement*, ENCYCLOPEDIA VIRGINIA, *available at* https://encyclopediavirginia.org/entries/disfranchisement/

Downs = GREGORY P. DOWNS, AFTER APPOMATTOX: MILITARY OCCUPATION AND THE ENDS OF WAR (2015)

*Drug War* = Drug Policy Alliance, *The Drug War, Mass Incarceration and Race* (June 2015), *available at* https://www.unodc.org/documents/ungass2016/Contributions/Civil/DrugPolicyAlliance/DPA_Fact_Sheet_Drug_War_Mass_Incarceration_and_Race_June2015.pdf.

Egerton = DOUGLAS R. EGERTON, THE WARS OF RECONSTRUCTION: THE BRIEF, VIOLENT HISTORY OF AMERICA'S MOST PROGRESSIVE ERA (2014)

Ford = Matt Ford, *The Racist Roots of Virginia's Felon Disenfranchisement*, THE ATLANTIC (Apr. 27, 2016), *available at* https://www.theatlantic.com/politics/archive/2016/04/virginia-felon-disenfranchisement/480072/

Gibson = Helen A. Gibson, *Felons and the Right to Vote in Virginia: a Historical Overview*, 91 THE VIRGINIA NEWS LETTER 1 (2015), *available at* https://vig.coopercenter.org/sites/vig/files/VirginiaNewsLetter_2015_V91-N1.pdf

Holloway = PIPPA HOLLOWAY, LIVING IN INFAMY: FELON DISENFRANCHISEMENT AND THE HISTORY OF AMERICAN CITIZENSHIP (2014)

Key = V.O. KEY, JR., SOUTHERN POLITICS IN STATE AND NATION (1984)

Kousser = J. MORGAN KOUSSER, THE SHAPING OF SOUTHERN POLITICS: SUFFRAGE RESTRICTION AND THE ESTABLISHMENT OF THE ONE-PARTY SOUTH, 1880–1910 (1974)

Manza = JEFF MANZA & CHRISTOPHER UGGEN, LOCKED OUT: FELON DISENFRANCHISEMENT AND AMERICAN DEMOCRACY (2006)

McIver = John McIver, *Voter Turnout*, *in* HISTORICAL STATISTICS OF THE UNITED STATES, MILLENNIAL EDITION ON LINE (Susan B. Carter, Scott Sigmund Gartner, Michael R. Haines,

Alan L. Olmstead, Richard Sutch & Gavin Wright, eds., 2006)

Nunn = Joseph Nunn, *The Posse Comitatus Act Explained*, BRENNAN CENTER FOR JUSTICE, available at https://www.brennancenter.org/our-work/research-reports/posse-comitatus-act-explained

NWM = *No White Man to Lose His Vote in Virginia*, ENCYCLOPEDIA VIRGINIA, *available at* https://encyclopediavirginia.org/no-white-man/

Perman = MICHAEL PERMAN, STRUGGLE FOR MASTERY: DISFRANCHISEMENT IN THE SOUTH, 1888–1908 (2001).

Pildes = Richard H. Pildes, *Democracy, Anti-Democracy, and the Canon*, 17 CONSTITUTIONAL COMMENTARY 295 (2000).

Riser = R. VOLNEY RISER, DEFYING DISFRANCHISEMENT: BLACK VOTING RIGHTS ACTIVISM IN THE JIM CROW SOUTH, 1890–1908 (2010)

Smith = J. DOUGLAS SMITH, MANAGING WHITE SUPREMACY: RACE, POLITICS, AND CITIZENSHIP IN JIM CROW VIRGINIA (2002)

Uggen et al. = Christopher Uggen, Ryan Larson, Sarah Shannon & Robert Stewart, *Locked Out 2022: Estimates of People Denied Voting Rights*, THE SENTENCING PROJECT (Oct. 25, 2022), *available at* https://www.sentencingproject.org/reports/locked-out-2022-estimates-of-people-denied-voting-rights/

VC = *The Virginia Constitution of 1971*, ENCYCLOPEDIA VIRGINIA, *available at* https://encyclopediavirginia.org/entries/the-virginia-constitution-of-1971/#:~:text=Among%20other%20changes%2C%20the%20Constitution,added%20an%20article%20on%20conservation.

*War on Drugs* = History.com, *War on Drugs* (updated Dec. 17, 2019), *available at* https://www.history.com/topics/crime/the-war-on-drugs.

Williams = KIDADA E. WILLIAMS, THEY LEFT GREAT MARKS ON ME: AFRICAN AMERICAN TESTIMONIES OF RACIAL VIOLENCE FROM EMANCIPATION TO WORLD WAR I (2012)

I.    **STATEMENT OF INTEREST**[1]

Amici curiae are university professors with decades of experience and scholarship concerning the era of the American Civil War and Reconstruction. They submit this brief to help the Court evaluate the history and intent behind, and ultimately the legality of, Virginia's felon-disenfranchisement clause (Article II, § 1 of the Virginia Constitution).

**Gregory P. Downs** is Professor and Chair of the History Department at the University of California, Davis. Professor Downs studies the political and cultural history of the United States in the nineteenth and early twentieth centuries, particularly the transformative impact of the Civil War, the end of slavery, and the role of military force in establishing new meanings of freedom. He is the author of three scholarly books on Reconstruction—*Declarations of Dependence: The Long Reconstruction of Popular Politics in the South, 1861–1908* (2011); *After Appomattox: Occupation and the Ends of War* (2015); and *The Second American Revolution: The Civil War Era Struggle Over Cuba and the Remaking of the American Republic* (2019)—and is the co-creator of *Mapping Occupation*, an interactive digital history of the U.S. Army's occupation of the South (www.mappingoccupation.org). In 2018, he was elected to the Society of American Historians and given UC Davis's Distinguished Scholarly Public Service Award.

**Kate Masur** is the Board of Visitors Professor of History at Northwestern University, where she specializes in the history of race, politics, and law in the United States. Her recent book, *Until Justice Be Done: America's First Civil Rights Movement, from the Revolution to Reconstruction* (2021), was a finalist for the Pulitzer Prize in History and winner of several other book prizes. Masur's other published scholarship includes *An Example for All the Land: Emancipation and the Struggle Over Equality in Washington, D.C.* (2010), and a new edition of the first book-length treatment of Lincoln's relationships with African Americans, John E. Washington's *They Knew Lincoln* (1942). Masur recently coordinated a team that produced the

---

[1] No party's counsel authored this brief in whole or in part; and no person, party, or party's counsel contributed money that was intended to fund preparing or submitting this brief, which was prepared on a *pro bono* basis.

web exhibit *Black Organizing in Pre-Civil War Illinois: Creating Community, Demanding Justice*. Part of the Colored Conventions Project, this online exhibit highlights early Black communities and Black activism in Illinois.

Professors Downs and Masur are frequent professional collaborators. They are co-authors of the National Park Service's only major study of Reconstruction, the *National Historic Landmarks Theme Study of the Era of Reconstruction* (2017), and they helped edit the Park Service's handbook on Reconstruction. They are co-editors of a scholarly volume on the post-Civil War world and co-editors of the preeminent scholarly journal in their field, the *Journal of the Civil War Era.* They have also consulted extensively on documentaries and museum projects, including serving as scholarly advisors to the 2019 documentary *Reconstruction: America after the Civil War*. Together and separately, they have published op-eds in many publications, including the *New York Times,* the *Washington Post,* the *Atlantic Monthly,* and the *San Francisco Chronicle*.

## II.    INTRODUCTION[2]

The United States is unique among the world's major democracies and industrialized nations for its broad, automatic loss of voting rights for people with felony convictions, even those who have completed their sentences. (Gibson 1.)[3] In 2022, an estimated 4.6 million people—two percent of the total U.S. voting-eligible population—were disenfranchised due to a felony conviction. Three-fourths of them had fully completed their sentences or remained supervised on probation or parole. And the racial disparity in disenfranchisement is stark. One in 19 African Americans of voting age is disenfranchised, a rate 3.5 times that of non-African Americans. Among the adult African American population, 5.3 percent are disenfranchised compared to 1.5 percent of the adult non-African American population. In eight states—

---

[2] Throughout this brief, unless otherwise indicated, emphases were added to quotations.

[3] Maine and Vermont, and most countries, allow incarcerated felons to vote. (Gibson 1.)

2

Alabama, Arizona, Florida, Kentucky, Mississippi, South Dakota, Tennessee, and Virginia—more than one in 10 African American adults is disenfranchised. (Uggen et al.)

In this brief, amici curiae historians examine how felon disenfranchisement developed in Virginia and throughout the former Confederate states after the Civil War as a method specifically designed to disenfranchise black voters *en masse*. Amici show that the Virginia Constitution's felon-disenfranchisement clause not only violates the federal statute that readmitted Virginia to the Union but also is grounded in racism and explicit racial discrimination. And amici specifically refute defendants' erroneous argument that Virginia's current Constitution complies with federal law because "it imposes no restrictions on the franchise beyond those imposed by [Virginia's] 1869 Constitution."[4]

## III.    DISCUSSION

### A.    Historical context of the felon-disenfranchisement provision

Article II, § 1 of the Virginia Constitution provides that "[n]o person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." This phrase carried forward an illegal program of felon disenfranchisement dating back the Virginia constitutional amendment of 1876 and to the Virginia Constitution of 1902. The purpose, significance, and blatant illegality of the Virginia Constitution's felon-disenfranchisement clause can be appreciated only when viewed in the context of history—specifically, the history of African American enfranchisement and disenfranchisement that followed the Civil War and led to this provision's inclusion in the state constitution.

In the years 1867–1908, African American men were first enfranchised by Republican Reconstruction policies and legal changes and then, in three distinct phases, were

---

[4] Defendants' Memorandum in Support of Their Motion to Dismiss the Complaint Under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) at 18 (Doc. 54) [hereinafter "MTD Brief"]. *See* Part III.B.2., *infra*.

3

disenfranchised again. (Perman 10-12.) To sum up the tumultuous developments of that period: Although the United States (along with Haiti) led the way among former slave societies for almost immediately enfranchising previously enslaved men, by the early twentieth century it had become a laggard, with lower voter turnouts than many comparable countries and more restrictive poll access. The United States also was remarkable for its volatility—for having extended the right to vote to a vast new group, the freedmen of the South, and then having largely taken it away again. (D&M 52.) Indeed, during the 50 years after the Civil War, Americans remade the country's political system not once, but twice. (D&M 40.)

Below, amici provide an overview of that series of events, followed by a more specific discussion of felon disenfranchisement. Along with literacy tests and poll taxes, felon disenfranchisement played a central role in southern politicians' systematic efforts to eliminate Black men from the electorate.

### 1.    Black enfranchisement during the early Reconstruction.

Almost 40 percent of residents of the former Confederate states were Black, and in some states they constituted an actual or near majority. Granting them voting rights thus had the potential to totally upend the southern political order. (D&M 40.) In 1865–1866, Black men's enfranchisement emerged as a pivotal issue for Reconstruction policymaking in Washington and for politics on the ground in the South. (D&M 43.) Following Lincoln's assassination, the question passed to his successor, Andrew Johnson. (D&M 43.) Disappointing the hopes of freedpeople and anti-slavery advocates, Johnson in late 1865 issued proclamations reorganizing state governments and allowing them to restrict the vote to whites eligible under old state constitutions. (D&M 43-44.)

Organizations of freedpeople lobbied Congress to include suffrage in the Fourteenth Amendment, which was then moving through Congress. (D&M 44.) But Johnson fiercely opposed Black suffrage, and the Fourteenth Amendment did not include it. (D&M 44-45.) After Republicans won a crushing victory in the fall 1866 elections, however, Congress overrode

Johnson's veto to pass the Military Reconstruction Acts, which ordered the army to register both Black and white male citizens (but not some high-ranking Confederates) to vote for new state constitutions. (D&M 45; Downs 174.) At conventions held in almost all former rebel states—despite a wave of white violence that included invading homes, raping women, and attacking children (Downs 196)—freedpeople and white allies wrote biracial suffrage into state constitutions. (D&M 45; Perman 16.) Virginia adopted a new constitution in 1869 that granted suffrage to Black men.[5] (Smith 20.)

Between 1867 and 1870, the governments that had been established under universal male suffrage transformed Southern politics, bringing Black men into elected and appointed office in many cities and spurring the modernization of legal, educational, and infrastructure systems in the South. But Black suffrage in the South hung on the narrow thread of state constitutions and statutes. (D&M 46.) After Ulysses S. Grant was elected president in 1868, Republicans seized upon the opportunity of a lame-duck Congress to push through the Fifteenth Amendment, a legislative compromise that again failed to enact a positive right to vote but barred restrictions based on race, color, or previous condition of servitude. (D&M 46-47.) The Amendment, ratified in 1870, nevertheless left the states responsible for determining the specific qualifications for voting. (Perman 16.) Literacy tests, property qualifications, the exclusion of women, and even religious limitations all remained constitutional. (D&M 46-47.)

Still, the Fifteenth Amendment was a milestone in U.S. history. During the Constitution's first 80 years of existence, states had exercised virtually limitless authority to determine who could vote. The Fifteenth Amendment made it illegal to bar people from voting based on their race. (D&M 48.)

---

[5] The document was known as the "Underwood Constitution" after New York native John C. Underwood, a Republican judge who dominated the convention in the absence of boycotting Democrats. The document that he helped to draft included full suffrage for all males 21 years or older, including African Americans. CC.

2.      **The Great Rollback, Phase One (1866–early 1870s): White terror tactics and Northern exhaustion effectively terminate Reconstruction reforms**

In the late 1860s, the Ku Klux Klan and other paramilitary clubs in the South mounted a campaign of violence, terror, and political assassinations to nullify Black men's right to vote. (D&M 48-49.) The years 1866–1867 were marked in the South by a string of massacres of and atrocities against African Americans. (D&M 55-58.) In response, Congress passed a series of voting-rights enforcement acts, most notably the Ku Klux Klan Act of 1871, which authorized the president to declare counties to be in a state of insurrection, suspend the writ of habeas corpus, and use the military to arrest and hold vigilantes and terrorists for trial in federal court. (D&M 49-50, 58-61.)

In the late 1860s and early 1870s there were notable enforcement successes, but the federal government's resources were effectively overwhelmed in the first half of the 1870s as so-called red shirts, rifle clubs, and the White League, serving as paramilitary arms of the Democratic party, targeted individuals and communities before elections to make it clear to Black citizens that engaging in politics meant risking death. (D&M 61; *see* Williams 17-54 (describing in detail the testimony of terrorized African Americans).) White Southerners' violent resistance to emancipation and the rise of Black political power, and the triumph of Democrats in the 1874 midterm elections, eventually wore down the Northern Republicans' resolve to enforce Reconstruction policy. (D&M 62.)

By 1875, the Grant administration had largely stopped trying to intervene to protect freedpeople's rights in the former Confederacy. (D&M 62.) And in 1878, the Democrats, resurgent in national politics, passed what became known as the Posse Comitatus Act, which attempted to limit the army's ability to intervene to protect voters. (D&M 50.)[6]

_____

[6] The Posse Comitatus Act consists of just one sentence: "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." This means that members of the military who are subject to the Act may not participate in civilian law enforcement unless expressly authorized to do so by a statute or by the Constitution. "Despite the ignominious

### 3.    The Great Rollback, Phase Two (mid-1870s to mid-1890s): Suffrage restriction through election-day fraud and intimidation

In the period from the mid-1870s to the mid-1890s, the South carried out disenfranchisement through fraud, tricks, and legal stratagems, frustrating the Black voter at election time by physical or verbal intimidation to prevent him from voting, or, if he did vote, by destroying his ballot, tallying his vote for a different candidate from the one he actually voted for ("counting out"), stuffing ballot boxes with phony ballots, or printing ballots containing false names similar to those of Republican candidates. (Perman 14; Dailey 160.) Laws passed in this period played a role, too, by "mak[ing] dishonesty and fraudulence possible and then protect[ing] the perpetrators. In effect, election laws and election fraud were essential and interdependent parts of the South's electoral system by the early 1890s." (Perman 19.) In a cruel perversion of Brandeis's "laboratory of democracy" model of federalism,[7] Southern states learned from each other's successes in eliminating the Black vote. (Kousser 39-40.)

Virginia absorbed lessons from this exchange, too. In 1883, Virginia Democrats regained control of both houses of the General Assembly. The following year, they passed the Anderson-McCormick Act, whose purpose was to complete the destruction of the Readjuster coalition that had won control of the state in 1879 and 1881. (*Disfranchisement*; Dailey 160-61.)[8] The Act effectively granted Democratic Party workers control of voter registration, the conduct of elections, and the compilation and reporting of election results. Under the Anderson-McCormick

---

origins of the law itself, the broader principle that the military should not be allowed to interfere in the affairs of civilian government is a core American value." (Nunn.)

[7] *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

[8] "The Readjuster Party . . . was the most successful interracial political alliance in the postemancipation South. An independent coalition of black and white Republicans and white Democrats, the Readjusters governed Virginia from 1879 to 1883. . . A black-majority party, the Readjusters legitimated and promoted African American citizenship and jury service. To a degree previously unseen in Virginia and unmatched elsewhere in the nineteenth-century South, the Readjusters became an institutional force for the protection and advancement of black rights and interests." (Dailey 1-2.)

Act, Virginia's election corruption became so notorious[9] that a decade later the General Assembly passed the Walton Act of 1894, which for the first time required the state to supply official ballots that listed all of the candidates. (*Disfranchisement*.)

Although the secret ballot often is thought of as a reform, its adoption in the South of the late nineteenth century was intended to depress voting by illiterate Black and white voters, who needed help to fill out the confusing ballots that were presented to them. (Perman 19-21; Kousser 51-56.) Thus, the Walton Act, although touted as an anti-corruption measure, achieved the same purpose as the Anderson-McCormick Act but by other means. (*Disfranchisement*.) Besides "secrecy," it required that the mandated state-printed ballots omit the party names and symbols that helped illiterate and barely literate voters determine how to mark their ballots. Voters were granted just two-and-a-half minutes to makes their choices and had to draw a line exactly three-fourths of the way through the printed name of every candidate they did ***not*** wish to vote for. (Perman 196; Dailey 160-61.) The *New York Times* reported on October 29, 1894, that the Act's "most effective, as well, possibly, as its most repugnant, feature is that providing for the appointment of a special constable. This officer is practically the ballot reader for the physically disqualified and the illiterate. It is within his power to disqualify or neutralize the votes of as many of the latter class as he may see fit." (CC.) The Walton Act was so effective that it is said to have "ended most actual black voting in Virginia." (Kousser 175.) Between 1888 and 1896, aggregate voter turnout in federal elections in Virginia fell from an estimated 83.2% of eligible voters to 71%. (McIver 5:165-66.)

---

[9] "In precincts with large numbers of Republican and African American voters, the Democratic officials could stuff ballot boxes, lose or destroy boxes or ballots, slow down voting so much that men were left standing in line when the polls closed, and employ other techniques to steal elections. A popular trick was for Democratic voters to bring ballots, or tickets, printed on tissue paper and deposit several ballots in the box at once. When the box was opened the judges would find more ballots than there were voters. Under the law, a blind-folded judge would then remove from the box enough ballots to make the numbers of voters and ballots equal; but because parties supplied their voters with tickets printed on various kinds of paper or in different sizes, a dexterous judge could easily remove mostly Republican ballots and allow Democratic candidates to win." (*Disfranchisement*.)

Mississippi, the pacesetter in disenfranchisement, faced the U.S. Supreme Court's judgment in *Williams v. Mississippi*, 18 S.Ct. 583 (1898), which upheld its disenfranchisement laws on the grounds that they did not "on their face discriminate between the races, and it ha[d] not been shown that their actual administration was evil; only that evil was possible under them." *Id.* at 225. (*See* D&M 50.)[10] Spurred on by the ruling, other states soon copied the Mississippi model, sometimes expanding on it through the use of the grandfather clause[11] and the deliberately confusing practice of handing voters different ballots for different races and requiring that each ballot be deposited in the correct ballot box. (D&M 50; Holloway 62-63; Kousser 50.)

Despite these tactics, Black male political participation remained surprisingly high, even after the loss of Republican control in southern state governments. In 1880, two-thirds of adult Black men voted in the Presidential election. Even in the 1890s, half of Black men still voted in key governor's races in southern states. Between 1867 and the early 1900s, Black officials also held around 2,000 political offices in the South, ranging from state supreme courts, to the U.S. Senate, down to the county and local levels. (Pildes 300.) But southern elites would not long tolerate that state of affairs.

> **4.    The Great Rollback, Phase Three (1890–1908): "Lawful" constitutional disenfranchisement by preventing the registration of Black voters**

After Congress failed to enact new voting-rights legislation in 1890–91 (D&M 50, Perman 38-43, Kousser 29-33), and then repealed all federal election laws in 1893–94 (Perman 43-47), the third and final phase of the Great Rollback commenced. (Perman 21-22, 31.) White

---

[10] Williams alleged that, in violation of the Fourteenth Amendment, he had been indicted by a grand jury from which African Americans were effectively excluded because Mississippi's 1890 constitution and implementing statutes had been designed to, and did, confer unconstitutional discretion on election officials to prevent African Americans from registering to vote and thus from sitting on grand or petit juries. 170 U.S. at 213–15.

[11] Grandfather clauses exempted from newly imposed suffrage restrictions those eligible to vote as of 1866 and their lineal descendants. (Pildes 298 n.15.)

southern elites now sought "a decisive and final solution to the suffrage problem" by "removing the black vote altogether and restoring the electorate to its pre-Reconstruction form and composition. In other words, the objective in [the] third phase, when the southern Democrats embarked on disfranchisement, was restoration of the status quo prior to the introduction of black suffrage during Reconstruction." (Perman 17.)

The focus now shifted from "deprivation of the *ability* to vote at *elections*" to "deprivation of the *right* to vote at *registration*." (Perman 15 (emphases in original).) In this period, starting with Mississippi in 1890 and ending with Georgia in 1908 (Pildes 301), "the vote was *eliminated* by constitutional means rather than being *manipulated* and controlled as before." (Perman 6.) "One by one, over a period of two decades, each state in the former Confederacy set in motion complicated and hazardous electoral movements aimed at *removing* large numbers of its eligible voters." (Perman 1.) By these means, "the forces of elite, conservative, white political control, through the organized vehicle of the Democratic party," engaged in a "step-by-step process eventually culminat[ing] in sufficient white control to produce new constitutional conventions, or suffrage-restricting constitutional amendments through referenda,[12] in every former Confederate state." (Pildes 301.)

The "avowed purpose of these new constitutions was to restore white supremacy, but that was not their only aim." (Pildes 301-02.) The "Framers of disfranchisement were typically the most conservative, large landowning, wealthy faction of the Democratic Party," and their favored laws "remov[ed] the less educated, less organized, more impoverished whites from the electorate as well," ensuring one-party Democratic rule over the South through most of the twentieth century (Pildes 302) and eliminating the dangerous influence of bi-racial populist coalitions (Kousser 33-39). "The white-supremacy purposes of these new constitutions were not

---

[12] Democrats in North Carolina, Texas, and Georgia avoided the risks and expense of calling constitutional conventions by amending the suffrage clauses of their constitutions in referenda. (Kousser 182.)

disguised (though the concomitant aim of reducing populist white political influence was)." (Pildes 302.)[13]

Another purpose of the constitutional conventions was to reverse the plummeting reputation of southern electoral systems and, by extension, of southern government generally. Democrats "turned increasingly to methods that actually struck voters from the lists" because the "flagrant chicanery" of ballot-stuffing and similarly fraudulent election-day methods had "eroded popular confidence in government, supplied grist for Republican campaign mills, and kept alive national GOP hope that they could regain power in the South if only they could obtain a fair count." (Kousser 47, *see also id.* at 262-65.) In Virginia, some delegates characterized the shift from fraudulent local-election administration to formalized constitutional disenfranchisement as a "reform" that would clean up and increase respect for Virginia's electoral system while still disenfranchising Black people. (Perman 14-16; Dailey 162-63; Smith 25.) Virginia Senator John Daniel thought suffrage restrictions would allow the white Southerner to rule with "decency and with the association of that law and order which will command the respect not only of himself but of the whole civilized world." (Kousser 263.) And future Senator Carter Glass, addressing the Virginia constitutional convention, explained the legal formalization of disenfranchisement in starker terms:

> [Disfranchisement] by fraud, no; by discrimination, yes. But it will be discrimination within the letter of the law, and not in violation of the law. Discrimination! Why, that is precisely what we propose; that, exactly, is what this Convention was elected for—to discriminate to the very extremity of permissible action under the limitations of the Federal Constitution, with a view to the elimination of every negro voter who can be gotten rid of, legally, without materially impairing the numerical strength of the white electorate. (Smith 26.)

---

[13] "The framers [of the disenfranchising state constitutions] could not have openly avowed a desire to disfranchise whites without courting defeat in the referenda on calling conventions or ratifying amended documents." (Kousser 69.)

5.    **The constitutional disenfranchisement process in Virginia (1901–1902)**

As discussed above, the former Confederate states amended their constitutions in 1890–1908 to eliminate Black suffrage. In Virginia, the constitutional "reform" process was itself spawned in perfidy, as the May 1900 referendum on whether to hold a constitutional convention was rigged in favor of holding one. (Perman 204-05.) A second referendum yielded a convention composed of 11 Republicans, one independent, and 88 Democrats, the latter group including a U.S. Senator, six former congressmen, one incumbent, and 64 lawyers, most of whom were past or present officeholders as judges or commonwealth attorneys. (Perman 205; CC.)

A broadside circulated in 1901 by Democratic leaders left no doubt as to the convention's purpose and intent.[14] State Democratic party chairman J. Taylor Ellyson gave his "personal and official assurance" that the convention had "the fixed and inalterable intention of enacting a clause which will . . . forever remove the negro as a factor in our political affairs and give to the white people of this Commonwealth the conduct and control of the destinies which they have the right to shape and determine." (NWM.) John Goode, the convention's president, reminded the public that the Democratic party had "pledged . . . to eliminate the ignorant and worthless negro as a factor from the politics of this State without taking the right of suffrage from a single white man[.]" (NWM.) And Democratic gubernatorial candidate A. J. Montague reassured whites that the convention was "slowly, but surely, framing a law that will so effectually exclude the idle, shiftless and illiterate of the negro race from the suffrage that the gates of republican wrath cannot prevail against it," and that "no white man will be disfranchised." (NWM.)

Throughout the chaotic and divisive year-long convention, delegates struggled with the seemingly intractable problem of how to eliminate the Black vote categorically and forever by legal means that were **(1)** facially neutral and thus apparently compliant with the Fifteenth Amendment, **(2)** fixed by rule and not dependent upon existing methods that involved the

---

[14] The broadside is reproduced after the signature blocks in this brief.

embarrassingly fraudulent exercise of discretion by local officials on election day, and **(3)** consistent with the Democratic pledge not to disenfranchise white men. (Perman 215-21; NWM.) In the end, Article II of the proposed constitution required would-be voters to fight their way through a maze of financial and educational impediments.

- An adult male applying in 1902–1903 to register to vote had to be **(1)** a veteran of the Confederate or Union army or navy or his son; or **(2)** a person who owned property for which state taxes of at least one dollar had been paid for the coming year; or **(3)** a person able to read and give a "reasonable explanation" of any section of the new Virginia constitution submitted to him by the registrars or, if unable to read that section, able to "understand and give a reasonable explanation" of it when a registrar read it to him.[15] On election day, a voter who registered before January 1, 1904 would forever be entitled to assistance from the election officer of his choice when preparing his ballot.[16] These temporary "loopholes" were designed to help poor whites. The third loophole—the so-called "understanding clause"—prolonged the embarrassingly corrupt election-day discretion of local officials just long enough to give any illiterate white people who were willing and able to pay the poll tax a last shot at permanent voter registration before the door closed in their faces. (Perman 214-23.)

- For those applying to register after January 1, 1904, the white-friendly loopholes evaporated and the applicant must **(1)** pay, at least six months before the election, all state poll taxes assessed or assessable against him under the new constitution for the three years preceding the year of the election in which he was offering to vote (but Civil War veterans were exempted from all poll taxes);[17] **(2)** unless

---

[15] VA. CONST., art, II, § 20 (1902).

[16] *Id*., art. II, § 21.

[17] *Id*., art. II, §§ 21–22. Poll taxes could not be collected by legal process until three years past due. *Id*., art. II, § 22. The official list of persons who had failed to timely pay their poll tax must

physically unable, apply to register in his own handwriting without aid, stating his name, age, date, and place of birth, residence, and occupation at the time of applying and for the two preceding years, and whether he had previously voted and, if so, the state, county, and precinct in which he last voted; and **(3)** answer under oath any and all questions put to him by the registrars about his qualifications as a voter, with his sworn answers being reduced to writing and kept on file.[18] In addition, on every election day for the rest of his life he must "prepare and deposit his ballot without aid[.]"[19]

- The General Assembly would provide ballots "without any [of the] distinguishing mark[s] or symbol[s]" that illiterate and near-illiterate voters had relied upon to determine a candidate's party affiliation.[20]

- The General Assembly was authorized to prescribe a property qualification not exceeding $250 for voters in any county or subdivision thereof, or city or town, as a prerequisite for voting in any election other than one for members of the General Assembly, upon the initiative of the representative of that county, city, or town affected, but could exempt anyone from the property qualification so long as the exemption would not violate the federal constitution.[21]

These byzantine rules were to be enforced by local registration boards invariably composed of three Democrats and zero Republicans. (Perman 221-22.)[22] Having approved these

---

"state the white and colored persons separately[.]" *Id*., art. II, § 38.

[18] *Id*., art, II, § 19.

[19] *Id*., art, II, § 21.

[20] *Id*., art. II, § 28.

[21] *Id*., art. II, § 30.

[22] In the immediate aftermath of the constitutional-disenfranchisement movement, the Democratic Party throughout the South instituted direct all-white primaries as a mechanism for enforcing party discipline on insurgent white candidates who might otherwise try to overthrow the Democratic machine by courting whatever remained of the Black vote. This completed the disenfranchisement project in the South. (Perman 302-03; *but see* Kousser 82 ("Despite its name,

measures, the constitutional convention—fearful that the public might not vote to disenfranchise itself—broke a Democratic Party pledge to submit the proposed constitution to a referendum. Instead, it simply proclaimed the document to be law. (Kousser 180-81.)

6.    **The effects of constitutional disenfranchisement on Black and white voter participation**

The effect of the new disenfranchising state constitutions throughout the South, combined with statutory suffrage restrictions, was "immediate and devasting." (Pildes 303.) The number of registered African Americans plummeted to a few thousand in each state. (Perman 319.) In Virginia, there was a *100% drop—to zero*—in estimated Black voter turnout between the elections of 1900 and 1904. (Pildes 304.)[23] Disenfranchisement also extended to poor, illiterate whites, causing a sharp decline in overall voter turnout. Between 1901 and 1904, the voting electorate in Virginia was halved, cementing Democratic control of the state because "the black vote had dropped so massively that the party could absorb the simultaneous loss of many of its own [white] voters." (Perman 221-22.)[24] Not until the abolition of the poll tax in the 1960s and the adoption of the federal Voting Rights Act of 1965 did Black men and women register and vote in substantial numbers in Virginia, outside of a few urban precincts. (*Disfranchisement*.) Indeed, the Virginia electorate as a whole was "so thoroughly eviscerated" that throughout the first half of the twentieth century, Democratic gubernatorial candidates where regularly elected with the support of less than 10% of the adult population, and state employees and officeholders

_____

the white primary had virtually no effect on Negro voting in the period from 1880 to 1910.")).

[23] *But see* CC ("Although as many as 15,000 African Americans managed to vote after 1902, they were significantly disempowered politically.").

[24] Similar results obtained in Louisiana, where Black registered voters dropped from 130,334 in 1896 to 5,320 in 1900, two years after the state's disenfranchising constitution was enacted. (Pildes 303.) In Alabama, there were 181,471 eligible Black voters in 1900, but only 3,000 were registered after the new constitutional provisions took effect. (Pildes 303–04.) In South Carolina, where Black legislators had constituted the majority in the lower house during Reconstruction, only 5,500 Black voters registered. (Pildes 303.)

accounted for one-third of the votes in state elections. Political scientist V.O. Key wrote that, by contrast with Virginia, "Mississippi [was] a hotbed of democracy." (Smith 26 (quoting Key 20).)

The Supreme Court effectively blessed the disenfranchising constitutions in the case of *Giles v. Harris*, 189 U.S. 475 (1903), a "momentous" decision that scholar Richard Pildes has characterized as "wed[ding] legalism with realpolitik into one of the most fascinatingly repellent analyses in the Court's history." (Pildes 297-98.) Giles alleged that "the whole registration scheme of the Alabama Constitution [was] a fraud upon the Constitution of the United States"; and for his remedy, he asked the court to **(1)** declare the Alabama voter-registration scheme illegal and void and **(2)** order that he and over 5,000 similarly situated Black men be registered to vote. 189 U.S at 486. When the case reached the Supreme Court, Justice Oliver Wendell Holmes's opinion for the Court disposed of Giles's claims on the grounds that "[t]he traditional limits of proceedings in equity have not embraced a remedy for political wrongs" and that Giles had sought remedies that were both improper[25] and impossible for the court to enforce in the face of widespread white hostility. *Id*. at 486–87.

"[O]nce the Supreme Court [in *Giles*] effectively blessed the disfranchising constitutions, those constitutions then created an electorate in their own image." (Pildes 313; *see also* Riser.) Southern politics turned sharply repressive, falling under the sway of large landowners and textile manufacturers. (D&M 50-51.) In Virginia, the disenfranchising constitution of 1902 remained in effect throughout most of the twentieth century until a new state constitutional

---

[25] As to the first remedy sought by Giles—declaring the registration scheme void—declaratory judgment was not then available in equity and would not become available in federal courts for another three decades. *Id*. at 486; *see* Borchard, *The Next Step Beyond Equity—The Declaratory Action*, 13 U. CHICAGO L. REV. 145 (1946); WRIGHT & MILLER, 10B FED. PRAC. & PROC. Civ. § 2752 (4th ed. 2023) (setting forth history of federal Declaratory Judgment Act).

As to the second remedy—the request to be registered—the court employed reasoning that Professor Pildes rightly denounces as specious: If the registration scheme was fraudulent and illegal as Giles alleged, "how can we make the court a party to the unlawful scheme by accepting it and adding another voter to its fraudulent lists?" 189 U.S. at 486.

commission sought to revise it, resulting in the Virginia Constitution of 1971. (CC.) As discussed below, however, the 1971 Constitution perpetuated felon disenfranchisement.

### B.    Felon disenfranchisement

Along with poll taxes and literacy tests, crime-based disenfranchisement played a central role in the South's system for eliminating the Black electorate. (Holloway *x*, *xiv–xv*.) Recognizing this, the Reconstruction Congress made the containment of crime-based disenfranchisement a "fundamental condition" for readmitting former Confederate states, including Virginia, to the Union. But obedience to that condition would prove to be another victim of the Great Rollback.

### 1.    Attempts by Congressional Republicans to restrict crime-based disenfranchisement in the former Confederate states

In the immediate aftermath of the Civil War—before newly freed African Americans had even been granted voting rights—southern whites wielded criminal conviction as a weapon to ensure that Black people would be "disqualified in advance" from being able to exercise any voting rights that the proposed Fourteenth Amendment might later confer on them. The disenfranchisers spotted their opportunity in Section Two of the proposed amendment, which allowed states to deny suffrage for any reason but punished those that did so with a loss of congressional representation—***unless*** suffrage was denied for "participation in rebellion, ***or other crime***." (Holloway 33-34, 173 n.39.)

North Carolina led the way in exploiting this "other crime" loophole. Under existing North Carolina law, individuals who had received whippings as criminal punishments were permanently barred from voting. So North Carolina rounded up as many Black men as possible for petty offenses and then engaged in a campaign of mass whippings that went on every day for a month. (Holloway 33-36.) With the same motive of achieving "disqualification in advance," South Carolina enacted a law authorizing judges to disenfranchise those convicted of felonies for 10 to 20 years—and the law also reclassified as felonies many types of petty theft previously considered to be misdemeanors. (Holloway 36.)

Republicans in Congress, aware of these developments, included a countermeasure in the first Reconstruction Act (the statute, passed on March 2, 1867, that set the basic terms for restoring former Confederate states to the Union). The Act affirmed that former Confederate states (except Tennessee) remained under military rule; established a new form of military governance; and delineated the process by which states would be readmitted after holding new constitutional conventions. Rather than deferring to prior state law, Congress set the parameters for who could vote in elections for delegates to the new conventions. The Act therefore provided that delegates must be elected by "the male citizens of said State, twenty-one years old and upward, of whatever race, color, or previous condition, who have been resident in said State for one year previous to the day of such election, except such as may be disfranchised for participation in the rebellion *or for felony at common law*."[26]

Two judgments shaped that provision. *First*, the Reconstruction Act acknowledged that states had the right to disenfranchise people convicted of the very small number of felonies that states had classed as infamous or as rising to the level of precluding people from participating in political life (though in some states the list of disenfranchising felonies did not even include murder). *Second*, the statute—written by legislators cognizant of Southern political developments—specified the precise conditions under which states could disenfranchise people who had committed crimes: Individuals could be disenfranchised for "felony at common law" but not, the statute implied, for other criminal convictions. That is, states could not manipulate or expand the list of disenfranchising felonies to exclude Black voters. In sum, when Congress approached Reconstruction, it acted to preserve the traditional state power over infamous felonies[27] while preventing the extension of disenfranchisement to broader lists of felonies.

_____

[26] An Act to Provide for the More Efficient Government of the Rebel States, enacted March 2, 1867, ch. 153, 14 Stat. 428, § 5 (1868).

[27] Pippa Holloway explains that white southerners seized upon the ancient notion of "infamy" as "a means to disfranchise a portion of the African American population, and [as] a rationale for making distinctions between different kinds of criminal convictions." (Holloway 2-3.) "Infamy," in Holloway's account, inverts the normal understanding that the criminal conduct justifies the punishment; instead, it asserts that the degrading or humiliating nature of the punishment—e.g.,

Southern Democrats tried to end-run the Reconstruction Act's requirement in various ways—for example, by disenfranchising Black people who had been *accused* of felonies but never properly tried and convicted. But federal administrators in the South pushed back, limiting disenfranchisement to those convicted of a felony by a "court of competent jurisdiction." (Holloway 38-40.) The state constitutions that emerged from the Congressionally mandated 1868 conventions protected (or failed to protect) African Americans from felon disenfranchisement to varying degrees, depending mainly on the balance of power between radical and moderate Republicans in those conventions. In Virginia, as in Florida and Alabama, the "moderates" won out and the resulting constitution of 1869 failed to rein in crime-based disenfranchisement. (Holloway 44-45.)

Based on what had occurred in North and South Carolina, some congressional Republicans surmised that southern Democrats would try to subvert the Reconstruction Act's restrictions on crime-based disenfranchisement. Accordingly, they persuaded Congress to use the Readmission Acts passed in 1868 and 1870 to further limit such disenfranchisement. For instance, in summer 1868, when Congress passed measures readmitting seven former Confederate states, it imposed various "fundamental conditions," including a requirement that the state not deny the vote to any citizen "entitled to vote by the constitution thereof . . . *except as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted, under laws equally applicable to all the inhabitants of the state*."[28] This language echoed both the Reconstruction Act's limiting of conviction-related disenfranchisement

---

whipping, branding, pillorying, confinement to hard labor (*id*. at 169 n.6)—proves the degraded and inferior nature of the person punished and thereby justifies their mistreatment. (*See id*. at 6-7.) This perversely circular notion served as a means to "disenfranchise the [Black] race—by associating African Americans with criminality, degrading them through legal and extralegal violence, and denying the newly freed slaves the dignity traditionally associated with those deserving of suffrage." (*Id*. at 3.) The North Carolina mass-whipping campaign described earlier is an example of "infamy" at work. (*See id*. at 33-36.)

[28] *See, e.g.*, An Act to Readmit the State of Arkansas to Representation in Congress, enacted June 22, 1868, ch. 69, 15 Stat. 72 (1868).

to "felonies at common law" and the Thirteenth Amendment, which likewise made due conviction of a crime the prerequisite for slavery or involuntary servitude.[29]

In Virginia's Readmission Act, signed by President Grant on January 26, 1870, Congress adopted the same language it had used earlier, making it a condition of readmission that "the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the right to vote . . . *except as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State*[.]"[30]

One proponent of the Virginia Readmission Act's felon-disenfranchisement restriction, Ohio Republican William Lawrence, called that restriction a "fundamental condition" of Virginia's readmission and an enforceable exercise of Congress's constitutional duty to "guarantee to each state a republican form of government."[31] He further explained that the "fundamental condition" regarding felon disenfranchisement was "designed to secure equality of rights and equal protection for all."[32] When questioned about the condition's enforceability, Lawrence replied:

> The "fundamental condition" . . . is designed to secure forever the equal right of all citizens having the proper qualifications to vote and hold office beyond the reach of denial by the State, and only liable to be changed by Congress or an amendment of the national Constitution. This condition will become a part of the fundamental law of Virginia, as high and as sacred as her constitution. . . .
>
> The "fundamental condition" fixes the rights of citizens, and the courts will furnish redress for their violation. If further legislation in aid of the remedy shall be necessary it can be had. The national courts are or may be clothed with the requisite power to enforce this fundamental law. . . .

---

[29] *See* U.S. CONST. amend. XIII, § 1.

[30] Act of January 26, 1870, ch. 10, 16 Stat. 63 (1871).

[31] CONG. GLOBE, 41st Cong., 2d Sess. 432 (1870); *see* U.S. CONST., art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government[.]").

[32] *Id*.

> [I]f Virginia should change her constitution so as to deny to citizens the right secured by this "fundamental condition," her constitution in that respect would itself be unconstitutional or at least void, and the national courts would so declare it.[33]

Others who spoke in favor of the "fundamental condition" affirmed Congress's power to impose such conditions on readmitted states and emphasized the practical need to do so in order to prevent those states from enacting laws that disenfranchised Black voters while complying facially with the Fifteenth Amendment.

As to Congress's constitutional power to impose conditions on newly admitted states, speakers pointed out that Congress recently had done so with respect to Nebraska[34] and all of the former Confederate states readmitted to the Union before Virginia (Arkansas, Alabama, Florida, Georgia, Louisiana, and North and South Carolina).[35] Senators also explained why the Congress must try to prevent states from abridging certain individual rights. Republican Senator Richard Yates of Illinois pointed out that the Civil War had settled the issue whether "states' rights" included the "right" to infringe upon individual rights enshrined in the Constitution. In the wake of the Civil War, he argued, those rights were now understood to be national in character and beyond the reach of state determination, much less state curtailment:

> The time has come when it has been decided by the American people that we are not to have thirty-six or forty state governments each legislating for itself and in contrary directions upon the innate principles and the inherent rights of men . . . . We have to draw distinctions now between what are *termed* State rights and what *are* State rights. There is a different construction placed by the American people upon that question from that which was formerly placed upon it. . . . We want Virginia to understand that if she is reconstructed she is reconstructed upon the plan of the American people, not upon the plan of the State of Virginia.[36]

---

[33] *Id*. at 433. Others went further, asserting the right of Congress, if Virginia violated the "fundamental condition," to eject the state from the Union and—as it had done in Georgia in late 1869—to reinstitute military supervision. *See id*. at 717 (Rep. Butler), 353 (Sen. Morton).

[34] *Id.* at 357 (Sens. Drake and Sumner).

[35] *Id*. at 465, 597–98 (Sens. Drake, Wilson, and Harlan).

[36] *Id*. at 354.

As for the practical need to enact the "fundamental condition," Senators Harlan and Howard spoke presciently about the likelihood that, absent such a condition, readmitted states would enact superficially race-neutral voting restrictions that disproportionately affected Black citizens.[37] And senators voiced concerns about other facially neutral schemes, such as literacy tests and property-ownership requirements.[38]

The "fundamental condition" enacted as part of the Readmission Acts thus attempted to thwart the expansion of crime-based disenfranchisement as a facially neutral scheme for negating the voting rights that Black men had acquired during Reconstruction. Unfortunately, as discussed below, enacting the fundamental condition failed to deter the former Confederate states from using crime-based disenfranchisement to decimate the Black electorate.

### 2.    Felon disenfranchisement after the Readmission Acts

In the wake of the Readmission Acts, the readmitted states adopted a variety of schemes for wielding criminal law to deprive Black men of the vote. Some states upgraded misdemeanor property crimes to felonies, which were classed as disenfranchising offenses in most states. Others amended or revised their constitutions to expand disenfranchisement to include larceny and/or petit larceny. And southern courts interpreted existing laws to include misdemeanor-grade offenses as disenfranchising crimes. (Holloway 57, 60-61.)

By the mid-1880s, nearly every southern state had expanded its crime-based disenfranchisement laws to include a far greater array of minor property crimes. (Holloway 78.) Petit larceny in particular was "believed to be a crime to which former slaves were prone (or of which they could be easily accused and convicted)." (Gibson 3.)[39] This led to the bizarre result in Mississippi that the state constitution was amended to disenfranchise persons convicted of the

---

[37] *Id*. at 598 (Harlan), 600 (Howard).

[38] *Id*. at 598 (Harlan), 600 (Howard).

[39] Petit larceny, or petty theft, refers to the act of stealing from another person an object or sum of money currently defined in the Virginia Code as having a value of less than $5 when taken directly from another person or $1,000 for stolen property not physically attached to a person. *See* VA. CODE § 18.2-96 & Gibson 3, 8 n.23.

petty "furtive" offenses associated with Black people (burglary, theft, arson, and obtaining

money under false pretenses) but ***not*** to disenfranchise persons convicted of "the more robust"—

that is, violent—"crimes of the whites," such as robbery, rape, and murder. (Manza 42 (quoting

*Williams v. Miss.*, 170 U.S. 213, 222 (1898) (quoting in turn *Ratliff v. Beale*, 74 Miss. 247, 20

So. 865, 868 (1896))). As intended, these expanded laws were enforced disproportionately

against Black men, in practical violation of the fundamental conditions imposed by the

Readmission Acts.[40] Thus, the result that prescient congressmen had sought to avoid had come to

pass. (Holloway 66.)

Virginia was no exception to this pattern. In fact, the historical record flatly refutes

defendants' contention that "[t]he 1971 Virginia Constitution does not violate the [Readmission]

Act because it imposes no restrictions on the franchise beyond those imposed by the 1869

Constitution."[41] The reality is that Virginia's violations of the Readmission Act began as early as

1876 and continue to this day. That year, an amendment to Virginia's constitution added "petit

larceny" to the list of criminal convictions that disqualified people from voting (a list that already

included "bribery in any election, embezzlement of public funds, treason, or felony" (Gibson 8

n.22)).[42] Petit larceny later was made punishable by whipping, rendering the crime "infamous"

and helping to justify subsequent disenfranchisement. (Gibson 3.)

---

[40] At the polls, lists of convicted felons were used not only for their obvious purpose of striking convicted felons from the rolls but also to delay and thus discourage voting by *all* African Americans, who were forced to wait in race-segregated lines while each Black voter was laboriously vetted. (Holloway *ix-x*; Gibson 3.) In one notorious case, this practice resulted in a Democrat's "winning" a race to represent an area of Richmond, Virginia that had a large Black population. Democratic precinct judges had challenged nearly every African American as having a prior conviction, leaving 557 of them still waiting in line when the precincts closed—more than the Democrat's margin of victory. (Holloway 70-71.)

[41] MTD Brief at 18.

[42] VA. CONST. (1870, amended 1876), art. 3, § 1. Plaintiffs' opposition to defendants' pending motion to dismiss explains why "felony" as used in the 1869 constitution could only refer to felonies then recognized at common law. *See* Plaintiffs' Opposition to Motion to Dismiss (Doc. 78) at 11–14.

Virginia's 1902 constitution went well beyond the 1876 constitutional amendment in openly violating the "fundamental condition" of Congress's 1870 Virginia Readmission Act. The delegates to Virginia's constitutional convention were "well aware of the racial imbalances in the state's criminal-justice system" and of how these could be used to facilitate racial disenfranchisement. (Ford.) Democratic delegate R. L. Gordon told the convention that in the South, six whites out of 10,000 were in prison compared to 29 blacks out of 10,000, "showing that since these people have been made free, instead of improving, the record of crime show that they are retrograding." (Ford.)

The result of the convention's labors was a 1902 constitution notable for "the breadth of crimes it included" as grounds for lifelong disenfranchisement. (Ford.) Whereas the 1876 amendment had illegally added petit larceny to the list of disenfranchisable crimes, the 1902 constitution now illegally disqualified persons from registering and voting if they **(1)** had been disqualified before the constitution's adoption or **(2)** were convicted thereafter for "***any*** felony"[43] or for treason, bribery (not, as before, only election-related bribery), petit larceny, obtaining money or property under false pretenses, embezzlement (not, as before, only embezzlement of public funds), forgery, perjury, dueling with a deadly weapon, or facilitating such a duel.[44] This expanded list went far beyond the federally approved "common law" disenfranchisable felonies, placing Virginia in flagrant violation of federal law. Moreover, the list of disenfranchising crimes could be infinitely expanded by the General Assembly, which was granted the power,

---

[43] The capacious term "any felony" would have stark racial ramifications. For example, most of the controlled-substance felonies that have contributed so heavily to the mass incarceration of Black people did not exist before 1909. *See War on Drugs*. Those laws have affected Black people disproportionately. In 2013, Black people comprised 13 percent of the U.S. population and were consistently documented by the U.S. government to use drugs at similar rates to people of other races; yet they comprised 30 percent of those arrested for drug-law violations and nearly 40 percent of those incarcerated in state or federal prison for drug-law violations. *See Drug War*. Disenfranchisement for "any felony" thus resulted in a vast expansion of crime-based disenfranchisement of Black people based on drug-related convictions.

[44] VA. CONST., art. II, § 23 (1902); Ford.

with respect to both existing criminal offenses and those prescribed in the future, to provide that "persons convicted of them shall thereafter be disqualified from voting or holding office."[45]

Although Federal election law was transformed between 1957 and 1965, those changes had no impact on felon disenfranchisement. The Virginia Constitution of 1971 featured many improvements. It omitted the obsolete and unconstitutional poll tax; required approximate equality of population in all legislative and congressional districts; banned governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin; empowered the Assembly to reform the state's court system; guaranteed all children in the state the right to a high-quality public education; and added an article on conservation. Voters subsequently ratified 54 amendments to the Constitution of 1971. (VC.)

Yet Virginia's felon-disenfranchisement clause persists despite its indisputable violation of the "fundamental condition" that Congress placed on the state's readmission to the Union. Carrying forward the illegal "any felony" language of the 1902 Constitution, the 1971 Constitution provides that "[n]o person who has been convicted of *a felony* shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority."[46] Even today, that provision bars over 20 percent of Virginia's African American voting-age population and more than seven percent of its total adult population from voting—one of the highest disenfranchisement rates in the nation. (Holloway *x*; Gibson 1.) These statistics reflect both the extent of Virginia's felon-disenfranchisement laws and the fact that African Americans in Virginia are incarcerated at a rate roughly six times greater than the white population. (Gibson 1-2.) Although Virginia enacted some reforms in 2014, the state continues to have one of the most restrictive felon-disenfranchisement regimes, reaching inmates, parolees, probationers, and some or all ex-felons. (Gibson 2, 6.)

---

[45] VA. CONST., art. II, § 36 (1902).
[46] VA. CONST., art. II, § 1.

In sum, the disenfranchising policies of the 1890s and 1900s—including those embodied in Virginia's 1902 constitution—were driven by racism, even when couched in facially race-neutral terms. Systematic disenfranchisement of Black southerners in particular was precisely what Congress had hoped to prevent in passing statutes like the Reconstruction Act and the Readmission Acts. Knowing that state authorities would likely try to use criminal law to unjustly disenfranchise Black citizens, Congress adopted policies designed to restrain the states. Yet those policies proved ineffective.

Fortunately, "our society has set its face against permanent disenfranchisement as a punishment."[47] Indeed, "[i]n the last fifty years, a national consensus has emerged among the state legislatures against permanently disenfranchising those who have satisfied their judicially imposed sentences and thus repaid their debts to society. Today, thirty-five states plus the District of Columbia disavow [that] practice[.]"[48] For this and other reasons, a federal appeals court recently held that permanent felon disenfranchisement violates the Eighth Amendment's ban on cruel and unusual punishments.[49] To disenfranchise in violation of a clear Congressional prohibition is doubly reprehensible. Amici therefore respectfully submit that the time has come to eliminate this illegal and anachronistic vestige of racist oppression.

---

[47] *Hopkins v. Sec'y of State*, 76 F.4th 378, 408 (5th Cir. 2023).

[48] *Id*. at 387.

[49] *Id.* at 387–88.

Respectfully submitted,

_____
STEVEN A. HIRSCH
California Bar No. 171825
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
Telephone:  (415) 391-5400
shirsch@keker.com

_____
STEPHEN B. PERSHING
Virginia Bar No. 31012
KALIJARVI, CHUZI, NEWMAN & FITCH, P.C.
818 Connecticut Ave., N.W., Suite 1000
Washington, D.C. 20006
(202) 331-9260
spershing@kcnlaw.com

Counsel for *amici curiae*
Gregory P. Downs and Kate Masur

^    ^    ^

## CERTIFICATE OF SERVICE

I certify that on this 2nd day of November, 2023, I caused the foregoing motion for leave, with attached proposed brief of *amici curiae,* to be filed with the Court's electronic case filing (ECF) system, through which it will be distributed to all counsel of record.

_____
Stephen B. Pershing

27

# NO WHITE MAN TO LOSE HIS VOTE IN VIRGINIA.

## This Assurance Given by Men Who Are Most Competent to Speak with Authority.

A Meeting was Held in Richmond on October 17, 1901, at which Chairman Ellyson Presided and Hon. John Goode and Mr. Montague Made Speeches—All Three Declared the Policy of the Convention in Language That Cannot Be Mistaken. Great Enthusiasm Aroused.

### STATE CHAIRMAN ELLYSON.

" The best men in this Commonwealth have been selected as the representatives of their people in the convention. They will not fail to be responsive to the wishes of their constituents, for every Democrat in that convention knows that the convention would never have been held but for the desire of the white people of this Commonwealth to have enacted such a constitutional provision as would take away from the negro the right to vote, and, at the same time preserve to the white men of the Commonwealth their right of suffrage.

" I have enjoyed the best opportunities for frequent conferences and consultation with the members of the convention on this question. I think I know their views as well as any other man in the State, and I do not hesitate to give to you and through you to the white men of this Commonwealth both my personal and official assurance that that convention has the fixed and unalterable intention of enacting a clause which will accomplish the end I have just mentioned and which will forever remove the negro as a factor in our political affairs and give to the white people of this Commonwealth the conduct and control of the destinies which they have the right to shape and determine.

" The Democrats of Virginia have always kept the pledges made to the people and they will not fail to do so in this instance."—Hon. J. Taylor Ellyson, Chairman of the State Democratic Committee.

### HON. JOHN GOODE.

" The Democratic party is pledged in its platform to eliminate the ignorant and worthless negro as a factor from the politics of this State without taking the right of suffrage from a single white man, and speaking for my colleagues in the convention, I solemnly declare to you that they will keep that pledge to the letter."—President Goode of the Constitutional Convention.

### HON. A. J. MONTAGUE.

" The Democratic party, through its representatives in the convention, is slowly, but surely, framing a law that will so effectually exclude the idle, shiftless and illiterate of the negro race from the suffrage that the gates of republican wrath cannot prevail against it. The trouble with our opponents is that they realize now that we will accomplish this and keep the pledge that no white man will be disfranchised. I stand here and declare it, for I do know it is the truth."—Hon. A. J. Montague, Democratic nominee for Governor.

Broadside 1901 .N68

28