**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| TATI ABU KING, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-408-JAG |
| | ) | |
| JOHN O'BANNON, in his official capacity | ) | |
| as Chairman of the State Board of Elections | ) | |
| for the Commonwealth of Virginia, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56**

Charles J. Cooper (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
Haley N. Proctor (VSB #84272)
Bradley L. Larson (*Pro Hac Vice*)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Not a D.C. Bar Member; practice limited to
matters in federal forums.

*Counsel for Defendants John O'Bannon,
Rosalyn R. Dance, Georgia Alvis-Long,
Christopher P. Stolle, J. Chapman Petersen,
Susan Beals, Eric Spicer, and Sandy C.
Elswick*

Jason S. Miyares
    *Attorney General*

Erika L. Maley (VSB #97533)
    *Solicitor General*

Thomas J. Sanford (VSB #95965)
    *Deputy Attorney General*

Kevin M. Gallagher (VSB #87548)
    *Principal Deputy Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
EMaley@oag.state.va.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. 5

LEGAL STANDARD ...................................................................................................... 6

ARGUMENT ................................................................................................................... 6

    I.    Plaintiffs' claim fails at the threshold ..................................................................6

        A.    Plaintiffs' claim presents a political question................................................... 6

        B.    Plaintiffs lack a cause of action ...................................................................... 8

        C.    Sovereign immunity bars the remaining claim ................................................ 12

    II.    Plaintiffs' Virginia Readmission Act claim lacks merit ...........................................13

        A.    The plain text and history of the Virginia Constitution of 1869 show that Virginia disenfranchised persons convicted of both statutory and common-law felonies ..................................................................................................... 13

        B.    Plaintiffs' contrary reading of the 1869 Constitution is unsupported and would create a host of problems ............................................................................. 21

CONCLUSION................................................................................................................ 29

CERTIFICATE OF SERVICE ...................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................................................................10, 11, 12

*Baker v. Carr*,
  369 U.S. 186 (1962) ......................................................................................................6, 8

*Bland v. Roberts*,
  730 F.3d 368 (4th Cir. 2013) .............................................................................................12

*Butler v. Thompson*,
  97 F. Supp. 17 (E.D. Va. 1951) .........................................................................................7

*Caetano v. Massachusetts*,
  577 U.S. 411 (2012) (per curiam) .....................................................................................27

*Clark v. Martinez*,
  543 U.S. 371 (2005) ..........................................................................................................11

*Columbia Gas Transmission, LLC v. Ott*,
  984 F. Supp. 2d 508 (E.D. Va. 2013) .................................................................................6

*Commonwealth v. Virginia Elec. & Power Co.*,
  214 Va. 457 (1974) ............................................................................................................25

*Connecticut National Bank v Germain*
  503 U.S. 249 (1992) .....................................................................................................16, 24

*Corley v. United States*,
  556 U.S. 303 (2009) ..........................................................................................................25

*Coyle v. Smith*,
  221 U.S. 559 (1911) ..........................................................................................................11

*Escanaba Co. v. Chicago*,
  107 U.S. 678 (1883) ..........................................................................................................11

*Ford Motor Co. v. Department of Treasury of State of Ind.*,
  323 U.S. 459 (1945) ..........................................................................................................12

*Greenhow v. Vashon*,
  81 Va. 336 (1886) ..............................................................................................................19

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ............................................................................................................9

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995) ...............................................................................................17

*Harvey v. Brewer*,
   605 F.3d 1067 (9th Cir. 2010) ...................................................................20, 22, 24

*Hayden v. Paterson*,
   594 F.3d 150 (2d Cir. 2010)...................................................................................22

*Hernández v. Mesa*,
   589 U.S. 93 (2020)...................................................................................................9

*Hollywood Cemetery Co. v. Commonwealth*,
   123 Va. 106 (1918) .................................................................................................16

*Howell v. McAuliffe*,
   292 Va. 320 (2016) ...................................................................................................3

*Indiana Prot. & Advocacy Servs. v. Indiana Family & Social Servs. Admin.*,
   603 F.3d 365 (7th Cir. 2010) (en banc) ...................................................................8

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018)................................................................................................11

*Jerome v. United States*,
   318 U.S. 101 (1943)................................................................................................23

*Jones v. Governor of Fla.*,
   950 F.3d 795 (11th Cir. 2020) ..................................................................................2

*K Mart Corp. v. Cartier, Inc.*,
   486 U.S. 281 (1988) (Scalia, J., concurring in part) ..............................................27

*Kerpen v. Metropolitan Wash. Airports Auth.*,
   907 F.3d 152 (4th Cir. 2018) ....................................................................................7

*King v. Youngkin*,
   122 F.4th 539 (4th Cir. 2024) .......................................................................8, 10, 12

*Luther v. Borden*,
   48 U.S. (7 How.) 1 (1849) ........................................................................................7

*McBurney v. Cuccinelli*,
   616 F.3d 393 (4th Cir.2010) ...................................................................................12

*Medina v. Planned Parenthood S. Atl.*,
   606 U.S. __, 2025 WL 1758505 (June 26, 2025) ...............................................9, 10

*Merritt v. Jones,*
259 Ark. 380 (1976) ................................................................................7, 20

*Michigan Corr. Org. v. Michigan Dep't of Corr.,*
774 F.3d 895 (6th Cir. 2014) ..........................................................................9

*New Jersey Thoroughbred Horsemen's Ass'n v. National Collegiate Athletic
Ass'n,*
584 U.S. 453 (2018) ........................................................................................11

*Ogden v. Saunders,*
25 U.S. (12 Wheat.) 213 (1827) ....................................................................16

*Pacific States Telephone & Telegraph Co. v. Oregon,*
223 U.S. 118 (1912) ..........................................................................................7

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) ........................................................................................9, 12

*Perry v. Beamer,*
933 F. Supp. 556 (E.D. Va. 1996) ...............................................................2, 3

*Pollard's Lessee v. Hagan,*
44 U.S. (3 How.) 212 (1845) .........................................................................11

*Pulsifer v. United States,*
144 S. Ct. 718 (2024) ......................................................................................24

*Richardson v. Ramirez,*
418 U.S. 24 (1974) ..........................................................................18, 19, 28

*Rubin v. United States,*
449 U.S. 424 (1981) ........................................................................................16

*Seminole Tribe of Fla. v. Florida,*
517 U.S. 44 (1996) ..........................................................................................10

*South Carolina v. United States,*
199 U.S. 437 (1905) ........................................................................................27

*Taggart v. Lorenzen,*
587 U.S. 554 (2019) ........................................................................................17

*Trump v. CASA,*
606 U.S. __, 2025 WL 1773631 (June 27, 2025) ......................................9, 10

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.,*
484 U.S. 365 (1988) ........................................................................................24

*United States v. States of La., Tex., Miss., Ala., & Fla.*,
363 U.S. 1 (1960) ........................................................................................................... 3

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
888 F.3d 651 (4th Cir. 2018) .......................................................................................... 6

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.*,
535 U.S. 635 (2002) .......................................................................................... 8, 10, 12

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ........................................................................................................ 10

*Ex parte Young*,
209 U.S. 123 (1908) ...................................................................................................... 12

*Zemedagegehu v. Arthur*,
2015 WL 1930539 (E.D. Va. Apr. 28, 2015) ................................................................ 2

**Statutes**

1848 Code of Virginia Title Ch. V, § 1 ................................................................................ 17

1848 Code of Virginia Ch. VIII § 2 ...................................................................................... 17

1860 Code of Virginia Title 54 Ch. 192 § 21 ....................................................................... 26

1860 Code of Virginia Title 54 Ch. 192 § 22 ....................................................................... 26

1860 Code of Virginia Title 54 Ch. 198 § 40 ....................................................................... 27

1860 Code of Virginia Title 54 Ch. 199 § 1 (1860) ....................................................... 16, 27

14 Stat. 428 (Mar. 2, 1867) ................................................................................................... 7

15 Stat. 72 (June 22, 1868) .................................................................................................. 18

15 Stat. 73 (June 25, 1868) .................................................................................................. 19

16 Stat. 62 ..................................................................................................................... *passim*

16 Stat. 63 ..................................................................................................................... *passim*

Title I, Ch. XI, Acts of the General Assembly of Virginia (1848) ....................................... 16

Va. Code § 18.2-8 .................................................................................................................. 2

**Constitutional Provisions**

Ala. Const. art. VII, § 3 (1867) ........................................................................................... 19

Ark. Const. art. VIII, § 3 (1868) ...................................................................19

Ga. Const. art. II, § 6 (1868) .......................................................................19

U.S. Const. amend. XIV, § 2 .......................................................................28

Va. Const. art. II, § 1 ..............................................................................2, 13

Va. Const. art. III, § I (1869) ...........................................................3, 13, 15, 26

Va. Const. art. III, § 14 (1830)......................................................................2

Va. Const. art. V, § 11 (1869) ....................................................................17

Va. Const. art. XII, § 1 ...............................................................................5

## Other Authorities

1 Wharton's Criminal Law § 17 (Torcia ed., 2009) ........................................27

1 Francis Wharton, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES
   (Kay & Brother, 6th ed. 1868) ..........................................................15, 23

1 Prentiss Bishop, Commentaries on the Criminal Law (1868) ..........................27

2 Alexander Burrill, A NEW LAW DICTIONARY AND GLOSSARY (1850)...................3, 15

2 Samuel Williston, The Law of Contracts § 663 (1923) .................................10

Antonin Scalia & Bryan Garner, READING LAW: THE INTERPRETATION OF
   JUDICIAL TEXTS 101 (2012).........................................................15, 17, 24

BLACK'S LAW DICTIONARY 483 (1st ed. 1891).............................................3, 15

Brief for Respondents in Opposition, *King v. O'Bannon*, No. 24-964 (2025) ...........8, 9

The Debates and Proceedings of the Constitutional Convention of the State of
   Virginia, Assembled at the City of Richmond, Tuesday, December 3, 1867
   (1868).........................................................................................18

Fed. R. Civ. P. 56 ......................................................................................6

Fed. R. Evid. 702 ....................................................................................15

Fed. R. Civ. P. 25 .....................................................................................4

Jackie Mitchell, *Virginia legislature advances three constitutional amendments on abortion, same-sex marriage, and felon voting rights restoration to the 2026 legislative session*, Ballotpedia News (Feb. 19, 2025), https://tinyurl.com/y56u4e6y ..............................................................................5

James M. Matthews, Digest of the Laws of Virginia (1871) .......................................17, 19, 20, 25

Lucian Minor, THE CRIMINAL CODE OF VIRGINIA, Southern Literary Messenger (1848) ........................................................................................................................4, 16

Richmond Dispatch. Wed, May 11, 1870 available at https://perma.cc/49SR-H57R ..............................................................................................................................19

S.J.R. 248, 2025 Gen. Assemb., Reg. Sess. (Va. 2025) ..............................................................5

WILLIAM BLACKSTONE: COMMENTARIES ON THE LAWS OF ENGLAND *94 (G.W. Childs 1868) .......................................................................................................................23

**INTRODUCTION**

Plaintiffs' theory would require a radical reinterpretation of both the Virginia Readmission Act of 1870 and Virginia's 1869 Constitution. Plaintiffs contend that the Readmission Act prohibits Virginia from disenfranchising felons except for those who committed a small number of "common law" felonies. They claim that Virginia must therefore re-enfranchise the hundreds of thousands of felons who committed "statutory" crimes, including felons still serving their sentences for serious violent felonies. No State in the Union has ever adopted such a system of "statutory" felon enfranchisement. Nor has any court ever interpreted a Readmission Act this way. This Court should not be the first.

When it passed the Virginia Readmission Act in 1870, Congress approved Virginia's 1869 Constitution as "republican" and declared that Virginia was again "entitled to representation in the Congress" following the Civil War. 16 Stat. 62. The Act also provided that "the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law." 16 Stat. 63. The 1869 Constitution that Congress approved disenfranchised all persons convicted of any felony. The plain text, structure, and legislative history confirm that "felony" in the 1869 Constitution was not limited to "felony at common law." By 1869, Virginia had for decades defined "felony" as a crime punishable with death or confinement in the penitentiary—a definition that included statutory felonies. Consistent with that understanding, Virginia enforced its 1869 Constitution from the beginning to disenfranchise individuals convicted of felonies that were not felonies at common law. Today, the 1971 Virginia Constitution likewise disenfranchises felons. Thus, because no felons were "entitled to vote by the [1869] Constitution," the 1971 Constitution does not "deprive

1

any citizen or class of citizens . . . of the right to vote who [were] entitled to vote" under the 1869 Constitution. 16 Stat. 62.

Plaintiffs' Virginia Readmission Act claim therefore fails under the plain text of Virginia's 1869 Constitution and the Readmission Act. That text makes clear that Virginia's current 1971 Constitution—the meaning of which is undisputed—does not narrow the class of persons eligible to vote compared to the 1869 Constitution. Defendants' motion for summary judgment should be granted.

## BACKGROUND

The undisputed material facts are set forth below; here, Defendants provide the relevant history to assist this Court. "The Commonwealth of Virginia has long excluded convicted felons from the franchise." *Perry v. Beamer*, 933 F. Supp. 556, 559 (E.D. Va. 1996) (citing Va. Const. art. III, § 14 (1830)). It is one of 48 States today that continue to disenfranchise felons in one form or another. See, *e.g.*, *Jones v. Governor of Fla.*, 950 F.3d 795, 801 n.3 (11th Cir. 2020). The current Virginia Constitution, ratified in 1971, grants the franchise to citizens of the United States who are 18 years of age, meet certain residency requirements, and are registered to vote. Va. Const. art. II, § 1. It disenfranchises any "person who has been convicted of a felony . . . unless his civil rights have been restored by the Governor or other appropriate authority." *Ibid.* Under Virginia law, a felony is a crime punishable by "confinement in a state correctional facility." Va. Code § 18.2-8. State correctional facilities in Virginia "house convicted offenders sentenced to a year or more of incarceration." *Zemedagegehu v. Arthur*, 2015 WL 1930539, at *5 (E.D. Va. Apr. 28, 2015). If a convicted felon wishes to regain the ability to vote, he can apply to the Governor, who has the power to restore felons' voting rights. Va. Const. Article II, § 1. The Governor has instituted an individualized, case-by-case review for voting-restoration applications, consistent with the

Supreme Court of Virginia's interpretation of the Virginia Constitution. See *Howell v. McAuliffe*, 292 Va. 320, 327 (2016).

Plaintiffs here are two convicted felons. See Statement of Undisputed Material Facts, *infra*. They assert that they (and supposedly similarly situated individuals in a putative class) are nonetheless entitled to vote because the 1971 Virginia Constitution's felon disenfranchisement clause violates the Virginia Readmission Act. See Second Amend. Class Action Compl. (SAC) ¶¶ 112–26 (ECF No. 96). The Virginia Readmission Act was one of a series of statutes Congress passed requiring States formerly in rebellion to adopt certain provisions in their state constitutions before Congress would seat their congressional delegations following the Civil War. See *Perry*, 933 F. Supp. at 559 (collecting statutes). After the former rebel States adopted post-war Constitutions, their Constitutions were submitted "'to Congress for examination and approval,' after which approval by Congress and after ratification of the Fourteenth Amendment by each State, each [was] 'declared entitled to representation in Congress'" in a Readmission Act. *United States v. States of La., Tex., Miss., Ala., & Fla.*, 363 U.S. 1, 124 (1960).

Virginia ratified its post-war Constitution in 1869. Article III, § 1 of that Constitution excluded from the franchise "person[s] convicted of bribery in any election, embezzlement of public funds, treason or *felony*." Va. Const. art. III, § I (1869) (emphasis added). "Felony" meant at the time an offense punishable by death or by imprisonment in a state penitentiary. See 2 Alexander Burrill, A New Law Dictionary and Glossary, 478 (1850); Black's Law Dictionary 483 (1st ed. 1891) (collecting definitions). Individuals were sent to a state penitentiary when sentenced to lengthy terms of incarceration; they were sent to a jail for short sentences. Similar to current Virginia law, the minimum term of imprisonment in a penitentiary was one year,

and any sentence under one year would be served in a jail. See Lucian Minor, THE CRIMINAL CODE OF VIRGINIA, 14 Southern Literary Messenger 543–45 (1848).

In 1870, Congress passed the Virginia Readmission Act, which approved the 1869 Constitution as "republican" and declared that Virginia was again "entitled to representation in the Congress of the United States." 16 Stat. 62. The Readmission Act also imposed certain "fundamental conditions" on Virginia's readmittance. 16 Stat. 63. The relevant condition here is that "the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State." *Ibid.*

In 2023, Plaintiffs sued various Virginia officials,[1] alleging that Article II, § 1 of Virginia's 1971 Constitution violates this condition of the Virginia Readmission Act. See Compl. (ECF No. 1). Specifically, they contended that the Virginia Readmission Act permits the Commonwealth to disenfranchise *only* felons who committed a crime that would have been a felony "at common law" in 1870. *Ibid.* They brought claims under both 42 U.S.C. § 1983 and *Ex parte Young*. See Opinion (MTD Op.), at 16 (ECF No. 88). This Court dismissed Plaintiffs' Virginia Readmission Act count brought under Section 1983, but it held that the count brought under *Ex parte Young* could

---

[1] Plaintiffs named Donald W. Merricks and Matthew Weinstein as defendants in their official capacities as members of the State Board of Elections for the Commonwealth of Virginia. See SAC ¶¶ 32, 33. Christopher P. Stolle and J. Chapman Petersen have replaced Merricks and Weinstein as members of the State Board of Elections and are automatically substituted as parties per Federal Rule of Civil Procedure 25(d). Plaintiffs also named Governor Glenn Youngkin and Secretary of State Kelly Gee, but those Defendants were dismissed after the Fourth Circuit held that sovereign immunity barred the claims against them. Order Dismissing Governor Youngkin and Secretary Gee, at 2 (ECF No. 104).

"proceed to summary judgment." *Id.* at 15, 18. In their remaining claim, Plaintiffs, as putative class representatives, ask this Court to issue a declaratory judgment holding that Article II, § 1 of the 1971 Constitution violates the Virginia Readmission Act, as well as injunctive relief enjoining Defendants from applying the Virginia Constitution with respect to citizens convicted of crimes that were not felonies at common law in 1870. SAC, Prayer for Relief.

In 2025, the Virginia General Assembly approved a constitutional amendment providing for automatic re-enfranchisement of felons upon their release from incarceration. S.J.R. 248, 2025 Gen. Assemb., Reg. Sess. (Va. 2025); see Jackie Mitchell, *Virginia legislature advances three constitutional amendments on abortion, same-sex marriage, and felon voting rights restoration to the 2026 legislative session*, Ballotpedia News (Feb. 19, 2025), https://tinyurl.com/y56u4e6y. If this amendment is again approved by the legislature in 2026, as required by the Virginia Constitution, it will appear on the November 2026 ballot. Va. Const. Art. XII, § 1. If a majority of voters then vote in favor of it, the Virginia Constitution will be changed accordingly. *Id.*

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiff Tati Abu King was convicted of felony robbery in 1988 and sentenced to 10 years in prison. Declaration of Kelly Gee (Gee Decl.) ¶ 9 (ECF No. 77-1). In 2000, King violated his probation, and his sentence for felony robbery was reimposed. *Id.* ¶ 10. King was again released from custody in 2011. *Id.* ¶ 11.

2. The Governor granted King's re-enfranchisement application in 2016. *Id.*

3. King was convicted of felony possession of marijuana with intent to distribute in 2018. In 2019, King was released from custody. *Id.* ¶ 12.

4. King submitted a re-enfranchisement application around four years later, on April 5, 2023. *Id.* ¶ 7.

5. King's application has since been denied.

5

6.     Plaintiff Toni Heath Johnson has been convicted of the following felonies: felony uttering in 1984, felony forgery in 1988, felony attempt to utter a forged check in 1988, felony credit card theft in 1991, felony bigamy in 1999, felony identity fraud in 2002, and felony grand larceny in 2003. *Id.* ¶ 18.

7.     In 2021, she was also convicted of two counts of felony abuse and neglect of a child with reckless disregard for life, and three counts of felony drug possession. *Id.* ¶ 19.

8.     Plaintiff Johnson's application for re-enfranchisement was denied in 2023. See *id.* ¶ 20.

## LEGAL STANDARD

A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quotation marks omitted).

## ARGUMENT

### I.     Plaintiffs' claim fails at the threshold

#### A.     Plaintiffs' claim presents a political question[2]

Whether Virginia has violated the Virginia Readmission Act presents a nonjusticiable political question. See *Baker v. Carr*, 369 U.S. 186, 216 (1962). Before the Virginia Readmission Act was passed, Congress had declared that Virginia's government was not "republican" in form.

---

[2] Defendants acknowledge that the Court rejected this argument at the motion-to-dismiss stage, MTD Op. at 10–11, but Defendants respectfully renew the argument here. See *Columbia Gas Transmission, LLC v. Ott*, 984 F. Supp. 2d 508, 523 (E.D. Va. 2013) (denial of a motion to dismiss "does not constitute 'the law of the case' as envisioned by the Fourth Circuit").

8 First Recontr. Act of Mar. 2, 1867, ch. 153, 14 Stat. 428, 428. As a "fundamental condition" of being deemed sufficiently republican to have its representatives seated in Congress again, the Virginia Readmission Act required Virginia to agree not to amend its constitution in certain ways. 16 Stat. 63. Congress has never since declared Virginia to have violated the Readmission Act, nor has it excluded Virginia's delegation. Thus, to hold that Virginia is in violation of the Virginia Readmission Act is to hold, contrary to Congress's judgment under the Guarantee Clause, that Virginia's form of government is not republican in nature. 16 Stat. 62. That is a quintessential political question. *Kerpen v. Metropolitan Wash. Airports Auth.*, 907 F.3d 152, 163 (4th Cir. 2018) (acknowledging that "claims premised on the Guarantee Clause" generally "present nonjusticiable 'political questions,' unfit for resolution within the judicial branch"); *Butler v. Thompson*, 97 F. Supp. 17, 20 (E.D. Va. 1951) ("Such a matter is one peculiarly within the domain of Congress itself, since it only purports to set up a condition governing Virginia's right to admission to representation in Congress."); *Merritt v. Jones*, 259 Ark. 380, 389 (1976) ("Even if we assume that the [Arkansas Readmission] Act has some force and effect, its enforcement is in the exclusive domain of Congress.").

Because only Congress can decide whether a state government is "republican," *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), adjudication of a State's compliance with the "conditions" of a Readmission Act presents a political question to be resolved by Congress. The Supreme Court has so held in a nearly identical case. *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912), held that a claim that Oregon had violated the statute admitting it to the Union presented a political question. *Id.* at 139. Because the question whether Oregon was complying with the conditions on its admission to the Union necessarily determined whether its government was republican in form, that question could only be answered by Congress. *Ibid.*

Indeed, a judicial determination that Virginia has breached a condition under the Readmission Act would "express[] [a] lack of [] respect" to Congress's own determination that Virginia has complied with the law—demonstrated by Congress's continued seating of the Virginia delegation over the past century and a half. *Baker*, 369 U.S. at 217. The Readmission Acts also present the rare circumstance where there is an "unusual need for unquestioning adherence to a political decision already made." *Ibid.* Adjudicating Plaintiffs' claim would require wading into the political decisions that ended the Civil War and restored the rebel States to the Union more than 150 years after they were made. Questioning that determination portends momentous consequences, such as casting doubt on the legitimacy of Virginia's current government and any federal laws in which the Virginia delegation played a deciding role.

### B.  Plaintiffs lack a cause of action

Plaintiffs must possess a right of action to sue Defendants. See *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 642–43 (2002); *Indiana Prot. & Advocacy Servs. v. Indiana Family & Social Servs. Admin.*, 603 F.3d 365, 374–75 (7th Cir. 2010) (en banc); *id.* at 392 (Easterbrook, J., dissenting) (agreeing with the majority that "to say that a claim against a state officer sidesteps sovereign immunity is not enough; plaintiffs still need a right of action"). They lack one.

The parties have disputed whether the existence of a right of action determines whether the *Ex parte Young* exception to sovereign immunity is available or whether the right of action is a merits question. See *King v. Youngkin*, 122 F.4th 539, 543–44 (4th Cir. 2024) (laying out the position of each side). In Plaintiffs' own words, "the *Ex parte Young* sovereign immunity issue is separate from, and does not depend on, the existence of a private cause of action." Brief for Respondents in Opposition, *King v. O'Bannon*, No. 24-964 at 13, 19–20 (2025). *Ex parte Young* "does not supply a right of action by itself," so that right must come from somewhere else. *Ibid.*

(quoting *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014)). The Fourth Circuit agreed with Plaintiffs that the *Ex parte Young* exception can lift sovereign immunity regardless of whether the plaintiff has a cause of action. *Ibid.* Defendants continue respectfully to believe this holding was incorrect and thus preserve their argument that *Ex parte Young* is unavailable when a plaintiff lacks a cause of action. But Defendants note that the Fourth Circuit did not rule on whether Plaintiffs have a cause of action to proceed on their remaining claim.

Despite acknowledging that they need a right of action to proceed, Plaintiffs have yet to identify a right that allows them to sue these Defendants. They originally argued that their authorization to sue was 42 U.S.C. § 1983, but as this Court has held, that statute requires an individual right, which the Virginia Readmission Act does not contain. MTD Op. at 12; see *Medina v. Planned Parenthood S. Atl.*, 606 U.S. __, 2025 WL 1758505, at *6 (June 26, 2025) (quoting *Hernández v. Mesa*, 589 U.S. 93, 100 (2020)) ("[O]ften enough, Congress may 'not wish to pursue a provision's purpose to the extent of authorizing private suits.' . . . [T]he decision whether to let private plaintiffs enforce a new statutory right poses delicate questions of public policy" that "belong[] to the people's elected representatives."); *id.* at *9 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)) ("[A] plaintiff must show, at a minimum, that Congress alerted the State in advance, 'clearly' and 'unambiguously,' that responding to private enforcement suits was a condition of its offer.").

Plaintiffs now rely on an implied private right to sue in equity under *Ex parte Young*. But "*Ex parte Young* does not say—either explicitly or implicitly—that courts may devise novel remedies that have no background in traditional equitable practice." *Trump v. CASA*, 606 U.S. __, 2025 WL 1773631, at *8 n.9 (June 27, 2025); see *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). And Plaintiffs point to no equitable tradition that

allows the sort of claim they make. See *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). Their suit falls outside the traditional equitable anti-suit injunction, because denying a felon's application to register to vote does not require any enforcement action in which the Readmission Act could be raised as a defense. See *CASA*, 2025 WL 1773631, at *8 n.9. The Fourth Circuit hypothesized in dicta that a lawsuit could theoretically occur because Plaintiffs could unlawfully register to vote and unlawfully cast a ballot, thus prompting criminal charges under Va. Code § 24.2-1004(B)(iii). See *King*, 122 F.4th at 544. But Plaintiffs have never said that they have any intent to do so. In any event, those hypothetical facts do not allow for an anti-suit injunction against *these* Defendants. Defendants are members of the Board of Elections. They are not prosecutors and do not enforce Virginia's criminal election laws. Thus, an anti-suit injunction is not available here and Plaintiffs cannot proceed under an implied right of action in equity.

Separately, Plaintiffs have no cause of action in equity because "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). A court lacks the power to hear *Ex parte Young* claims outside the scope of those limitations. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 76 (1996). Congress's "intent to foreclose" equitable judicial relief under the Readmission Act prevents Plaintiffs from proceeding in equity. *Armstrong*, 575 U.S. at 328 (quoting *Verizon*, 535 U.S. at 647). *Armstrong* discussed two indicia of congressional intent to foreclose private parties from equitable relief. The most important indication is whether Congress has created an alternative remedial scheme. *Ibid*. The Readmission Act is in the nature of a contract between the State and Congress. See, *e.g.*, 16 Stat. 62. As the counterparty to the Commonwealth, Congress is the exclusive enforcer of the conditions set forth in the Acts. See 2 Samuel Williston, The Law of Contracts § 663 (1923); *Medina*, 2025 WL 1758505, at *8 ("federal-

10

state agreements" "generally do not confer individually enforceable rights against a sovereign, but depend for the enforcement of their provisions on the governments which are parties to them" (citation modified)). The second indication is "the judicially unadministrable nature" of the statutory provision. *Armstrong*, 575 U.S. at 328. The Readmission Act conditions are unfit for judicial administration because they are conditions of Congress's judgment that Virginia's Constitution is "republican." See Part I.A, *supra*.

Even if the Court is uncertain that this is the best reading of the Readmission Act, however, the canon of constitutional avoidance further counsels in favor interpreting the Readmission Act not to provide a cause of action for equitable relief. See *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) (the canon of constitutional avoidance favors rejecting a reading that "raises serious constitutional doubts"). As this Court stated, "[t]he canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" MTD Op. at 11 n.3, quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). Here, any ambiguity as to whether Congress intended the Readmission Act to be judicially enforceable by private parties seeking equitable relief, or intended the only remedy to be enforcement by Congress itself, should be resolved in Defendants' favor. Plaintiffs' position that the Act is judicially enforceable raises grave constitutional questions under the "equal footing" doctrine, because it would subject only those States covered by Readmission Acts to private lawsuits in federal court seeking to invalidate provisions of their constitutions. See *Coyle v. Smith*, 221 U.S. 559, 573 (1911); *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212 (1845); *Escanaba Co. v. Chicago*, 107 U.S. 678, 689 (1883). In addition, it raises questions under the anticommandeering doctrine by interpreting the Acts to empower private parties and the federal judiciary to bar States from amending state laws, contra *New Jersey Thoroughbred Horsemen's*

*Ass'n v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018). These questions disappear if the Readmission Acts are enforceable only by Congress. The avoidance of the grave constitutional questions posed by Plaintiffs' interpretation is thus another reason for rejecting it.

### C. Sovereign immunity bars the remaining claim[3]

This Court also lacks jurisdiction because sovereign immunity bars Plaintiffs' suit. *See, e.g., Ford Motor Co. v. Department of Treasury of State of Ind.*, 323 U.S. 459, 464 (1945). In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a limited exception to state sovereign immunity that permits a federal court "to issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law." *Bland v. Roberts*, 730 F.3d 368, 390–91 (4th Cir. 2013) (quoting *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir.2010)). *Ex parte Young* is inapplicable to Plaintiffs' claim for three reasons.

First, for the same reasons discussed above, Congress intended to foreclose *Ex parte Young* actions under the Readmission Act. See 9–12, *supra*; *Armstrong*, 575 U.S. at 328 (quoting *Verizon*, 535 U.S. at 647). The *Ex parte Young* exception to sovereign immunity is therefore unavailable. Second, and again for the same reasons stated above, the *Ex parte Young* exception to sovereign immunity is inapplicable when plaintiffs lack a cause of action. See 8–9, *supra*.

Third, Plaintiffs improperly seek a federal court order instructing "state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. In such a case, "the entire basis for the doctrine of" *Ex parte Young* "disappears" because a "federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law." *Ibid.* Here, although Plaintiffs characterize their claim as

---

[3] Defendants acknowledge that the Court rejected this argument at the motion-to-dismiss stage, MTD Op. at 8–9, and that the Fourth Circuit affirmed that ruling as to the remaining Defendants, *King*, 122 F.4th at 543-47. Defendants respectfully renew the argument here to preserve it for further appellate review.

premised on a violation of federal law—the Virginia Readmission Act—it is a state-law claim in substance. Plaintiffs could prevail on their purported federal claim only if this Court were to hold that Virginia deprived citizens of voting rights granted exclusively by Virginia's own 1869 Constitution. See Part II, *infra*; MTD Op. at 15.

## II.    Plaintiffs' Virginia Readmission Act claim lacks merit

Plaintiffs' claim also fails on the merits. Plaintiffs misread the Readmission Act as prohibiting the disenfranchisement of felons other than those who committed common-law crimes. In fact, the Act states that Virginia cannot amend its Constitution to disenfranchise those entitled to vote under the 1869 Constitution, except for those who committed common-law felonies. Both the plain text and the history of the 1869 Constitution demonstrate that it disenfranchised *all* felons, just as the current 1971 Constitution does. Therefore, the 1971 Constitution comports with the Readmission Act because it does not disenfranchise any person or class of persons entitled to vote under the 1869 Constitution. Plaintiffs' interpretation of the statute is also unworkable and would create highly anomalous results, confirming that it is inconsistent with the meaning of the Readmission Act. Defendants' motion for summary judgment should be granted.

### A.    The plain text and history of the Virginia Constitution of 1869 show that Virginia disenfranchised persons convicted of both statutory and common-law felonies

The 1971 Virginia Constitution does not violate the Virginia Readmission Act because it imposes no restrictions on the franchise beyond those imposed by the 1869 Constitution. The 1971 Virginia Constitution disenfranchises all felons unless they have their rights restored by the Governor. See Va. Const. art. II, § 1 ("No person who has been convicted of a felony shall be qualified to vote . . ."). The 1869 Constitution disenfranchised "[p]ersons convicted of bribery in any election, embezzlement of public funds, treason *or felony*." Va. Const. art. III, § 1 (1869) (emphasis added). The Virginia Readmission Act approved as "republican" the 1869 Constitution.

16 Stat. 62. It imposed "conditions" on Virginia's representation in Congress, including that the Virginia Constitution "shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law." 16 Stat. 62.

Plaintiffs fixate on the "except" clause, contending that the Act "explicitly and unambiguously forbids Defendants from enforcing Article II, Section 1 of the Virginia Constitution, to the extent that it disenfranchises any citizens for crimes that were not felonies at common law in 1870." SAC ¶ 119. But this argument ignores the Act's governing command: that Virginia may not amend its Constitution to disenfranchise a class of citizens *admitted to the franchise by the 1869 Constitution*. Virginia did not do so in the 1971 Constitution because *all* felons were excluded from the franchise in the 1869 Constitution that Congress approved. The Readmission Act declared that Virginia's 1869 Constitution may not be "amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the [1869] Constitution." 16 Stat. 62–63. But the Act also provided an exception to this limitation: Virginia *could* amend its Constitution to disenfranchise any citizen or class of citizens who committed "crimes as are now felonies at common law," even if they were not disenfranchised by the 1869 Constitution. *Id.* The upshot is that the Readmission Act permits Virginia to disenfranchise "any citizen or class of citizens" disenfranchised by the 1869 Constitution, *and* to amend its Constitution to disenfranchise "any citizen or class of citizens" convicted of a crime that was a felony at common law.

The text of the 1869 Constitution that the Readmission Act approved is clear: persons convicted "of bribery in any election, embezzlement of public funds, treason or *felony*" may not

vote. Va. Const. art. III, § 1 (1869) (emphasis added). The operative term, "felony," was defined at the time as "[a]n offence punishable by death, or by imprisonment in a state prison." 2 Alexander Burrill, A NEW LAW DICTIONARY AND GLOSSARY, 478 (1850); BLACK'S LAW DICTIONARY 483 (1st ed. 1891) (listing States that defined "felony as any public offense on conviction of which the offender is liable to be sentenced to death or to imprisonment in a penitentiary or state prison"). This definition includes both felonies that existed at common law and felonies that were created by state legislatures. See Antonin Scalia & Bryan Garner, READING LAW: THE INTERPRETATION OF JUDICIAL TEXTS 101 (2012) (explaining that terms should be given "their full and fair scope" and not "arbitrarily limited" to a subset of their natural meaning).

Indeed, Francis Wharton's 1868 treatise on criminal law—which Plaintiffs' expert describes as "one of the leading contemporaneous sources on the common law as it was understood in the mid-nineteenth century," Ex. 1, Report of Carissa Hessick (Hessick Report) ¶ 22—explained that "felony" included both common-law felonies and crimes designated as felonies by statute. 1 Francis Wharton, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES § 2 (Kay & Brother, 6th ed. 1868). The treatise explicitly states that "*in Virginia*, [felony] comprehends [1] all offences, below treason, which occasioned a forfeiture of property at common law, [2] all so denominated by statutes, and [3] all to which statutes have annexed capital punishment or confinement in the penitentiary," unless they were "declared misdemeanors by the statutes creating them." *Ibid.* (emphasis added). Thus, when Virginia used the term "felony" in its Constitution one year later, it was referring to both common-law and statutory felonies.[4] "When the words of a statute are

---

[4] As explained in Defendants' motion to exclude Professor Hessick's report, ECF 144 at 14–17, the fact that Professor Hessick failed even to mention this statement from Wharton in her expert report demonstrates that her testimony is biased. See Fed. R. Evid. 702(c), (d). Professor Hessick admits that Wharton's treatise was a leading source on the common law in the mid-19th

unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Connecticut National Bank v Germain* 503 U.S. 249, 254 (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)); see also *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 302 (1827) ("If this provision in the constitution was unambiguous, and its meaning entirely free from doubt, there would be no door left open for construction."); *Hollywood Cemetery Co. v. Commonwealth*, 123 Va. 106, 110 (1918) ("When the words of Constitutions . . . are unambiguous and have a clear and definite meaning, indicating their purpose, it is well settled that courts are not permitted to interpret that which needs no interpretation."). The plain meaning of "felony" unambiguously includes both statutory and common-law felonies.

That plain meaning is confirmed by the longstanding meaning of "felony" under Virginia law at the time Virginia ratified the 1869 Constitution. Virginia codified its criminal law in 1848. Lucian Minor, THE CRIMINAL CODE OF VIRGINIA, 14 Southern Literary Messenger 543–45 (1848). The criminal code of 1848 included definitions of the terms "felony" and "misdemeanor": "Offences committed by free persons shall be either felonies or misdemeanors. Those offences shall be felonies which are punishable with *death or confinement in the penitentiary*; all other offences shall be misdemeanors." An Act to reduce into one the several acts concerning crimes and punishments, and proceedings in criminal cases, Title I, Ch. XI, Acts of the General Assembly of Virginia, at the Session of 1847-1848, at 89, 121 (1848) (emphasis added). When Virginia recodified in 1860, the legislature kept the definition of felony the same. See 1860 Code of Virginia Title 54 Ch. 199 § 1. This definition remained in effect after the Virginia Constitution of 1869 was

---

century. And she conceded in her deposition that she read Wharton's explanation of what constituted a felony under Virginia law when preparing her report. Ex. 2, Hessick Dep. Tr. 129:11-17. Indeed, she quoted that very page of Wharton in the report. See Ex. 1, Hessick Report ¶ 7 n.19. Despite the obvious relevance of a leading treatise speaking directly to a question on which she opined, Professor Hessick omitted this valuable evidence from her report.

ratified. See James M. Matthews, Digest of the Laws of Virginia, at 73 (1871) (same definition). The code included as felonies crimes punishable with time in the penitentiary, such as forgery and bigamy, which were not felonies at common law. See *id.* at 89 n.1 ("At common law the offense of forgery was punishable as a misdemeanor."); Ex. 2, Hessick Dep. Tr. 94:16-17 (admitting "[b]igamy was not a felony at common law"); 1848 Code of Virginia Title Ch. V, § 1 (establishing a minimum sentence of two years in the penitentiary for forgery); *id.* Ch. VIII § 2 (establishing a minimum of one year in the penitentiary for bigamy). The converse was also true: the Virginia code made some offences misdemeanors by statute that were felonies at common law, including some types of larceny. See 25–26, *infra*.

It is black-letter law that when a statutory or constitutional term has a pre-existing legal meaning, it retains that meaning in new enactments. See *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019); see also Scalia & Garner, *supra*, at 322. Given that Virginia law defined the term "felony" to mean a crime punishable by death or time in the penitentiary, the term "felony" in the 1869 Constitution carried the same meaning.

Further, the 1869 Constitution clearly used "felony" elsewhere to denote all felonies. The Constitution exempted members of the Virginia General Assembly from arrest during the session of their respective chamber "in all cases except treason, felony or breach of the peace." Va. Const. art. V, § 11 (1869). "Felony" in this clause clearly refers to more than just common-law felonies, as it would make no sense to subject members of the General Assembly to arrest for a vague set of common-law felonies while privileging them from arrest for crimes that the legislature itself has designated as felonies. And given that "felony" means statutory and common-law felonies in one part of the 1869 Constitution, it is extremely likely to retain that meaning throughout the entire document. See *Gustafson v. Alloyd Co.*, 513 U.S. 561, 567–69 (1995).

17

The legislative history of the 1869 Constitution likewise confirms that "felony" means all crimes punishable with death or confinement in the penitentiary and not just felonies at common law. For example, delegate to the Virginia Constitutional Convention and former judge Edward Snead explained that "our State has divided crime into two classes, felonies and misdemeanors. *A felony is any offence for which the punishment is the infliction of death or confinement in the penitentiary*. Any offence not so punished is denominated a misdemeanor, but both are treated and considered crimes. That position seems to be sustained by the highest authority." The Debates and Proceedings of the Constitutional Convention of the State of Virginia, Assembled at the City of Richmond, Tuesday, December 3, 1867, at 539 (1868) (emphasis added). Similarly, delegate Jonathan Catlett Gibson Jr. linked the distinction between felonies and misdemeanors with punishment: "if a man commits a capital offence he certainly forfeits his life. If he commits a felony he forfeits his liberty. If he commits a misdemeanor, he forfeits property, and may, for a limited time, forfeit his liberty." *Id.* at 248. These statements comport with the understanding that a "felony" within the meaning of the 1869 Constitution was defined by the punishment for the crime, rather than by the common law.

The other state constitutions approved under Readmission Acts also demonstrate that the term "felony" referred to crimes punishable by imprisonment in the penitentiary, not to crimes that were felonies at common law. Ten former rebel States were readmitted to representation in Congress upon approval of their state constitutions in Readmission Acts. See *Richardson v. Ramirez,* 418 U.S. 24, 52 (1974). All of the Readmission Acts imposed the same "fundamental condition" concerning voting, "with only slight variations in language." *Ibid.* The Readmission Acts approved these state constitutions as "republican" while additionally permitting amendments to disenfranchise any class of citizens for committing "felonies at common law." See An Act To

Admit the State of Arkansas to Representation in the Congress of the United States, 15 Stat. 72 (June 22, 1868); An Act To Admit the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida to Representation in Congress 15 Stat. 73 (June 25, 1868). Nearly every approved state constitution disenfranchised felons. *Cf. Richardson*, 418 U.S. at 48 n.14 (collecting 19th-century constitutional provisions). Some of the constitutions, like Virgina's, used the term "felon," while others used the legal definition of that term, "crimes punishable by law with imprisonment in the penitentiary." *See* Ala. Const. art. VII, § 3 (1867); Ark. Const. art. VIII, § 3 (1868); Ga. Const. art. II, § 6 (1868). Under Plaintiffs' theory, the Readmission Acts for these States would have radically different applications, despite using virtually identical language and having the same statutory purpose. See *Richardson*, 418 U.S. at 52. There is no basis to accept this strained interpretation, rather than the common-sense conclusion that "felony" means "felony."

Contemporaneous understanding and practice further reinforce this conclusion. Immediately after the ratification of the Virginia Constitution of 1869, the public understood that "felony" meant any crime by which a person could be sentenced to the penitentiary. The Richmond Dispatch, for example, put out a notice in 1870 stating that an individual "can and ought to register" to vote if the individual is "not an idiot, and has neither been in the penitentiary nor fought a duel since July 1869." Richmond Dispatch. Wed, May 11, 1870, Page 1, available at https://perma.cc/49SR-H57R. The Constitution had been ratified in July 1869, see *Greenhow v. Vashon*, 81 Va. 336, 352 (1886), so this publication clearly links the "felony" provision in the Virginia Constitution with confinement "in the penitentiary." Likewise, post-enactment treatises also used the term "felony" to mean a crime for which a person could serve time in the penitentiary or suffer death. James M. Matthews, Digest of the Laws of Virginia, at 73 (1871).

Records also show that, immediately after the passage of the Readmission Act, Virginia disenfranchised persons convicted of *statutory* felonies and not just common-law felonies. Individuals convicted of a statutory felony in the Richmond Hustings Court from the years 1870 through 1892 were listed in the Richmond voter-registration books as having been disenfranchised. See Ex. 3 (list of disenfranchised persons); Ex. 4 (list of convicted felons and their offenses). For example, bigamy was not a felony at common law but was made a felony by statute in Virginia. See Matthews, *supra*, at 118–20. Yet those convicted of the statutory felony of bigamy, such as Thomas Valentine, David Williams, Dabney Brooks, and William Radford Page, Ex. 4 at 207 (Valentine), 208 (Williams), 209 (Brooks), 210 (Radford Page), were all listed as disenfranchised in the voter-registration books, Ex. 3 at 171, (Brooks), 177 (Radford Page), 179 (Valentine), 180 (Williams). Individuals convicted of forgery, which was not a felony at common law, see Matthews, *supra*, at 89 n.1, such as Moses Jackson, William King, Cabell Carter, Samuel Washington, Elijah Edmonds, Alfred Hopkins, James Marks, Joseph Meekins, and Willis Corbin, Ex. 4 at 196 (Jackson), 197 (King), 198 (Carter), 199 (Washington), 200 (Edmonds), 201 (Hopkins), 202 (Marks & Meeks), 204 (Corbin), were also listed as disenfranchised, Ex. 3 at 171 (Carter), 172 (Edmonds & Corbin), 174 (Moses Jackson & Hopkins), 175 (King), 176 (Marks & Meekins), 180 (Washington).  These records thus confirm that "felony" in the 1869 Constitution was understood to include not only common-law felonies but also statutory felonies.

Nothing in the 1869 constitutional provision limited disenfranchisement to "felonies at common law," and it was never so interpreted. The 1869 Constitution disenfranchised anyone convicted of a "felony"—not only those convicted of a "felon[y] at common law." 16 Stat. 63; see *Merritt*, 259 Ark. at 387 (holding that "'felony at common law' is far too restrictive and could not realistically be read into the word 'felonies' as used" in the Arkansas Constitution); *Harvey v.*

*Brewer*, 605 F.3d 1067, 1075 (9th Cir. 2010) ("[P]laintiffs provide absolutely no support for the proposition that the word 'crimes' meant 'common-law felonies' at the time of the Fourteenth Amendment's ratification."). Continuing to disenfranchise felons thus wholly comports with the Readmission Act.

### B. Plaintiffs' contrary reading of the 1869 Constitution is unsupported and would create a host of problems

There is no support for Plaintiffs' contrary position that the 1869 Constitution disenfranchised only "common law" felons. This interpretation creates a host of problems, including imposing a highly anomalous disenfranchisement regime that has never been used in Virginia or any other State. Making disenfranchisement turn on a felony's status at common law is also impracticable, given the conceded difficulty of determining what was considered to be a "common law" felony in 1869. And Plaintiffs' interpretation would create surplusage both in the Readmission Act and in the 1869 Constitution. Plaintiffs' alternative interpretation, that "felony" includes only crimes that existed in 1869, is equally implausible. Both interpretations should be rejected.

First, Plaintiffs' interpretation would impose a highly anomalous regime, where some felons would be disenfranchised for life, while others could not be disenfranchised even during their incarceration. And this distinction would turn not on the seriousness of the offense, but on whether it was considered to be a "common law" felony in 1869. Under Plaintiffs' interpretation, individuals who are convicted of "statutory" felonies would have a right to vote even while incarcerated in the penitentiary, given that nothing in the 1869 Constitution or the Virginia Readmission Act turns on whether the person has served his sentence. 16 Stat. 62-63. Thus, according to Plaintiffs, Virginia would be obligated to hand out ballots to attempted murderers, drug dealers, domestic and child abusers, child pornographers, counterfeiters, kidnappers, and

21

perjurers who are *still serving* their prison sentences. Hessick Report ¶¶ 31-34. But at the same time, burglars, robbers, and larcenists can have their right to vote permanently stripped, because those crimes were felonies at common law. See *id*. It is not remotely plausible that the ratifiers of the Virginia Constitution set up such a strange system, where some serious criminals keep their ability to vote while incarcerated in the penitentiary, but other less-serious criminals lose it forever.

No court has ever adopted Plaintiffs' interpretation, in the more than 150-year history of the Readmission Acts. Nor are Defendants aware of any State that has ever used such a scheme, in which disenfranchisement turns on whether or not a crime was classified as a felony at common law.  Not one of the 29 States that disenfranchised felons in 1869 applied this kind of backward rule—including none of the Readmission Act States. *Harvey*, 605 F.3d at 1076 ("Of the 29 State constitutions that *Richardson* referred to, it does not appear that any of them limited disenfranchisement to persons convicted of common-law felonies."). And not a single State has chosen, through its political process, to do so today.[5] Yet in Plaintiffs' view, the Readmission Acts have *required* States to use this anomalous distinction for more than 150 years. And, under their interpretation, every single Readmission Act State has been violating those Acts continuously since the day they were passed—even though neither Congress nor any court has ever found such a violation. See 6–8, *supra*. The Court should reject this radical re-interpretation of the Readmission Acts.

---

[5] Some States, under their political process, have adopted provisions allowing felons to vote once they have served their sentence. See, *e.g.*, *Hayden v. Paterson*, 594 F.3d 150, 155 (2d Cir. 2010) (describing a New York statute that "allow[s] felons to vote if they have completed their sentences"). Virginia is on the path to doing the same thing: an amendment to the Virginia Constitution adopting a similar policy has passed the Virginia General Assembly. See 5, *supra*. Plaintiffs' theory would make not only Virginia's current Constitution, but also the proposed Amendment, unlawful because it does it does not distinguish between "common law" and "statutory" felons.

Second, Plaintiffs' proposed interpretation is also unworkable. Although some crimes, such as murder, were universally understood to be felonies at common law, much confusion surrounds which crimes the phrase covers. Plaintiffs' own expert concedes that there was "disagreement" at the time about which felonies were felonies at common law. Hessick Report ¶ 20. She further admits that there were two wholly different approaches to determine which crimes fell into this category. *Id.* ¶ 28. One approach enumerated specific crimes, while the other defined "felonies at common law" as covering any crimes that would historically have been punished by forfeiture of goods in England. For example, Blackstone defined felonies at common law to include "species of crime which occasioned at common law the forfeiture of lands and goods." WILLIAM BLACKSTONE: COMMENTARIES ON THE LAWS OF ENGLAND *94 (G.W. Childs 1868). Wharton, on the other hand, defined felonies at common law on a crime-by-crime basis, listing "murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny" as the common-law felonies. FRANCIS WHARTON, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES (KAY & BROTHER, 6TH ED. 1868). "[B]oth Wharton's discrete list approach and Blackstone's historical approach were commonly used to determine whether a crime was a common law felony." Hessick Report ¶ 28.

Perhaps because of the competing lists and confusing terminologies, Professor Hessick was unable to define the crimes considered to be common law felonies, instead proposing multiple lists in which she expressed varying levels of confidence. *Id.* ¶ 34. She was also unable to determine whether hundreds of current Virginia statutory felonies would be "felonies at common law." *Id.* ¶ 41. And notably, even the list of offences that Professor Hessick expressed "great confidence" are common-law felonies is inconsistent with lists used by some courts. See, *e.g.*, *Jerome v. United*

*States*, 318 U.S. 101, 108 n.6 (1943); see also *Harvey*, 605 F.3d at 1073 n.1 ("We could quibble further with [*Jerome*'s] list—as it may be over- or under-inclusive.").

Thus, Plaintiffs' approach would require Virginia's election officials to parse the Commonwealth's criminal code and conduct extensive historical research in an attempt to determine the status of each offense under the common law—and even then, to face numerous thorny questions where historical sources disagree. Professor Hessick has spent her career studying the history of criminal law, and she cannot determine which offenses were felonies at common law. When asked how to determine whether a crime was a felony at common law, Professor Hessick stated that the first step was to "spend, like, ten plus years, fifteen plus years learning about the common law" before even starting the relevant legal analysis. Hessick Dep. Tr. 103:12-13. Indeed, Professor Hessick stated that she did not even believe "*a court*" "could perform an analysis" like hers "without serious errors." *Id.* 43:13-14. The Court should reject a reading of the Virginia Constitution that would inject such uncertainty into the voting process. See *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988); see also *Pulsifer v. United States*, 144 S. Ct. 718, 731–35 (2024). Rather, the Constitution used the same definition of "felony" that was on the statute books—a definition that turned on the potential for a sentence in the penitentiary, and thus can be determined by a quick glance at the Virginia Code.  See 14–17, *supra*.

Third, Plaintiffs' interpretation should also be rejected because it would render portions of both the Virginia Readmission Act and the 1869 Constitution surplusage. There is no need to look to the canon against surplusage because the Act and Constitution are clear. See 13–19, *supra*; Scalia & Garner, *supra*, at 176; *Connecticut National Bank*, 503 U.S. at 254. The canon, however, would only provide more support for following the plain meaning of the text, that "felony" means

24

"felony." Under Plaintiffs' interpretation, that "felony" in the 1869 Constitution means "felon[y] at common law," the "except" clause in the Readmission Act is surplusage: providing that Virginia may "amend[] or change[]" the 1869 Constitution to disenfranchise felons at common law would be entirely meaningless if that Constitution already had precisely such a provision. 16 Stat. 62. The Court should reject Plaintiffs' interpretation for this reason as well. See, *e.g.*, *Commonwealth v. Virginia Elec. & Power Co.*, 214 Va. 457, 465 (1974); *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (citation modified).

By contrast, under the plain-language interpretation of the 1869 Constitution, the "except" clause of the Readmission Act has a clear purpose: it permitted Virginia to "amend[] or change[]" its Constitution to disenfranchise additional "classes of citizens," but also strictly limited such amendments to cover only those who were convicted of "felonies at common law." 16 Stat. 63. The provision had an important practical effect, because some crimes that were "felonies at common law" were *not* felonies under Virginia law.

For instance, petite larceny was a felony at common law but merely a misdemeanor under Virginia law. Larceny was divided into two classes: grand larceny and petite larceny, both of which were felonies at common law. Hessick Report ¶¶ 31 & n.64, 44. But Virginia chose a different path. It made grand larceny a felony, punishable by time in the penitentiary, but it made petite larceny a misdemeanor, punishable by less than a year in the local jail. See Matthews, *supra*, at 219 ("If any person steal from the person of another, money or other thing of the value of five dollars or more, he shall be guilty of grand larceny, and be confined in the penitentiary for a period not less than five nor more than ten years . . . and if they be of less value than five dollars in the

first case . . . he shall be deemed guilty of petit larceny, and be confined in jail not exceeding one year . . . ."). The 1869 Constitution therefore did not disenfranchise those who committed petite larceny, because its felony disenfranchisement provision applied only to crimes punishable by death or confinement in the penitentiary. See 14–21, *supra*. The Readmission Act, however, permitted Virginia to amend its Constitution to disenfranchise those convicted of petite larceny, because it is a "felon[y] at common law." 16 Stat. 63. Indeed, an amendment to Virginia's Constitution very shortly after the Readmission Act was passed demonstrates this precise understanding: in 1876, Virginia amended its Constitution to add petite larceny to the list of crimes that would result in disenfranchisement. See Va. Const art. III, § 1 (1876).

Plaintiffs' interpretation would create surplusage within the 1869 Constitution as well. That provision disenfranchised those who committed "embezzlement of public funds," in addition to "felony." See Va. Const. art. III, § 1 (1869). As Plaintiffs point out, "embezzlement of public funds" was considered a species of larceny under Virginia law at the time. See Pls. MTD Opp. at 12 (citing 1860 Code of Virginia Title 54 Ch. 192 §§ 21-22). Again, larceny was a felony at common law, so "felony at common law" encompasses all forms of embezzlement. See Hessick Report ¶¶ 31 & n.64, 44. Thus, under Plaintiffs' interpretation, the provision of the 1869 Constitution disenfranchising those convicted of "embezzlement of public funds" would be surplusage, because all embezzlers would be disenfranchised as common-law felons.

Interpreting the term "felony" according to its plain meaning entirely solves this surplusage problem. Because Virginia law at the time made grand larceny a felony, but petite larceny a misdemeanor, not all convictions for public embezzlement were felonies. Rather, if "embezzlement of public funds" had not been enumerated as an offense subject to disenfranchisement, persons who stole a small amount of money from the public treasury would

retain their right to vote. Given the rampant public corruption after the Civil War, it was logical for the Framers of the Virginia Constitution to guard against that outcome and disenfranchise *all* who embezzled from the public fisc, which the term "felony" would not have done.[6]

Finally, Plaintiffs' proposed alternative reading—that the word "felony" in the 1869 Constitution should be interpreted only to encompass the felonies that existed in 1869—is also implausible. Pls. MTD Opp. at 12-13. This reading is inconsistent with both the plain text of the 1869 Virginia Constitution and basic principles of legal interpretation. As explained above, the term "felony" did not describe a closed set of crimes that existed in 1869; rather, it meant any crime that was punishable by incarceration in the penitentiary. See 14–21, *supra*; see, *e.g.*, 1860 Code of Virginia Title 54 Ch. 199 § 1. When the Virginia General Assembly creates a new crime and authorizes punishment in the penitentiary, that crime is a felony. *Ibid.* It is black-letter law that although the meaning of a term in a legal text remains constant, that meaning is applied to new situations. See *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2012) (per curiam) (explaining that "arms" in the Second Amendment protects modern weapons, such as stun guns); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 323 (1988) (Scalia, J., concurring in part) ("A 19th-century statute criminalizing the theft of goods is not ambiguous in its application to the theft of microwave ovens simply because the legislators enacting it were unlikely to have contemplated those appliances[.]" (internal quotation marks omitted)); see also Scalia & Garner, *supra*, at 86; *South Carolina v.*

---

[6] The other two crimes listed—"bribery in any election," and "treason"—also each had meaning independent of "felony." First, as Plaintiffs themselves admit, "bribery in any election" was a misdemeanor. Pls.' Opp. to Mot. to Dismiss (Pls.' MTD Opp.), at 12 (ECF No. 78); Hessick Dep. Tr. 57:3–8; see also 1860 Code of Virginia Title 54 Ch. 198 § 40. And because of treason's seriousness, it was historically considered a class of crime unto itself, above felony. 1 Prentiss Bishop, Commentaries on the Criminal Law, at § 578 (1868); see also 1 Wharton's Criminal Law § 17 (Torcia ed., 2009) ("At common law, there were three kinds of offenses: treason, felony, and misdemeanor."); Hessick Report ¶ 33.

*United States*, 199 U.S. 437, 448–49 (1905). The meaning of "felony" in the 1869 Constitution is fixed: it refers to crimes designated by the legislature as worthy of punishment in the penitentiary. But the application of that meaning may change based on which crimes the legislature designates as deserving of that punishment.

*Richardson v. Ramirez,* 418 U.S. 24 (1974), provides a good example of how this works in practice. In that case, a group of felons claimed that the state law disenfranchising them for their felony convictions violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 26–27. The Supreme Court upheld the law, in large part, because the Fourteenth Amendment expressly authorizes States to disenfranchise persons who "participat[ed] in rebellion, or other crime." *Id.* at 43 (quoting U.S. Const. amend. XIV, § 2). One of the plaintiffs in that case had been convicted of a "felony . . . heroin possession," *Id.* at 32 n.9, which was not a "crime" in 1868, but the Court had no trouble concluding that Congress intended to allow disenfranchisement for *all* "crimes," even those that did not exist at the time. Just as the generic noun "crimes" covers modern offenses like possession of heroin, the term "felony" covers modern felonies.

Virginia is not disenfranchising a "class of persons" who were allowed to vote under the 1869 Constitution in violation of the Virginia Readmission Act. See 16 Stat. 63. The relevant "class of persons" who are disenfranchised, felons, has not changed. Felons cannot vote under either the 1869 Constitution or the current 1971 Constitution. Some felonies exist today which did not exist in 1869, but the relevant "class" has remained the same. Virginia has therefore not "deprive[d] any citizen or class of citizens of the United States of the right to vote who [were] entitled to vote" under the 1869 Constitution. 16 Stat. 63. Indeed, the absurdity of interpreting "felony" to reference a closed set of crimes is laid bare when one applies that approach to other terms in the statute. For example, the Virginia Readmission Act protects the right to vote of

"citizens" and "class[es] of citizens" "who are entitled to vote by the Constitution herein recognized." 16 Stat. 63. Applying a closed-set approach to the term "citizen," Plaintiffs would not qualify because neither of them was a "citizen" in 1869, much less a citizen "entitled to vote." *Ibid.*

## CONCLUSION

For these reasons, the Court should grant Defendants' motion for summary judgment, dismiss this action, and award the Defendants any further such relief the Court deems necessary and appropriate.

Dated: July 18, 2025

Respectfully submitted,

JOHN O'BANNON
ROSALYN R. DANCE
GEORGIA ALVIS-LONG
CHRISTOPHER P. STOLLE
J. CHAPMAN PETERSEN
SUSAN BEALS
ERIC SPICER
SANDY C. ELSWICK


By: ____*/s/ Erika L. Maley*____
    Erika L. Maley (VSB #97533)
      *Solicitor General*

    Jason S. Miyares
      *Attorney General*

Charles J. Cooper *(Pro Hac Vice)*
John D. Ramer *(Pro Hac Vice)*
Haley N. Proctor (VSB #84272)
Bradley L. Larson (*Pro Hac Vice*)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

    Thomas J. Sanford (VSB #95965)
      *Deputy Attorney General*

    Kevin M. Gallagher (VSB #87548)
      *Principal Deputy Solicitor General*

    Office of the Attorney General
    202 North Ninth Street
    Richmond, Virginia 23219
    (804) 786-2071 – Telephone
    (804) 786-1991 – Facsimile
    EMaley@oag.state.va.us

*Not a D.C. Bar Member; practice limited to
matters in federal forums.

*Counsel for Defendants John O'Bannon,
Rosalyn R. Dance, Georgia Alvis-Long,
Christopher P. Stolle, J. Chapman Petersen,
Susan Beals, Eric Spicer, and Sandy C.
Elswick*

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on July 18, 2025, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all parties of record.


*/s/ Erika L. Maley*
Erika L. Maley (VSB #97533)
  *Solicitor General*

31