**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

TATI ABU KING *and* TONI HEATH JOHNSON,

     *Plaintiffs,*

  *v.*

JOHN O'BANNON, *in his official capacity as Chairman of the State Board of Elections for the Commonwealth of Virginia*; ROSALYN R. DANCE, *in her official capacity as Vice Chair of the State Board of Elections for the Commonwealth of Virginia*; GEORGIA ALVIS-LONG, *in her official capacity as Secretary of the State Board of Elections for the Commonwealth of Virginia*; DONALD W. MERRICKS, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; MATTHEW WEINSTEIN, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; SUSAN BEALS, *in her official capacity as Commissioner of the Department of Elections for the Commonwealth of Virginia*; ERIC SPICER, *in his official capacity as the General Registrar of Fairfax County, Virginia*; and SANDY C. ELSWICK, *in her official capacity as the General Registrar of Smyth County, Virginia,*

    Defendants.

Case No. 3:23-cv-00408 (JAG)

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND FOR PERMANENT INJUNCTION**

<h1 align="center">TABLE OF CONTENTS</h1>

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

    A.    The Reconstruction Congress Establishes A Federal Statutory Framework To Protect Black Voting Rights .................................................................................3

    B.    Virginia Repeatedly Amends Its Constitution To Expand Disenfranchisement And Suppress Black Voting Power ...........................................................................6

    C.    Defendants Enforce Article II Section 1 To Disenfranchise Virginians Convicted Of Any Felony ...............................................................................................9

LEGAL STANDARD...........................................................................................................11

ARGUMENT ......................................................................................................................12

I.    VIRGINIA'S FELONY DISENFRANCHISEMENT REGIME VIOLATES THE VIRGINIA READMISSION ACT...................................................................................................12

    A.    Federal Law Prohibits Defendants From Disenfranchising Otherwise Eligible Voters For Offenses That Were Not Felonies At Common Law In 1870 .............13

        1.    The Virginia Readmission Act's Text Is Clear And Dispositive..............13

        2.    The Virginia Readmission Act's Structure And Purpose Confirm That Defendants' Disenfranchisement Regime Violates The Act ....................17

    B.    Defendants Enforce Virginia's Felony Disenfranchisement Provision ................22

II.    DEFENDANTS SHOULD BE ENJOINED FROM DISENFRANCHISING OTHERWISE ELIGIBLE VIRGINIA VOTERS ON THE BASIS OF A CRIMINAL RECORD, EXCEPT FOR CONVICTION OF AN OFFENSE THAT WAS A FELONY AT COMMON LAW IN 1870 .......................................23

    A.    Unlawfully Disenfranchised Virginians Will Continue To Suffer Irreparable Harm Absent Injunctive Relief And Have No Adequate Remedy At Law ....................23

    B.    The Balance Of Equities And The Public Interest Favor An Injunction ...............25

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aleman v. City of Charlotte,*
  80 F.4th 264 (4th Cir. 2023) .................................................10

*Armstrong v. Exceptional Child Center, Inc.,*
  575 U.S. 320 (2015)..................................................10, 11

*Bostock v. Clayton County, Georgia,*
  590 U.S. 644 (2020)............................................12, 15, 19

*Boston Correll v. Herring,*
  212 F. Supp. 3d 584 (E.D. Va. 2016) ...............................22

*Cela v. Garland,*
  75 F.4th 355 (4th Cir. 2023) ..................................16, 21

*Dunn v. Blumstein,*
  405 U.S. 330 (1972)..........................................................21

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) ..........................................................11

*Griffin v. North Carolina State Board of Elections,*
  2025 WL 1292530 (E.D.N.C. May 5, 2025) ......................22

*Hafer v. Melo,*
  502 U.S. 21 (1991)............................................................11

*Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.,*
  530 U.S. 1 (2000)..............................................................16

*Hunter v. Hamilton County Board of Elections,*
  635 F.3d 219 (6th Cir. 2011) ............................................23

*King v. Youngkin,*
  122 F.4th 539 (4th Cir. 2024) ................................10, 11, 22

*Lackey v. Stinnie,*
  145 S. Ct. 659 (2025)........................................................13

*League of Women Voters of North Carolina v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014) ......................................21, 22

*Marx v. General Revenue Corp.*,
568 U.S. 371 (2013)............................................................................20

*Nero v. Mosby*,
890 F.3d 106 (4th Cir. 2018) ........................................................19, 20

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................................11

*O'Bannon v. King*,
2025 WL 1727393 (U.S. June 23, 2025) ...........................................10

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)................................................................................22

*Reynolds v. Sims*,
377 U.S. 533 (1964)............................................................................21

*Roberts v. Sea-Land Services, Inc.*,
566 U.S. 93 (2012)..............................................................................12

*State of North Carolina v. United States*,
7 F.4th 160 (4th Cir. 2021) ................................................................17

*Terrace v. Thompson*,
263 U.S. 197 (1923).............................................................................22

*United States v. Texas*,
2025 WL 1836640 (5th Cir. July 3, 2025)..........................................12

*University of Texas Southwestern Medical Center v. Nassar*,
570 U.S. 338 (2013)............................................................................17

*Wo v. Hopkins*,
118 U.S. 356 (1886)............................................................................21

**Federal Statutes**

21 U.S.C. § 841 ......................................................................................8

42 U.S.C. § 1983 ....................................................................................2

First Reconstr. Act of Mar. 2, 1867, ch. 153, 14 Stat. 428 ................... *passim*

Virginia Readmission Act, 16 Stat. 62 (Jan. 26, 1870).......................4, 19

**State Statutes and Constitutional Provisions**

Va. Code Ann.§ 18.2................................................................8, 9, 10, 16

Virginia Const. art. II § 1 (1971) ................................................................8, 14

Va. Const. art. I § 20 (1869) ................................................................4

Virginia Const. art. III § 1 (1869) ................................................................4, 15, 20

# INTRODUCTION

In 1870, Congress passed and President Ulysses S. Grant signed the Virginia Readmission Act ("the Act"), readmitting Virginia's delegates to Congress following Virginia's ratification of the Fourteenth and Fifteenth Amendments. However, Congress imposed what it described as a "fundamental condition" on Virginia's readmission: "That the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes ***as are now felonies at common law.***" This action seeks to put an end to Virginia's longstanding violation of that fundamental condition.

Virginia amended the felony disenfranchisement provision of its constitution four times after Congress passed the Act. Since 1902, when white supremacists called a constitutional convention to eliminate vestiges of Reconstruction from Virginia's fundamental law and thereby guarantee a "white man's government," the state Constitution has purported to disenfranchise ***any*** otherwise eligible Virginian convicted in ***any*** jurisdiction of ***any*** felony. That includes hundreds of crimes—such as carrying a concealed weapon or drug possession—not recognized as "felonies at common law" in 1870. Today, Article II Section 1 of the Virginia Constitution (the "Felony Disenfranchisement Provision") reads: "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the governor." Defendants admit they enforce this provision to cancel voting rights and block voter registration for conviction of "***all*** felonies," and that they "do not make any distinction between 'common law' felonies or non-

'common law' felonies." Ex.A (Defendants' Resp. & Objs. to First Set of Interrogatories) at 1.[1] This violates the clear textual mandate of the Virginia Readmission Act.

Virginia's unlawful felony disenfranchisement regime has resulted in one of the nation's largest populations of disenfranchised people, composed disproportionately of Black Virginians— the very result that Congress crafted the Virginia Readmission Act to prevent. Voting-age Black Virginians make up only about one-fifth of Virginia's voting-age population, yet Black people comprise approximately 46% of those Defendants have disenfranchised based on felony convictions. *See* Plaintiffs' Statement of Undisputed Material Facts ("SUMF") ¶ 64. In fact, Virginia disenfranchised 190,605 Black citizens in 2020—the second-highest number of Black citizens disenfranchised for a felony conviction of any state. *Id.* ¶ 67.

Plaintiffs therefore respectfully request that the Court (1) enter summary judgment in their favor on Count II of the Second Amended Complaint, (2) declare that Defendants' enforcement of the Felony Disenfranchisement Provision violates the Act, and (3) permanently enjoin Defendants or those acting in concert with them from disenfranchising Plaintiffs, members of the class they represent (described in the motion for class certification filed alongside this motion) or any otherwise eligible Virginia voter under color of the Felony Disenfranchisement Provision, except for conviction for an offense that would have been a felony at common law in 1870.[2]

---

[1] Citations to Ex._ refer to Exhibits to the Declaration of Brittany Blueitt Amadi, filed herewith. Internal quotation marks, citations, and alterations have been omitted and emphasis added, except as noted.

[2] Plaintiffs' Virginia Readmission Act claim under 42 U.S.C. § 1983 and Plaintiffs' Eighth Amendment claims were dismissed. *See* Opinion, Dkt. 88. Plaintiffs reserve all associated appellate rights.

**A.    The Reconstruction Congress Establishes A Federal Statutory Framework To Protect Black Voting Rights**

Following the Civil War, former Confederate states, including Virginia, reacted against the Black political power that Emancipation had created by repeatedly "passing vagrant laws" and enacting new criminal "laws … on purpose to oppress the colored people" and "to disenfranchise [Black] men who ha[d] been voters there."  Ex.B (Expert Report of Dr. Edward L. Ayers) ¶ 35 (quoting 1866 testimony of a sheriff in Fairfax County, Virginia).  Congress responded to reports of these tactics by passing the Military Reconstruction Acts, which *inter alia* "required former Confederate states, including Virginia, to adopt new state constitutions and grant Black men the right to vote in and be elected to constitutional conventions."  *Id.* ¶ 33.  Section 5 of the first Military Reconstruction Act expressly prohibited the new constitution of any former Confederate state from disenfranchising any adult man except for "participation in the rebellion or for ***felony at common law***."  First Reconstr. Act of Mar. 2, 1867, ch. 153, 14 Stat. 428, 428; *see also* Ex.B ¶ 34.  The Republicans in Congress crafted this provision because they concluded it was easier for former Confederate states to disenfranchise Black people by both inventing and prosecuting vagrancy and other offenses in the new "Black Codes" rather than through prosecutions for the more serious crimes recognized as felonies at common law.  Ex.B ¶¶ 35-38.

Virginia initially complied with these mandates.  Black men thus could vote in the election of October 1867, helping to elect twenty-four Black men to the constitutional convention.  Ex.B ¶ 39.  On July 6, 1869, Virginia ratified a new constitution pursuant to the Military Reconstruction Act.  *Id.* ¶ 41.  That 1869 Constitution included a provision in its Bill of Rights providing "[t]hat all citizens of the State are hereby declared to possess equal civil and political rights and public

privileges." *Id.* (quoting Va. Const. art. I § 20 (1869)). These "political rights" included the right to the "Elective Franchise":

> Every male citizen of the United States, twenty-one years old, who shall have been a resident of this State twelve months, and of the county, city, or town in which he shall offer to vote three months next preceding any election, shall be entitled to vote upon all questions submitted to the people at such election: Provided … That ***the following persons shall be excluded from voting***:
> 1st. Idiots and lunatics.
> 2d. ***Persons convicted of bribery in any election, embezzlement of public funds, treason or felony***.
> 3d. No person who, while a citizen of this State, has, since the adoption of this Constitution, fought a duel with a deadly weapon, [or otherwise participated in dueling.]

Va. Const. art. III § 1 (1869). At the time, and as explained later, *see* Part I.A.1, *infra*, the word "felony" is best read to have referred to felonies at common law. *See* Ex.C ¶ 15 (Expert report of Professor Carissa Byrne Hessick); Ex.B ¶ 43.

The Reconstruction Congress had consistently refused to readmit to the Senate or House of Representatives delegates from any former Confederate state until that state complied with the Military Reconstruction Acts. Ex.B ¶ 33. As each former Confederate state ratified the Fourteenth and Fifteenth amendments and enacted a new constitution, Congress assessed its compliance with the Military Reconstruction Acts and, when satisfied, enacted a "Readmission Act." *Id.* ¶¶ 44-49. In assessing states' compliance, members of Congress focused particularly on the Military Reconstruction Act's language prohibiting state constitutions from disenfranchising any adult man except for "participation in the rebellion or for ***felony at common law***," First Reconstr. Act § 5. *See* Ex.B ¶ 45. Accordingly, among the "fundamental conditions" Congress included in all but Tennessee's readmission act was a provision prohibiting the covered state from amending its constitution to disenfranchise otherwise eligible voters except as punishment for those convicted of "felonies at common law." *Id.* Congressmen debating the readmission acts explained that this

"condition was inserted to perpetuate negro suffrage." *Id.* ¶ 46 (quoting Sen. McCreery). "[W]ithout this condition," one Senator stated, "the people of [each state] … [would] have the right at the first election to decide whether they will change this constitution," and "they will change it," because "[t]he rebel leaders have the power there; they own the lands; they have the money; they have the disposition to do it, by fraud, by force, by murder, by assassination, by bribery, by starvation, by intimidation and threats." *Id.* ¶ 47 (quoting Sen. Yates).

Virginia was among the last states to comply with the Military Reconstruction Acts. *See* Ex.B ¶ 44 n.49. Indeed, Congress considered Virginia's readmission only after those committed to preserving "a white man's government" in Virginia reached a compromise with Republican congressmen and President-Elect Grant to ratify the proposed 1869 Constitution after the provisions disenfranchising former supporters of the Confederacy were stripped out of it. *Id.* ¶¶ 39-40. After Virginia ratified its 1869 Constitution, Congress took up Virginia's readmission. Congress and the President ultimately determined that Virginia had "adopted a constitution precisely in harmony with the reconstruction acts" and had ratified the Fourteenth and Fifteenth Amendments. *Id.* ¶¶ 43, 50 (quoting Sen. Stewart). Congress declared that "the people of Virginia have framed and adopted a constitution of State government which is republican" and that complied with the Military Reconstruction Act's requirements on January 26, 1870, when it passed and President Grant signed the Virginia Readmission Act (the "Act"), 16 Stat. 62 (1870). *See* Ex.B ¶ 50. As relevant here, the Act provides:

> That the State of Virginia is admitted to representation in Congress as one of the States of the Union upon the following fundamental condition[]: … That the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the right to vote who are entitled to vote by the Constitution herein recognized, ***except as a punishment for such crimes as are now felonies at common law***, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State.

16 Stat. 62 (1870).  Numerous Congressmen who participated in the January 1870 debate over the Act emphasized how "[t]h[is] 'fundamental condition' fixes the rights of citizens, and the courts will furnish redress for their violation."  Ex.B ¶ 56 (quoting Rep. Lawrence); *see also, e.g., id.* ("If the State should pass any law or adopt any constitutional change in violation of this fundamental compact the courts would hold that these claimants for their rights should have their remedy." (quoting Rep. Ward)).  And the Act worked to prevent the racial backlash that the Reconstruction Congress and President Grant feared:  Between 1869 and 1889, Black Virginians helped elect nearly ninety Black men to the General Assembly, and numerous other Black Virginians to city councils, county boards of supervisors, and other local offices.  *Id.* ¶ 60.

The Virginia Readmission Act has never been repealed.

**B.      Virginia Repeatedly Amends Its Constitution To Expand Disenfranchisement And Suppress Black Voting Power**

Virginia has amended its Constitution's felony disenfranchisement provision four times since the Virginia Readmission Act was passed: in 1876, 1902, 1928, and 1971.

***First***, on November 7, 1876, Virginians ratified a set of amendments to the state constitution that drastically restricted voting rights.  Ex.B ¶ 61.  Among the changes was the addition of "petit larceny" to the list of crimes that would lead to an otherwise qualified voter's disenfranchisement.  *Id.*  The chief architect of the measure, an "unrepentant rebel" who "was a leader of the 'Konservative Kampaign Klub' in Richmond, Virginia" defended the change as a way to "help Eastern Virginia by relieving its counties from the rule of ignorance and vagrancy." *Id.* ¶ 63 n.78.  The amendment was based on the belief that Black people were more likely to be convicted of petit larceny, both because of "the racist belief that Black people were inherently more dishonest than white people, as well as on the economic reality that Black people were more likely to be poor than white people."  *Id.* ¶ 63.  These amendments depressed the number of

Virginia voters by about 10 percent and immediately cut the number of Black officeholders elected in Virginia by well over half. *Id.* ¶ 64. By the 1890s, the number of Black men elected to the General Assembly fell to zero, and the number of Black men elected to local office fell to near-zero. *Id.* ¶ 65.

***Second***, in 1902, Virginia again amended its constitution to further constrict the right to vote. Among other changes (such as adding a poll tax), the 1902 amendments expanded disenfranchisement to those persons convicted "either within or without this State ... of treason or of ***any felony***, bribery, petit larceny, ***obtaining money or property under false pretenses***, embezzlement, ***forgery***, or ***perjury***." Ex.B ¶¶ 73-74 (quoting 1902 Va. Const. art. II, § 23). A small group of white supremacists directed a legislative maneuver to trigger the constitutional convention that enacted these amendments, which were never subject to a referendum. *Id.* ¶¶ 67, 76. An editor of the *Richmond Planet*, the state's most influential Black newspaper, denounced the process at the time as an "unconstitutional 'Constitutional' Convention" because its stated purpose—to disenfranchise Black voters as much as possible without violating the Fifteenth Amendment—plainly violated the Virginia Readmission Act. *Id.* ¶ 68. In an "address accepting the presidency of the convention," a "former secessionist and Confederate Congressman … denounced the grant of the vote to Black men in the 1860s as 'not only a stupendous blunder, but a crime against civilization and Christianity.'" *Id.* ¶ 69 (quoting *Report of the Proceedings and Debates of the Constitutional Convention, State of Virginia, Held in the City of Richmond June 12, 1901 to June 26, 1902*, 1:20 (Hermitage Press, 1906)). The amendments that resulted and laws

implementing them ultimately reduced the small number of Black voters by about 90 percent in nearly all communities in Virginia over the ensuing decades.  *Id.* ¶ 77.[3]

**Third**, in 1928, voters ratified a new state constitution that retained the 1902 Constitution's disenfranchisement provision, except that it eliminated bribery from the list of enumerated offenses punishable by disenfranchisement.  Ex.B ¶ 78 (discussing 1928 Va. Const. art. II, § 23).

**Finally**, in 1971, voters adopted a revised constitution that again amended the disenfranchisement provision, yielding the language still in force today:

> In elections by the people, the qualifications of voters shall be as follows: Each voter shall be a citizen of the United States, shall be eighteen years of age, shall fulfill the residence requirements set forth in this section, and shall be registered to vote pursuant to this article. ***No person who has been convicted of a felony shall be qualified to vote*** unless his civil rights have been restored by the Governor or other appropriate authority. As prescribed by law, no person adjudicated to be mentally incompetent shall be qualified to vote until his competency has been reestablished.

Va. Const. Art. II § 1 (1971).  The Governor called this constitutional convention in 1968 to bring the Constitution into conformance with recent changes in federal law, such as the Nineteenth Amendment.  Ex.D at 148:20-149:11 (deposition of Edward Ayers).  The commission explained that, with this revision, "[t]he generic term 'felony' has been substituted for the list of crimes contained in" the 1902 version, but that "disenfranchisement of persons convicted of a felony remains automatic;" this language thus "work[ed] no change in the present law."  Commission on Constitutional Revision, Constitution of Virginia at 106 (1968); *see also* Ex.B ¶ 80.

---

[3] Among the other constitutional amendments that emerged from the 1902 convention were changes that removed "clauses that (1) abolished and prohibited slavery; (2) repudiated secession; (3) declared that acts of Congress and treaties … were the supreme law of the land; and (4) specified 'that all citizens of the State … possess equal civil and political rights.'"  Ex.B ¶¶ 70, 73.

## C.     Defendants Enforce Article II Section 1 To Disenfranchise Virginians Convicted Of Any Felony

Defendants strictly enforce the Constitution's Felony Disenfranchisement Provision to prohibit **every person** from voting who has been convicted of **any felony** codified under Virginia law, federal law, or the law of another state. *See* SUMF ¶ 47. Virginia statutes implementing the Constitution's felony disenfranchisement provision require Defendants "to cancel the voter registration of any otherwise eligible voter who has been convicted of any criminal offense categorized as a felony that is set forth in the Code of Virginia, including all felony offenses codified in Title 18.2 of the Code of Virginia," and "to deny the application for voter registration of any otherwise eligible voter who has been convicted (1) of any criminal offense categorized as a felony that is set forth in the Code of Virginia, including all felony offenses codified in Title 18.2 of the Code of Virginia." SUMF ¶ 53. Defendants thus disenfranchise otherwise eligible Virginians who have been convicted for hundreds of distinct offenses that are now codified as felonies but were not felonies at common law in 1870. For instance, while there are numerous drug-related felonies set forth in the Virginia Code and Title 21 of the U.S. Code, there were no drug-related felonies at common law in 1870. SUMF ¶ 36. (Nor were there even statutory drug crimes in Virginia in 1870. Ex.C ¶ 36.) Indeed, of the more than 1,100 offenses codified as felonies under Virginia law, only 96 "would have been understood as constituting 'felonies at common law' as the terms were used in the Virginia Readmission Act." SUMF ¶ 35 (citing Ex.C ¶ 39). By contrast, more than 858 offenses codified as felonies in Virginia today would not have been understood as 'felonies at common law' as the term was used in the Virginia Readmission Act. SUMF ¶ T36 (citing Ex.C ¶¶ 40-41). The latter list includes, for example, three felonies

related to carrying a concealed weapon and approximately 80 narcotics-related felonies. SUMF ¶ 36 (citing Ex.C at Exhibit D).[4]

Virginia law criminalizes registering or attempting to register to vote by any person who is disqualified, including people disenfranchised for a prior felony conviction. *See* Va. Code §§ 24.2-653, 24.2-1004. To implement the Constitution's felony disenfranchisement provision, the Virginia Department of Elections receives monthly datasets from the Virginia State Police and the U.S. Attorneys' Offices in Virginia reporting all recent felony convictions, and the Registrars cancel any existing registration determined to be associated with a person who was convicted. SUMF ¶ 48. The Department maintains a "prohibited table" in its computerized registration system listing people who are barred from registering to vote because of their criminal histories. *Id.* The prohibited table now has more than 300,000 records. *Id.* ¶ 49.

Plaintiffs Tati Abu King and Toni Heath Johnson are among the numerous Virginians who are (and may be) disenfranchised for having committed statutory felonies that would not have been recognized as felonies at common law in 1870. Mr. King is currently disenfranchised based on his 2018 felony conviction under Va. Code § 18.2-248, for possession with intent to distribute a controlled substance. SUMF ¶¶ 6-7. Ms. Johnson is currently disenfranchised based on her 2021 felony convictions under Va. Code §§ 18.2-248 and 18.2-371.1, for possession with intent to distribute a controlled substance, distribution of a controlled substance, and the related neglect of a child. *Id.* ¶¶ 15-17. Neither the drug nor the child neglect offenses would have been recognized

---

[4] This figure is conservative. Plaintiff's expert on the history of the common law of crimes, Professor Carissa Hessick, refrained from "definitively classify[ing]" another "238 [] Virginia statutory felonies" that also do not clearly correspond to the felonies at common law in 1870. *See* Ex. C ¶¶ 40-41. However, Plaintiffs maintain that none of these 238 Virginia statutory felonies nor any other uncategorized offense under federal law or the law of another state can serve as a lawful basis of disenfranchisement unless Defendants can establish it would have been recognized as a felony at common law in 1870.

as felonies at common law in 1870.  *Id.* ¶ 20.  Mr. King and Ms. Johnson seek to register to vote and vote, but they are barred from doing so under Article II Section 1's felony disenfranchisement provision.  *Id.* ¶ 21.

Virginia's automatic, lifetime disenfranchisement of any person convicted of any felony has made the Commonwealth a national outlier in the suppression of voting rights.  Although voting-age Virginians account for less than 2.7% of the voting-age population nationwide, Virginia accounts for about 10% of all people nationwide who are disenfranchised after having completed a criminal sentence and roughly 16% of all Black citizens nationwide who are disenfranchised after completing their sentences.  *See id.* ¶¶ 60, 69-70.  In 2024, Virginia disenfranchised approximately 120,606 Black Virginians.  SUMF ¶ 63.  That year, approximately 46% of Virginia's disenfranchised population of approximately 264,292 was Black, even though Black people account for only about 20% of Virginia's voting-age population of approximately 6.3 million.  *Id.* ¶¶ 62-65.  As a result, nearly 10% of voting-age Black Virginians are disenfranchised. *Id.* ¶ 65.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact."  *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023).

In this equitable suit, Plaintiffs need only show that injunctive relief is necessary "against state officers who are violating, or planning to violate, federal law."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015), *cited in King v. Youngkin*, 122 F.4th 539, 546 (4th Cir. 2024), *cert. denied*, 2025 WL 1727393 (U.S. June 23, 2025).  As the Fourth Circuit held in this case, the Court retains inherent "power to grant equitable relief" to Plaintiffs in this suit for prospective relief from preempted state regulation and enforcement.  *King*, 122 F.4th at 544 & n.1.  "No more is required" than for Plaintiffs to show that "'federal law immunizes [the]m from state

regulation,'" and that "'the state regulatory actions'" are "'preempted.'" *Id.* at 545 (quoting *Armstrong*, 575 U.S. at 326). Courts routinely grant such equitable relief. *See, e.g.*, *United States v. Texas*, 2025 WL 1836640, at *17 (5th Cir. July 3, 2025) (listing examples). "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327. But here the Fourth Circuit has held that "the Virginia Readmission Act creates no such limitations." *King*, 122 F.4th at 546.

To obtain a permanent injunction, "plaintiff[s] must demonstrate: (1) that [they] ha[ve] suffered an irreparable injury (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by" injunctive relief. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "Suits against state officials in their official capacity" are for purposes of the injunction inquiry "treated as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991), *cited in King*, 122 F.4th at 543. Accordingly, "[w]hen the government is the defendant, the inquiry into the last two" permanent injunction factors "merge." *Boyle v. Trump*, 2025 WL 1677099, at *13 (D. Md. June 13, 2025) (citations omitted).

## ARGUMENT

I.   **VIRGINIA'S FELONY DISENFRANCHISEMENT REGIME VIOLATES THE VIRGINIA READMISSION ACT**

Through their continued enforcement of the Felony Disenfranchisement Provision—an amendment to Virginia's constitution that the Virginia Readmission Act plainly prohibits—Defendants are violating, and plan to continue violating, federal law.

**A.      Federal Law Prohibits Defendants From Disenfranchising Otherwise Eligible Voters For Offenses That Were Not Felonies At Common Law In 1870**

1.      The Virginia Readmission Act's Text Is Clear And Dispositive

The Court must "begin by examining the key statutory terms," reading them "in accord with the ordinary public meaning of [those] terms at the time of [the statute's] enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654-55 (2020). And where, as here, "the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," the Court's analysis must also end with the text. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012).

The Virginia Readmission Act's "fundamental condition[]" safeguarding voting rights provides "[t]hat the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the right to vote who are entitled to vote by the Constitution herein recognized, ***except as a punishment for such crimes as are now felonies at common law***, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State." 16 Stat. 62 (1870). But Virginia has "amended or changed" its Constitution's disenfranchisement clause no less than four times since 1870, each time disenfranchising people who ***were*** entitled to vote by the 1869 Constitution that Congress recognized. *See supra* pp.6-8. As a result of those amendments, Defendants permanently disenfranchise every "person who has been convicted of a felony" in any jurisdiction, Va. Const. art. II § 1. *See* SUMF ¶ 45. Many thousands of Virginians—including both Mr. King and Ms. Johnson—are therefore denied their fundamental right to participate in self-governance solely because they were convicted of engaging in conduct that was not criminalized in any form in 1870, let alone recognized then as a felony at common law. *See id.* ¶ 20; Ex.C ¶ 36.

The Virginia Readmission Act expressly prohibits Virginia from amending its constitution to disenfranchise its citizens, "***except*** as a punishment for such crimes as are ***now felonies at***

***common law***." 16 Stat. 62 (1870).  In other words, the Act prohibits Virginia from expanding the scope of disenfranchisement to encompass conviction of a crime that was not a felony at common law in 1870.  As Professor Hessick's comprehensive historical analysis makes clear, the phrase "felonies at common law" had an established meaning when Congress enacted the Virginia Readmission Act.  *See* Ex.C ¶¶ 19-23.  Well-worn statutory construction principles require that when Congress uses a "legal term of art" ("felonies at common law") without defining it, courts accept that Congress "presumably knows and adopts the cluster of ideas that were attached to each borrowed word," including "the legal tradition and meaning of centuries of practice."  *Lackey v. Stinnie*, 145 S. Ct. 659, 666-667 (2025).  As Professor Hessick explains, "[l]eading up to and during 1870, scholars and courts uniformly recognized a distinction between statutory and common law felonies, and they would have understood the term 'felonies at common law' to exclude statutory felonies and instead refer only to a discrete and narrow list of common law crimes."  Ex.C ¶ 42; SUMF ¶ 33.

Professor Hessick's historical review explains why the distinction between a relatively static set of "common law felonies" and the legislatively defined set of "statutory felonies" would have been familiar to any contemporary legislator in 1870.  At that time, "the common law was the main source of substantive criminal law in the United States."  Ex.C ¶ 21.  Although "some U.S. states undertook efforts to systematically codify" criminal law "[b]eginning in the mid-1800s, … the common law remained an important source of substantive criminal law well into the late nineteenth century," and "common law crime[s] often continued to endure unless [a] statute expressly or impliedly repealed [them]."  *Id.*  Accordingly, the 1870 Congress "would have … understood" the term "felonies at common law" to refer to "a category distinct from statutory

felonies—that is, crimes that a legislature had designated as felonies." *Id.* ¶ 20. This was "widely recognized." *Id.* ¶¶ 22-23, 29 (listing examples).

There was also general agreement as to the core crimes that were considered felonies at common law, such that one can "confidently identify a list of crimes that would have been broadly understood to fall within the language 'such crimes as are now felonies at common law' in the year 1870": arson; burglary; escape and rescue from a prison or jail; homicide, including murder and manslaughter; larceny; mayhem (i.e., causing a debilitating injury); rape (including statutory rape of a minor less than 12); robbery; sodomy (including, at the time, bestiality); and suicide. *Id.* ¶ 31. Indeed, Defendants appear to agree; although they cite a range of treatises—some from centuries before the Virginia Readmission Act was passed—Defendants have acknowledged that "murder, arson, sodomy, robbery, and larceny were understood as felonies at common law." Ex.A at 6 (Supplemental Response to Interrogatory No. 2); *see also* Defendants' Memorandum in Support of Motion to Dismiss the First Amended Complaint, Dkt. 77 at 15 (asserting the same list as the relevant felonies at common law).[5]

Nor does the language specifying that the Virginia Constitution "shall never be so amended or changed as to deprive any citizen or class of citizens of the right to vote who are entitled to vote by the Constitution herein recognized," 16 Stat. 62 (1870), expand the crimes for which Virginia could impose disenfranchisement. As explained, *supra* pp.5-6, the "Constitution herein recognized" was the 1869 Constitution. Although the 1869 Constitution disenfranchised "[p]ersons convicted of bribery in any election, embezzlement of public funds, treason or felony,"

---

[5] To the extent there are other crimes which "possibly could have been understood to fall within the phrase 'felonies at common law' as used in the [Act]," because they "appear in only some of the authoritative treatises," that list, too, is small and similar: it includes treason; bribery of a judge; conspiracy to falsely indict another for a felony; perjury and subornation of perjury; and escaping from a penal colony. Ex.C ¶¶ 33-34.

Va. Const. Art. III, § 1 (1869), the Court must interpret that phrase "in accord with the ordinary public meaning of its terms at the time of its enactment," *Bostock*, 590 U.S. at 654, giving them "the meaning they had when the text was adopted," A. Scalia & B. Garner, *Reading Law* 78 (2012). As Professor Hessick explains, in 1869, legislators "likely would have interpreted the reference to 'felony'" in the 1869 Constitution "to mean a felony at common law, rather than any crime that had been deemed a felony by the Virginia legislature," because the common law continued to serve as the default source of substantive criminal law even after states began codifying felonies. Ex.C ¶ 15. The term "felony" in the 1869 Constitution "certainly would ***not*** have been understood to track the modern definition[]" to encompass any crime, statutory or not, that is "punishable by a year or more in prison" today. *Id.* ¶ 20. This understanding is confirmed by the history surrounding the Constitution's ratification: the 1869 Constitution was ratified to comply with the Military Reconstruction Act of 1867, *see* Ex. B ¶¶ 52-54, which mandated that former Confederate states adopt republican constitutions that did not "disenfranchise[e] any adult man except for participation in the rebellion or for ***felony at common law***," First Reconstr. Act § 5; *see supra* pp.4-5.

There is no dispute that Defendants enforce Virginia's Felony Disenfranchisement Provision to disenfranchise people for conviction of offenses that were not felonies at common law in 1870. Defendants admit that "***all*** felonies result in disenfranchisement" under the Constitution adopted in 1971, and "they do not make any distinction between 'common law' felonies or non-'common law' felonies." Ex.A at 1 (emphasis in original); *see* SUMF ¶ 57. Nor can there be any genuine dispute that Title 18.2 of the Virginia code codifies numerous offenses as felonies that have no relation whatsoever to any of the felonies at common law recognized in 1870, including offenses such as credit card forgery (Va. Code § 18.2-193), driving under the

influence (Va. Code § 18.2-266), and carrying concealed weapons (Va. Code § 18.2-308). Yet Defendants admit that they would cancel the registration of any voter upon conviction for these modern statutory felonies. *See* Ex.E (Def. Resp. to 2d RFAs) at 1; *see* SUMF ¶ 55. Indeed, Professor Hessick identified 1,096 modern Virginia statutory felonies that were not felonies at common law in 1870—none of which may lawfully serve as a basis for disenfranchisement. *See* Ex.C at Ex. E-F.

"[W]hen 'the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Cela v. Garland*, 75 F.4th 355, 365 (4th Cir. 2023) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). Defendants violate the Virginia Readmission Act's plain text by disenfranchising otherwise eligible Virginians who were convicted of an offense that was not a felony at common law in 1870. That unlawful practice should be permanently enjoined.

2.  The Virginia Readmission Act's Structure And Purpose Confirm That Defendants' Disenfranchisement Regime Violates The Act

"[T]he design and structure of the [Virginia Readmission Act] as a whole" confirms that Defendants violate federal law by disenfranchising any otherwise-eligible Virginia voter for conviction of a statutory felony that was not recognized as a felony at common law in 1870. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). Indeed, the historical context in which the Virginia Readmission Act was passed and the Act's legislative history confirm that the Commonwealth's broad disenfranchisement regime violates Congress's manifest "purpose," *State v. United States*, 7 F.4th 160, 170 (4th Cir. 2021), in imposing the Act's "fundamental conditions": to prohibit Virginia from disenfranchising voters on the basis of statutory felonies that the General Assembly might create after the state's readmission.

The Court need not guess at Congress's object or purpose in passing the Virginia Readmission Act. The Act is, from the start, committed to preventing disenfranchisement. Thus, it begins by stating that Virginia's expansion of the franchise was critical to Congress' decision to readmit the Commonwealth's delegation:

> WHEREAS the people of Virginia have framed and adopted a constitution of State government which is republican; and whereas the legislature of Virginia elected under said constitution have ratified the fourteenth and fifteenth amendments to the Constitution of the United States; and whereas the performance of these several acts in good faith was a condition precedent to the representation of the State in Congress[.]

16 Stat. 62. The Act's "felonies at common law" standard and "condition precedent" language refer back to Congress's mandate in section 5 of the Military Reconstruction Act of 1867 that former Confederate states adopt republican constitutions that did not "disenfranchise[e] any adult man except for participation in the rebellion or for ***felony at common law***," First Reconstr. Act § 5; *see supra* pp.4-5. Only after recognizing that Virginia had met this "condition precedent" to readmission, 16 Stat. 63, does the Virginia Readmission Act readmit Virginia's congressional delegation, subject to the forward-looking "fundamental condition" that Virginia cannot in the future "deprive any citizen or class of citizens of the right to vote" that Virginia had established in compliance with the Military Reconstruction Act. *See* Ex.B ¶¶ 52-54.

The avowed "purpose of the fundamental condition was to 'plant barriers against the future robbery of the civil and political rights of the colored citizens'… us[ing] 'ingeniously prepared laws' to exclude 'a very large proportion' of Black men from voting." Ex.B ¶ 54 (quoting Sen. Drake and Sen. Harlan). An additional requirement of the fundamental condition reinforces that purpose: any conviction used for disenfranchisement must have been obtained under laws "equally applicable to all" Virginians, 16 Stat. 62—a requirement clearly targeting the former Confederate states' concerted efforts to leverage Black Codes to eliminate Black voting power. *See id.* ¶ 55.

In other words, the fundamental condition was singularly focused on preventing Virginia from doing precisely what the 1902 and 1971 amendments accomplished: disenfranchising people based on convictions for any new offenses Virginia's General Assembly might later create.

Defendants have previously argued that disenfranchising any otherwise eligible voter for conviction under any statutory felony, as they admit the 1971 Constitution requires, comports with the Virginia Readmission Act. According to Defendants, Congress intended to incorporate the 1869 Constitution, which, in their view, permitted disenfranchisement not just for felonies at common law or even only for statutory felonies codified in 1869, but for ***any future statutory "felony"*** the General Assembly or legislatures of other jurisdictions may choose to enact, including twenty-first century offenses that did not exist in statute or at common law in 1870. *See* Ex. F (Def. Mem. in Support of Motion to Dismiss First Amended Compl., Dkt. 77) at 14 (arguing that "[t]he 1869 Constitution disenfranchised anyone convicted of a "felony"—not only those convicted of a "felony at common law"). As explained above, the word "felony" as used in the 1869 Constitution referred to a limited set of common-law felonies, not the over 1,000 modern statutory felonies Virginia has since codified. *Compare* Ex.C ¶ 36 n.82, *with id.* ¶¶ 38-41. Although the word "felony" might ***today*** encompass the thousands of crimes codified in vast criminal codebooks, the "ordinary meaning at the time of enactment usually governs," and "a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context," *Bostock*, 590 U.S. at 674-675.

The 1869 Constitution's historical context also refutes Defendants' view that the 1869 Constitution's use of "felony" incorporates all current and future statutory felonies. Virginia enacted the 1869 Constitution under a mandate to comply with the requirements set forth in section

5 of the Military Reconstruction Act, which expressly prohibited the state's readmission to Congress until a state constitution had been enacted that only "disenfranchised … for ***felony at common law***." First Reconstr. Act § 5; Ex.B ¶ 34.  By imposing this requirement, Congress sought to prevent former Confederate states from disenfranchising Black men for conviction under new statutory felonies—a pervasive practice perpetuated through the enactment of "Black Codes."  *See* Ex.B ¶¶ 26, 34-35; *supra* p.3.  Defendants' position requires the Court to presume that Virginia immediately violated Congress's clear mandate—despite that Congress concluded three years later in the Virginia Readmission Act that the Commonwealth had completed "the performance of these several acts in good faith [that were] a condition precedent" to readmission, 16 Stat. 62.  Ex.B ¶ 43 ("The history … makes clear that Congress understood the phrase 'or felony' at the end of Article III Section 1 of Virginia's 1869 Constitution to comply with the requirements of the Reconstruction Act, including the requirement that disenfranchisement not extend beyond conviction for felonies at common law ….").

There is likewise strong historical evidence that Congress did not intend the Virginia Readmission Act's reference to those "entitled to vote by the constitution herein recognized" to incorporate an exclusion for anyone convicted of any statutory felony, then existing or later created by statute.  As explained, Congress's central purpose in imposing the Act's "fundamental condition" was to prohibit the former Confederate states from inhibiting their citizens' voting rights by linking disenfranchisement to conviction under new statutory felonies.  *See* Ex.B ¶ 53; *see* 16 Stat. at 62 (prohibiting disenfranchisement except as punishment for convictions for "crimes as [were then] ***felonies at common law***").  Defendant's position would render Congress's "fundamental condition" a nullity, violating the fundamental principle that "when … interpret[ing] statutes, [courts] must construe all parts to have meaning" and "avoid interpretations that would

turn some statutory terms into nothing more than surplusage." *Nero v. Mosby*, 890 F.3d 106, 124 (4th Cir. 2018) (quoting *United States v. Briley*, 770 F.3d 267, 273 (4th Cir. 2014)).

Moreover, Defendants' reading of "felony" to incorporate all statutory felonies would also render terms in the 1869 Constitution itself "into nothing more than surplusage," *Nero*, 890 F.3d at 124. The 1869 Constitution "excluded from voting … [p]ersons convicted of bribery in any election, embezzlement of public funds, treason or felony." Va. Const. Art. III, § 1 (1869). "Bribery in any election" was neither a common-law felony nor a statutory felony in Virginia in 1869. Ex.C ¶¶ 15, 34. Both embezzlement of public funds and treason were statutory felonies in Virginia in 1869. *See* 1860 Code of Virginia Title 54 Ch. 192 §§ 21-22 (making embezzlement a statutory felony).[6] *Id.* Ch. 190 § 1 (stating that treason "shall be punished by death," which rendered it a felony); *id.* Ch. 199 § 1 ("Such offences as are punishable when committed by free persons, with death or confinement in the penitentiary, are felonies."); Ex.C ¶ 33 & n.75. But if the 1869 Constitution's use of "felony" incorporated even then-codified statutory felonies, then the words "embezzlement of public funds" and "treason" would be superfluous. Defendants' construction cannot be the correct one where reading "felony" to refer to only felonies at common law gives effect to every word of the 1869 Constitution. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) ("[T]he canon against surplusage [applies] where a competing interpretation gives effect to every clause and word of a statute.").

In addition, even under Defendants' (erroneous) reading of the Virginia Readmission Act, those "entitled to vote by the Constitution herein recognized," 16. Stat. 62, would at most have excluded those convicted of one of the "only 60 felonies" in the state's then-operative criminal

---

[6] Treason was only sometimes considered a common law felony, and in 1869, it was punished as a statutory felony in Virginia.

code—a similarly limited list that mostly encompassed felonies recognized at common law at the time. Ex.C ¶ 36 n.82; *see also id.* at Exhibit C (listing them). Virginia has now adopted more than a thousand "felonies," the vast majority of which were neither a felony at common nor a statutory felony in 1870 and thus would not have given rise to disenfranchisement under the 1869 Constitution even under Defendants' interpretation. *See* SUMF ¶ 35.

The Virginia Readmission Act's plain text prohibits precisely what Virginia has done: "amend[]" its Constitution so "as to deprive any citizen or class of citizens of the right to vote who are entitled to vote by the Constitution" of 1869. The Virginia Readmission Act's structure and history confirm that federal law prohibited Virginia from altering its constitution's disenfranchisement provision to bar from voting any person convicted of any felony, as Defendants admittedly do. Federal law therefore preempts enforcement of the Felony Disenfranchisement Provision, except with respect to convictions for offenses that were recognized as felonies at common law in 1870.

## B. Defendants Enforce Virginia's Felony Disenfranchisement Provision

As the Fourth Circuit acknowledged, Defendants "administer the rules restricting voter eligibility" in Virginia. *King*, 122 F.4th at 548 (citing Va. Code §§ 24.2-409, 24.2-417, 24.2-427). All but two defendants are officers of Virginia's Board of Elections or of its Department of Elections; the remaining two (Eric Spicer and Sandy C. Elswick) are the General Registrars of the two Virginia counties where Mr. King and Ms. Johnson reside. SUMF ¶ 52. The State Board of Elections acts "through" the Department of Elections, Va. Code § 24.2-103, whose officials are in turn responsible for "notify[ing] the appropriate general registrar of the felony conviction of any registered voter" as the Felony Disenfranchisement Provision requires, *id.* § 24.2-409. The General Registrars also enforce the Provision: they cancel registrations on that basis or on an independent determination that a voter is ineligible due to a felony conviction, and refer any

violations "for prosecution" for the making of a "false statement." *Id.* §§ 24.2-417, 24.2-427(D). Indeed, at least one Defendant has acknowledged that she enforces the Provision against Plaintiffs and others similarly situated. *See* SUMF ¶¶ 54-56 *see, e.g.*, Ex.F (Declaration of Susan Beals) at 2 ("General registrars … process the cancellation of voter registration of felons who reside within their jurisdiction."). Thus, Defendants, individually and collectively, enforce the Felony Voting Provision, either through supervision and direction or by directly disenfranchising Plaintiffs and those similarly situated.

\*     \*     \*

There is no genuine dispute about any material fact that would preclude summary judgment in Plaintiffs' favor. It is therefore the Court's "function … to enforce [the Virginia Readmission Act] according to its terms." *Cela*, 75 F.4th at 365. Defendants' enforcement of the Felony Disenfranchisement Provision should be declared unlawful, to the extent it requires the disenfranchisement of Mr. King, Ms. Johnson, or any other qualified voter who has not been convicted of an offense that would have been recognized as a felony at common law in 1870.

## II.     DEFENDANTS SHOULD BE ENJOINED FROM DISENFRANCHISING OTHERWISE ELIGIBLE VIRGINIA VOTERS ON THE BASIS OF A CRIMINAL RECORD, EXCEPT FOR CONVICTION OF AN OFFENSE THAT WAS A FELONY AT COMMON LAW IN 1870

### A.     Unlawfully Disenfranchised Virginians Will Continue To Suffer Irreparable Harm Absent Injunctive Relief And Have No Adequate Remedy At Law

Because the Virginia Readmission Act prohibits their disenfranchisement for convictions of offenses that were not felonies at common law in 1870, Plaintiffs are suffering an irreparable injury for which no legal remedy would suffice. "[T]he right of suffrage is a fundamental matter in a free and democratic society," because it is "preservative of other basic civil and political rights[.]" *Reynolds v. Sims*, 377 U.S. 533, 561-562 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "Courts routinely deem restrictions on fundamental voting rights irreparable

injury." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases). Virginia's continuing violation of the Act impermissibly "restrict[s]" the "fundamental voting rights" of Mr. King, Ms. Johnson, and thousands of other unlawfully disenfranchised Virginians, *id.*; *supra* p.10, by unlawfully preventing them from registering to vote and criminalizing any attempt to exercise the franchise. Indeed, absent an injunction, Class members could even "be subject to criminal prosecution for illegal voting." *King*, 122 F.4th at 544 (citing Va. Code. § 24.2-1004(B)(iii)); *supra* p.10 (describing "prohibited table" system).

No adequate alternative remedy can compensate Plaintiffs and the Class for Defendants stripping them of their fundamental right to vote and preventing them from seeking to regain it. Where enforcement of state law will deprive "a plaintiff of [constitutional] rights, the threat to enforce" the state law "constitutes 'a continuing unlawful restriction upon and infringement of the rights' of the plaintiff as to which he has 'no remedy at law which is as practical, efficient or adequate as the remedy in equity.'" *Boston Correll v. Herring*, 212 F. Supp. 3d 584, 615 (E.D. Va. 2016) (quoting *Terrace v. Thompson*, 263 U.S. 197, 215 (1923)). Specifically, "monetary damages are inadequate to compensate … voters for the loss of their fundamental right to vote." *Griffin v. North Carolina State Bd. of Elections*, 2025 WL 1292530, at *34 (E.D.N.C. May 5, 2025). Nor would such damages even be available here; they would be "barred by sovereign immunity." *King*, 122 F.4th at 543.

Injunctive relief is also especially appropriate as a means of enforcing the Virginia Readmission Act. As Professor Ayers explains, the Congressional record is replete with contemporaneous statements from Congressmen who understood that the federal courts would provide an appropriate remedy should Virginia violate the fundamental condition. *See* Ex.B ¶¶ 54-56. During the 1870 debates regarding the readmission of Virginia's congressional

representatives, Congressman William Lawrence of Ohio declared that "[t]he 'fundamental condition' fixes the rights of citizens, and the courts will furnish redress for their violation." *See id.* ¶ 56. As the Fourth Circuit has explained, "such questions also fall within the heartland of what federal courts do every day." *King*, 122 F.4th at 547.

## B.     The Balance Of Equities And The Public Interest Favor An Injunction

Congress provided no expiration date for the rights that the Virginia Readmission Act was designed to safeguard. The public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). "By definition, '[t]he public interest ... favors permitting as many qualified voters to vote as possible.'" *League of Women Voters*, 769 F.3d at 247-248. That "interest is best served by favoring enfranchisement." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011). Here, enjoining Defendants from continuing to unlawfully disenfranchise otherwise-eligible Virginia voters would further the public interest by restoring voting rights to a large portion of the more than 300,000 people Defendants have conceded are now ineligible to register or to vote. *Supra* p.10.

## CONCLUSION

Plaintiffs respectfully request that the Court (1) enter summary judgment in their favor on Count II of the Second Amended Complaint; (2) declare that Defendants' enforcement of the Felony Disenfranchisement Provision to bar Mr. King, Ms. Johnson, and other members of the proposed class from registering to vote or from voting violates the Virginia Readmission Act; and (3) permanently enjoin Defendants or those acting in concert with them from disenfranchising Plaintiffs and any otherwise-eligible Virginia voter under color of the Felony Disenfranchisement Provision, except for conviction for an offense that was recognized as a felony at common law in 1870.

Dated: July 18, 2025

Respectfully submitted,

/s/ Brittany Blueitt Amadi

Vishal Agraharkar (VSB No. 93265)
Eden Heilman (VSB No. 93554)
ACLU FOUNDATION OF VIRGINIA
701 E. Franklin Street, Ste. 1412
Richmond, VA 23219
(804) 523-2151
vagraharkar@acluva.org
eheilman@acluva.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
(202) 579-4582
jared.davidson@protectdemocracy.org

Benjamin L. Berwick*
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Beau C. Tremitiere*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 153
Washington, DC 20006
(202) 579-4582
beau.tremitiere@protectdemocracy.org

Brittany Blueitt Amadi (VSB No. 80078)
Medha Gargeya**
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
(202) 663-6000
brittany.amadi@wilmerhale.com

Robert Kingsley Smith*
Jason H. Liss*
Robert Donoghue*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
robert.smith@wilmerhale.com

Nicholas Werle*
Noelle Higginson*
Brandon Roul*
Dylan S. Reichman**
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
nick.werle@wilmerhale.com

Nitisha Baronia*
WILMER CUTLER PICKERING
HALE AND DORR LLP
50 California Street, St # 3600
San Francisco, CA 94111
(202) 718-6494
nitisha.baronia@wilmerhale.com

**Counsel for Plaintiffs**
*admitted pro hac vice
**pro hac vice application forthcoming