# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| TATI ABU KING *and* TONI HEATH JOHNSON, <br><br> *Plaintiffs,* <br><br> v. <br><br> JOHN O'BANNON, *in his official capacity as Chairman of the State Board of Elections for the Commonwealth of Virginia*; ROSALYN R. DANCE, *in her official capacity as Vice Chair of the State Board of Elections for the Commonwealth of Virginia*; GEORGIA ALVIS-LONG, *in her official capacity as Secretary of the State Board of Elections for the Commonwealth of Virginia*; DONALD W. MERRICKS, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; MATTHEW WEINSTEIN, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; SUSAN BEALS, *in her official capacity as Commissioner of the Department of Elections for the Commonwealth of Virginia*; ERIC SPICER, *in his official capacity as the General Registrar of Fairfax County, Virginia*; and SANDY C. ELSWICK, *in her official capacity as the General Registrar of Smyth County, Virginia*, <br><br> Defendants. | Case No. 3:23-cv-00408 (JAG) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY OF DR. EDWARD AYERS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii
INTRODUCTION ...................................................................................................................1
BACKGROUND .....................................................................................................................1
LEGAL STANDARD ..............................................................................................................4
ARGUMENT ...........................................................................................................................5
    I.     Professor Ayers Provided Relevant Testimony Of A Sort Routinely Admitted And Considered By Courts ......................................................................5
    II.    Professor Ayers's Methodology Is Sound ...............................................................8
CONCLUSION ......................................................................................................................13

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AVX Corp. v. United States*,
 518 F. App'x 130 (4th Cir. 2013) ..................................................................................6

*Boumediene v. Bush*,
 553 U.S. 723 (2008) ........................................................................................................7

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993) ............................................................................................2, 5, 12

*David E. Watson, P.C. v. United States*,
 668 F.3d 1008 (8th Cir. 2012) .....................................................................................5

*Gregory v. Northam*,
 300 Va. 226 (2021) .........................................................................................................3

*Herndon v. Huntington Ingalls Indus., Inc.*,
 2020 WL 5809965 (E.D. Va. Aug. 28, 2020) ..........................................................5

*Hunter v. Underwood*,
 471 U.S. 222 (1985) ....................................................................................................6, 7

*Huskey v. Ethicon, Inc.*,
 29 F. Supp. 3d 691 (S.D. W. Va. 2014) ...................................................................12

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products
 Liability Litigation (No II)*,
 892 F.3d 624 (4th Cir. 2018) .......................................................................................11

*Metavante Corp. v. Emigrant Sav. Bank*,
 619 F.3d 748 (7th Cir. 2010) .......................................................................................5

*Nease v. Ford Motor Co.*,
 848 F.3d 219 (4th Cir. 2017) .......................................................................................5

*Students for Fair Admissions, Inc. v. Univ. of N. Carolina*,
 567 F. Supp. 3d 580 (M.D.N.C. 2021) ......................................................................6

*SunTrust Banks, Inc. v. Robertson*,
 2010 WL 11566593 (E.D. Va. Aug. 12, 2010) ........................................................9

*Taylor v. Northam*,
 300 Va. 230 (2021) .........................................................................................................3

*Trauernicht v. Genworth Fin., Inc.*,
    2024 WL 3996019 (E.D. Va. Aug. 29, 2024) ........................................................................5

*Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*,
    29 F.3d 137 (4th Cir. 1994) ................................................................................................13

*United States v. Brown*,
    415 F.3d 1257 (11th Cir. 2005) ............................................................................................5

*United States v. Cortez*,
    205 F. Supp. 3d 768 (E.D. Va. 2016) ...................................................................................9

*vonRosenberg v. Lawrence*,
    413 F. Supp. 3d 437 (D.S.C. 2019) ......................................................................................6

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ........................................................................................13, 14

### Docketed Cases

*Community Success Initiative v. Moore*,
    No. 19-cv-15941 (N.C. Superior Court) ...............................................................................7

*Perry v. Schwarzenegger*,
    No. 3:09-cv-02292 (N.D. Cal. Dec. 11, 2009) .....................................................................9

### Federal Statutes & Rules

15 Stat. 72 (1868) (An Act to Admit the State of Arkansas to Representation in
    Congress) ...........................................................................................................................13

16 Stat. 62 (1870) (Virginia Readmission Act) .................................................................. *passim*

Federal Rule of Evidence 702 ...................................................................................... 2, 4, 5

### State Constitutions

Virginia Const. (1869) ............................................................................................... 2, 4, 10, 12

Virginia Const. (2025) ........................................................................................................12

### Other Authorities

Edward Ayers, *Vengeance and Justice: Crime and Punishment in the Nineteenth-
    Century American South* (Oxford Uni. Press 1984) ..........................................................10

M. Henry Ishitani, *Today's Brandeis Brief? The Fate of the Historians' Brief
    Amidst the Rise of an Originalist Court*, 2 J. Am. Const. Hist. 1, 6-8 (2024) ....................7

**INTRODUCTION**

In this case challenging Virginia's felony disenfranchisement law under the 1870 Virginia Readmission Act, Plaintiffs served an expert report of Professor Edward L. Ayers, an eminent historian of Reconstruction who analyzed the historical context and purpose of the Act. Although there will be no jury to shield, Defendants have moved to exclude Professor Ayers's opinions in their entirety under Federal Rule of Evidence 702 and *Daubert*, claiming that they are irrelevant and methodologically deficient. Defendants are wrong on both counts. Professor Ayers's report provides relevant, reliable testimony of the sort courts routinely admit and consider. Defendants' motion should be denied.

**BACKGROUND**

The Virginia Readmission Act provides "[t]hat the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law." 16 Stat. 62, 63 (1870). The parties in this case disagree on the meaning of that language. Plaintiffs contend that the Act prohibits Virginia from amending its constitution to disenfranchise eligible voters except as punishment for crimes that were felonies at common law in 1870—and thus the current Virginia Constitution violates the Act because it automatically disenfranchises citizens convicted of ***any*** felony, including crimes that were not felonies at common law in 1870. Defendants, on the other hand, argue that the Act permitted Virginia to disenfranchise any person convicted of any offense it would ever codify as a felony, because the 1869 Virginia Constitution disenfranchised "persons convicted of bribery in any election, embezzlement of public funds, treason or felony," Va. Const. art. III, § I (1869).

In support of their interpretation of the statute, Plaintiffs have submitted an expert report by Professor Edward L. Ayers, a lauded expert in American history and, in particular, the history

1

of Reconstruction. Dkt. 153-2 ("Ayers Rep.") ¶ 5. Professor Ayers has authored nine books on American history and, among other awards, received the National Humanities Medal from the President in 2013. *Id.* He spent 27 years teaching American history at the University of Virginia, and later served as President of the University Richmond. *Id.* ¶¶ 2, 4. The Virginia Attorney General's Office has twice retained Professor Ayers as an expert witness: in *Taylor v. Northam*, 300 Va. 230 (2021) and *Gregory v. Northam*, 300 Va. 226 (2021), where he testified on the history of the Robert E. Lee monument in Richmond. *Id.* ¶ 9.

Professor Ayers "analyzed the historical context and purpose of the Virginia Readmission Act" to inform the proper interpretation of the provision in question. *Id.* ¶ 12. Specifically, he "consulted a variety of primary and secondary sources, as is customary in [his] field," and "drew upon [his] decades of experience analyzing the history of race, citizenship, and criminal law in the southern states, with a particular focus on Virginia's response to efforts to enfranchise Black citizens during Reconstruction." *Id.* ¶ 14. The sources Professor Ayers considered include the readmission acts of Virginia and other former Confederate states, records of congressional debates surrounding the readmission acts, the Military Reconstruction Acts and related legislative materials, various iterations of the Virginia Constitution, materials from Virginia's Constitutional Conventions, historical state laws, contemporary periodicals, secondary sources on Reconstruction politics, and more. *See generally id.* Ex. B.

Based on this historical analysis, Professor Ayers explains that "after the Civil War, when the U.S. Constitution disavowed conditions of servitude and restrictions of citizenship on the basis of race, Virginia joined other former Confederate states" in using "criminal law as a back door to impose race-based mass disenfranchisement." *Id.* ¶ 15. Professor Ayers further explains that "[r]ecognizing these attempts to circumvent the goals of Reconstruction, Congress conditioned the

2

former Confederate states' readmission to representation in Congress on their promise not to amend their constitutions to use the criminal law to disenfranchise the very population that the Union had fought to liberate." *Id.* ¶ 16.  Accordingly, "the Virginia Readmission Act was designed to ensure that Virginia could not amend its constitution to disenfranchise recently enfranchised Black Virginians through manipulation of its criminal code." *Id.*  And "the Act did so by imposing a 'fundamental condition' on Virginia's readmission to representation in Congress:  Virginia could not amend its constitution to disenfranchise voters for conviction for felonies not already punishable as felonies at common law at the time of the Act's passage in 1870." *Id.* ¶ 12.  Because the Virginia Readmission Act was one of several similar acts containing nearly identical language, *see id.* ¶¶ 50-58, Professor Ayers also recounted legislative debates surrounding passage of readmission acts for other former Confederate states, concluding that the "fundamental condition" imposed in each of the readmission acts was intended to protect Black voting rights after the end of federal occupation, *id.* ¶¶ 44-49.  Notably, Defendants have not challenged any of Professor Ayers's ultimate conclusions.

Professor Ayers also analyzed the passage of the 1869 Virginia Constitution on which Defendants' rely, explaining that history "makes clear that Congress understood the phrase 'or felony' at the end of Article III Section 1 … to comply with the requirements of the Reconstruction Act, including the requirement that disenfranchisement not extend beyond conviction for felonies at common law and participation in the rebellion." *Id.* ¶ 43.  Finally, Professor Ayers traced the history of Virginia's post-Readmission Act constitutional amendments.  *See id.* ¶¶ 59-82.

Defendants have moved to exclude the entirety of Professor Ayers's opinions under Federal Rule of Evidence 702, seeking to preclude this Court's consideration of this important historical context.  Dkt. 146 ("Defs. Mem.").

3

## LEGAL STANDARD

Under Federal Rule of Evidence 702, "the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citation omitted). Moreover, as Defendants admit, "the Rule 702 standard is relaxed for a bench trial." Defs. Mem. at 2. That is because the principal purpose of "[t]he district court's 'gatekeeping function' under *Daubert*" is to "ensure[] that expert evidence is sufficiently relevant and reliable ***when it is submitted to the jury***." *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017) (emphasis in original); *see also David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) ("relax[ing] *Daubert*'s application for bench trials" because "'there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself'" (quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005))); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) ("[T]he usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting, and our review must take this factor into consideration."). The Fourth Circuit, and district courts in this circuit, have widely recognized as much. *See, e.g.*, *Nease*, 848 F.3d at 231; *Trauernicht v. Genworth Fin., Inc.*, 2024 WL 3996019, at *3 (E.D. Va. Aug. 29, 2024) ("In the context of a bench trial … the trial court's gatekeeping function is much less critical ... because there [is] 'little danger' of prejudicing the judge, who can, after hearing the expert's testimony or opinion, determine what, if any, weight it deserves.") (quotation marks omitted); *Herndon v. Huntington Ingalls Indus., Inc.*, 2020 WL 5809965, at *4 (E.D. Va. Aug. 28, 2020), *report and recommendation adopted*, 2020 WL 5809996 (E.D. Va. Sept. 29, 2020) ("[W]hen the judge serves as the factfinder, this risk of confusion presents significantly less of a concern, if any at all.").

4

# ARGUMENT

Unable to challenge Professor Ayers's qualifications or scholarship, Defendants resort to unfounded assertions that his opinions in this case are irrelevant, Defs. Mem. at 3-4, and that he somehow departed from his normally-sound historical methodology here, *id.* at 4-10. Both objections are misplaced. Professor Ayers provides relevant historical expert testimony—a category routinely admitted and considered by courts—on issues central to this case, and he employed sound historical methodology in reaching his conclusions. Defendants' motion should be denied.

## I.  PROFESSOR AYERS PROVIDED RELEVANT TESTIMONY OF A SORT ROUTINELY ADMITTED AND CONSIDERED BY COURTS

The expert opinions of historians are widely recognized as valuable for the purpose of understanding the background, purpose, and meaning of a statute.[1] *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) ("The evidence of legislative intent available to the courts below consisted of the proceedings of the convention, several historical studies, and the testimony of two expert historians. Having reviewed this evidence, we are persuaded that the Court of Appeals was correct in its assessment."). For example, in a case challenging North Carolina's felony disenfranchisement law, the court admitted an expert report by Professor Orville Vernon

---

[1] Courts also routinely admit the expert testimony of historians on other issues. *See, e.g.*, *AVX Corp. v. United States*, 518 F. App'x 130, 133 (4th Cir. 2013) (affirming decision in which the "district court was persuaded by the expert testimony of historian Dr. Jay Brigham"); *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 450 (D.S.C. 2019) (admitting expert report by historian that synthesized historical texts to assess whether references to "Episcopal" or "Protestant Episcopal" churches referred to churches affiliated with the national church); *Students for Fair Admissions, Inc. v. Univ. of N. Carolina*, 567 F. Supp. 3d 580, 590 n.5 (M.D.N.C. 2021), *rev'd on other grounds sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) (noting that a historian's "expert report—which details UNC's reckoning with race over the full course of its history and illuminates the history of racial discrimination in North Carolina's K-12 public schools—is an important contribution to the Court's understanding of the context of this case").

Burton, a historian focused on the American South, which "assist[ed] the court in assessing the history and intent underlying the North Carolina constitutional provision and statutes disenfranchising persons convicted of crimes." Expert Report of Orville Vernon Burton at 2, *Community Success Initiative v. Moore*, No. 19-cv-15941 (N.C. Superior Court) (May 8, 2020), *available at* https://s3.documentcloud.org/documents/6887555/Expert-Report-of-Orville-Vernon-Burton-Reenfranch.pdf; Final Judgment and Order at 8, *Community Success Initiative*, No. 19-cv-15941 (Mar. 28, 2022) ("The Court credits Dr. Burton's testimony, as well as the materials on which he relied, and accepts his findings and conclusions."), *available at* https://s3.documentcloud.org/documents/21561450/20220328-final-judgment-and-order-19-cvs-15941.pdf. Indeed, the Supreme Court has routinely cited amicus briefs from historians, including when interpreting statutes. *See* M. Henry Ishitani, *Today's Brandeis Brief? The Fate of the Historians' Brief Amidst the Rise of an Originalist Court*, 2 J. Am. Const. Hist. 1, 6-8 (2024) (finding that, in recent years, historians' briefs have been cited by the justices at a sharply higher rate than other amicus briefs, except for those filed by the Solicitor General); *see also Boumediene v. Bush*, 553 U.S. 723, 746 (2008) (citing amicus brief by legal historians in constructing a view of the common-law writ of habeas corpus as it existed in 1789).

Professor Ayers's report should similarly be admitted. As noted, Professor Ayers synthesized historical texts and relied on his decades of experience to analyze "the historical context and purpose of the Virginia Readmission Act." Ayers Rep. 3. As in *Hunter*, his report will plainly aid the Court in evaluating, among other things, legislative intent. 471 U.S. at 229 (The appeals "court's opinion presents a thorough analysis of the evidence"—including "the testimony of two expert historians"—"and demonstrates conclusively that § 182 was enacted with the intent of disenfranchising blacks"). Resisting this conclusion, Defendants offer three

6

arguments for why Professor Ayers's report is purportedly irrelevant. Each fails. In short, Professor Ayers conducted a comprehensive survey of the history surrounding passage of the Virginia Readmission Act. To the extent that the Court finds the Act ambiguous, that history is relevant in construing the Act's text and Congress's legislative intent.

*First*, Defendants assert that "racial discrimination in the south" "is not at issue in this case because Plaintiffs are not bringing a racial-discrimination claim." Defs. Mem. at 3. But the history of racial discrimination (and Reconstruction more broadly) provides important context for understanding the Virginia Readmission Act—which aimed to address the former Confederate states' attempts to suppress Black voting rights by limiting those states' (including Virginia's) ability to expand the scope of disenfranchisement. *See* Ayers Rep. ¶¶ 12, 50-58.

*Second*, Defendants assert that Professor Ayers's discussion of other former Confederate states is irrelevant because "this case is about Virginia." Defs. Mem. at 3. Not so. As Professor Ayers explains, because all the readmission acts (except Tennessee's) contain the same "fundamental condition" regarding disenfranchisement, legislative debates regarding the readmission of other states sheds light on the nature of the broad remedy Congress fashioned. *See* Ayers Rep. ¶¶ 44-45, 49. Moreover, as Professor Ayers explains, "[b]y the time Congress was debating the Virginia Readmission Act, members of Congress had spent nearly half a decade debating, drafting, and passing readmission statutes," *id.* ¶ 49, and so analyzing these prior debates is relevant to understanding the genesis of the identical language in the Virginia Readmission Act.

*Third*, Defendants argue that "Dr. Ayers's discussion of the Military Reconstruction Acts, the legislative history of the Virginia Readmission Act, and the meaning of the 1869 Virginia Constitution are all issues suitable for legal briefing and argument, not expert-witness testimony." Defs. Mem. at 4. Defendants are again incorrect; as explained above, courts routinely rely on the

7

specialized knowledge of expert historians to understand the context and legislative history of a statute.[2] *See supra* p.5-6. Such historical evidence is distinct from testimony that "merely states a legal conclusion," such as that in *United States v. Cortez*, 205 F. Supp. 3d 768, 776 (E.D. Va. 2016), on which Defendants rely. *Cortez* involved "the expert testimony of a Virginia lawyer on the proper interpretation and application of the Virginia Rules of Professional Conduct to the facts of this case," *id.* at 775. The expert report excluded in *SunTrust Banks, Inc. v. Robertson*, 2010 WL 11566593, at *5 (E.D. Va. Aug. 12, 2010), is likewise distinguishable: That 5-page report, submitted by a practicing attorney, merely drew legal conclusions about Virginia's trust law based on past court opinions; it did not provide historical context. Here, in contrast, Professor Ayers offers no legal opinion or argument, but rather conclusions based on his examination of the historical record surrounding the Virginia Readmission Act.

## II. PROFESSOR AYERS'S METHODOLOGY IS SOUND

Contrary to Defendants' protestations (Mem. 4-10), Professor Ayers—an expert historian whom the state itself has retained, Ayers Rep. ¶ 9—used standard, sound historical methods in preparing his report for this case. Each of Defendants' objections is, at most, classic cross-examination material, not a reason for exclusion.

*First*, Defendants are wrong that Professor Ayers departed from his usual method of historical inquiry. They fault him for not consulting dictionaries or "legal sources" when

---

[2] Opposing counsel themselves often rely on expert historical (and similar) evidence. For example, in defending California's prohibition on same-sex marriage in 2009, counsel from Cooper & Kirk proffered and defended the use of three different expert social science reports—from a comparative religious scholar, a family studies scholar, and an author who drew upon "continuing anthropological, historical, and cultural study" regarding marriage. Defendant-Intervenors' Opposition to Motion in Limine re Young, Marks, & Blankenhorn at 4-16, *Perry v. Schwarzenegger*, No. 3:09-cv-02292 (N.D. Cal. Dec. 11, 2009), ECF No. 302. For the latter, Cooper & Kirk attorneys argued that their expert's opinions offered value to the court because he analyzed "the textured history of the institution itself" and its "historical structure [and] commonly accepted understanding." *Id.* at 18-19.

"interpreting the word 'felony' in the Virginia Constitution of 1869." Defs. Mem. 6.[3] But Professor Ayers stated that he refers to "legal sources" only when researching "legal terms" familiar to lawyers but not historians. Dkt. 146-2 ("Ayers Tr.") 139:21-140:4. And again, Professor Ayers was not attempting to "interpret[] the word 'felony'" (assuming that was a purely legal rather than a historical term); instead, he was determining how—based on the historical record—"***Congress understood*** the phrase 'or felony' at the end of Article III Section 1 of Virginia's 1869 Constitution." Ayers Rep. ¶ 43 (emphasis added). Regardless, Professor Ayers did, in fact, consult a wealth of legislative texts, including several late nineteenth-century statutes, the readmission acts, historical state constitutional provisions, and several volumes of legislative debates. Ayers Rep. ¶¶ 47-51. Moreover, contrary to Defendants' assertions (Mem. 6), Professor Ayers did not need to begin with a dictionary to determine the meaning of a term. Rather, Professor Ayers explained that when he is "not sure of the meaning" of a term "in a letter, in a statute, or in a debate," he usually begins with "a quick online search" and may use the Oxford English Dictionary for "an archaic term," "if necessary." Ayers Tr. at 138:11-139:12. But "felony" is not an "archaic term," and Defendants offer no basis to suggest that it was unfamiliar to Professor Ayers, who has written for decades about crime and punishment in the American South. *See* Ayers Rep. ¶¶ 4-5; *e.g.*, Edward Ayers, *Vengeance and Justice: Crime and Punishment in the Nineteenth-Century American South* (Oxford Uni. Press 1984).

Defendants are also wrong that "Dr. Ayers was not familiar with the fact that Virginia had codified its criminal law." Defs. Mem. 6. Professor Ayers merely testified that he was not familiar with the ***process*** of that codification or the entire criminal code, *see* Ayers Tr. 144:16-144:23—an

---

[3] Confoundingly, Defendants fault Professor Ayers for ***not*** consulting such "legal" sources, while at the same time challenging Plaintiffs' other expert Professor Carissa Byrne Hessick's opinions relying on such sources as inadmissible "legal opinions." *See* Dkt. 144 at 5-7.

9

issue having no bearing on his opinions here. Professor Ayers of course knew that Virgina had codified certain crimes; he explained in his report that "ways to keep Black people from the ballot box" through "criminalization" were "codified in laws known as 'Black Codes,'" and specifically listed Virginia's "vagrancy law" as an example. Ayers Rep. ¶¶ 26, 28.

Nor did Professor Ayers "depart[] from his normal methodology" by "present[ing] the legislative history of the Readmission Act as uniformly supporting his conclusion that members of Congress believed Virginia was complying with the Military Reconstruction Acts," as Defendants suggest. Defs. Mem. 7. Specifically, Defendants allege that Professor Ayers only cited statements of two senators, who shared this view, instead of "read[ing] the entire debate he relie[d] upon." *Id.* That is incorrect. Professor Ayers cited to many other members of Congress, including those who opposed the fundamental condition on disenfranchisement. *See, e.g.*, Ayers Rep. ¶¶ 46, 47; *id.* ¶ 51 ("Congressman James Beck of Kentucky insisted that Congress could not 'force negro suffrage on the South as a condition-precedent.'"); *id.* ¶ 51 n.60 (describing the "frequent refrain on the part of Democrats opposed to Black suffrage and to attaching fundamental conditions to the readmission bills" and citing similar statements of nine different legislators); *id.* ¶¶ 52-57. And the deposition transcript makes clear that Professor Ayers is well-informed regarding the entire debate, *see* Ayers Tr. 69-73, including "Senator Howard's statement that full compliance was not required for approval of the Virginia Constitution" (Defs. Mem. 8), *see* Ayers Tr. 122-124 (discussing Senator Howard's statement). Moreover, the primary case Defendants invoke, *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation (No II)*, which involved selective use of statistical sampling tests, has no relevance here; in any event, Professor Ayers has engaged in no "cherry-picking." 892 F.3d 624, 631 (4th Cir. 2018).

10

*Second*, none of the three purportedly "objective inaccuracies" Defendants identify, *see* Defs. Mem. 8-10, come anywhere near rendering Professor Ayers's testimony inadmissible; at most, whether an expert is "incorrect" is a "topic for cross-examination," not a basis for exclusion. *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 727 (S.D. W. Va. 2014); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Defendants first accuse Professor Ayers of wrongly suggesting in his report that Virginia's 1869 Constitution only disenfranchised the persons the Military Reconstruction Acts authorized Virginia to disenfranchise, even though—as he later clarified at deposition—Virginia's 1869 Constitution also disenfranchised "lunatics" and "duelists." Defs. Mem. 8-9. But although Professor Ayers acknowledged that Virginia's 1869 Constitution was "more detailed," Ayers Tr. 99:7, his report was not erroneous, it simply had a different focus. And for good reason: Plaintiffs' challenge in this case is not on the disenfranchisement of "lunatics" and "duelists"—provisions that appear nowhere in the current Virginia Constitution—but on disenfranchisement on the basis of conviction for crimes that were not felonies at common law in 1870. *See generally* Va. Const. (2025). As Professor Ayers explained, the relevant portions of the Military Reconstruction Act and the Virginia Readmission Act were aimed at prohibiting Black disenfranchisement through the use of Black codes, and "lunatics" and "duelists" were not Black-coded exclusions from the franchise. *See* Ayers Tr. 212-214.

Defendants also fault Professor Ayers for stating in his report that "Virginia was the last of the former Confederate states to have their congressional representatives gain readmission to Congress," Ayers Rep. ¶ 44, because Mississippi and Texas were readmitted one and two months

11

later, respectively.  At most, Professor Ayers's omission of "one of" before "the last" was an inadvertent error; as Professor Ayers's report acknowledges elsewhere, the Mississippi and Texas Readmission Acts were passed later.  *Id.* ¶ 44 n.49.  In any event, this detail has no relevance to Professor Ayers's ultimate opinions; the point of Professor Ayers's observation that Virginia's representatives gained readmission after other Confederate states (whether it was one of the last or truly last) was that Congress had repeatedly debated readmission and settled on a framework for assessing a state's compliance with the Military Reconstruction Act by the time the Virginia's Readmission Act came to the floor.  *See* Ayers Rep. ¶¶ 44-49.

Finally, Defendants fault Professor Ayers for stating that "Arkansas was the first former Confederate state to have its congressional representatives readmitted," Ayers Rep. ¶ 45, when Tennessee's Readmission Act was passed two years earlier.  Again, this is far from an "objective error" that demonstrates "faulty methods."  Defs. Mem. 9.  Professor Ayers himself observed in a footnote, before making the challenged statement, that Tennessee's Readmission Act was passed in 1866 while Arkansas's was passed in 1868.  Ayers Rep. ¶ 44 n.49.  He then made the challenged statement in the context of discussing debates over the "fundamental condition" on disenfranchisement, and Arkansas ***was*** the first former Confederate state to be readmitted through a statute that imposed the same "fundamental condition" at issue in this case.  *See* Ayers Rep. ¶ 45 & n.50; *see* An Act to Admit the State of Arkansas to Representation in Congress, ch. 69, 15 Stat. 72 (1868).

These purported errors are far from the sort of opinion that "should be excluded when it is based on assumptions which are speculative and are not supported by the record."  *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).  Rather, as in *Westberry v. Gislaved Gummi AB*, "the court need not determine that the expert testimony a litigant seeks to

offer into evidence is irrefutable or certainly correct." 178 F.3d 257, 261 (4th Cir. 1999) (citation omitted).  The purported errors are—at most—topics ripe for Defendants to explore on cross-examination if they wish to do so.  *Id.* ("As with all other admissible evidence, expert testimony is subject to being tested by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" (citing *Daubert*, 509 U.S. at 596)).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Exclude the Testimony of Dr. Edward Ayers in its entirety.

| | |
|---|---|
| Dated: August 8, 2025 | Respectfully submitted, |
| | |
| | /s/ Brittany Blueitt Amadi |
| Vishal Agraharkar (VSB No. 93265) | Brittany Blueitt Amadi (VSB No. 80078) |
| Eden Heilman (VSB No. 93554) | Medha Gargeya** |
| ACLU FOUNDATION OF VIRGINIA | WILMER CUTLER PICKERING |
| 701 E. Franklin Street, Ste. 1412 | HALE AND DORR LLP |
| Richmond, VA 23219 | 2100 Pennsylvania Ave NW |
| (804) 523-2151 | Washington, DC 20037 |
| vagraharkar@acluva.org | (202) 663-6000 |
| eheilman@acluva.org | brittany.amadi@wilmerhale.com |
| | |
| Jared Fletcher Davidson* | Robert Kingsley Smith* |
| PROTECT DEMOCRACY PROJECT | Jason H. Liss* |
| 3014 Dauphine Street, Suite J | Robert Donoghue* |
| New Orleans, LA 70117 | WILMER CUTLER PICKERING |
| (202) 579-4582 | HALE AND DORR LLP |
| jared.davidson@protectdemocracy.org | 60 State Street |
| | Boston, MA 02109 |
| Benjamin L. Berwick* | (617) 526-6000 |
| PROTECT DEMOCRACY PROJECT | robert.smith@wilmerhale.com |
| 15 Main Street, Suite 312 | |
| Watertown, MA 02472 | Nicholas Werle* |
| (202) 579-4582 | Noelle Higginson* |
| ben.berwick@protectdemocracy.org | Brandon Roul* |
| | Dylan S. Reichman** |
| Beau C. Tremitiere* | WILMER CUTLER PICKERING |
| PROTECT DEMOCRACY PROJECT | HALE AND DORR LLP |
| 2020 Pennsylvania Ave NW, Suite 153 | 7 World Trade Center |
| Washington, DC 20006 | 250 Greenwich Street |
| (202) 579-4582 | New York, New York 10007 |
| beau.tremitiere@protectdemocracy.org | (212) 230-8800 |
| | nick.werle@wilmerhale.com |
| | |
| | Nitisha Baronia* |
| | WILMER CUTLER PICKERING |
| | HALE AND DORR LLP |
| | 50 California Street, St # 3600 |
| | San Francisco, CA 94111 |
| | (202) 718-6494 |
| | nitisha.baronia@wilmerhale.com |
| | |
| | ***Counsel for Plaintiffs*** |
| | *admitted pro hac vice |
| | **pro hac vice application pending |

14

## **CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on August 8, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically e-mail notification of such filing to all counsel of record.

                                              */s/ Brittany Blueitt Amadi*
                                              Brittany Blueitt Amadi (VSB No. 80078)
                                              *Counsel for Plaintiff*