**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

TATI ABU KING *and* TONI HEATH JOHNSON,

      *Plaintiffs,*

    *v.*

JOHN O'BANNON, *in his official capacity as Chairman of the State Board of Elections for the Commonwealth of Virginia*; ROSALYN R. DANCE, *in her official capacity as Vice Chair of the State Board of Elections for the Commonwealth of Virginia*; GEORGIA ALVIS-LONG, *in her official capacity as Secretary of the State Board of Elections for the Commonwealth of Virginia*; DONALD W. MERRICKS, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; MATTHEW WEINSTEIN, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; SUSAN BEALS, *in her official capacity as Commissioner of the Department of Elections for the Commonwealth of Virginia*; ERIC SPICER, *in his official capacity as the General Registrar of Fairfax County, Virginia*; and SANDY C. ELSWICK, *in her official capacity as the General Registrar of Smyth County, Virginia*,

      Defendants.

Case No. 3:23-cv-00408 (JAG)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE**
**TESTIMONY OF PROFESSOR CARISSA BYRNE HESSICK**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .........................................................................................................1

BACKGROUND ...........................................................................................................1

LEGAL STANDARD....................................................................................................4

ARGUMENT.................................................................................................................5

     I.     Professor Hessick Provided Testimony Of A Sort Routinely Admitted And
           Considered By Courts ...................................................................................5

     II.    Professor Hessick's Methodology Is Sound .......................................................10

CONCLUSION..............................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adalman v. Baker, Watts & Co.*,
   807 F.2d 359 (4th Cir. 1986) ...................................................9

*North Carolina v. Alcoa Power Generating, Inc.*,
   853 F.3d 140 (4th Cir. 2017) ...................................................5

*AVX Corp. v. United States*,
   518 F. App'x 130 (4th Cir. 2013) .............................................5

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)..................................................1, 4, 9, 11

*David E. Watson, P.C. v. United States*,
   668 F.3d 1008 (8th Cir. 2012) .................................................4

*Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   672 F. Supp. 3d 118 (E.D. Va. 2023) .......................................8

*Harvester, Inc. v. Rule Joy Trammell + Rubio, LLC*,
   2010 WL 2653373 (E.D. Va. July 2, 2010) ...............................9

*Herndon v. Huntington Ingalls Indus., Inc.*,
   2020 WL 5809965 (E.D. Va. Aug. 28, 2020)..............................4

*Hunter v. Underwood*,
   471 U.S. 222 (1985)................................................................5

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
   626 F. Supp. 3d 814 (D. Md. 2022)..........................................9

*Marvel Characters, Inc. v. Kirby*,
   726 F.3d 119 (2d Cir. 2013)....................................................6

*Metavante Corp. v. Emigrant Sav. Bank*,
   619 F.3d 748 (7th Cir. 2010) ..................................................4

*Nease v. Ford Motor Co.*,
   848 F.3d 219 (4th Cir. 2017) ..................................................4

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022)...................................................................8

*Newkirk v. Enzor*,
    2017 WL 823553 (D.S.C. Mar. 2, 2017) ............................................9

*Roake v. Brumley*,
    756 F. Supp. 3d 219 (M.D. La. 2024) .......................................7

*Students for Fair Admissions, Inc. v. Univ. of N. Carolina*,
    567 F. Supp. 3d 580 (M.D.N.C. 2021) ....................................5

*SunTrust Banks, Inc. v. Robertson*,
    2010 WL 11566593 (E.D. Va. Aug. 12, 2010).........................7

*Synopsys, Inc. v. Risk Based Security, Inc.*,
    2022 WL 3005990 (E.D. Va. July 28, 2022)...........................7

*Trauernicht v. Genworth Fin., Inc.*,
    2024 WL 3996019 (E.D. Va. Aug. 29, 2024)...........................4

*United States v. Brown*,
    415 F.3d 1257 (11th Cir. 2005) ..............................................4

*United States v. Bullock*,
    2022 WL 16649175 (S.D. Miss. Oct. 27, 2022) ......................8

*United States v. Cortez*,
    205 F. Supp. 3d 768 (E.D. Va. 2016) ...............................7, 8, 9

*vonRosenberg v. Lawrence*,
    413 F. Supp. 3d 437 (D.S.C. 2019)......................................5, 6

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) .............................................9, 10

*Widespread Elec. Sales LLC v. Upstate Breaker Wholesale Supply Inc*,
    2022 WL 18028285 (N.D. Tex. Dec. 29, 2022) ......................10

## Docketed Cases

*United States v. Skrmetti*, No. 23-477, Brief of Professor Kurt T. Lash As *Amicus Curiae* In Support Of Respondents (U.S. Oct. 15, 2024) ......................................10

## Federal Statutes & Rules

16 Stat. 62 (1870) (Virginia Readmission Act) ................................................... *passim*

Fed. R. Evid. 702 .................................................................................................1, 4, 8

Fed. R. Evid. 704 ........................................................................................................8

**State Statutes**

Va. Code § 18.2 *et seq.* ................................................................................14, 15

**Other Authorities**

Brian Leiter's Law School Reports, *10 Most-Cited Legal History Faculty in U.S. Law Schools, 2019-2023 (2nd CORRECTION)* (Oct. 20, 2024) ..............................................10

Brian Leiter's Law School Reports, *Most Cited Law Professors by Specialty, 2000-2007* (December 18, 2007) ..............................................................10

Carissa Byrne Hessick & Joseph E. Kennedy, *Criminal Clear Statement Rules*, 97 Wash. U. L. Rev. 351, 408, 417 (2019) .............................................13

Carissa Byrne Hessick, *Bribery, Impeachment, and the Common Law*, PrawfsBlawg (Nov. 21, 2019) ..........................................................12

Carissa Byrne Hessick, *Bribery Is Right There in the Constitution*, The Atlantic (Nov. 21, 2019) .................................................................12

Carissa Byrne Hessick, *The Myth of Common Law Crimes*, 105 Va. L. Rev. 965 (2019)........................................................................2

M. Henry Ishitani, *Today's Brandeis Brief? The Fate of the Historians' Brief Amidst the Rise of an Originalist Court*, 2 J. Am. Const. Hist. 1 (2024) ..................5

Wharton's 1868 Treatise on Criminal Law ..............................................15

## INTRODUCTION

In this case challenging Virginia's felony disenfranchisement law under the 1870 Virginia Readmission Act, Plaintiffs served an expert report of Professor Carissa Byrne Hessick, an expert on the history of common law crimes. Professor Hessick analyzed both how Congress in 1870 would have understood a phrase in the Act, "felonies at common law," and which of Virginia's current statutory felonies qualify as "felonies at common law" as the term was used in the Act. Although there will be no jury to shield, Defendants have moved to exclude Professor Hessick's opinions in their entirety under Federal Rule of Evidence 702 and *Daubert*, claiming that they are inadmissible legal conclusions and methodologically deficient. Defendants are wrong on both counts. Professor Hessick's report provides relevant, methodologically sound historical testimony of the sort routinely admitted and considered by courts. Defendants' motion should be denied.

## BACKGROUND

The Virginia Readmission Act provides "[t]hat the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are ***now felonies at common law***." 16 Stat. 62, 63 (1870). Plaintiffs contend that the Act prohibits Virginia from amending its constitution to disenfranchise eligible voters except as punishment for a limited category of crimes that were felonies at common law in 1870, and thus the Virginia Constitution violates the Act because it automatically disenfranchises citizens convicted of ***any*** felony, including crimes that were not felonies at common law in 1870.

To aid the Court in understanding the scope of the phrase "felonies at common law" as used by Congress in 1870, Plaintiffs have submitted an expert report by Professor Carissa Byrne Hessick, an expert on the history of common law crimes, substantive criminal law, and the history of criminal law. Dkt. 153-3 ("Hessick Rep.") ¶ 2; Dkt. 144-2 ("Hessick Tr.") 12:21-15:12. A

Professor at the University of North Carolina School of Law, Professor Hessick has been researching and teaching criminal law for twenty years, Hessick Rep. ¶ 1, and has authored many articles, essays, and opinion pieces on the history of common law crimes and criminal statutes, *id.* ¶¶ 2-4. For example, in 2019, she published *The Myth of Common Law Crimes* in the Virginia Law Review, which among other things, traces the history of common law crimes. *See* 105 Va. L. Rev. 965, 971-978 (2019). In addition, she has spent years studying and teaching "the history of criminal law, and the structure of criminal law, and the cultural context surrounding criminal law." Hessick Tr. 14:2-14:5. For this case, Professor Hessick "analyzed how Congress would have understood the phrase 'felonies at common law' when it readmitted Virginia to representation in the United States Congress in 1870 following the Civil War." Hessick Rep. ¶ 8. In addition, she "analyzed which of Virginia's current statutory felonies … qualify as 'felonies at common law' as the term was used in the Virginia Readmission Act" in order to "assist the Court in determining the extent to which the modern Virginia Constitution may disenfranchise individuals beyond what the Virginia Readmission Act permits." *Id.* ¶ 11.

In conducting these analyses, Professor Hessick "reviewed a number of prominent American criminal law treatises from the mid-nineteenth century" along with "prominent English treatises," Hessick Rep. ¶ 13, "consulted several modern secondary sources about the history of the word 'felony,' the codification movement in the nineteenth and twentieth century, and the history of forfeiture," *id.* ¶ 14, "conducted research on legal education in the early and mid-nineteenth century to ensure that [she] understood which sources would have been formative and informative for the lawyers and politicians who drafted the Virginia Readmission Act," *id.*, and "examined the legislative history of the 1869 Virginia Constitution and the Virginia Readmission Act to find evidence of how 'felony' and 'felonies at common law' were used and understood,"

*id.* ¶ 15.   The sources Professor Hessick considered include 30 historical cases and 53 other documents, including historical treatises, books, dictionaries, and state laws, along with contemporary secondary sources.  *See id.* Ex. B.  She also drew on "over fifteen years of experience teaching common law crimes" and her "knowledge and expertise" from "researching common law crimes and the history of statutory interpretation of criminal statutes."  *Id.* ¶ 16.

Based on this historical analysis, Professor Hessick concluded "that, in 1870, the term 'felonies at common law' referred to a discrete and narrow list of crimes," which "included crimes like arson and murder that were recognized through the development of case law" but "excluded many crimes that were created through the legislative process."  Hessick Rep. ¶ 9.  She explained that "although some scholars defined" felonies at common law "in reference to crimes traditionally punishable by forfeiture and others adopted a slightly shorter oft-repeated list, both approaches identified a narrow set of serious crimes distinct from those punishable by statute."  *Id.* ¶ 43.  Moreover, she concluded, members of Congress "likely would have interpreted the reference to 'felony'" in the 1869 Virginia Constitution "to mean a felony at common law, rather than any crime that had been deemed a felony by the Virginia legislature."  *Id.* ¶ 15.  Professor Hessick also developed a list of common law felonies that includes all of the crimes identified under either approach used by scholars in 1870, and a second list "encompassing crimes that one could argue existed at common law but for which the evidence is more contestable."  *Id.* ¶ 44.  Finally, she "categorized current Virginia felonies listed in the state's Virginia Criminal Code Index as (i) 'felonies at common law' as the term was used in the Virginia Readmission Act; (ii) not 'felonies at common law' as the term was used in the Virginia Readmission Act; or (iii) not clearly falling into category (i) or category (ii)."  *Id.* ¶ 12.

Defendants have moved to exclude the entirety of Professor Hessick's opinion under

Federal Rule of Evidence 702, seeking to preclude this Court's consideration of this important historical analysis.  Dkt. 144 ("Defs. Mem.").

## LEGAL STANDARD

Under Federal Rule of Evidence 702, "the rejection of expert testimony is the exception rather than the rule.  *Daubert* did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citation omitted).  Moreover, as Defendants admit, "the Rule 702 standard is relaxed for a bench trial."  Defs. Mem. 3.  That is because the principal purpose of "[t]he district court's 'gatekeeping function' under *Daubert*" is to "ensure[] that expert evidence is sufficiently relevant and reliable ***when it is submitted to the jury***."  *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017) (emphasis in original); *see also David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) ("relax[ing] *Daubert*'s application for bench trials" because "'there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself'" (quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005))); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) ("[T]he usual concerns of the rule—keeping unreliable expert testimony from the jury—are not present in such a setting, and our review must take this factor into consideration.").  The Fourth Circuit, and district courts in this circuit, have widely recognized as much.  *See, e.g.*, *Nease*, 848 F.3d at 231; *Trauernicht v. Genworth Fin., Inc.*, 2024 WL 3996019, at *3 (E.D. Va. Aug. 29, 2024) ("In the context of a bench trial … the trial court's gatekeeping function is much less critical ... because there [is] 'little danger' of prejudicing the judge, who can, after hearing the expert's testimony or opinion, determine what, if any, weight it deserves.") (quotation marks omitted); *Herndon v. Huntington Ingalls Indus., Inc.*, 2020 WL 5809965, at *4 (E.D. Va. Aug. 28, 2020), *report and recommendation adopted*, 2020 WL 5809996 (E.D. Va. Sept.

29, 2020) ("[W]hen the judge serves as the factfinder, this risk of confusion presents significantly less of a concern, if any at all.").

## ARGUMENT

### I. PROFESSOR HESSICK PROVIDED TESTIMONY OF A SORT ROUTINELY ADMITTED AND CONSIDERED BY COURTS

The opinions of experts in history, including legal history, are widely recognized as valuable for understanding the background, purpose, and meaning of a statute. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) ("The evidence of legislative intent available to the courts below consisted of the proceedings of the convention, several historical studies, and the testimony of two expert historians. Having reviewed this evidence, we are persuaded that the Court of Appeals was correct in its assessment."). Indeed, in recent years, the Supreme Court has routinely cited amicus briefs from legal historians, including when interpreting constitutional or statutory language. *See* M. Henry Ishitani, *Today's Brandeis Brief? The Fate of the Historians' Brief Amidst the Rise of an Originalist Court*, 2 J. Am. Const. Hist. 1, 6-8, 33-34 (2024) (finding that historians' briefs have been cited by the justices at a sharply higher rate than other amicus briefs, except for those filed by the Solicitor General).[1]

---

[1] Courts also routinely admit reports by history experts on other issues. *See, e.g.*, *AVX Corp. v. United States*, 518 F. App'x 130, 133 (4th Cir. 2013) (affirming decision in which the "district court was persuaded by the expert testimony of historian Dr. Jay Brigham"); *North Carolina v. Alcoa Power Generating, Inc.*, 853 F.3d 140, 145 (4th Cir. 2017) (crediting historian's testimony regarding North Carolina's navigable waterways at time of admission to the Union); *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 450 (D.S.C. 2019) (admitting expert report by historian that synthesized historical texts to assess whether references to "Episcopal" or "Protestant Episcopal" churches referred to churches affiliated with the national church); *Students for Fair Admissions, Inc. v. Univ. of N. Carolina*, 567 F. Supp. 3d 580, 590 n.5 (M.D.N.C. 2021), *rev'd on other grounds sub nom. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) (noting that a historian's "expert report—which details UNC's reckoning with race over the full course of its history and illuminates the history of racial discrimination in North Carolina's K-12 public schools—is an important contribution to the Court's understanding of the context of this case").

Professor Hessick's analysis should likewise be admitted and considered. As noted, Professor Hessick synthesized historical treatises, dictionaries, legislative history, historical cases, and contemporary secondary sources, and relied on her years of experience, to analyze how Congress would have understood the phrase "felonies at common law" in 1870, and, based on that understanding, which of Virginia's current statutory felonies qualify as "felonies at common law." Hessick Rep. ¶¶ 8, 11, 13-16. "[T]his type of evidence, synthesizing voluminous historical texts, is precisely the type of expertise that courts acknowledge historians possess." *vonRosenberg*, 413 F. Supp. 3d at 450 (collecting cases); *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-136 (2d Cir. 2013) ("[A] historian's 'specialized knowledge' could potentially aid a trier of fact" by "for example, help[ing] to identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson."). Professor Hessick's opinion, "identifying, reviewing and synthesizing voluminous historical texts, therefore required specialized knowledge and is appropriate for expert testimony." *vonRosenberg*, 413 F. Supp. 3d at 450. Resisting this outcome, Defendants argue that Professor Hessick's opinion consists of inadmissible legal conclusions. Defs. Mem. 4-9. That is incorrect.

*First*, Defendants are wrong that "Professor Hessick's interpretation of the 'felonies at common law' in the Readmission Act is an opinion on a pure question of law." Defs. Mem. 5. Her opinion is about historical fact—namely, how a certain phrase ("felonies at common law") was understood at a particular time (1870). The fact that the historical materials she analyzes to answer this historical question include "legal treatises" and "law review articles," *id.*, does not render her report an inadmissible legal conclusion. As one court explained in admitting "an expert in the history of the United States Constitution and the First Amendment" in a case challenging the constitutionality of a state law under the Establishment Clause, "[u]ntrained judges can

certainly attempt to answer such difficult historical questions without expert testimony by looking directly at history texts, treatises, law review articles, and original sources and attempt to interpret same, but that seems to this Court be an endeavor fraught with risk." *Roake v. Brumley*, 756 F. Supp. 3d 219, 224, 235 (M.D. La. 2024), *hearing en banc denied*, 132 F.4th 748 (5th Cir. 2024), *and aff'd*, 141 F.4th 614 (5th Cir. 2025).  Considering expert reports by legal historians can reduce that risk; as Professor Hessick explained, her opinion was informed by extensive background knowledge and expertise that help her avoid substantive errors that a nonexpert might make.  *See* Hessick Tr. 89:4-89:14.

Defendants' cited cases (Mem. 5-7) are inapposite.  *United States v. Cortez*, 205 F. Supp. 3d 768 (E.D. Va. 2016), excluded testimony that "merely state[d] a legal conclusion," *id.* at 776—namely, "the expert testimony of a Virginia lawyer on the proper interpretation and application of the Virginia Rules of Professional Conduct to the facts of [that] case," *id.* at 775.  Likewise, *SunTrust Banks, Inc. v. Robertson*, 2010 WL 11566593 (E.D. Va. Aug. 12, 2010), excluded a 5-page expert report by a practicing attorney that merely drew legal conclusions about Virginia's trust law based on past court opinions without providing any historical information, *see* 2010 WL 10246032 (E.D. Va. May 20, 2010).  And *Synopsys, Inc. v. Risk Based Security, Inc.*, 2022 WL 3005990 (E.D. Va. July 28, 2022), excluded only the portion of a cybersecurity expert's testimony that conveyed legal conclusions (namely, that the parties' Reseller Agreement permitted used of alleged copyrighted material).  Here, in contrast, Professor Hessick offered robust opinions about historical fact—how "felonies at common law" was understood in 1870—based on extensive examination of historical sources, not mere legal conclusions.  Indeed, she repeatedly clarified at her deposition that she was not opining on the ultimate legal issues in this case.  *See, e.g.*, Hessick Tr. 137:5-137:8 ("I'm offering an opinion about how that language would have been understood

in 1870."); *id.* at 153:3-153:6 ("I'm not providing a legal interpretation. I'm providing an expert opinion about how members of Congress would have understood a phrase.").[2]

That judges sometimes conduct their own historical analysis of the law, Defs. Mem. 5-6, does not mean expert historical analyses are impermissible. To the contrary, the fact that judges must increasingly assess historical facts makes expert legal historians ***more*** "'helpful' as required by Rule 702," Defs. Mem. 4 (quoting *Cortez*, 205 F. Supp. 3d at 776). While expert opinions may be unnecessary where the historical issue is straightforward, in other cases, the history will be more complicated and expert opinions can help the court avoid making a legal determination based on an incorrect historical factual predicate. *See* Hessick Tr. 49:6-50:12. For example, in the wake of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), many district courts have said that they would find historical expertise helpful. *See, e.g.*, *Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 672 F. Supp. 3d 118, 137 n.20 (E.D. Va. 2023) (noting that "[t]he Court is staffed by lawyers who are neither trained nor experienced in making the nuanced historical analyses called for by *Bruen*"), *rev'd and remanded sub nom. McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568 (4th Cir. 2025); *United States v. Bullock*, 2022 WL 16649175, at *1-2, *3 (S.D. Miss. Oct. 27, 2022) (explaining that judges "lack both the methodological and substantive knowledge that historians possess … [t]he sifting of evidence that judges perform is different than the sifting of sources and methodologies that historians perform," and concluding that "an expert may help the Court identify and sift through authoritative sources on founding-era firearms restrictions.").

*Second*, for similar reasons, Professor Hessick's analysis of which of Virginia's current

---

[2] That Professor Hessick's historical opinion bears on the ultimate issue does not justify excluding it. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue.").

statutory felonies qualify as "felonies at common law" as the term was used in the Virginia Readmission Act is also not an inadmissible legal opinion.  *See* Defs. Mem. 7-8.  It is merely an extension of her other historical analysis, illustrating whether modern Virginia felonies fall within the scope of "felonies at common law" in 1870.  *See* Hessick Rep. ¶ 11 ("I conducted this exercise to assist the Court in determining the extent to which the modern Virginia Constitution may disenfranchise individuals beyond what the Virginia Readmission Act permits.").

Experts regularly provide—and indeed must provide—opinions "sufficiently tied to the facts of the case."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (quoted case omitted).  That includes developing models (such as a list of common-law felonies) "based on historical observations" and applying them "to the facts of th[e] case.".  *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 626 F. Supp. 3d 814, 830 (D. Md. 2022); *see also, e.g.*, *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999) (expert can apply "reliable differential diagnosis" method to specific patient facts).  Aside from *Cortez*, 205 F. Supp. at 768, distinguished at p.7, *supra*, Defendants' remaining cited cases concern lawyers planning to testify to a **jury** as to the ultimate legal question in a case, including the "meaning and applicability of" a securities disclosure law whose violation the lawsuit alleged, *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 366 (4th Cir. 1986), *abrogated on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988), "the scope of protection for architectural works under the Copyright Act" in a case alleging a Copyright Act violation, *Harvester, Inc. v. Rule Joy Trammell + Rubio, LLC*, 2010 WL 2653373, at *5 (E.D. Va. July 2, 2010), and an attorney's opinion that "a reasonable officer could have thought probable cause did exist" for an arrest challenged for lack of probable cause, *Newkirk v. Enzor*, 2017 WL 823553, at *2, *6 (D.S.C. Mar. 2, 2017).

*Third*, Defendants contend that Professor Hessick is not qualified to offer anything **but** a

legal opinion, because she "is a law professor, not a history professor" and does not have a history degree.  Defs. Mem. 8-9.  That defies belief.  Professor Hessick is "an expert in the criminal law *and* the history of criminal law," Hessick Tr. 12:21-13:1 (emphasis added); *see also supra* pp.1-2, which are different, *id.* at 15:5-15:12.  While many criminal lawyers, and even criminal law professors, lack expertise in the *history* of criminal law, Professor Hessick's academic career and publications make clear that she has such expertise.  *See* Hessick Rep. ¶¶ 2-4.  It is simply not true that only someone with a history degree can be an expert in legal history; indeed, many prominent legal historians have only law degrees, including Stanford's Lawrence Friedman, Harvard's Morton Horwitz, Columbia's Philip Hamburger, Richmond's Kurt Lash, and UCLA's Stuart Banner.[3]  These law professors, and others, regularly author expert reports and historical amicus briefs, precisely *because* they are experts on historical issues that can be relevant to legal determinations.  *See, e.g.*, Brief of Professor Kurt T. Lash As *Amicus Curiae* In Support Of Respondents, *United States v. Skrmetti*, No. 23-477 (U.S. Oct. 15, 2024) (analyzing "the original understanding of the Fourteenth Amendment"); *Widespread Elec. Sales LLC v. Upstate Breaker Wholesale Supply Inc*, 2022 WL 18028285, at *14-16 (N.D. Tex. Dec. 29, 2022) (admitting opinions of law professor on the "history and development of the group registration copyright").

## II.    PROFESSOR HESSICK'S METHODOLOGY IS SOUND

Professor Hessick used standard, sound historical methods in preparing her report for this case.  Each of Defendants' objections (Mem. 10-17) is, at most, classic cross-examination material, not a reason for exclusion.  *See Westberry*, 178 F.3d at 261 ("As with all other admissible evidence,

---

[3] *See 10 Most-Cited Legal History Faculty in U.S. Law Schools, 2019-2023 (2nd CORRECTION)*, Brian Leiter's Law School Reports (Oct. 20, 2024), https://leiterlawschool. typepad.com/leiter/2024/10/10-most-cited-legal-history-faculty-in-us-law-schools-2019-2023.html; *Most Cited Law Professors by Specialty, 2000-2007*, Brian Leiter's Law School Rankings (December 18, 2007), https://www.leiterrankings.com/faculty/2007faculty_impact_areas.shtml#LegalHistory.

expert testimony is subject to being tested by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" (citing *Daubert*, 509 U.S. at 596)).

*First*, Defendants are wrong that Professor Hessick's classification methodology is "unverifiable *ipse dixit*." Defs. Mem. 10-14. Professor Hessick first identified the set of common law felonies as Congress would have understood them in 1870; she then reviewed each modern statutory felony giving rise to disenfranchisement and classified them based on whether they were "substantially similar to or fall comfortably within the scope of one of the fifteen common law felonies," criminalized conduct unrelated to or "substantially exceed[ing]" the bounds of any common-law felony, or "overlapped" with or "implicated" a common-law felony or one that may have been understood as a common-law felony. Hessick Rep. ¶¶ 37-41.

At deposition, Professor Hessick answered a large number of questions about both her general methodology and how she classified specific statutes, and her answers were far more than simply "because I say so." *See* Hessick Tr. 29-40, 49-121. For example, when explaining what she considered when determining whether a felony was "substantially similar" to a common-law felony, Professor Hessick explained that she considered both the "conduct" punished and the "attendant circumstances" of the crime, providing arson (which punishes the conduct of burning but also turns on the attendant circumstance of the thing burned) as an example. *Id.* at 65:11-67:6. In describing how she categorized one particular statutory felony, Professor Hessick explained that she reviewed "the entire statute," then "observed that some of" its language "placed this section of this statute inside of a common law felony, namely common law murder," and then determined whether any other provision "would have either taken this subsection outside of felony murder or extended it beyond the bounds of felony murder" and concluded that the statute denoted a

11

common-law felony, because "[t]he premeditated killing of a person under most any circumstance would have been a felony at common law." *Id.* at 83:21-85:13. That Professor Hessick used certain descriptive and internally consistent terms to ensure her classifications were consistent— terms she described in detail during her deposition, *see id.* at 39-40, 42-43, 51-52, 62-72—shows the precision of her analysis. She also explained that her analysis could be replicated by others with expertise in the common law of crimes, and she specifically adopted an analytical framework that was designed to avoid contestable classifications. *See id.* at 42:3-42:21. Had Defendants engaged their own expert, they would have easily been able to "verify whether a modern-day felony 'substantially' exceeds the scope of a common-law felony," Defs. Mem. 11; the fact that Defendants did not bother to engage their own expert does not render Professor Hessick's classifications unverifiable or unfalsifiable—Defendants simply did not attempt to either verify or falsify them. And Defendants do not even attempt to propose an alternative methodology that an expert conducting this analysis should have employed.

*Second*, Defendants falsely state that this case is the first time Professor Hessick has performed the sort of classification analysis reflected in her report. *See* Defs. Mem. 11-12. To be sure, she has not previously had reason to classify an entire state's criminal code, but she has repeatedly performed the same type of analysis in order to classify a modern-day statutory crime as falling within or outside of the common law understanding of that crime. As Defendants themselves acknowledge (Mem. 11-12), she conducted such an analysis with respect to the common law crime of bribery in both an article, *see* Hessick, *Bribery Is Right There in the Constitution*, The Atlantic (Nov. 21, 2019), and a blog post, Hessick, *Bribery, Impeachment, and the Common Law*, PrawfsBlawg (Nov. 21, 2019)—both of which relied on historical sources in noting that non-experts were getting things wrong about the substantive limits of that crime. In

12

addition, Professor Hessick explained that she "routinely conduct[s] this sort of analysis with my students in [her] first-year criminal law class." Hessick Tr. 34:2-34:4. And more generally, the historical analysis underlying her classification has appeared in her published work. *See, e.g.*, Carissa Byrne Hessick & Joseph E. Kennedy, *Criminal Clear Statement Rules*, 97 Wash. U. L. Rev. 351, 408, 417 (2019).

*Third*, Defendants' assertion that Professor Hessick's methodology is "so indeterminate" that she "cannot even apply it herself," Defs. Mem. 12, is similarly unfounded. This paragraph of Defendants' brief is merely a string of citations to sections of Professor Hessick's report where she was transparent about the limitations of historical knowledge. In other words, in contrast to Defendants' portrayal of her, these are examples of how Professor Hessick is serving as an objective and "dispassionate expert witness," rather than a "legal advocate," *id.* at 2. In her effort to "assist the Court in analyzing" how "Congress would have understood the phrase 'felonies at common law'" in 1870, Hessick Rep. ¶ 8, Professor Hessick endeavored to provide a complete and thorough analysis of the offenses and in which categories they fall. It is left to the Court as the ultimate finder of fact to identify the crimes for which the Virginia Readmission Act permits disenfranchisement. That task, aided by Professor Hessick's analysis, is straightforward and does not require interpreting any felonies whose status is debatable; the Court need only bar Defendants from disenfranchising otherwise eligible Virginians for any felony outside the short list of modern statutory felonies Professor Hessick has identified as felonies at common law in 1870—a list to which Defendants propose no additions. *See* Plaintiffs' Proposed Order, Dkt. 151-1.

*Fourth*, Defendants claim that Professor Hessick "could not even explain the source from which she derived half of her analysis" because when asked if she could explain "what [the Virginia Criminal Sentencing Commission's 2024 Virginia Crime Codes Index] is," she said "no."

13

Defs. Mem. 12-13 (quoting Hessick Tr. 50:13-50:20).   But that answer merely reflects an ambiguously worded question by Defendants' counsel, who failed to ask any follow-up questions about the index.  As Professor Hessick's report reflects, her understanding is that the index includes all of Virginia's modern felonies, which is why she used it in order to identify the relevant statutes in the current code.  Hessick Rep. ¶ 38.  After using the index to identify statutory felonies, she read and analyzed those statutes.  *Id.*  Her deposition answer merely reflects that she does not know details about the index besides that it identifies felonies—such as why it was created or how the Virginia Criminal Sentencing Commission uses it (context that is not relevant to her opinion).   In any event, this index is not "the source from which she derived half of her analysis," Defs. Mem. 12, because she used it only to ***identify*** current felonies, not to ***analyze*** them, Hessick Rep. ¶ 38.

*Fifth*, echoing their first objection, Defendants assert that Professor Hessick is unable to say how she categorized modern-day felonies.  Defs. Mem. 13-14.  Again, that is incorrect.  In her deposition, Professor Hessick provided explanations—many of them quite detailed—in response to questions about how she classified at least eleven different modern Virginia felonies.[4]  The one statute that Defendants claim she could not fully explain, Va. Code §18.2-152.14, involves one of the most complicated common law crimes: forgery.  As Professor Hessick noted at her deposition, in order to classify Section 18.2-152.14, she had to conduct additional historical research, and she was not able to fully recall the details of that research given the time that had elapsed between her preparation of the report and the deposition.  *See* Hessick Tr. 106-107.  But, she explained, she

---

[4] *See* Hessick Tr. 76-85 (Va. Code § 18.2-31(9)); Hessick Tr. 85-92, 99-101 (Va. Code § 18.2-108.01); Hessick Tr. 92-93 (Va. Code §18.2-58.1(A)); Hessick Tr. 93-94 (Va. Code §18.2-36.1); Hessick Tr. 94 (Va. Code §18.2-362); Hessick Tr. 95-98 (Va. Code §18.2-32.2); Hessick Tr. 101-107 (Va. Code §18.2-152.14); Hessick Tr. 108-110 (Va. Code §18.2-112; §19.2-361; §18.2-111.2); Hessick Tr. 110-113 (Va. Code §18.2-29); Hessick Tr. 113-117 (Va. Code §18.2-77); Hessick Tr. 117-121 (Va. Code §18.2-361(B)).

would be able to recreate her analysis if she went back into the statute and historical sources. *Id.* The fact that Professor Hessick was unable to specifically recall the details of one particularly complicated analysis out of more than 1,000 that she performed does not mean she could not say how she classified modern-day felonies. Defendants also insinuate that Professor Hessick's methodology was erroneous because Section 18.2-152.14 appears in all three of her spreadsheets (a critique they did not raise at deposition). Not so. A single statute often appears more than once in Professor Hessick's spreadsheets because, according to the Virginia Criminal Code Index, a single statute can create more than one felony. In fact, Section 18.2-152.4 appears twice in Exhibit D, five times in Exhibit E, and once in Exhibit F. The fourth column in each exhibit contains additional information about the precise felony, which Professor Hessick used to locate the appropriate language in the statute and perform her analysis on that particular felony. *See* Hessick Rep. ¶ 38. For example, Section 18.2-97 appears twice in Exhibit D, but the fourth column makes clear that one entry pertains to larceny of specific animals (dog, horse, pony, mule, cow, steer, bull, calf) while the other pertains to larceny of "[c]ertain animals and poultry worth less than $1000."

*Finally*, Defendants accuse Professor Hessick of ignoring "material that was directly contrary to portions of her opinion," Defs. Mem. 14—namely, language from Wharton's 1868 Treatise on Criminal Law noting that Virginia had adopted a definition of the term "felony" that "comprehends all offences, below treason, which occasioned a forfeiture of property at common law, all so denominated by statutes, and all to which statutes have annexed capital punishment or confinement in the penitentiary." Defs. Mem. 15-16 (quoting Wharton). This argument not only misstates Professor Hessick's report, but also misunderstands either the language from Wharton, Hessick's expert opinion, or both. First, although Professor Hessick did not quote this specific

language from Wharton, she *did* cite to it, and explained that it was an "outlier."  *See* Hessick Rep. ¶ 20 n.19 (stating that "the small number of states that had adopted such a [statute-based] definition as a matter of statute were characterized as outliers").  She also explicitly acknowledged that Virginia was one of the first states to systematically codify its criminal laws, and provided an exhaustive list of every crime that was a statutory felony in Virginia at the time the Virginia Readmission Act was passed.  *See* Hessick Rep. ¶ 21, Ex. C.  Professor Hessick thus did not fail to "mention, let alone engage with" this sentence from Wharton, Defs. Mem. 16.

In any event, the language Defendants quote does not cast doubt on Professor Hessick's testimony.  The passage from Wharton says that Virginia, like New York, had adopted a more expansive *statutory* definition of the term "felony" than had the other states.  That has no bearing on Professor Hessick's opinion that ***members of Congress*** would have understood the phrase "felonies at common law" to mean something different than whatever Virginia makes a felony by virtue of a statute.  *See* Hessick Rep. ¶¶ 8-9.  Similarly, Professor Hessick's opinion about the use of the word "felony" in Virginia's 1869 Constitution is limited to what ***members of Congress*** would have understood the term to mean; i.e., that they would have understood the word "felony" as used in the Virginia Constitution to be consistent with its use in the Virginia Readmission Act. *See id*. ¶ 15; Hessick Tr. 134-137.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Exclude the Testimony of Professor Carissa Byrne Hessick in its entirety.

Dated: August 8, 2025

Respectfully submitted,

Vishal Agraharkar (VSB No. 93265)
Eden Heilman (VSB No. 93554)
ACLU FOUNDATION OF VIRGINIA
701 E. Franklin Street, Ste. 1412
Richmond, VA 23219
(804) 523-2151
vagraharkar@acluva.org
eheilman@acluva.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
(202) 579-4582
jared.davidson@protectdemocracy.org

Benjamin L. Berwick*
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Beau C. Tremitiere*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 153
Washington, DC 20006
(202) 579-4582
beau.tremitiere@protectdemocracy.org

*/s/ Brittany Blueitt Amadi*
Brittany Blueitt Amadi (VSB No. 80078)
Medha Gargeya**
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
(202) 663-6000
brittany.amadi@wilmerhale.com

Robert Kingsley Smith*
Jason H. Liss*
Robert Donoghue*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
robert.smith@wilmerhale.com

Nicholas Werle*
Noelle Higginson*
Brandon Roul*
Dylan S. Reichman**
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
nick.werle@wilmerhale.com

Nitisha Baronia*
WILMER CUTLER PICKERING
HALE AND DORR LLP
50 California Street, St # 3600
San Francisco, CA 94111
(202) 718-6494
nitisha.baronia@wilmerhale.com

*Counsel for Plaintiffs*
**admitted pro hac vice*
***pro hac vice application pending*

17

## **CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on August 8, 2025, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will automatically e-mail notification of

such filing to all counsel of record.

*/s/ Brittany Blueitt Amadi*
Brittany Blueitt Amadi (VSB No. 80078)
*Counsel for Plaintiff*