# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

TATI ABU KING *and* TONI HEATH JOHNSON,

     *Plaintiffs,*

  *v.*

JOHN O'BANNON, *in his official capacity as Chairman of the State Board of Elections for the Commonwealth of Virginia*; ROSALYN R. DANCE, *in her official capacity as Vice Chair of the State Board of Elections for the Commonwealth of Virginia*; GEORGIA ALVIS-LONG, *in her official capacity as Secretary of the State Board of Elections for the Commonwealth of Virginia*; DONALD W. MERRICKS, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; MATTHEW WEINSTEIN, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; SUSAN BEALS, *in her official capacity as Commissioner of the Department of Elections for the Commonwealth of Virginia*; ERIC SPICER, *in his official capacity as the General Registrar of Fairfax County, Virginia*; and SANDY C. ELSWICK, *in her official capacity as the General Registrar of Smyth County, Virginia*,

     Defendants.

Case No. 3:23-cv-00408 (JAG)

## PLAINTIFFS' BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND.......................................................................................2

ARGUMENT ...............................................................................................................4

I.  THE VIRGINIA READMISSION ACT PROHIBITS DEFENDANTS FROM DISENFRANCHISING
    OTHERWISE ELIGIBLE VIRGINIANS FOR CONVICTION OF AN OFFENSE THAT WAS NOT A
    FELONY AT COMMON LAW IN 1870 ...........................................................................4

    A.  Defendants' Interpretation Of The Virginia Readmission Act Inverts The Text
        And Violates Fundamental Principles Of Statutory Interpretation.........................4

    B.  Defendants' Interpretation Of The Virginia Readmission Act Is Irreconcilable
        With The Relevant History And Context.................................................................12

    C.  Even Accounting For The 1869 Virginia Constitution, Defendants' Interpretation
        Of The Virginia Readmission Act Fails..................................................................14

        1.  Congress Would Have Understood "Felony" In The 1869 Constitution To
            Mean Felony At Common Law. .............................................................................14

        2.  Defendants' Arguments For Broadly Reading "Felony" To Include Any
            Statutory Felonies (Past, Present, and Future) Fail.....................................17

        3.  Even Under Defendants' Interpretation Of "Felony" In The 1869
            Constitution, Defendants Are Violating The Virginia Readmission Act ..20

II. THE COURT SHOULD REJECT DEFENDANTS' UNPERSUASIVE PROCEDURAL AND POLICY
    ARGUMENTS, MOST OF WHICH THE FOURTH CIRCUIT CONCLUSIVELY REJECTED ...........22

    A.  Plaintiffs' Claim Does Not Present A Political Question Or Trigger Other
        Avoidance-Based Abstention Doctrines.................................................................22

    B.  The Fourth Circuit Already Decided That Plaintiffs Have A Cause Of Action In
        Equity....................................................................................................................26

    C.  The Fourth Circuit Already Decided That Sovereign Immunity Does Not Apply
        Here......................................................................................................................28

    D.  The Court Should Reject Defendants' Remaining Policy Arguments...................28

CONCLUSION.........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Armstrong v. Exceptional Child Care Ctr.*, 575 U.S. 320 (2015)..................................................27

*Baker v. Carr*, 369 U.S. 186 (1962).........................................................................22, 23

*Bannon v. United States*, 156 U.S. 464 (1895) ..................................................................15

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ...........................................................15, 29

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) ................................................................19

*Butler v. Thompson*, 97 F. Supp. 17 (E.D. Va. 1951)..........................................................24

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam) ......................................22

*Civil Rights Cases*, 109 U.S. 3 (1883) ..................................................................................11

*Colorado River Water Conservation District v. United States*, 424 U.S. 800
    (1976)....................................................................................................................................25

*Ex parte Wilson*, 114 U.S. 417 (1885) ..................................................................................15

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ..................................24

*Harvey v. Brewer*, 605 F.3d 1067 (9th Cir. 2010) ...........................................................20

*Hedin v. Thompson*, 355 F.3d 746 (4th Cir. 2004) ..............................................................5

*Hewitt v. United States*, 145 S. Ct. 2165 (2025)......................................................13, 14

*Hillman v. IRS*, 263 F.3d 338 (4th Cir. 2001)......................................................................12

*Hopkins v. Sec'y of State Delbert Hosemann*, 76 F.4th 378 (5th Cir. 2023) ...............29

*Jam v. Int'l Fin. Corp.*, 586 U.S. 199 (2019) ...................................................................22

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986) ...........................26

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ........................................................22

*King v. Youngkin*, 122 F.4th 539 (2024)........................................23, 24, 26, 27, 28, 30

*Lackey v. Stinnie*, 145 S.Ct. 659 (2025).................................................................................6

*Luther v. Borden*, 48 U.S. 1 (1849) ...............................................................................23, 24

ii

*Merritt v. Jones*, 533 S.W.2d 497 (Ark. 1976) ............................................................24

*Michigan Corrections Organization v. Michigan Department of Corrections*, 774 F.3d 895 (6th Cir. 2014) ...................................................................................................27

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ..........................................................9

*Morton v. Mancari*, 417 U.S. 535 (1974) .......................................................................7

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ................................25

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ................................30

*O'Bannon v. King*, 2025 WL 1727393 (2025) ...............................................22, 26, 28

*Pacific States Telephone & Telegraph Co. v. Oregon,* 223 U.S. 118 (1912) ................23

*Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*, 58 F.4th 785 (4th Cir. 2023) ...................................................................................................................14

*Reagan v. United States*, 157 U.S. 301 (1895) ..............................................................15

*Richardson v. Ramirez*, 418 U.S. 24 (1974) .................................................................20

*Romer v. Evans*, 517 U.S. 620 (1996) ...........................................................................11

*Sejman v. Warner-Lambert Co.*, 845 F.2d 66 (4th Cir. 1988) .................................26, 27

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ..................................................................11

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ...............................................................25

*Soto v. United* States, 145 S. Ct. 1677 (2025) ...............................................................28

*South Carolina v. United States*, 199 U.S. 437 (1905) .................................................22

*Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 (2025) .....................................................27

*United States. v. Jett*, 63 Fed. App'x 155 (4th Cir. 2003) .............................................28

*United States v. Bell*, 5 F.3d 64 (4th Cir. 1993) ............................................................28

*United States v. Davis*, 588 U.S. 445 (2019) ................................................................10

*United States v. Palomar-Santiago*, 593 U.S. 321 (2021) ...........................................25

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ..............................................6, 7

## STATUTES AND CONSTITUTIONAL PROVISIONS

An Act to provide for the more efficient Government of the Rebel States, 14 Stat. 428 (1867) (first Military Reconstruction Act).........................................................3, 9, 10, 12

An Act to admit the State of Virginia to Representation in the Congress of the United States, 16 Stat. 62 (1870) ....................................................................................*Passim*

Va. Code § 18.2-248 .................................................................................................................2

Va. Code § 18.2-371.1 .............................................................................................................2

Va. Code § 24.2-653 .................................................................................................................4

Va. Code § 24.2-1004 ...............................................................................................................4

Va. Const. Art. III § 1 (1869)............................................................................................*Passim*

Va. Const. Art. II § 1 (1971).....................................................................................................3

## OTHER AUTHORITIES

A. Scalia & B. Garner, *Reading Law* (2012) ...........................................................................15

# INTRODUCTION

The Virginia Readmission Act was the culmination of a long, hard-fought struggle—civil war, emancipation, military occupation, Reconstruction—to expand liberty, broaden democracy, and prevent Virginia from undermining its first broad grant of voting rights to Black people in history.  In enacting the readmission acts, the Reconstruction Congress was particularly concerned with quelling the former Confederate states' practice of expanding their criminal codes and using convictions under newly-prescribed crimes (the "Black Codes") to strip Black men of their voting rights.  Accordingly, after Congress concluded that Virginia had "adopted a constitution precisely in harmony with the reconstruction acts," Ex. J at 17 (Sen. Stewart), [1] and ratified the Fourteenth and Fifteenth Amendments, the Virginia Readmission Act readmitted Virginia's representatives to Congress upon the "fundamental condition" that "the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law[.]"  16 Stat. 62 (1870).  This text is clear: it acknowledges Virginia's pronouncement that ***all*** citizens are "entitled to vote" regardless of race, then bars Virginia from amending its constitution to deprive any such citizen of that right except for a "felon[y] at common law" in 1870.

Despite the Act's clear directive, Virginia has amended—and expanded—its Constitution's felony disenfranchisement provision four times since 1870.  Defendants enforce today's felony disenfranchisement provision to prohibit every person—including Plaintiffs and the rest of the proposed class—from voting, as a consequence of having been convicted of ***any*** felony, regardless

---

[1] All citations to lettered exhibits refer to exhibits to the Declaration of Brittany Amadi, Dkt. 153 and the Second Declaration of Brittany Amadi, filed herewith.  Unless otherwise noted, all quotation marks, citations, and alterations are omitted, and all emphasis is added.

whether the offense of conviction would have been recognized as a felony at common law in 1870.

Defendants' enforcement of the Constitution's felony disenfranchisement provision violates federal law. This straightforward federal preemption argument does not turn on Defendants' proposed interpretation of *state* law, nor on their view of how Virginians later implemented the 1869 Virginia Constitution. The Court should reject Defendants' invitation to construe the Virginia Readmission Act by relying on records of "colored persons" disenfranchised in the decades *after* its enactment and instead enforce the Act's plain text. As historical context confirms, that text prohibits Virginia from amending its constitution to disenfranchise eligible voters *other than* for felonies at common law in 1870. The Court should also reject Defendants' resurrection of procedural and policy arguments the Fourth Circuit already rejected in an opinion the Supreme Court declined to review. As the Fourth Circuit directed, now is the time for this Court to reach and decide the merits of Plaintiffs' claim. There is no genuine dispute of material fact that precludes summary judgment for Plaintiffs. The Court should enter such judgment, deny Defendants' Motion for Summary Judgment ("Defendants' MSJ"), Dkt. 148, and order injunctive relief necessary to reinstate the primacy of federal law.

## FACTUAL BACKGROUND[2]

The Virginia Readmission Act was enacted in the wake of the Civil War and Reconstruction, following Virginia's ratification of the Fourteenth and Fifteenth Amendments and compliance with the Military Reconstruction Acts. *See generally* Brief In Support Of Plaintiffs'

---

[2] Plaintiffs hereby incorporate the recitation of the undisputed factual record set forth in their Brief In Support Of Plaintiffs' Motion For Summary Judgment, Dkt. 152. Plaintiffs dispute Defendants' statement of fact number 2, because Governor McAuliffe granted Mr. King's application for restoration of voting rights on June 13, 2017. *See* Ex. L. Plaintiffs also dispute Defendants' statement of fact number 7: In 2021, Ms. Johnson was convicted of possession with intent to distribute a controlled substance, Va. Code § 18.2-248, distribution of a controlled substance, *id.*, and neglect of a child (for presence of a teen-aged minor in the vicinity of such substances), Va. Code § 18.2-371.1. *See* Declaration of Toni Johnson, Dkt. 150-2. Neither dispute is material.

Motion for Summary Judgment ("Plaintiffs' MSJ"), Dkt. 152 at 3-6; *see also* 16 Stat. 62. In particular, the first Military Reconstruction Act required Virginia and the other former Confederate states to adopt constitutions granting the franchise to any adult male except for "participation in the rebellion or for felony at common law." 14 Stat. 428 (1867); *see* Dkt. 152-1 ("Plaintiffs' SUMF") ¶ 24; Report of Edward Ayers ("Ayers Rep."), Dkt. 153-2 ¶ 45. Based on its understanding that Virginia had satisfied this requirement, Congress enacted the Virginia Readmission Act to readmit Virginia's representatives to Congress pursuant to certain fundamental conditions that protected the newly guaranteed equal civil and political rights of Black citizens, including a "condition … to perpetuate negro suffrage." Plaintiffs' MSJ at 5 (quoting Ex. N at 15 (Sen. McCreery)). That fundamental condition "sought to prevent the use of convictions for misdemeanor and other minor offenses … to disenfranchise Black men," a practice among former Confederate states of which Congress was "keenly aware," Ayers Rep. ¶¶ 34-35.

Since the Virginia Readmission Act passed, Virginia has amended the disenfranchisement provision four times, expanding the scope of disenfranchisement, depriving additional citizens and classes of citizens of the right vote. *See* Plaintiffs' MSJ at 6-8. Today, Defendants disenfranchise every person convicted of ***any*** offense codified as a felony. *See* Va. Const. Art. II § 1 (1971) ("Felony Disenfranchisement Provision"); Plaintiffs' SUMF ¶ 47; *see also* Plaintiffs' MSJ at 9. Many of these statutory felonies—*e.g.*, drug crimes and child neglect offenses—did not exist either in the Virginia criminal code of 1869 or as felonies at common law in 1870. *See* Plaintiffs' MSJ at 9. Defendants' disenfranchisement practices have disproportionately impacted Black Virginians; today, Black people constitute only approximately 20% of Virginia's voting-age but 46% of its disenfranchised populations. *See id.* at 11; Plaintiffs' SUMF ¶¶ 62-65.

Plaintiffs are disenfranchised for convictions of felony offenses that did not exist either in

statute or at common law in 1870.  *See* Plaintiffs' SUMF ¶¶ 6-7, 15-17, 20.  Plaintiffs seek to

register to vote and vote, but Defendant's enforcement of the Felony Disenfranchisement Provision

blocks their registration, and they could face prosecution if they registered to vote while

disqualified.  *See id.* ¶¶ 8, 19; Plaintiffs' MSJ at 10; Va. Code §§ 24.2-653, 24.2-1004.

## ARGUMENT

I.  **THE VIRGINIA READMISSION ACT PROHIBITS DEFENDANTS FROM DISENFRANCHISING OTHERWISE ELIGIBLE VIRGINIANS FOR CONVICTION OF AN OFFENSE THAT WAS NOT A FELONY AT COMMON LAW IN 1870**

Congress prescribed that "the Constitution of Virginia shall never be so amended or

changed as to deprive any citizen or class of citizens of the United States the right to vote who are

***entitled*** to vote by the Constitution herein recognized, ***except*** as a punishment for such crimes as

are now felonies at common law."  16 Stat. 63.  The text contains two straightforward parts.  The

first, the "entitled to vote" clause, recognizes the 1869 Constitution's ***grant*** of the franchise to all

adult, male citizens regardless of race.  The second, the "except" clause—the Act's core,

substantive prohibition—then bars Virgina from ***excluding*** from this race-neutral entitlement any

citizen for a crime that was not a "felon[y] at common law" in 1870.  That reading is not only

straightforward as a matter of text; it also properly accounts for the Act's history and context.  The

Court should apply and enforce that straightforward reading here.

### A.  **Defendants' Interpretation Of The Virginia Readmission Act Inverts The Text And Violates Fundamental Principles Of Statutory Interpretation**

Defendants argue (at, *e.g.*, p.14) that because the Virginia Readmission Act prohibits the

Virginia Constitution from being "amended or changed as to deprive any citizen or class of citizens

of the right to vote who are entitled to vote by the Constitution herein recognized," and because

the Virginia's 1869 Constitution excluded from the franchise those who had committed a "felony,"

the Act must have implicitly authorized Virginia to disenfranchise ***any*** citizen for the commission

of any statutory felony created in the future.  But Defendants' theory not only reads out of the Act the operative "except" clause (and the central purpose of the fundamental condition), but it also improperly assumes that Congress adopted Defendants' idiosyncratic understanding of Virginia's 1869 Constitution.  Defendants' reading of the Act simply cannot be the correct one.

*First*, the fundamental condition, when read as a whole, prohibits Virginia from amending its constitution to "***deprive***" citizens of their voting rights based on new crimes the General Assembly might later codify.  *See* Plaintiffs' MSJ at 13.  Yet Defendants would instead read the fundamental condition to grant Virginia free rein to deprive even ***more*** citizens of their right to vote in the future.  *See* Defendants' MSJ at 25 ("[The Act] permitted Virginia to 'amend[] or change[]' its Constitution to disenfranchise additional 'classes of citizens' …").  Defendants' absurd reading of the Act violates several fundamental principles of statutory interpretation.

The Act's reference to not depriving of the vote those "who are entitled to vote by the Constitution herein recognized," 16 Stat. 63, specifically protected those citizens whom Virginia had through its 1869 Constitution and ***for the first time*** decreed were "entitled to vote": all adult male citizens, ***regardless of race***, Va. Const. art. III § 1 (1869).  Rather than incorporating the Virginia Constitution's ***exclusion*** from that entitlement for "[i]diots and lunatics" or "[p]ersons convicted of bribery in any election, embezzlement of public funds, treason or felony," *id.*, Congress imposed in the Act's subsequent clause a specific limit on the permissible bases for exclusion: a bar on disenfranchising any eligible voter for a crime that was not a "felon[y] at common law," 16 Stat. 63.  As a matter of federal law, Virginia (and all the other states Congress subjected to the identical restriction, *see infra* p.10) may not amend or change its constitution and impose disenfranchisement except for a crime that was a "felon[y] at common law" in 1870.

Reading the Act's reference to those "who are entitled to vote by the Constitution herein

recognized" as protecting the population the 1869 Constitution **enfranchised** rather than the population it excluded from the franchise properly "give[s] each word meaning and … avoid[s] creating surplusage." *Hedin v. Thompson*, 355 F.3d 746, 750 (4th Cir. 2004). Defendants acknowledge that straightforward understanding, stating (at p.14) that "the Act's governing command" barred Virginia from "disenfranchis[ing] a class of citizens *admitted to the franchise by the 1869 Constitution.*" (emphasis Defendants'). But they then argue (at p.14) that the Readmission Act permitted Virginia to disenfranchise anyone the 1869 Constitution excluded (including, in their view, anyone convicted of any **future** statutory felony) "**and** to amend its Constitution to disenfranchise" those "convicted of a crime that was a felony at common law." Defendants' argument that the fundamental condition's express and specific restraint is nullified through incorporation by reference violates basic principles of statutory construction. To adopt Defendants' view, the Court would have to ignore the Act's prohibition against "**depriv[ing]** any citizen or class of citizen of the United States of the right to vote" and instead read the Act's reference to those "entitled to vote by the Constitution herein recognized" as doing all the work, such that the phrase "**except** as a punishment for **such crimes** as are now felonies at common law" places no limit whatsoever on the crimes for which Virginia may disenfranchise. 16 Stat. 63.

But "Congress … does not alter the fundamental details of a [statutory] scheme in vague terms." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). In the Virginia Readmission Act, Congress used the clearest terms possible. It added the phrase "felonies at common law" to the Act as a "legal term of art," meaning Congress "presumably kn[ew] and adopt[ed] the cluster of ideas that were attached to [the] borrowed [term]." *Lackey v. Stinnie*, 145 S.Ct. 659, 666-667 (2025). "Leading up to and during 1870, scholars and courts uniformly recognized a distinction between statutory and common law felonies, and they would have understood Congress's chosen

term—'felonies at common law'—to exclude statutory felonies and instead refer only to a discrete and narrow list of common law crimes." Expert Report of Carissa Hessick ("Hessick Rep."), Dkt. 153-3 ¶ 42; Plaintiffs' SUMF ¶ 33; Plaintiffs' MSJ at 14-15. Congress further confirmed its intent ***not*** to authorize Virginia to disenfranchise "[w]hen[ever] the … General Assembly creates a new crime and authorizes punishment in the penitentiary," Defendants' MSJ at 27, by expressly prohibiting Virginia from amending its Constitution to deprive citizens of the franchise, "***except*** as a punishment for such crimes as are ***now*** felonies at common law," 16 Stat. 63.

Defendants do not dispute that "felonies at common law" is a term of art. Nor do they claim that any crime beyond those Plaintiffs have identified was a felony at common law in 1870. *See* Plaintiffs' MSJ at 15; Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories, Dkt. 153-1 at 6. But Defendants' theory—that the Virginia Readmission Act's express, specific condition means next-to-nothing—would require Congress to have "hid[den an] elephant[] in [a] mousehole[]," a tactic "it does not [do]," *Whitman*, 531 U.S. at 468. *See also Morton v. Mancari*, 417 U.S. 535, 550-551 (1974) (A specific provision cannot be "controlled or nullified by [a] general one."). No canon of statutory construction supports Defendants' theory.

To avoid this result, Defendants assert (at p.25) that their reading gives a sliver of meaning to the fundamental condition because it ***authorizes*** "Virginia to … ***disenfranchise [an] additional*** 'class[] of citizens'": people convicted of "petite larceny." Under Defendants' theory, "some crime**s** … were 'felonies at common law' [but] were not felonies under Virginia law"; but neither Defendants nor Professor Hessick have identified more than ***one*** such offense: petit larceny. *See id.* (citing Hessick). Under Defendants' interpretation (where "felony" in the 1869 Virginia Constitution encompasses both statutory ***and*** common law felonies, *see, e.g.*, Defendants' MSJ at 15, 16), there would be no reason to authorize Virginia to ***amend its constitution*** to disenfranchise

people who commit petit larceny, because those convicted of petit larceny would already be disenfranchised, and in any event, Virginia could achieve the same result simply by recodifying petit larceny as a statutory felony. And if all Congress meant to do was clarify that Virginia could extend disenfranchisement to petit larceny, it would have done so expressly.

More importantly, the "fundamental **condition**"—which prohibits Virginia from amending its Constitution to "**deprive**" any citizen or class of citizen of the franchise—must be read to actually **limit** Virginia's ability to disenfranchise its citizens. It cannot plausibly be recast as **authorizing** Virginia to expand disenfranchisement, as Defendants insist. Defendants also make no attempt to reconcile Congress's designation of this prohibition as a "**fundamental** condition" of readmission with their conclusion that its only function is to authorize the expansion of disenfranchisement to cover people convicted for thefts of "less value than five dollars." *Id.* at 25.

**Second**, even if Congress had incorporated by reference the 1869 Constitution's exclusions (and rendered meaningless its "felonies at common law" language), as explained below, *see infra* pp.14-17, Congress would have understood the 1869 Constitution's reference to "felony" to refer to common law felonies. Defendants' only answer (at p.27) is to point to the general principle that "the meaning of a term in a legal text [does not] remain[] constant." But they never contend with clear textual evidence that here, Congress intended the contrary. Even if the "herein recognized" phrase is read as broadly as Defendants demand, the Virginia Readmission Act expressly ties the scope of permissible disenfranchisement to a fixed time through the phrase "such crimes as are **now** felonies at common law," 16 Stat. 63. Defendants tellingly ignore this statutory requirement, which speaks precisely to whether Congress intended to allow Virginia to disenfranchise citizens for "felonies [that] exist today which did not exist in 1869." Defendants' MSJ at 28; *see generally id.* at 27-29. As explained in more detail below, *see infra* pp.9-10, there is no "absurdity" in

interpreting the Act "to reference a closed set of crimes," *id.* at 28; that was how Congress intended "to perpetuate negro suffrage" against the threat posed by "rebel leaders [who] ha[d] the power" in the former Confederate states, Ayers Rep. ¶¶ 46-47 (quoting Sens. McCreery and Yates).

***Third***, Defendants' reading of the fundamental condition's "except clause" is incompatible with the Act's overall structure the Military Reconstruction Act, which uses nearly identical language. The Readmission Act's statement that Virginia had satisfied the "condition precedent" to readmission refers to Congress's mandate in the Military Reconstruction Act that former Confederate states adopt constitutions providing that "the elective franchise shall be enjoyed by" all "male citizens of said State … of whatever race, color, or previous condition … except such as may be disenfranchised for participation in the rebellion or ***for felony at common law***," 14 Stat. 428. *See* Plaintiffs' MSJ at 4-5, 18. The clear purpose of this language was to stop the former Confederate states from leveraging Black Codes to eliminate Black voting power.

Only after recognizing that Virginia had met this "condition precedent" to readmission, 16 Stat. 62, did the Virginia Readmission Act readmit Virginia's congressional delegation, subject to the "fundamental condition." *See* 16 Stat. 63. Courts must "assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). That Congress borrowed the "felony at common law" phrase from the Military Reconstruction Act confirms that it "must have intended to incorporate" the Military Reconstruction Act's disenfranchisement "limitation … as well." *Id.* Reading the Military Reconstruction Act and Virginia Readmission Act together, Congress clearly sought (1) to limit felony disenfranchisement in the former Confederate states to a fixed set of then-existing felonies at common law and then (2) to prohibit Virginia from expanding disenfranchisement to encompass crimes beyond those crimes. *See* Plaintiffs' MSJ at 18-19. Defendants' theory—that Congress's fundamental condition

authorized Virginia to use the ***same*** voter suppression tactic that the Military Reconstruction Act was designed to eliminate—cannot be right.

***Fourth***, Defendants' argument that the Virginia Readmission Act's "fundamental condition" implicitly incorporates by reference all current and future statutory and common law felonies via the word "felony" in the 1869 Virginia Constitution—cannot be squared with the consistent imposition of substantially the same "fundamental condition" on the other nine former Confederate states. *See* Defendants' MSJ at 18. The first Military Reconstruction Act required each state to enact a constitution guaranteeing the franchise to "the male citizens of said State … of whatever race, color, or previous condition." 14 Stat. 428. Each of the former Confederate states, including Virginia, did so. However, in each case (save one) Congress made clear that should the state amend its constitution, it could not deprive of the right to vote those to whom the franchise had been granted, except for felony at common law. Ayers Rep. ¶ 45. This makes clear that Congress intended to impose a uniform level of protection for voting rights in the former Confederate states—not to impose state-specific obligations contingent on interpretation of any particular state's constitution. Defendants' contrary incorporation-by-reference theory would render the extent of federal-law protection via the fundamental condition dependent on each state's interpretations of its own constitution—thereby introducing varying interpretations of the same statutory language. *See United States v. Davis*, 588 U.S. 445, 458 (2019) ("[W]e normally presume that the same language in related statutes carries a consistent meaning."). Defendants agree (at p.19) the readmission acts should not have "different applications" across states, but they incorrectly assert—without any explanation or citation—that Plaintiffs' interpretation would lead to "radically different applications." To the contrary, Plaintiffs' construction alone maintains the uniformity of federal law, because it interprets the fundamental condition on its own terms, without

requiring a state-by-state incorporation by reference of historical state constitutions.

**_Finally_**, Defendants cite no authority to support a core premise for their theory: that "Virginia is not disenfranchising a 'class of persons' who were allowed to vote under the 1869 Constitution" because supposedly "[t]he relevant 'class of persons' who are disenfranchised, felons, has not changed." Defendants' MSJ at 28. Of course, Plaintiffs do not need to show that Defendants have deprived a "class" of the franchise to obtain relief; Plaintiffs and members of the proposed class are each "citizen[s]" who would have been entitled to, but have now been "deprive[d]" of, "the right to vote." 16 Stat. 63. But in any event, Defendants cite no authority to suggest that "felons" were a "class of citizens" contemplated by Congress under the Act as being carved out from protection. To the contrary, the Supreme Court has long understood the phrase "class of citizens" to refer to groupings defined by immutable characteristics that a "State may not [use to] accomplish … invidious distinctions between classes of its citizens" under the Fourteenth Amendment's Equal Protection Clause—a source of law contemporaneous with and referenced in the Virginia Readmission Act. *E.g.*, *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969); *Romer v. Evans*, 517 U.S. 620, 633 (1996); *Civil Rights Cases*, 109 U.S. 3, 24 (1883).

Indeed, Congressmen debating the Act used the phrase "class of citizens" to refer to racial distinctions: While any State which "excludes any large class of her citizens from the right of suffrage" is not "a government republican in form," that was entirely different from limiting the franchise by age, residency, or other temporary exclusions, which apply to all men alike without regard to color. Ex. N at 37 (Sen. Yates). "Felons" are not a "class of citizens" carved out of the "fundamental condition's" protection, which extends to those citizens whom Virginia's 1869 Constitution had for the first time enfranchised.

Defendants advance an implausible interpretation of the Virginia Readmission Act that

would require the Court to recast the Act's "fundamental condition" from a constraint on "rebel leaders" to a license to the state to disenfranchise, at will and in perpetuity. Even if this was the best reading of the Act's plain language, the Act should not be interpreted to "produce[] an outcome that is demonstrably at odds with clearly expressed congressional intent to the contrary." *Hillman v. IRS*, 263 F.3d 338, 342 (4th Cir. 2001). But it is not the best reading, or even a plausible one. The Act's plain text and clear structure preclude such a topsy-turvy interpretation.

### B. Defendants' Interpretation Of The Virginia Readmission Act Is Irreconcilable With The Relevant History And Context

While Defendants' disenfranchisement regime clearly violates the Virginia Readmission Act's plain text, the Act's history and context confirm the deep flaws in Defendants' interpretation.

The historical record confirms the textual linkage between the Virginia Readmission Act, which acknowledged Virginia's adoption of the 1869 Constitution, the first Military Reconstruction Act, which established the procedure for enacting that constitution, including its requirement to extend the franchise to all men, regardless of race. *See* Plaintiffs' MSJ at 3-6, 17-22. Congress enacted the Military Reconstruction Acts in part to respond to reports that former Confederate states—including Virginia—were eradicating nascent Black political power by enacting new criminal laws "to disenfranchise [Black] men who ha[d] been voters there." Ayers Rep. ¶ 35 (quoting 1866 testimony of a sheriff in Fairfax County, Virginia). The Military Reconstruction Act directly targeted these Black Codes. *See id.* It required Virginia to ratify the Fourteenth Amendment and enact a constitution that enfranchised adult men "except such as may be disfranchised for participation in the rebellion or for *felony at common law*." 14 Stat. 428. Virginia enacted its 1869 Constitution to fulfill this mandate, eventually "submitt[ing] [it] to Congress for examination and approval," *id. See* Ayers Rep. ¶ 43 n.46.

In assessing Virginia's and other former Confederate states' constitutions for compliance

with the Military Reconstruction Act, Congress sought to ensure not only that the franchise was extended to those previously enslaved, but also that states could not in the future use criminal law to undermine this goal (as Congress was aware former Confederate states were doing). *See* Plaintiffs' MSJ at 3-6, 18-19. That concern is what drove the readmission acts' "except as a punishment for such crimes as are now felonies at common law" "fundamental condition." *See id.* at 3-6, 17-19. Specifically, the "purpose of the [Readmission Act's] fundamental condition was to 'plant barriers against the future robbery of the civil and political rights of the colored citizens'… us[ing] 'ingeniously prepared laws' to exclude 'a very large proportion' of Black men from voting." Ayers Rep. ¶¶ 54-55 (quoting Sen. Drake and Sen. Harlan). Congress designed the fundamental condition to ensure that the former Confederate states never again effected Black disenfranchisement under the auspices of "vagrant laws and other laws of similar character." *Id.* ¶ 53 (quoting Sen. Stevens). Against this backdrop, it is inconceivable that (as Defendants argue) Congress's intent in passing the Virginia Readmission Act was to "permit[] Virginia to ... disenfranchise additional classes of citizens," Defendants' MSJ at 25, and grant Virginia *carte blanche* authority to disenfranchise for conviction of any felony.

This Court should "reject[] an interpretation that would undermine the statute and run 'plainly contrary to Congress' intent in enacting' it." *Hewitt v. United States*, 145 S. Ct. 2165, 2178 (2025). Defendants would read the Act's "except" clause not to limit disenfranchisement, but as a license to disenfranchise for **additional** crimes. Defendants' reading requires the conclusion that Congress—in enacting a statute to protect Black voting rights when it was well-aware that Virginia and other former Confederate states were enacting Black Codes—intended to both permit disenfranchisement for all felonies at common law and, more confoundingly, to encourage Virginia's disenfranchisement of all citizens with any "felony" conviction. This reading

is patently "contrary to Congress' intent in enacting" the Act. *Hewitt*, 145 S. Ct. at 2178. "Courts must interpret a given statute in accord with Congress's purposes and intent in enacting it." *Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*, 58 F.4th 785, 796 (4th Cir. 2023). The text, structure, and history of the Virginia Readmission Act permits no genuine debate that Congress's intent was to ***prevent*** Virginia from expanding disenfranchisement at its whim.

## C. Even Accounting For The 1869 Virginia Constitution, Defendants' Interpretation Of The Virginia Readmission Act Fails

Even if the Court were to conclude that the meaning of Virginia's 1869 Constitution is somehow relevant, Defendants are wrong about how that impacts the proper interpretation of the Virginia Readmission Act. The relevant question here is how ***Congress*** understood the 1869 Constitution when it passed the Act, not how ***Virginia*** understood or subsequently enforced it. And Congress would have understood "felony" in the 1869 Constitution's provision excluding from the franchise "[p]ersons convicted of bribery in any election, embezzlement of public funds, treason or felony," Va. Const. art. III § 1 (1869), to refer to felonies at common law.

### 1. Congress Would Have Understood "Felony" In The 1869 Constitution To Mean Felony At Common Law.

As Professor Hessick, an expert in the history of the criminal common law, explains, Congress would have understood the 1869 Constitution's reference to "felony" "to mean a felony at common law, rather than any crime that had been deemed a felony by the Virginia legislature." Hessick Rep. ¶ 15. That is because the common law continued to serve as the default source of substantive criminal law even after states began codifying felonies. *Id.* ¶¶ 21-23; *see also, e.g.*, Ex. Q at 2 (3 Joseph Story, *Commentaries On The Constitution* § 1153 (1st ed. 1833)) (noting that Congress "never undertook to define, what piracies or felonies were. It was taken for granted, that these were sufficiently known and understood at the common law; and that resort might, in all such cases, be had to that law, as the recognized jurisprudence of the Union."); *id.* Ex. R (1 Joel

Prentiss Bishop, Commentaries on the Criminal Law §§ 176, 187, 201 (Little, Brown, and Co., 4th ed. 1868)) (distinguishing statutory crimes and common law crimes). Bare reference to "felony" without more would therefore have invoked the crimes "sufficiently known and understood at the common law," Ex. Q § 1153, rather than any codified set of state crimes.

Even decades after the Virginia Readmission Act was passed, the word "felony" was generally understood to refer to a discrete set of common-law crimes. *See* Hessick Rep. ¶ 23 (compiling cases). To federal lawmakers, "[t]here [wa]s no statutory definition of 'felonies' in the legislation of the United States," and "'in the absence of such statute, the word [wa]s used to designate such serious offenses as were formerly punishable by death, or by forfeiture of the lands or goods of the offender.'" *Reagan v. United States*, 157 U.S. 301 (1895). "The word 'felony' was used at common law to denote offenses which occasioned a forfeiture" such that "capital or other punishment [m]ight be superadded," and that although by "the present day [as of 1895], imprisonment in a state prison or penitentiary[]" began to be "considered an infamous punishment[,] [i]f such imprisonment were made the sole test of felonies, … a great many offenses of minor importance[]" would be improperly "treated as felonies." *Bannon v. United States*, 156 U.S. 464, 467 (1895); *see also Ex parte Wilson*, 114 U.S. 417, 423 (1885) (explaining that "any felony" as understood at "the law of England" meant "any offense which ***at common law*** occasioned a total forfeiture of the offender's lands or goods, or both."). Congress thus would have understood "felony" to refer to common law felonies because it is "in accord with the ordinary public meaning of its terms at the time of its enactment," *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020), reflecting the constitutional provision's meaning as of "when the text was adopted," A. Scalia & B. Garner, *Reading Law* 78 (2012).

Defendants' sources are not to the contrary. Although they cite (at p.15) to an 1850

dictionary that they suggest defines the term "felony" more broadly, that dictionary offers multiple definitions in different contexts, one of which (derived from New York) states only that a felony was "punishable by death, or by imprisonment in a state prison." Ex. S at 7 (2 Alexander Burrill, *A New Law Dictionary And Glossary* 478 (1850)). It does not speak to the statutory/common law distinction at issue, and in fact relies on Blackstone's definition of a felony as "an offense which occasions a total forfeiture of either lands or goods, or both, ***at the common law***." *Id.* Defendants also cite (at p. 15) to a similar definition from Wharton's 1868 description of felonies and assert it reflects ***Virginia's*** understanding. But Defendants offer no evidence that ***Congress*** adopted this minority view or understood "felony" to include all statutory felonies.[3]

Professor Hessick relies on two treatises (including the ***same*** Wharton treatise Defendants cite) to explain that "the small number of states that had adopted such a definition" of felony tied to punishment by confinement in the penitentiary "as a matter of statute were characterized as outliers." Hessick Rep. ¶ 20 n.19. Wharton described how "felony" was generally understood across the nation (i.e., how Congress would have understood it): "[W]ith a few exceptions, the common law classification has obtained; the principal felonies being received as they originally existed, and their number being increased as the exigencies of society prompted." Ex. T at 3 (1 Francis Wharton, *A Treatise On The Criminal Law Of The United States* § 2 (Kay & Brother, 6th ed. 1868)). Congress did not craft the fundamental condition to be anchored to how ***Virginia*** understood its criminal law (or a treatise's summary of Virginia's purported understanding). *See supra* p.10. Indeed, anchoring the proper interpretation of the readmission acts to a single state's understanding of the word "felony" would allow for the very mischief those acts were enacted to

---

[3] These statements also have minimal probative value, as they focus on comparing "felony" to "misdemeanor," a distinction that also existed at common law.

prevent. Congress's understanding of "felony" as it appeared in Virginia's 1869 Constitution—to the extent it intended to incorporate that language into the readmission acts at all (*see supra* pp.8-9)—would have been linked to the generally accepted understanding of the term.

Defendants are also wrong (at p.25) that interpreting "felony" in the 1869 Constitution to refer to "felonies at common law" would render "the 'except' clause in the Readmission Act … entirely meaningless." The "except" clause places a forward-looking limitation on Virginia's ability to amend its constitution's enfranchisement provision. That limitation carries independent meaning even if Congress understood the 1869 Constitution's exclusion to bar only felonies at common law, because it prohibited Virginia from *modifying* its extension of the franchise to deprive of the vote citizens convicted of *new* felonies that were not "*now* felonies at common law," 16 Stat. 63, and Defendants have never disputed that Congress was referring to felonies *already recognized* at common law in 1870. *See generally* Defendants' Motion to Dismiss, Dkt. 54. The Act's "except" clause ensures that Virginia could not disenfranchise otherwise eligible Virginians except for "felonies at common law" in the future.

### 2. Defendants' Arguments For Broadly Reading "Felony" To Include Any Statutory Felonies (Past, Present, and Future) Fail

Defendants' other arguments for their reading of the 1869 Constitution also fail. *First*, Defendants are incorrect (at pp.26-27) that "under Plaintiffs' interpretation, the provision of the 1869 Constitution disenfranchising those convicted of 'embezzlement of public funds' would be surplusage." Embezzlement of public funds was not a separately enumerated common-law felony, and its status was at best ambiguous. *See* Hessick Rep. at 80 (listing embezzlement crimes as not crimes at common law); *id.* at 107 (noting "[c]omplicated distinction between common law larceny and embezzlement"). Embezzlement of public funds *was* a statutory felony in Virginia in 1869—so Defendants' reading (where "felony" includes statutory felonies) creates surplusage. *See* Ex. U

at 9-10 (1860 Code of Va. Title 54, Ch. 192 §§ 21-22) (making embezzlement a statutory felony).[4]

The 1869 Constitution's inclusion of "treason"—also a statutory felony in Virginia at the time—would render Defendants' interpretation redundant twice over—there would be no reason to separately list "treason" and "embezzlement of public funds" as triggering disenfranchisement if "felony" captured all common law and statutory felonies as Defendants' suggest. In contrast, because treason was often treated separately from felonies at common law, it is unsurprising that the 1869 Constitution would identify it separately under Plaintiffs' reading where "felony" refers to felonies at common law. *See id.* Ex. U at 3 (Ch. 190 § 1); Plaintiffs' MSJ at 21.

***Second***, Defendants' reliance (at p.17), on the 1869 Constitution's reference to "felony" in an unrelated provision concerning legislative immunity from arrest is also misplaced. That provision has no bearing on how ***Congress*** understood "felony" in the disenfranchisement provision of the 1869 Constitution. And Defendants notably offer no support whatsoever for their conclusory reading of that unrelated provision. Indeed, a provision limiting grounds for legislators' arrest could reasonably limit those grounds to the narrow set of felonies at common law and not to incorporate any "felony" the legislature might later create.

***Third***, ignoring the text Congress enacted and the history against which it did so, Defendants point (on pp. 15-21, 25-26) to post-enactment statements and practices of ***state*** lawmakers—that would not have been available to the Readmission Act Congress—as purportedly probative evidence of how Virginia's 1869 Constitution should be interpreted. But Virginia's criminal code was designed by a state legislature that members of Congress understood to be "overwhelmingly rebel," with 25 of 43 state senators "engaged in open rebellion against the United

---

[4] And even if, as Defendants suggest, "embezzlement of public funds" were a common law felony in 1870, Defendants' interpretation too would lead to surplusage, as Defendants broadly interpret "felony" to include "both statutory ***and*** common-law felonies." Defendants' MSJ at 16.

States" and unable to swear allegiance to it. Ex. J at 18 (Sen. Howard). And Defendants nowhere explain how Virginia's **post-enactment** enforcement of its disenfranchisement regime is relevant to the proper interpretation of the Virginia Readmission Act—Congress obviously could not have considered those records in January 1870, so it cannot be presumed to have condoned Virginia's disenfranchisement practices (Defendants' records of underlying convictions, for example, reflect that none occurred before 1871. *See generally* Defendants' MSJ, Ex. 4 to the Sanford Decl., Dkt. 148-5). Indeed, "[p]ost-enactment legislative history ... is not a legitimate tool of statutory interpretation," because "by definition [it] could have had no effect on the congressional vote." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011).

It is hard to imagine a document less probative for construing the Virginia Readmission Act than the "Official List of Colored Persons Convicted of Felony or Petit Larceny in the Hustings Court of the City of Richmond, and Thereby Disenfranchised," on which Defendants rely. *See* Defendants' MSJ at 20; Dkt. 148-8 ("Colored Males Disenfranchised"). These "records" reflect only disenfranchisement of "colored persons" convicted in the Hustings Court of Richmond, from which approximately 1,000 Black men were disenfranchised between 1870 and 1892, Ex. V at 3 (Charles E. Wynes, Race Relations in Virginia, 1870-1902 136 (Rowman & Littlefield 1st ed. 1971)). Defendants notably submitted no similar record of white men disenfranchised for convictions over that time period; nor have Plaintiffs located one. Moreover, the selective and openly racist records show that after 1870, Virginia officials disenfranchised Black men who were convicted of offenses that were not felonies at common law; underscoring the specific threat that the fundamental condition was intended to prevent. *See supra* p.3. For example, state legislatures specifically prosecuted bigamy (a statutory, but not common-law, felony) to punish recently emancipated Black citizens, who had gained the legal right to marry after Emancipation but often

had quasi-marital relationships formed during enslavement (sometimes against their will) that had not been legally terminated. Ex. W at 5-7, 9-12 (Tera W. Hunter, *Bound in Wedlock: Slave and Free Black Marriage in the Nineteenth Century* 220, 230-231, 282-285 (Harvard Univ. 2017)). That practice exemplifies the very tactics Congress intended the fundamental condition to prohibit. There is simply no basis to conclude that the 1870 Congress would have approved of this conduct, or that Virginia's disenfranchisement practices from 1870-1892 compel Defendants' interpretation of the 1869 Constitution.[5]

*Fourth*, Defendants' reliance (at p.28) on *Richardson v. Ramirez*, 418 U.S. 24 (1974), which interpreted the word "crime" in the Fourteenth Amendment as incorporating modern offenses, only confirms the importance of the Virginia Readmission Act's express limitation on the crimes eligible for disenfranchisement. Cases interpreting *Ramirez* distinguish the Fourteenth Amendment's reference to a "crime" from Congress' clear reference to "common law felonies" in reconstruction-era legislation. "The Reconstruction Act's reference to felonies at common law," for example, "shows that … Congress meant to specify felonies at common law," in **contrast to** the Fourteenth Amendment's more general phrase "other crime." *Harvey v. Brewer*, 605 F.3d 1067, 1076-1077 (9th Cir. 2010) (O'Connor, A.J.). The same logic applies to the Virginia Readmission Act, which expressly locked the felonies it referenced in time through the phrase "**as are now** felonies at common law." 16 Stat. 63. The choice was deliberate and clear.

3. Even Under Defendants' Interpretation Of "Felony" In The 1869 Constitution, Defendants Are Violating The Virginia Readmission Act

---

[5] Defendants' suggestion (at p.26) that their interpretation is supported by Virginia's 1876 constitutional amendment adding petit larceny to the disenfranchisement provision is misplaced. Defendants' own historical records demonstrate that Virginia was **already** disenfranchising based on petit larceny **before** the November 7, 1876 amendment: George Cosby was convicted of petit larceny on June 6, 1876, and thereby disenfranchised. *See* Defendants' MSJ, Ex. 4 to Sanford Decl. at 5 (Cosby conviction); Ex. 3 to Sanford Decl. at 7 (Cosby disenfranchisement).

Even accepting Defendants view that Congress would have understood "felony" in the 1869 Constitution to encompass felonies beyond those recognized at common law, Defendants are nonetheless violating the Virginia Readmission Act. Virginia has since amended its constitution (four times) to "deprive … citizen[s] or class[es] of citizens of the right to vote who [were] entitled to vote" under the 1869 Constitution. The Virginia Readmission Act froze **both** in substance and time the felonies for which citizens could be disenfranchised: it limited such disenfranchisement to "felonies at common law" and to those "***as are now***" (*i.e.*, in 1870) so delineated. *See supra* p.17. Defendants do not advance any other reading of the "as are now" phrase; even if Congress meant to incorporate all statutory felonies in 1869, nothing in the Act's text would allow Virginia to amend its constitution, adding to that list the more than a thousand statutory felonies in Virginia's modern criminal code, many of which no one would have imagined in 1869.

Defendants' suggestion (at pp.16-18) that the 1869 Constitution defined "felony" as a crime punishable by "confinement in the penitentiary" is similarly misplaced. That definition, too, would encompass a very narrow set of crimes, as confinement in the penitentiary was not nearly as common in 1870 as it is today. Virginia's criminal code in 1870 identified only a small handful of statutory felonies, which overlap substantially with the common-law felonies Professor Hessick identifies. *See* Hessick Rep. at 56-59. And in 1870, states punished by confinement in the penitentiary only crimes that "evidenced the moral corruption that a period of reformation in the penitentiary regime was designed to correct." Ex. X (Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 483 (2009), *cited in* Hessick Rep. ¶ 30 n.58).

Without grappling with the "as are now" text, Defendants generally assert (at p.27) that the Act's "meaning" should be "applied to new situations." But the Act's "as are ***now***" command

confirms that Congress intended to freeze the scope of permissible disenfranchisement in time, rather than extend it to "new situations." Defendants cite no case involving a statute which, like this one, *itself* contained a temporal limitation on how its terms should be understood. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 287-288 (1988) (majority op.) (no explicit temporal limitation in the relevant text of the Tariff Act of 1922); *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (discussing U.S. Const., amend. II); *South Carolina v. United States*, 199 U.S. 437, 448 (1905) (no explicit temporal limitation in the definition of "person" under the statute). Here, Congress "specified that it was incorporating the law … as it existed on a particular date." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 207 (2019). It applies as written.

## II. THE COURT SHOULD REJECT DEFENDANTS' UNPERSUASIVE PROCEDURAL AND POLICY ARGUMENTS, MOST OF WHICH THE FOURTH CIRCUIT CONCLUSIVELY REJECTED

### A. Plaintiffs' Claim Does Not Present A Political Question Or Trigger Other Avoidance-Based Abstention Doctrines

Expressly acknowledging that this Court already "rejected this argument at the motion-to-dismiss stage," Defendants again argue that enforcement of the Virginia Readmission Act presents a nonjusticiable political question. Defendants' MSJ at 6 n.2. This Court rejected that argument because "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." *See* Dkt. 88 at 11. The Supreme Court, too, denied Defendants' Petition for Certiorari raising the same argument. *See* Petition for Writ of Certiorari, *O'Bannon v. King*, 2025 WL 1727393. "[T]he mere fact that the suit seeks protection of a political right does not mean it presents a political question." *Baker v. Carr*, 369 U.S. 186, 209 (1962). This straightforward preemption case presents none of the circumstances in which political-question abstention is appropriate. *See* Dkt. 88 at 11 (quoting *Baker*, 369 U.S. at 217).

Even assuming the Act was passed pursuant to the Constitution's Guarantee Clause, *Baker v. Carr* instructs that any non-justiciability of claims brought pursuant to the Guarantee

Clause "has nothing to do with their touching upon matters of state governmental organization," but with the "absence of standards whereby [adjudication] could be made by a court acting independently." 369 U.S. at 218-220. Here, Plaintiffs' claims challenge Defendants' violation of the Virginia Readmission Act—not the Guarantee Clause—and the Fourth Circuit has already held that there is "no basis for concluding the Virginia Readmission Act lacks judicially manageable standards." *King*, 122 F.4th at 547. That judgment controls.

Nor do Defendants cite any authority for the proposition that statutes enacted pursuant to the Guarantee Clause (assuming they have been so enacted) may not be enforced. Defendants' two other Guarantee Clause cases are far from "nearly identical" to this one, *contra* Defendants' MSJ at 7, and they do not support Defendants' reading of the Guarantee Clause as a bar on private enforcement of the readmission acts. In *Pacific States Telephone & Telegraph Co. v. Oregon*, a state telecommunications corporation alleged that Oregon violated the Guarantee Clause by adopting a ballot initiative system of legislation (which in turn resulted in a tax on Pacific States Telephone). 223 U.S. 118 (1912). Here, Plaintiffs are not suing under the Guarantee Clause to challenge a method of legislation; they are simply asking Virginia to stop enforcing state law in violation of a federal statute. *Pacific States* does not limit such suits; it explains that had the corporation's attack been on the preempted law (*i.e.*, "on the tax as a tax") instead of "on the State as a State," the case "would have been justiciable." *Id.* at 150. Plaintiffs here do not "demand of the State that it establish its right to exist as a State, republican in form," but instead seek to "test[] judicially some exercise of power" that "has injuriously affected the[ir] rights." *Id.* at 150-151. *Luther v. Borden* is similarly far afield. 48 U.S. 1, 41 (1849). There, the parties disputed which of two governments was to be recognized, "call[ing] into question" the "***existence*** and authority of the government." *Id.* at 34. Plaintiffs raise no such question; they seek only to conform

Defendants' actions to federal law.  As *Luther* makes clear, the judiciary may "determine what political privileges the citizens of a State are entitled to" if "there is an established constitution or law to govern its decision."  *Id.* at 41.  Here, that established and (per the Fourth Circuit) "judicially administrable" law is the Virginia Readmission Act.  *King*, 122 F.4th at 547.

The only cases Defendants cite stating that the readmission acts cannot be enforced by the courts do not turn on the Guarantee Clause, and they are not remotely persuasive.  The first is a 1951 decision of this District which found that Virginia's ***poll tax***—which the Supreme Court soon held to be unconstitutional, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966)— did not violate the Virginia Readmission Act, noting in the alternative that the Act may not be enforceable.  *See Butler v. Thompson*, 97 F. Supp. 17 (E.D. Va. 1951).  Defendants' second case is a state court opinion that first concluded that an argument concerning the Arkansas Readmission Act "was not presented" and then stated in dicta (and without analysis) that the Readmission Act's purpose of ensuring "former slaves['] … right to vote" was "no longer a consideration."  *Merritt v. Jones*, 533 S.W.2d 497, 502 (Ark. 1976).  Whether Congress has declared that Virginia's constitution is republican is irrelevant to Plaintiffs' claims, as their request for injunctive relief against preempted state action does not ask the Court to make any pronouncements about whether Virginia's constitution is republican.  And that Congress has not taken up whether Virginia has violated the Readmission Act does not preclude this Court from doing so; as the Fourth Circuit "conclude[d]," Congress has not in the Virginia Readmission Act "limit[ed]" the "power of federal courts of equity to enjoin unlawful executive action."  *King*, 122 F.4th at 546.

For the same reasons, the Court should once again reject Defendants' related invocation (at p.11) of the "canon of constitutional avoidance" and "anticommandeering doctrine."  As the Court explained when it first rejected those arguments, the Virginia Readmission Act contains no

"statutory ambiguity'" triggering constitutional avoidance. *See* Dkt. 88 at 11 n.3 (quoting *United States v. Palomar-Santiago*, 593 U.S. 321, 329 (2021)). And there is no equal-footing issue, because Congress enacted the readmission acts not arbitrarily, but as a direct response to Virginia's (and other former Confederate states') disproportionate efforts to disenfranchise Black citizens. Unlike the only case in modern history in which the Court has found an equal-footing violation, there is no indication that the Virginia Readmission Act was "intended to be temporary" or that the state has "dramatically" shifted in its treatment of Black citizens convicted of felonies. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 546-547 (2013). Virginia ***today*** has the highest disparity between disenfranchised Black citizens and the overall population of any readmission act state. Plaintiffs' SUMF ¶ 71. Nor, as this Court already held, do Plaintiffs ask the Court to commandeer a state legislature. *See* Dkt. 88 at 11 n.3. The anticommandeering principle "prevents Congress from shifting the costs of regulation to the States" by "dictat[ing] what a state legislature may and may not do." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018). But this case does not involve regulatory costs, or a requirement that Virginia's legislature "enact and enforce" some congressional program. *Id.*

At bottom, Defendants' demand (at p.7) that the Court defer to "Congress's judgment" by refusing to enforce the Virginia Readmission Act inverts the Act's very purpose and instead invites the Court to ***defy*** Congress's judgment limiting Virginia's ability to disenfranchise its citizens. As one congressional proponent explained: "The 'fundamental condition' fixes the rights of citizens, and the ***courts will furnish redress*** for their violation … if Virginia should change her constitution so as to deny to citizens the rights secured by this 'fundamental condition.'" Ex. J at 91 (Rep. Lawrence). The Court now has a "'virtually unflagging'" obligation to exercise its jurisdiction over this case, *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817

(1976), whatever the political consequences, *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The Court should again reject Defendants' arguments.

## B. The Fourth Circuit Already Decided That Plaintiffs Have A Cause Of Action In Equity

Defendants admit that "the Fourth Circuit agreed with Plaintiffs that the *Ex parte Young* exception" to sovereign immunity "can lift sovereign immunity regardless of whether the plaintiff has a cause of action," but dispute that the Fourth Circuit "rule[d] on whether Plaintiffs have a cause of action to proceed on their remaining claim." Defendants' MSJ at 9. That is wrong. The Fourth Circuit held that Plaintiffs have a cause of action in equity and the Supreme Court denied Defendants' request for review. *O'Bannon*, 2025 WL 1727393. The Fourth Circuit's opinion is now the law of the case, and it is binding "both" as "to questions actually decided as well as to those decided by 'necessary implication,'" *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988). There is no cause-of-action argument for Defendants to "preserve" (*contra* p. 9).

Because this Court had already dismissed Plaintiffs' Section 1983 claim (as to which Plaintiffs reserve all appellate rights, *see* Plaintiffs' MSJ at 2 n.2), the Fourth Circuit addressed only "[t]he relevant count"—*i.e.*, the count seeking relief in equity that remains here and which "alleges that the defendants are violating federal law by preventing King and Johnson from registering to vote." *King*, 122 F.4th at 542-543. The Fourth Circuit "conclude[d]" that although "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," the "Virginia Readmission Act *creates no such limitations*." *Id.* at 546. That is because (contrary to Defendants' argument at p.11) the Act "has no clear enforcement mechanism—much less a 'sole' or 'express' one," and it presents "judicially manageable standards." *Id.* at 547. And it specifically rejected the argument Defendants now repeat (at p.9), holding that Plaintiffs do ***not*** need "a cause of action from somewhere else" to

obtain such relief; the invocation of the Court's equitable authority *is* the cause of action. *Id.* at 544 n.1 (quoting and distinguishing *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895 (6th Cir. 2014)); *see also Armstrong v. Exceptional Child Care Ctr.*, 575 U.S. 320, 328 (2015).

Defendants' authorities (at pp.9-10) offer no change in law or other basis to deviate from this law of the case. The Supreme Court recently reaffirmed federal courts' equitable judicial power in *Trump v. CASA, Inc.*, which held only that "[b]ecause the *universal injunction* lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority." 145 S. Ct. 2540, 2554 (2025). The opinion contrasts sweeping (and relatively novel) universal injunctions with the "long line of cases authorizing suits against state officials in certain circumstances," including courts' power in equity to "issue an antisuit injunction to prevent an officer from engaging in tortious conduct." *CASA, Inc.*, 145 S. Ct. at 2554 n.9. Defendants already presented to the Fourth Circuit their argument (at p.10) that the Readmission Act is analogous to a contract enforceable only by Congress. *See* Appellants' Opening Brief at 31, *King v. Youngkin*, 122 F.4th 539 (May 22, 2024). The Fourth Circuit necessarily rejected that argument; that decision is binding law of the case. *Sejman*, 845 F.2d at 69.

Plaintiffs simply ask that Virginia state officials "do nothing more than refrain from violating federal law," and that is all the cause of action they need. *King*, 122 F.4th at 544. Contrary to Defendants' suggestion (at p.10), Plaintiffs also meet the requirements for an anti-suit injunction; the Fourth Circuit held that if Plaintiffs "somehow managed to register and cast a ballot, they would—absent the relief they seek in this lawsuit—be subject to criminal prosecution for illegal voting." *Id.* These Defendants, though "not prosecutors," Defendants' MSJ at 10, maintain the very "prohibited table" that identifies disenfranchised voters for potential prosecution. *See* Plaintiffs' SUMF ¶¶ 48-52. No more is necessary.

### C. The Fourth Circuit Already Decided That Sovereign Immunity Does Not Apply Here

Defendants acknowledge (at p.12 n.3) that their sovereign immunity argument is squarely foreclosed by the Fourth Circuit's opinion, which held that this Court "correctly refused to dismiss the one remaining count of [Plaintiffs'] complaint based on sovereign immunity," *King*, 122 F.4th at 549. Again, the Supreme Court denied Defendants' petition for a writ of certiorari. *See O'Bannon*, 2025 WL 1727393. Defendants claim (at p.12 n.3) they "renew the argument here to preserve it for further appellate review," but no further appellate review is available to them, and the sovereign immunity claim has been finally adjudicated. *See United States v. Jett*, 63 Fed. App'x 155, 157 (4th Cir. 2003) ("[T]he mandate rule … 'forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" (quoting *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993))). The Fourth Circuit rejected both bases for sovereign immunity that Defendants raise. *See King*, 122 F.4th at 543-546. The Fourth Circuit rejected the first, concerning the scope of equitable relief pursuant to *Ex parte Young*. *See* Defendants' MSJ at 12; *supra* pp.26-27. As to the second (which Defendants label "third"), the Fourth Circuit "conclude[d] King and Johnson are seeking to enforce federal law, not state law." *King*, 122 F.4th at 545.

### D. The Court Should Reject Defendants' Remaining Policy Arguments

Defendants argue (at pp.21, 23) that "Plaintiffs' interpretation" of the Virginia Readmission Act would lead to "anomalous" results. Far from being "highly anomalous," *id*. at 21, enforcing the Readmission Act according to its terms would remove Virginia from the "radical" position of being the **only** remaining state that permanently disenfranchises its citizens for conviction of any felony. But "[e]ven if [this Court] thought sound policy called for a [different construction] … that policy choice is a matte[r] for Congress, not this Court, to resolve." *Soto v. United* States, 145 S. Ct. 1677, 1689 (2025). Contrary to Defendants' assertion (at p.21), that

Virginia has never "used" the disenfranchisement regime Congress required does not excuse it from compliance now. And as explained, *supra* pp.9-10, Congress had good reason to require disenfranchisement only for common law felonies rather than, as Defendants propose (at p.21), based on "the seriousness of the offense." Congress understood that the former rebel states had begun to enact new, ostensibly 'serious' felonies specifically for the purpose of disenfranchising Black citizens. And so it limited disenfranchisement to a group of crimes considered universally serious—*i.e.*, crimes "as are now felonies at common law," 16 Stat. 63, and preserved that limited basis for disenfranchisement in time. This is no "strange system" (*contra* p.22); it is one Congress designed to protect Black voters from the whims of former Confederate state legislatures.

Nor is there anything "backward" about a legal regime that disenfranchises people for only some felony offenses. Maine, Vermont, the District of Columbia, and Puerto Rico do not impose disenfranchisement for ***any*** criminal conviction, *cf.* Defendants' MSJ at 21-22, and "four … states only permit permanent disenfranchisement for corrupt practices in elections or governance." *Hopkins v. Sec'y of State Delbert Hosemann*, 76 F.4th 378, 405 (5th Cir. 2023), *reh'g en banc granted, opinion vacated on other grounds* 108 F.4th 371 (5th Cir. 2024).[6] It also does not matter whether any former Confederate state has ever enforced its law to disenfranchise only for common-law felony convictions. *See* Defendants' MSJ at 22. It is refusing to enforce Congress's fundamental condition that would constitute a "radical" reworking of our union. *Id.* "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock*, 590 U.S. at 674.

---

[6] Defendants' assert (at p.21 n.5) that granting Plaintiffs' relief would undermine Virginia's proposed constitutional amendment providing for automatic re-enfranchisement upon release from incarceration. This assertion is plainly wrong: the Virginia Readmission Act expressly prohibits certain kinds of ***dis***enfranchisement, it puts no limits on ***re***-enfranchisement. Regardless, the pending amendment has no bearing on the issues currently before the Court.

Defendants also argue (at pp.23-24) that enforcing the Virginia Readmission Act would be "unworkable." But the Fourth Circuit saw "no basis for concluding the Virginia Readmission Act lacks judicially manageable standards," stating that "[t]o be sure, interpreting and applying this statute may not always be easy[] [b]ut 'resolving whether a particular interpretation of a statute'— even an old one—'is correct represents a familiar judicial exercise, one for which there is a superabundance of tools that federal judges employ every day.'" *King*, 122 F.4th at 546-547. As the Fourth Circuit acknowledged, "even if the Virginia Readmission Act, properly construed, will require the district court to decide whether people with certain convictions would have been 'entitled to vote' under Virginia's 1869 constitution or if a particular crime was a 'felon[y] at common law,' such questions also fall within the heartland of what federal courts do every day." *Id.* at 547. The Fourth Circuit thus rejected the argument (at p.24) that identifying common law crimes is beyond judicial competence, leaving this Court to conduct the necessary analysis, as courts routinely do. *See e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022).

Plaintiffs' requested relief is even more straightforward than the Fourth Circuit contemplated. Professor Hessick already identified the felonies that would have clearly been felonies at common law in 1870, and Plaintiffs ask the Court to prohibit Virginia from disenfranchising otherwise eligible voters for conviction of any felony not on that list. *See* Plaintiffs' MSJ at 25; Plaintiffs' Proposed Order, Dkt. 151-1.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (1) deny Defendants' Motion for Summary Judgment, Dkt. 147, and (2) grant Plaintiffs' Motion for Summary Judgment and Permanent Injunctive Relief, Dkt. 151.

Dated: August 8, 2025

Respectfully submitted,

*/s/ Brittany Blueitt Amadi*

Vishal Agraharkar (VSB No. 93265)
Eden Heilman (VSB No. 93554)
ACLU FOUNDATION OF VIRGINIA
701 E. Franklin Street, Ste. 1412
Richmond, VA 23219
(804) 523-2151
vagraharkar@acluva.org
eheilman@acluva.org

Brittany Blueitt Amadi (VSB No. 80078)
Medha Gargeya**
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
(202) 663-6000
brittany.amadi@wilmerhale.com

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
(202) 579-4582
jared.davidson@protectdemocracy.org

Robert Kingsley Smith*
Jason H. Liss*
Robert Donoghue*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
robert.smith@wilmerhale.com

Benjamin L. Berwick*
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Nicholas Werle*
Noelle Higginson*
Brandon Roul*
Dylan S. Reichman**
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
nick.werle@wilmerhale.com

Beau C. Tremitiere*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 153
Washington, DC 20006
(202) 579-4582
beau.tremitiere@protectdemocracy.org

Nitisha Baronia*
WILMER CUTLER PICKERING
HALE AND DORR LLP
50 California Street, St # 3600
San Francisco, CA 94111
(202) 718-6494
nitisha.baronia@wilmerhale.com

*Counsel for Plaintiffs*
*\*admitted pro hac vice*
*\*\*pro hac vice application pending*

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on August 8, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically e-mail notification of such filing to all counsel of record.

/s/ Brittany Blueitt Amadi
Brittany Blueitt Amadi (VSB No. 80078)
*Counsel for Plaintiff*