**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| TATI ABU KING, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-408-JAG |
| | ) | |
| JOHN O'BANNON, in his official capacity | ) | |
| as Chairman of the State Board of Elections | ) | |
| for the Commonwealth of Virginia, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' SUPPLEMENTAL BRIEF**
**SUBMITTED PURSUANT TO THE COURT'S ORDER (ECF NO. 182)**

Charles J. Cooper *(Pro Hac Vice)*
Haley N. Proctor (VSB #84272)
John D. Ramer *(Pro Hac Vice)*
Bradley L. Larson (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants John O'Bannon,*
*Rosalyn R. Dance, Georgia Alvis-Long,*
*Christopher P. Stolle, J. Chapman Petersen,*
*Susan Beals, Eric Spicer, and Sandy C.*
*Elswick*

Jason S. Miyares
   *Attorney General*

Kevin M. Gallagher (VSB #87548)
   *Solicitor General*

Thomas J. Sanford (VSB #95965)
   *Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
KGallagher@oag.state.va.us

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ..............................................................................................................1

RELEVANT BACKGROUND ...........................................................................................2

ARGUMENT......................................................................................................................3

      I.     Judicial enforcement of the Readmission Act against Virginia is unconstitutional.................................................................................................3

      II.    Any injunction should permit disenfranchisement for crimes punishable by confinement in facilities analogous to a state penitentiary ....................................9

            A.     There was no accepted list of common-law felonies in 1870......................9

            B.     Blackstone's classification of common-law felonies based on the punishment imposed offers the only administrable and rational test.........14

            C.     Plaintiffs' proposed remedial scheme raises numerous issues ..................19

      III.   As Plaintiffs concede, any injunction must provide only prospective relief .........21

CONCLUSION..................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altria Group v. Good,*
    555 U.S. 70 (2008)...................................................................................................14

*Arizona v. Inter Tribal Council of Az.,*
    570 U.S. 1 (2013).....................................................................................................14

*Armstrong v. Exceptional Child Ctr.,*
    575 U.S. 320 (2015)...................................................................................................5

*Bates v. Dow Agrosciences LLC,*
    544 U.S. 431 (2005).................................................................................................14

*Bianchi v. Brown,*
    111 F.4th 438 (4th Cir. 2024) .................................................................................15

*Butler v. Thompson,*
    97 F. Supp. 17 (E.D. Va. 1951) .............................................................................4, 6

*Cipollone v. Liggett Group, Inc.,*
    505 U.S. 504 (1992).................................................................................................14

*Coyle v. Smith,*
    221 U.S. 559 (1911)...................................................................................................5

*District of Columbia Court of Appeals v. Feldman,*
    460 U.S. 462 (1983).................................................................................................19

*Escanaba Co. v. Chicago,*
    107 U.S. 678 (1883)...................................................................................................5

*Giaccio v. Pennsylvania,*
    382 U.S. 399 (1966)...................................................................................................7

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999).................................................................................................19

*King v. Youngkin,*
    122 F.4th 539 (4th Cir. 2024) ...............................................................................2, 8

*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949).................................................................................................21

*Medina v. Planned Parenthood S. Atl.,*
    606 U.S. 357 (2025)...................................................................................................4

ii

*Merritt v. Jones*,
   259 Ark. 380 (1976)..................................................................................................4

*Murphy v. National Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018)..................................................................................................6

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   597 U.S. 1 (2022)....................................................................................................15

*New York v. United States*,
   505 U.S. 144 (1992)..................................................................................................6

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013) ..................................................................................20

*Pollard's Lessee v. Hogan*,
   44 U.S. (3 How.) 212 (1845) ....................................................................................5

*Printz v. United States*,
   521 U.S. 898 (1997)................................................................................................19

*Rooker v. Fidelity Trust Co.*,
   261 U.S. 114 (1923)................................................................................................19

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)................................................................................................20

*Sessions v. Dimaya*,
   584 U.S. 148 (2018)..................................................................................................7

*Shook v. Board of Cnty. Commr's of Cnty. of El Paso*,
   543 F.3d 597 (10th Cir. 2008) ................................................................................20

*United States v. Johnson*,
   576 U.S. 591 (2015)........................................................................................7, 8, 18

*United States v. L. Cohen Grocery Co.*,
   255 U.S. 81 (1921)....................................................................................................7

*United States v. Rahimi*,
   602 U.S. 680 (2024)..........................................................................................15, 16

**Statutes**

Ala. Code §17-3-30.1................................................................................................20

Alaska Stat. §15.80.010 ...........................................................................................20

16 Stat. 62 ..................................................................................................................4

Va. Code § 18.2-8 ...........................................................................................................16

Va. Code § 18.2-61 .........................................................................................................17

Va. Code § 18.2-77 .........................................................................................................17

Va. Code § 24.2-431 .......................................................................................................18

**Other Authorities**

1 William Hawkins, Treatise on the Pleas of the Crown (1762) available at
    https://tinyurl.com/3ffphck5 .....................................................................................13

9 William Henning, The Statutes at Large, 127 (1821), available at
    https://tinyurl.com/yzawebfv ....................................................................................11

1 Samuel Williston, The Law of Contracts (1923) ............................................................4

2 Alexander Burrill, A NEW LAW DICTIONARY AND GLOSSARY (1850).....................................15

2 Samuel Williston, The Law of Contracts (1923) ............................................................4

3 Edward Coke, The Third Part of the Institutes of the Laws of England (4th ed.
    1669) available at https://tinyurl.com/5yax2ter .......................................................13

4 William Blackstone, Commentaries on the Laws of England (G.W. Childs
    1868) ........................................................................................................................15

An Act to reduce into one the several acts concerning crimes and punishments,
    and proceedings in criminal cases, Title I, Ch. XI, Acts of the General
    Assembly of Virginia, at the Session of 1847-1848 (1848)........................................11

Carissa Byrne Hessick, *Legality, Legal Standards, and the Legacy of Marvin
    Frankel*, 35 Fed. Sent. Rep. 249 (2023)...................................................................11

Eric Biber, *The Price of Admission: Causes, Effects, and Patterns of Conditions
    Imposed on States Entering the Union*, 46 Am. J. Legal Hist. 119 (2004)...............6

Fed. R. Civ. P. 65...........................................................................................................20

Ford W. Hall, *The Common Law: An Account of its Reception in the United
    States*, 4 Vand. L. Rev. 791 (1951)...........................................................................11

Gary Fields and John R. Emshwiller, *Many Failed Efforts to Count Nation's
    Federal Criminal Laws*, WALL STREET JOURNAL (July 23, 2011) .........................16

Henry Campbell Black, BLACK'S LAW DICTIONARY (1st ed. 1891)............................................15

James Q. Dealey, *Growth of American State Constitutions* (1915)....................................6

Matthew Hale, The History of the Common Law of England (3d ed. 1739),
      available at https://tinyurl.com/4zszhfmn ........................................................................10, 17

Michael Dalton, The Country Justice (1746) available at
      https://tinyurl.com/36m2jptr ........................................................................................13, 17

Va. Const. art. II, § 1.............................................................................................................18

William Clark & William Marshall, A Treatise on the Law of Crimes (1900)
      available at https://tinyurl.com/4rrvxd6a ...............................................................14

William Hening, The New Virginia Justice (1810) available at
      https://tinyurl.com/39ekhttk........................................................................................13

13 Williston on Contracts (4th ed.)..........................................................................................4

11A Wright & Miller, Federal Practice & Procedure (3d ed. 2025)...............................................19

**INTRODUCTION**

The Court gave Plaintiffs a second chance to find an administrable remedy for their unprecedented reading of the Virginia Readmission Act. They have barely even tried. Instead, Plaintiffs have doubled down on the half-baked analysis set forth in Professor Hessick's report, adding only (another) incomplete analysis of federal law and essentially no analysis whatsoever with respect to crimes in the other 49 States. Because Professor Hessick's conclusions simply rest on her own *ipse dixit*, the only way election officials in the Commonwealth could be sure they are complying with Plaintiffs' proposed remedial order would be to pick up the phone and ask Professor Hessick. Nothing in the Readmission Act, the Federal Rules of Civil Procedure, or the Court's equitable authority authorizes the entry of an injunction based on the vague, incomplete, and amorphous analysis that Plaintiffs propose.

Plaintiffs' requested relief is both radical and unconstitutional. In the current and ongoing political debate regarding the Commonwealth's disenfranchisement provision, *no one* has suggested the line should be drawn where Plaintiffs propose. See Defs.' Mem. in Supp. of Mot. for Summ. J. (Defs.' MSJ Mem.) at 5 (ECF No. 148) (discussing the General Assembly's consideration of a constitutional amendment that would result in "automatic re-enfranchisement of felons upon their release from incarceration"). On Plaintiffs' theory, some lucky category of convicted felons are entitled to vote *in prison* because (Plaintiffs say) they were never lawfully disenfranchised in the first place. Child pornographers, terrorists, and drug kingpins would all have the good fortune of casting their ballots for the future leadership of the Commonwealth while still serving time.[1] Meanwhile, those convicted of stealing a dog, some oysters, or a handful of lottery

---

[1] See Exhibit E to Exhibit 1 to Defs.' MSJ Mem, Report of Carissa Hessick (Hessick Report) (ECF No. 148-2) (listing "[r]eproduc[tion], transmi[ssion], sell[ing], etc." of "child porn"; "possess[ing]" a "weapon of terrorism w/intent to terrorize"; and "distribut[ing]" "2.5 kilograms or more" of "[c]ocaine base" as crimes that would *not* result in disenfranchisement).

1

tickets would be *permanently* disenfranchised with no help from the Readmission Act—even after serving their complete sentences.[2] This line makes no sense whatsoever, and no rational Congress would have adopted it, much less in 1870. Given the numerous flaws with Plaintiffs' requested relief, the Court should not shut down the ongoing political process currently taking place in the Commonwealth regarding a potential amendment to Virginia's disenfranchisement provision.

This Court's expressed intent to adopt Plaintiffs' reading of the Virginia Readmission Act calls into question the constitutionality of the statute. If the Readmission Act requires what the Court appears to believe it requires, the Act violates the equal footing doctrine, violates the anticommandeering doctrine, and is unconstitutionally vague. Instead, if the Court accepts Plaintiffs' merits argument, it should adopt the only reading of the Readmission Act that results in an administrable test that is supported by history and comports with common sense. Specifically, it should hold that the historical understanding was that felonies at common law were determined by the nature of the punishment imposed for the crime. By 1870, the punishment imposed for common-law felonies was confinement in the penitentiary. Therefore, accepting Plaintiffs' merits theory, the Readmission Act permits the Commonwealth to disenfranchise individuals convicted of crimes punishable by confinement in the equivalent of the state penitentiary—*e.g.*, a state correctional facility. If the Court rules for Plaintiffs on the merits, it should adopt this remedial analysis, which has historical support and is vastly more administrable than Plaintiffs' proposed test.

### RELEVANT BACKGROUND

After this Court denied Defendants' motion to dismiss and the Fourth Circuit affirmed in part and reversed in part, *King v. Youngkin*, 122 F.4th 539 (4th Cir. 2024), the parties filed cross

---

[2] See Ex. D to Hessick Report (listing "[t]heft of oysters, clams, shells, etc."; larceny of a "dog"; and "[l]arceny of lottery ticket(s)" as crimes that *would* result in disenfranchisement).

motions for summary judgment. At the same time, Plaintiffs moved for class certification, and the Defendants moved to exclude two putative expert witnesses put forth by Plaintiffs. After the motions were fully briefed, the Court held argument on all of them. At argument, the Court indicated that it was "leaning toward granting summary judgment for the Plaintiffs" because even if Virginia permissibly disenfranchised all felons in its 1869 Constitution, it could not continue disenfranchising all felons if it ever amended its Constitution. See Tr. 38:15–18, 57:2–6 (ECF 183). Although the Court stated that it is inclined to accept this novel and unbriefed theory of the Readmission Act, the Court expressed concerns about the administrability of a remedy in this case and asked the parties for supplemental briefs. *Id.* at 58:5–12.

A few days later, the Court issued an order that required the parties to "file briefs that address (A) what crimes are disqualifying felonies at common law and (B) what form an injunction should take in this case." Order at 1 (ECF 182). The Court also ordered the parties' briefs to include a "defin[ition]" of "felonies at common law," offer a list of disqualifying modern felonies," and answer "whether an injunction should provide only forward-looking relief or something more."[3] *Ibid.*

## ARGUMENT

### I.    Judicial enforcement of the Readmission Act against Virginia is unconstitutional

This Court ordered the parties to brief "what form an injunction should take in this case." Order at 1. There should be no injunction in this case; judicial enforcement of the Virginia Readmission Act renders the statute unconstitutional. Defendants have previously argued that the Court should reject Plaintiffs' reading of the Virginia Readmission Act on the merits under the

---

[3] By complying with this briefing order, Defendants do not waive or forfeit any argument or concede any fact. Defendants instead adopt by reference all previous arguments they have made with respect to the summary-judgment motions, the class certification motion, and the motions to exclude Plaintiffs' expert witnesses.

doctrine of constitutional avoidance. See, *e.g.*, Defs.' MSJ Mem. 11–12. Now that the Court has expressed that it is "leaning toward granting summary judgment for the plaintiffs," Tr. 57:2–3, these constitutional questions can no longer be avoided. If the Court holds that Plaintiffs' reading of the Readmission Act is correct, the Readmission Act violates the equal footing doctrine, the anticommandeering doctrine, and is unconstitutionally vague.

The Readmission Act is in the nature of a contract between Virginia and Congress. See, *e.g.*, 16 Stat. 62. It provides that Virginia "is entitled to representation in the Congress of the United States" if it meets certain "conditions," including as to the franchise, that are "precedent to the representation of the State in Congress." *Id.* at 62, 63. As the counterparty to the Commonwealth, Congress is the exclusive enforcer of the conditions set forth in the Act through its determination whether Virginia remains entitled to representation in Congress. See 2 Samuel Williston, The Law of Contracts § 663 (1923) ("A condition in a promise limits the undertaking of the promisor to perform . . . ."); *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 371–72 (2025) ("federal-state agreements" "generally do not confer individually enforceable rights against a sovereign, but 'depen[d] for the enforcement of [their] provisions on . . . the governments which are parties to them'"); see also *Butler v. Thompson*, 97 F. Supp. 17, 20 (E.D. Va. 1951) ("Such a matter is one peculiarly within the domain of Congress itself, since it only purports to set up a condition governing Virginia's right to admission to representation in Congress."); *Merritt v. Jones*, 259 Ark. 380, 389 (1976) ("Even if we assume that the [Arkansas Readmission] Act has some force and effect, its enforcement is in the exclusive domain of Congress."). Private enforcement of the Act on the theory that individuals are "incidental beneficiaries" would have been unthinkable to Congress at the time. 1 Samuel Williston, The Law of Contracts § 402 (1923) (describing the general rule that incidental beneficiaries may not sue on a contract); 13 Williston on Contracts

§ 37:1 (4th ed.) (describing common-law rule that "only parties in privity of contract could sue on a contract"). And courts today continue to refuse to infer that Congress intended to permit private parties to sue in federal court to enforce "contracts between two governments." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 332 (2015).

Interpreting the Virginia Readmission Act to allow judicial enforcement of its provisions is unconstitutional in three primary ways. *First*, an injunction subjecting only those States covered by Readmission Acts to lawsuits in federal court seeking to invalidate provisions of their constitutions violates the equal footing doctrine, because it imposes restrictions on Virginia that do not apply equally to all its sister States. "[W]hen a new State is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original States, and . . . such powers may not be constitutionally diminished, impaired, or shorn away by any conditions, compacts, or stipulations embraced in the act under which the new State came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission." *Coyle v. Smith*, 221 U.S. 559, 573 (1911). Each State "was admitted, and could be admitted, only on the same footing" as all of its sister States. *Escanaba Co. v. Chicago*, 107 U.S. 678, 689 (1883). On these grounds, the Supreme Court has consistently held that conditions on admission that are not otherwise "plainly within the regulating power of Congress" are invalid. *Coyle*, 221 U.S. at 574. The Court held unenforceable, for instance, conditions purporting to prohibit a State from moving the location of its state capital, or attempting to strip a State of title to land beneath its navigable waters. *Pollard's Lessee v. Hogan*, 44 U.S. (3 How.) 212 (1845).

Plaintiffs' interpretation of the Virginia Readmission Act—which this Court has previewed its intention to accept—is similarly unconstitutional. "All states, after their admission into the Federal Union, stand upon equal footing and the constitutional duty of guaranteeing each state a

5

republican form of government gives Congress no power in admitting a state to impose restriction which would operate to deprive that state of equality with other states." *Butler*, 97 F. Supp. at 20–21. Indeed, courts and commentators have long "dismissed the [Reconstruction-era] conditions as unenforceable infringements of state sovereignty" to the extent they attempted to create judicially enforceable private rights or restrict a State's authority to alter state law. Eric Biber, *The Price of Admission: Causes, Effects, and Patterns of Conditions Imposed on States Entering the Union*, 46 Am. J. Legal Hist. 119, 190 (2004); see also James Q. Dealey, *Growth of American State Constitutions* 70 (1915) (readmission acts "may remain as moral obligations but would hardly be enforcible [sic] at law").

*Second*, this Court's suggested interpretation of the Virginia Readmission Act renders the Act unconstitutional under the anticommandeering doctrine. Under this Court's proposed interpretation, the Act permanently prohibits Virginia from amending its Constitution in certain ways. See Tr. 57:2–6 ("I am at this stage leaning toward granting summary judgment for the plaintiffs in this case because I believe that the constitution of Virginia has been amended to include felonies that are not felonies at common law, and as grounds for disenfranchisement."). Congress has no power to force States to pass new laws, *New York v. United States*, 505 U.S. 144, 175–76 (1992), or to bar them from altering old ones, *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018). "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Id.* at 473. Indeed, the Framers "explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York*, 505 U.S. at 166. Plaintiffs' interpretation of the Virginia Readmission Act violates "this limit on congressional authority" as well. *Murphy*, 584 U.S. at 471.

*Third*, if the Readmission Act means what Plaintiffs say it means or what this Court stated at argument, the Act is void for vagueness. A law is unconstitutionally vague if it fails to provide "fair notice" of what it requires from the regulated party. *United States v. Johnson*, 576 U.S. 591, 595 (2015). The fair-notice requirement exists regardless of whether the law is civil or criminal, so long as the consequence for the regulated party for a breach is sufficiently "severe." See *Sessions v. Dimaya*, 584 U.S. 148, 183–84 (2018) (Gorsuch, J., concurring in the judgment) (quoting *Giaccio v. Pennsylvania,* 382 U.S. 399, 402 (1966)). There can be no doubt that being enjoined to allow felons to vote is a "severe" intrusion on state sovereignty, *ibid.*, and if anything is clear at this point in the litigation, Virginia has not received "fair notice" of what the Virginia Readmission Act requires. *Johnson*, 576 U.S. at 595.

The Virginia Readmission Act provides no methodology to determine whether a modern crime would have been a felony at common law in 1870. It is completely silent on this question. And after hundreds of pages of briefing over the course of multiple years, the application of the Readmission Act is still hopelessly unclear, largely due to two features. See *Johnson*, 576 U.S. at 597–98 ("This Court has acknowledged that the failure of 'persistent efforts . . . to establish a standard' can provide evidence of vagueness." (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921)). First, as Defendants have previously explained (and reiterate below, see Part II.A, *infra*), there was no generally accepted "list" of felonies at common law in 1870. See, *e.g.*, Defs.' Resps. & Objs. to Ps.' First Set of Interrogs., at 2 (ECF No. 153-1) ("[D]etermining what crimes constituted 'felonies at common law' in 1870 is not a straightforward analysis."). Even Plaintiffs' own expert, Professor Hessick, acknowledged that there was not a full "consensus regarding which crimes were appropriately deemed common law felonies." Hessick Report ¶ 24. Without a generally accepted list of common-law felonies, it is impossible to classify every single

modern felony as falling in or out of the category of felonies at common law in 1870. Second, even if there were a universally accepted list of common-law felonies in 1870, Plaintiffs have offered no judicially administrable test for classifying every modern felony. The Act itself contains no test, so Plaintiffs have continued to offer Professor Hessick's *ipse dixit*. Her purported test involves determining "the contours" of common law felonies that she identified and then deciding whether "current statutory felonies are substantially similar to," "fall comfortably within," or "substantially exceed the boundary" of those "contours." Hessick Report ¶¶ 37, 39–40. The adverb-laden test that Professor Hessick uses has no discernible meaning other than what Professor Hessick says and thus confirms that the Readmission Act provides so little notice that it is unconstitutionally vague.

Although the Fourth Circuit concluded that determining whether "a particular crime was a 'felon[y] at common law'" was within the judicial competence, *King*, 122 F.4th at 547, it did not bless Professor Hessick's analysis. It may well be that a court could generate a test to conclude that *some* modern-day felony would not have been a felony at common law. But whatever that test might look like, Plaintiffs have not offered it here. Nor have they decided to proceed on a crime-by-crime basis. Instead, they have asked this Court to certify a class and classify *every single* crime that could lead to disenfranchisement—under Virginia law, federal law, and the law of the 49 other States—in one fell swoop. Nor would proceeding on an individual basis save the Virginia Readmission Act in any event because the Supreme Court has rejected the idea that a "vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 604. If the Court accepts Plaintiffs' reading, the Readmission Act is unconstitutionally vague.

8

II.     **Any injunction should permit disenfranchisement for crimes punishable by confinement in facilities analogous to a state penitentiary**

The Court directed the parties to address "what crimes are disqualifying felonies at common law." Order at 1; see also *ibid.* ("Specifically, the parties should define 'felonies at common law' and offer a list of disqualifying modern felonies."). The historical record makes clear that there was no consensus regarding a list of felonies at common law in 1870. Rather than create a "list" of felonies, Blackstone defined common-law felonies by reference to their punishment. By 1870, that principle—that common-law felonies are defined by the nature of the punishment—had evolved in the United States such that the phrase "felonies at common law" in the Virginia Readmission Act is best understood to cover any crime punishable by confinement in facilities analogous to a state penitentiary. To the extent that this Court is attempting to determine "what form an injunction should take in this case," Order at 1; but see Part I, *supra*, only this punishment-based understanding is even remotely administrable, supported by history, and consistent with what a rational Congress would have enacted in 1870.

A.     **There was no accepted list of common-law felonies in 1870**

In 1870, there was no consensus regarding a full list of crimes that were understood as "felonies at common law." To begin this analysis, it is necessary to understand the role of the common law in mid-19th Century America, which in turn requires tracing the common law's roots back to England. The "common law" in England was understood as rules and customs that emerged from time immemorial through practice and tradition. For example, Matthew Hale provided the following description of what constituted "the written law" (*i.e.*, Acts of Parliament) and the "unwritten Laws or Customs" (*i.e.*, "common law"):

> The Laws of England may aptly enough be divided into two Kinds, *viz. Lex Scripta*, the written Law; and *Lex non Scripta*, the unwritten Law . . . for some of those Laws have obtain'd their Force

9

by immemorial Usage or Custom, and such Laws are properly call'd *Leges non Scripta*, or unwritten Laws or Customs.

Those Laws therefore, that I call *Leges Scripta*, or written Laws, are such as are usually called *Statute Laws*, or Acts of Parliament, which are originally reduced into Writing before they are enacted, or receive any binding Power . . . .

Now, *Statute Laws*, or Acts of Parliament, are of Two Kinds, *viz.* First, Those Statutes which were made *before Time of Memory*; and Secondly, Those Statutes which were made *within* or *since Time of Memory*; wherein observe, That according to a juridical Account and legal Signification, *Time within Memory* is the Time of Limitation in a Writ of Right; which by the Statute of *Westminster* 1. *cap.* 38. was settled, and reduced to the Beginning of the Reign of King Richard I. . . . So that whatever was before that Time is *before* Time of Memory; and what is since that Time, is, in a legal Sense, said to be *within* or since the Time of Memory.

And therefore it is, that those Statutes or Acts of Parliament that were made before the Beginning of the Reign of King *Richard* I. and have not since been repealed or altered, either by contrary Usage, or by subsequent Acts of Parliament, are now accounted Part of the *Lex non Scripta*, being as it were incorporated thereinto, and become a Part of the Common Law . . . [and] they obtain their Strength by meer immemorial Usage or Custom.

And doubtless, many of those Things that now obtain as Common Law, had their Original by Parliamentary acts or Constitutions, made in Writing by the King, Lords and Commons; though those Acts are now either not extant, or if extant, were made before Time of Memory; and the Evidence of the Truth hereof will easily appear, for that in many of those old Acts of Parliament that were made before Time of Memory, and are yet extant, we may find many of those Laws enacted which now obtain meerly as Common Law, or the General Custom of the Realm[.]

Matthew Hale, The History of the Common Law of England, 1–4 (3d ed. 1739), available at https://tinyurl.com/4zszhfmn. In simpler language, the common law consisted of both unwritten law that was created by custom and by written law that was so ancient that it became woven into the customary law itself.

10

Whether that precise definition of "common law" carried over into the early United States raises another complex question. For example, English common law was primarily incorporated into American law through reception statutes. See Ford W. Hall, *The Common Law: An Account of its Reception in the United States*, 4 Vand. L. Rev. 791, 797–805 (1951). Virginia's reception statute provided, for example:

> That the common law of England, all statutes or acts of parliament made in aid of the common law prior to the fourth year of the reign of king James the first, and which are of a general nature, not local to that kingdom, together with the several acts of the general assembly of this colony now in force, so far as the same may consist with the several ordinances, declarations, and resolutions of the general convention, shall be the rule of decision, and shall be considered as in full force, until the same shall be altered by the legislative power of this colony."

9 William Henning, The Statutes at Large, 127 (1821), available at https://tinyurl.com/yzawebfv. These statutes thus incorporated the common law of England to a large extent, while excluding the amorphous aspect of the common law that was "local to that kingdom." *Ibid.*

But even after English "common law" was incorporated, *state* common law continued to develop throughout the 18th and 19th centuries. See Carissa Byrne Hessick, *Legality, Legal Standards, and the Legacy of Marvin Frankel*, 35 Fed. Sent. Rep. 249, 249 (2023) (noting that "common law prosecutions persisted in the states long after" 1812). Thus, it is not obvious what the phrase "common law" entailed in 1870 America, especially as States had each independently developed their own common-law practices for nearly 100 years. This is especially true in Virginia, which enacted a criminal code in 1848 that codified formerly common-law crimes into the statute books. See An Act to reduce into one the several acts concerning crimes and punishments, and proceedings in criminal cases, Title I, Ch. XI, Acts of the General Assembly of

11

Virginia, at the Session of 1847-1848 (1848). The phrase "felonies at common law" may have meant the unwritten criminal offenses that existed before the reign of King Richard I; it may have meant all crimes that existed in England at the time the reception statutes were enacted (*i.e.*, the late 18th Century); or it may have meant the *American* common law that continued to develop in the various States through 1870—or some combination of the three.

Given these varied potential understandings, Defendants continue to agree with Professor Hessick that there was not a full "consensus regarding which crimes were appropriately deemed common law felonies." Hessick Report ¶ 24. Given the confusion surrounding the nature of the common law in mid-19th Century America, it is unsurprising that different commenters applied different methodologies to determine which crimes would have been recognized by the common law. Some treatises took a punishment-based approach, asking if the crime would have made the offender subject to a severe punishment, such as forfeiture of lands and goods or death. See *id.* ¶ 24. Other commentators simply declared that a "discrete list" of crimes were felonies at common law, even though this "discrete list" often varied from commentator to commentator. *Id.* ¶¶ 24–28.

With the uncertainty of what constituted the "common law" in 1870 and the inconsistent approaches commentators took to defining what felonies the common law recognized, Defendants cannot enumerate an exhaustive list of "what crimes are disqualifying felonies at common law." Order at 1. Felonies that appear on nearly every list of common-law felonies include: murder, arson, sodomy, robbery, and larceny. But this list is significantly underinclusive because esteemed treatise writers enumerated vastly different common-law felonies. Below is a list of respected treatises that list various crimes as falling within the phrase "felonies at common law":

3 Edward Coke, The Third Part of the Institutes of the Laws of England (4th ed. 1669)[4]:
the servant's murder of a master, parricide, a wife murdering her husband, one's killing an
ecclesiastical superior (a prelate), poisoning, rape, buggery or sodomy (including humans and
animals), maiming, mayhem, castration, burglary, arson, robbery, stealing a hawk, killing of a
prisoner by extreme duress imposed by a jailor, and larceny.

Michael Dalton, The Country Justice (1746)[5]: suicide; murder; manslaughter;
misadventure; casual death; homicide upon necessity; burglary; robbery; larceny; various forms
of arson;[6] the act of a juror in a treason or felony case "discover[ing] the King's Council and his
Fellows"; rescuing a person arrested or detained for a felony; arresting and then releasing a felon;
breaking of a prison; returning to the realm after having been expelled.

1 William Hawkins, Treatise on the Pleas of the Crown (1762)[7]: burglary; arson; sodomy;
larceny; maiming; and "if a Person draw his Sword on any Judge, in the Presence of the Court of
King's Bench, Chancery, Common Pleas, or Exchequer, or before the Justices of Assize, or Oyer
and Terminer, whether he strike or not, or strike a Juror, or any other Person, with or without a
Weapon."

William Hening, The New Virginia Justice (1810)[8]: arson; burglary; a jailor keeping a
prisoner too strictly and killing him; prison breaches; stealing a hawk; robbery on the highway;
and killing someone during a duel.

---

[4] Available at https://tinyurl.com/5yax2ter.
[5] Available at https://tinyurl.com/36m2jptr.
[6] These include the following: "burning of a barn (which is adjoining to a Dwelling-house)
in the Night," "burn[ing] a Barn (in the Day-time) having Corn in it, and though it adjoined not to
the Dwelling-house"; "[b]urning of any dwelling-house, or other house, parcel thereof . . . whether
it be done by Night or by Day"; "[b]urning of any other House, or of a Stack of Corn." The Country
Justice, M. Dalton, The Country Justice 354–55 (1746).
[7] Available at https://tinyurl.com/3ffphck5.
[8] Available at https://tinyurl.com/39ekhttk.

13

William Clark & William Marshall, A Treatise on the Law of Crimes (1900)[9]: murder, manslaughter, rape, sodomy, robbery, larceny, arson, burglary, "and perhaps mayhem."

To the extent that adopting a "list" of felonies at common law in 1870 is even conceivable, that list would have to be as expansive as possible due to the Supreme Court's presumption against preemption of state law. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518 (1992). When a federal law purportedly displaces the "historic police powers of the States," federal courts adopt a "reading" of the federal law "that disfavors pre-emption." *Altria Group v. Good*, 555 U.S. 70, 77 (2008) (quoting *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005)). Because States have always determined who may vote in their elections, this case obviously involves a "historic" power of States, and so the presumption against preemption is triggered. See *Arizona v. Inter Tribal Council of Az.*, 570 U.S. 1, 16 (2013) ("[T]he Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."). Given the uncertainty in the definition of "felonies at common law," this Court should construe the term expansively and allow Virginia to exercise its historic functions to the maximum extent possible. See *Altria Group*, 555 U.S. at 77.

**B.     Blackstone's classification of common-law felonies based on the punishment imposed offers the only administrable and rational test**

As Professor Hessick has admitted, there were two wholly different approaches to determine which crimes fell into the categories of felonies at common law. Hessick Report ¶ 28. One approach enumerated specific crimes, although there was no consensus on the list of crimes. See Part II.A, *supra*. The other defined "felonies at common law" as covering any crimes that would historically have been punished by forfeiture of lands or goods in England. In essence, the

---

[9] Available at https://tinyurl.com/4rrvxd6a.

*punishment* is what mattered to the common law when determining what constituted a felony. It is *that* approach that provides the only administrable and rational test for this Court.

There is historical support for the proposition that determining whether a crime was a "felony" at common law in England depended on the punishment imposed for the crime. As William Blackstone explained, the common law declared a felony of any crime that "occasioned . . . the forfeiture of lands and goods." 4 William Blackstone, Commentaries on the Laws of England, *205–09 (G.W. Childs 1868). Historically, the forfeiture of lands and goods signaled that a crime was serious enough to rise to the level of "felony." And although "forfeiture was no longer a common punishment in nineteenth-century America," Hessick Report ¶ 26, States began using the authorization of time in the penitentiary to delineate which crimes were serious enough to be felonies. See 2 Alexander Burrill, A NEW LAW DICTIONARY AND GLOSSARY, 478 (1850); Henry Campbell Black, BLACK'S LAW DICTIONARY 483 (1st ed. 1891). Thus, the punishment-based approach to common law felonies would mean that "felonies at common law" in 1870 would have included all felonies serious enough to result in a penitentiary sentence.[10]

Defining common-law felony as any crime where the judge may impose time in a penitentiary is consistent with the Supreme Court's applications of century-old texts to modern issues. In the Second Amendment context, for example, the Supreme Court has explained that a modern statute need only be analogous to a historical one to qualify as a predicate for regulating a firearm. *United States v. Rahimi*, 602 U.S. 680, 699–700 (2024). There is no need for a "'dead ringer' or a 'historical twin.'" *Id.* at 692 (quoting *New York State Rifle & Pistol Association, Inc.*

---

[10] Indeed, the fact that forfeiture of lands and goods was no longer a punishment by the middle of the 19th Century does not foreclose using a punishment-based approach to determining which crimes the common law would consider as felonies. After all, using history to determine the application of an archaic text does not require putting on a "straightjacket" when confronted with new circumstances. See *Bianchi v. Brown*, 111 F.4th 438, 462 (4th Cir. 2024) (cleaned up).

15

*v. Bruen*, 597 U.S. 1, 30 (2022)). What matters are the "principles underlying" the law to determine what the modern equivalent is. *Ibid.* And this approach makes sense because modern problems may arise that could never have been foreseen in the mid-19th century. Would it have been a common-law felony to sell fentanyl to schoolchildren? It is difficult to tell because fentanyl did not exist. Thus, to answer the question of whether a modern felony is analogous to a common-law felony, a court cannot apply "a law trapped in amber" and should distill the principle of what made a crime a felony at common law. *Id.* at 691, 699–700. The answer, historically, was its punishment.

Therefore, if the Court agrees with Plaintiffs' reading of the Readmission Act, the Court should construe the Readmission Act to incorporate Blackstone's principle that felonies at common law were understood by reference to the seriousness of their punishment. Under this approach, the Court would ask whether a particular crime is punishable by confinement in a state penitentiary. And Virginia law specifies which crimes "are punishable with confinement in a state correctional facility": felonies. Va. Code § 18.2-8. The list would therefore be simple to administer with respect to the Commonwealth's crimes. And a similar analysis could be conducted with respect to the crimes of other sovereigns: the question would be whether the maximum punishment for the crime is imprisonment in a government facility like a penitentiary, as opposed to a sentence in a local jail or a fine.[11]

Beyond having historical support, linking disenfranchisement to punishment makes sense. The more severe the potential punishment, the more serious the crime, and the more reason to

---

[11] Creating a literal "list" of every single crime where time in a facility akin to the penitentiary is authorized is still wholly impracticable because there are thousands of federal crimes alone, in addition to the thousands of crimes in each State. Indeed, when the federal government attempted to simply identify every federal crime on the books, it was forced to abandon the project because it was impossible. See Gary Fields and John R. Emshwiller, *Many Failed Efforts to Count Nation's Federal Criminal Laws*, WALL STREET JOURNAL (July 23, 2011).

16

disenfranchise the perpetrator. Plaintiffs' test, in contrast, results in a bizarre world where child pornographers, terrorists, and drug kingpins are all entitled to vote *while imprisoned*, but someone who steals a dog, or some oysters, or a handful of lottery tickets can be *permanently* disenfranchised. See nn. 1 & 2, *supra*. There is no reason to think Congress would have adopted a statute to establish such a strange regime. Defendants' test would thus credit Congress with drawing the line in a sensible place.

Finally, this test avoids the pitfalls of Plaintiffs' requested relief. On Plaintiffs' theory, even crimes that appear easy to classify will turn out to raise numerous thorny questions. Defendants' class-certification opposition provided the example of arson. See Defs.' Opp. to Pls.' Mot. for Class Certification at 6–7 (ECF No. 161). At common law, the crime of arson was generally understood as the "[b]urning of any dwelling-house." See M. Dalton, *supra*, at 354–55. But Virginia's modern-day arson statute criminalizes the malicious burning of (among other structures) a "dwelling house," "occupied hotel," "hospital," "mental health facility," "occupied railroad car, boat, vessel, or river craft in which persons usually dwell or lodge," "occupied jail or prison," or "occupied church." Va. Code § 18.2-77. What happens if an individual convicted of violating § 18.2-77 did, in fact, burn down a dwelling house—may he be disenfranchised since that specific act was a felony at common law? Or does he benefit from the fact that the statute also makes it a felony to burn down other structures that would not have qualified as felonies at common law? Would the answer change if the statute divided up the structures into subsections—*e.g.*, "(a) dwelling house, (b) occupied church, and (c) mental health facility"?

Another example is the crime of rape. The common law did not recognize the crime of rape against one's spouse. See 1 Hale, Pleas of the Crown, 628–29 (1736). But modern Virginia law recognizes the concept of spousal rape. Va. Code § 18.2-61. Is modern rape still a felony at

17

common law despite being broader than its historical predecessor? A test that asked whether modern rape is "substantially similar" to its common-law predecessor provides no concrete answer. Hessick Report ¶ 39; Pls. Supp. Br. 14 (ECF No. 186). And forcing the registrar to look to the individual facts of the conviction has been described by the Supreme Court as "utter[ly] impracticab[le]" because the conviction may have happened decades ago, and many convictions, such as when the defendant pleads guilty, do not come with a factual record to examine. *Johnson*, 576 U.S. at 605. These are just the questions that arise in the context of *two* Virginia crimes— leaving aside the *thousands* of crimes under federal law and the laws of 49 other States.[12]

Plaintiffs have no answer to any of this. Instead, they spend the lion's share of their supplemental brief discussing the minutiae of Virginia's electronic voter-registration platform. See Pls. Supp. Br. 2–8, 18–24. But the question of administrability that this Court raised at the hearing—and that Defendants have been highlighting from the beginning—is not about the technical procedure for updating Virginia's paperwork or the Department of Elections' computer systems; it is that registrars will be forced to apply a vague and indeterminant test to thousands of crimes under threat of contempt proceedings in federal court. And registrars cannot simply put a thumb on the scale of allowing individuals to vote when a tough question arises: the Virginia Constitution creates a mandatory duty for them not to allow felons to vote, Va. Const. art. II, § 1, and Virginia law allows third-party challenges to an individual's eligibility to vote, Va. Code § 24.2-431. Thus, a registrar faced with an application to vote from a felon will face the prospect of contempt on the one hand and a state-court challenge on the other. *Ibid.* Plaintiffs have offered nothing to address this problem other than repackage Professor Hessick's deeply flawed, back-of-

---

[12] Professor Hessick's supplemental analysis of a few dozen federal crimes changes nothing. Her methodology is still inherently subjective, and she has not come close to analyzing the entire universe of modern federal crimes, much less modern crimes in all 50 States.

the-napkin test to come up with a partial list of Virginia felonies, which now also includes a partial list of federal felonies. The only way to avoid the issues of administrability raised by Plaintiffs' reading of the Readmission Act is to adopt the punishment-based definition of felony at common law, which would create a test that registrars could actually understand and apply.

### C.    Plaintiffs' proposed remedial scheme raises numerous issues

In their supplemental brief, Plaintiffs devise an elaborate scheme of judicial review that would apparently involve this Court reviewing the decisions of Virginia courts. See Pls.' Supp. Br. 23. Specifically, Plaintiffs assert that this Court would not be required to classify every crime in its injunction because "the Commonwealth's courts can adjudicate in the first instance any disputes about whether a particular conviction is a lawful basis for disenfranchisement under the Court's remedial order." *Ibid.* Plaintiffs cite no precedent whatsoever for the proposition that "state courts" should "apply this Court's remedial order" instead of *this Court* applying its remedial order. *Ibid.* Indeed, commanding Virginia's courts to implement the Court's injunctive order would likely violate the anticommandeering doctrine by forcing the Commonwealth's judges not merely to apply federal law but to serve as an adjunct to the federal government. See *Printz v. United States*, 521 U.S. 898 (1997). It would also likely violate the *Rooker-Feldman* doctrine because federal district courts have no jurisdiction to hear appeals from state courts. *Rooker v. Fidelity Trust Co.*, 261 U.S. 114, 116–17 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476–79 (1983). Finally, it would exceed this Court's equitable authority to set up a system of appeals with itself sitting at the apex of state courts because such a remedy would not have been historically available. See *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).

Plaintiffs either misunderstand or choose to ignore that injunctions are enforced through contempt proceedings, not state courts. See 11A Wright & Miller, Federal Practice & Procedure

19

§ 2955 (3d ed. 2025). The fact that they seek an injunction, enforced through contempt, also explains why their reliance on the election laws of other States is inapposite. Plaintiffs analogize the injunction they seek to the laws of States like Alaska and Alabama, which disqualify individuals who have committed crimes of "moral turpitude" from voting. Pls. Supp. Br. 17–19. Because Alaska and Alabama use this purportedly vague language without administrability problems, Plaintiffs say that an injunction in this case would not create administrability issues. *Ibid*. But this analogy is inapposite for at least two reasons. First, Alaska and Alabama law actually define the term "moral turpitude" with specific examples of crimes that result in disenfranchisement. Alaska Stat. §15.80.010(10) ("[F]elony involving moral turpitude' includes those crimes that are immoral or wrong in themselves such as murder, manslaughter, assault, sexual assault…"); Ala. Code §17-3-30.1 (listing crimes). Second, Federal Rule of Civil Procedure 65(d) "requires courts granting injunctions to 'describe in reasonable detail the act or acts restrained or required.'" *Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013) (ellipses omitted). "The Supreme Court has explained that Rule 65(d) 'was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'" *Ibid.* (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). Thus, "injunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65." *Shook v. Board of Cnty. Commr's of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (Gorsuch, J., for the panel) (quotation marks omitted). The fact that Alabama and Alaska use putatively vague terms in statutory language to determine which criminals may vote does not authorize this Court to enter a vague injunction in this case.[13]

---

[13] Plaintiffs curiously assert that "Defendants have not identified any steps they take to block or remove the registration of a Virginian who may have been convicted of a felony outside of Virginia." Pls. Supp. Br. 6. Yet they acknowledge that Virginia asks individuals who seek to

20

**III.    As Plaintiffs concede, any injunction must provide only prospective relief**

The Court directed the parties to "consider whether an injunction should provide only forward-looking relief or something more." Order at 1. Defendants agree with Plaintiffs that a mandatory injunction would be inappropriate in this case. The Supreme Court has ruled that "a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of." *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 691 n.11 (1949). A mandatory injunction here would require Defendants not merely to refuse to act but to take affirmative steps to reregister class members. Likely for these reasons, Plaintiffs request only prospective relief. Pls. Supp. Br. 14 ("[T]he proposed order does not require Defendants to retroactively apply this Court's decision—for example, by reviewing past denials of voter registration applications for compliance with the Virginia Readmission Act."). On that point, the parties agree.

**CONCLUSION**

For these reasons, if the Court adopts Plaintiffs' position on the merits, it should enter an injunction permitting disenfranchisement for crimes punishable by confinement in facilities analogous to a state penitentiary.

---

register to vote whether they have been convicted of a felony. If that applicant answers "yes," he cannot register to vote. True, Virginia does not search court records from other States when assessing eligibility, but asking the individual whether he has been convicted of a felony, including a felony outside of Virginia, certainly counts as taking a "step[]" to "block" the registration of a person "convicted of a "felony outside of Virginia."

21

Dated: November 20, 2025

Respectfully submitted,

JOHN O'BANNON
ROSALYN R. DANCE
GEORGIA ALVIS-LONG
CHRISTOPHER P. STOLLE
J. CHAPMAN PETERSEN
SUSAN BEALS
ERIC SPICER
SANDY C. ELSWICK

By:   */s/ Kevin M. Gallagher*
      Kevin M. Gallagher (VSB #87548)
      *Solicitor General*

Charles J. Cooper *(Pro Hac Vice)*
Haley N. Proctor (VSB #84272)
John D. Ramer *(Pro Hac Vice)*
Bradley L. Larson *(Pro Hac Vice)*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

Jason S. Miyares
   *Attorney General*
Thomas J. Sanford (VSB #95965)
   *Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

*Counsel for Defendants John O'Bannon,
Rosalyn R. Dance, Georgia Alvis-Long,
Christopher P. Stolle, J. Chapman Petersen,
Susan Beals, Eric Spicer, and Sandy C.
Elswick*

22

## **CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on November 20, 2025, the foregoing memorandum was electronically transmitted to all counsel of record in this matter.

_/s/ Kevin M. Gallagher_
Kevin M. Gallagher (VSB #87548)
_Solicitor General_