# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

TATI ABU KING *and* TONI HEATH JOHNSON,

      *Plaintiffs,*

  *v.*

JOHN O'BANNON, *in his official capacity as Chairman of the State Board of Elections for the Commonwealth of Virginia*; ROSALYN R. DANCE, *in her official capacity as Vice Chair of the State Board of Elections for the Commonwealth of Virginia*; GEORGIA ALVIS-LONG, *in her official capacity as Secretary of the State Board of Elections for the Commonwealth of Virginia*; DONALD W. MERRICKS, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; MATTHEW WEINSTEIN, *in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia*; SUSAN BEALS, *in her official capacity as Commissioner of the Department of Elections for the Commonwealth of Virginia*; ERIC SPICER, *in his official capacity as the General Registrar of Fairfax County, Virginia*; and SANDY C. ELSWICK, *in her official capacity as the General Registrar of Smyth County, Virginia*,

      Defendants.

Case No. 3:23-cv-00408 (JAG)

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR
## SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
## AND REGARDING THE APPROPRIATE EQUITABLE REMEDY

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................2

I.  THE FELONIES AT COMMON LAW IN 1870 ARE THE DISCRETE CRIMES PLAINTIFFS HAVE IDENTIFIED, NOT ALL MODERN OFFENSES PUNISHABLE BY INCARCERATION ...................2

    A.  The Virginia Readmission Act's Phrase "Crimes As Are Now Felonies At Common Law" Refers To The Offenses Plaintiffs Have Identified......................2

    B.  The Virginia Readmission Act Permits Disenfranchisement For A Limited Set of Present-Day Felonies, Not Any Crime Punishable By Incarceration .....................6

II.  DEFENDANTS HAVE IDENTIFIED NO PRACTICAL OR LEGAL BARRIER TO PLAINTIFFS' PROPOSED REMEDY ........................................................................................................9

III.  DEFENDANTS' CONSTITUTIONAL OBJECTIONS ARE PROCEDURALLY IMPROPER AND WRONG ON THE MERITS ..................................................................................................11

    A.  Defendants' Constitutional Objections Are Not Properly Before This Court .......11

    B.  Defendants' Constitutional Objections Are Wrong On The Merits .....................13

    C.  The Court Should Disregard Defendants' Baseless, Untimely, And Prejudicial Rule 5.1 Notice .................................................................................................19

CONCLUSION ..................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adarand Constructors, Inc. v. Romer*,
    174 F.R.D. 100 (D. Colo. 1997) .......................................................................21

*Altria Grp. v. Good*,
    555 U.S. 70 (2008) ................................................................................................5, 6

*Alvarez v. Lynch*,
    828 F.3d 288 (4th Cir. 2016) ..........................................................................13

*Arizona v. Inter Tribal Council of Az., Inc.*,
    570 U.S. 1 (2013) .................................................................................................6

*Armstrong v. Exceptional Child Center Inc.*,
    575 U.S. 320 (2015) ................................................................................12, 14, 15

*Atl. Recording Corp. v. Anderson*,
    2008 WL 2316551 (S.D. Tex. Mar. 12, 2008) ...............................................22

*Bannon v. United States*,
    156 U.S. 464 (1895) ...........................................................................................8, 9

*Barnes v. Gorman*,
    536 U.S. 181 (2002) ...........................................................................................15

*Bates v. Dow Agrosciences LLC*,
    544 U.S. 431 (2005) ...........................................................................................6

*Belk, Inc. v. Meyer Corp., U.S.*,
    679 F.3d 146 (4th Cir. 2012) ..........................................................................13

*Bianchi v. Brown*,
    111 F.4th 438 (4th Cir. 2024) .......................................................................9, 10

*Branch v. Smith*,
    538 U.S. 254 (2003) (Scalia, J.) ....................................................................16

*Brown v. Nucor Corp.*,
    785 F.3d 895 (4th Cir. 2015) ..........................................................................13

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ...........................................................................................6

*Chisholm v. U.S. Postal Serv.*,
    665 F.2d 482 (4th Cir. 1981) ..........................................................................6

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992)................................................................................5

*Clark v. Martinez*,
    543 U.S. 371 (2005)..............................................................................21

*Constantine v. Rectors & Visitors of Geo. Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) ..............................................................15

*Coyle v. Smith*,
    221 U.S. 559 (1911)..............................................................................17

*D'Oench, Duhme & Co. v. FDIC*,
    315 U.S. 447 (1942) (Jackson, J., concurring)....................................5

*Egelhoff v. Egelhoff ex rel. Breiner*,
    532 U.S. 141 (2001)................................................................................6

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)........................................................................13, 14

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) ..............................................................5

*Franks v. Bowman Transp. Co.*,
    424 U.S. 747 (1976)................................................................................6

*Gamewell Mfg., Inc. v. HVAC Supply, Inc.*,
    715 F.2d 112 (4th Cir. 1983) ................................................................5

*Gillispie v. City of Miami Twp.*,
    2023 WL 11922094 (S.D. Ohio Nov. 8, 2023), *aff'd*, 2025 WL 1276900
    (6th Cir. May 2, 2025) .........................................................................21

*Grayson O Co. v. Agadir Int'l, LLC*,
    856 F.3d 307 (4th Cir. 2017) ..............................................................13

*Hampton Roads Bankshares, Inc. v. Harvard*,
    291 Va. 42 (2016) ................................................................................11

*Hathorn v. Lovorn*,
    457 U.S. 255 (1982)..............................................................................11

*Heard Constr., Inc. v. Waterfront Marine Constr. Co.*,
    98 Va. Cir. 67 (Chesapeake Cir. Ct. 2018) ........................................11

*Henley v. Sunier*,
    2018 WL 6268297 (S.D. Ind. Nov. 30, 2018) ....................................21

*Henson v. Santander Consumer USA, Inc.*,
  582 U.S. 79 (2017)................................................................................10

*Horizon Shipbuilding, Inc. v. Jackson*,
  2025 WL 2167913 (11th Cir. July 31, 2025)...................................21

*League of Women Voters of Ohio v. LaRose*,
  741 F. Supp. 3d 694 (N.D. Ohio 2024)...............................6, 16, 21

*Johnson v. Governor of State of Fla.*,
  405 F.3d 1214 (11th Cir. 2005) ........................................................19

*King v. Youngkin*,
  122 F.4th 539 (4th Cir. 2024), Dkt. 99..........................12, 15, 19

*Marquez v. KBMS Hosp. Corp.*,
  492 F. Supp. 3d 1058 (C.D. Cal. 2020) ..........................................21

*Medina v. Planned Parenthood S. Atl.*,
  606 U.S. 357 (2025)..............................................................................15

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018)..............................................................................16

*Nairne v. Ardoin*,
  715 F. Supp. 3d 808 (M.D. La. 2024), *aff'd*, 151 F.4th 666 (5th Cir. 2025)...................21

*New York v. United States*,
  505 U.S. 144 (1992)..............................................................................16

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009)........................................................................17, 20

*O'Bannon v. King*,
  145 S.Ct. 2815 (2025)......................................................................5, 13

*Oregon v. Mitchell*,
  400 U.S. 112 (1970)................................................................................6

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981)..................................................................................15

*Pollard's Lessee v. Hagan*,
  44 U.S. 212 (1845)................................................................................17

*Reagan v. United States*,
  157 U.S. 301 (1895)................................................................................8

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
    120 F.4th 390 (4th Cir. 2024) ........................................................16

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ...........................................................................6

*Richardson v. Ramirez*,
    418 U.S. 24 (1974) ...........................................................................19

*Shelby Cnty v. Holder*,
    570 U.S. 529 (2013) ...........................................................17, 18, 19, 20

*Soto v. United States*,
    605 U.S. 360 (2025) ........................................................................10

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ....................................................................17, 18

*Texas v. White*,
    74 U.S. 700 (1885) ...........................................................................17

*Underwood v. Hunter*,
    730 F.2d 614 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985) ............19

*United States v. Aramony*,
    166 F.3d 655 (4th Cir. 1999) ..........................................................13

*United States v. Johnson*,
    576 U.S. 591 (2015) ........................................................................20

*United States v. Lynch*,
    137 U.S. 280 (1890) ........................................................................21

*Williams On Behalf of J.E. v. Reeves*,
    954 F.3d 729 (5th Cir. 2020) ..........................................................19

## STATUTES, RULES, AND REGULATIONS

U.S. Const.

    amend. II .............................................................................................9

    amend. V ...........................................................................................20

Arkansas Readmission Act ...................................................................15

Fed. R. Civ. P. 5.1 ...............................................................1, 20, 21, 22

Fed. R. Civ. P. 65 ................................................................................11

Va. Code §18.2-8 ..................................................................................................7

Va. Code §18.2-61 ..............................................................................................10

Virginia Readmission Act, 16 Stat. 62 (1870) ....................................... *passim*

## OTHER AUTHORITIES

3 Edward Coke, *The Third Part of the Institutes of the Laws of England* (4th ed. 1669), *available at* https://tinyurl.com/ ..............................................4

Eric Biber, *The Price of Admission*, 46 Am. J. Legal Hist. 119, 190 (2004)................................20

James Q. Dealey, *Growth of American State Constitutions* 70-71 (1915) ....................................19

Michael Dalton, *The Country Justice* 325 (1746), https://tinyurl.com/yexx589w ..............................................4

William Clark & William Marshall, *A Treatise on the Law of Crimes* 12 (1900), https://tinyurl.com/4rrvxd6a ..............................................3

1 William Hawkins, *Treatise on the Pleas of the Crown* 55-57 (1762), https://tinyurl.com/mha2jt5s ..............................................4

William Hening, *The New Virginia Justice* 320 (1810), https://tinyurl.com/39ekhttk..............................................4

## INTRODUCTION

This Court directed the parties to brief (A) what crimes are disqualifying felonies at common law and (B) what form an injunction should take. Plaintiffs' brief, Dkt. 203 ("Br.") presents a list of felonies at common law and explains why Plaintiffs' proposed injunction is feasible and consistent with nearly a dozen states' existing disenfranchisement systems. Defendants' brief, Dkt. 199 ("Opp."), addresses neither directive. Instead of offering a list of common law felonies, Defendants reassert their atextual and ahistorical argument that "felonies at common law" must mean *all* modern felonies—an old refrain they repackage as a "punishment-based" approach none of their cited historical sources actually support. And instead of addressing the form of an appropriate injunction, Defendants identify no practical or legal barrier to Plaintiffs' proposal (aside from a misguided reference to an appeals procedure Plaintiffs never proposed).

Defendants devote the majority of their brief to asserting a grab bag of alleged "constitutional" defenses to enforcement of the Virginia Readmission Act—defenses that either this Court or the Fourth Circuit already rejected or that Defendants have long forfeited. They then pair their brief with a baseless (and years late) Federal Rule of Civil Procedure 5.1 Notice, Dkt. 200, in a transparent attempt to further delay relief to the hundreds of thousands of Virginians currently barred from voting in violation of the Virginia Readmission Act. These arguments should be rejected as procedurally improper and indefensible on the merits. Congress enacted the fundamental condition to prohibit state officials from disenfranchising Virginians with impunity. None of Defendants' late-breaking "constitutional" arguments preclude the Court from enforcing that clear mandate. Plaintiffs respectfully request that the Court declare Defendants' practices to be in violation of the Virginia Readmission Act and put an end to Virginia's long history of unlawful disenfranchisement.

**ARGUMENT**

I.    **THE FELONIES AT COMMON LAW IN 1870 ARE THE DISCRETE CRIMES PLAINTIFFS HAVE IDENTIFIED, NOT ALL MODERN OFFENSES PUNISHABLE BY INCARCERATION**

A.    **The Virginia Readmission Act's Phrase "Crimes As Are Now Felonies At Common Law" Refers To The Offenses Plaintiffs Have Identified**

When Congress expressly limited disenfranchisement to "punishment for such crimes as are ***now*** felonies at common law," it referred to the discrete set of eleven offenses that Professor Hessick identified as the accepted set of common law felonies in 1870: (1) arson; (2) burglary; (3) escape and rescue from a prison or jail; (4) homicide, including murder and manslaughter; (5) larceny; (6) mayhem (i.e., causing a debilitating injury); (7) rape (including statutory rape of a minor less than 12); (8) robbery; (9) sodomy (including, at the time, bestiality); (10) suicide; and (11) treason.  Hessick Report ¶¶31-32.[1]  There was "a clear consensus" among Congress, courts, and scholars "that common law felonies were distinct from statutory felonies," and Congress's phrase "as are now felonies at common law" referred to a distinct set of felonies.  *Id.* ¶¶24, 29. Although there was "less consensus regarding which crimes" belonged in the set, both leading approaches to identifying them—the "Wharton approach," which identified the felonies by reference to history, and the "Blackstone approach," which identified the felonies by reference to whether they "resulted in forfeiture of land or goods and/or capital punishment"—"overlapped significantly as a practical matter," such that Professor Hessick readily identified the crimes "that would have been broadly understood" as felonies at common law in 1870, ***regardless*** of the approach used.  *Id.* ¶¶24-27, 31.  Rather than identifying "what crimes are disqualifying felonies at common law" as the Court expressly requested (Dkt. 182 at 1), Defendants instead appear to

---

[1] Abbreviated citations appear as in Plaintiffs' supplemental remedies brief, Dkt. 186.  Emphasis added and internal quotation marks, citations, and alterations omitted unless noted.

claim (at 9-14) that this Court is incapable of ascertaining the scope of that phrase because there is some variation among historical sources. But there is no practical variation, and even if there were, it would not prevent the Court from identifying a set of common-law felonies as the Fourth Circuit previously recognized. Variation among sources is endemic to common-law jurisprudence, and courts interpreting the common law "*should* disregard precedent that articulates a law incorrectly when necessary." *Gamble v. United States*, 587 U.S. 678, 715-716 (2019) (Thomas, J., concurring); *see also, e.g.*, *Weishaupt v. Commonwealth*, 315 S.E.2d 847, 850 (Va. 1984) (rejecting argument that marital rape was not recognized at common law).

As an initial matter, Defendants play up disagreement that simply does not exist; none of their sources establishes any "confusion" (Opp.12) as to the common law felonies in 1870; several of them do not even address that specific term. The Virginia Readmission Act does not refer to "common law" or "criminal offenses" (including misdemeanors) writ large—the topic of Defendants' excerpt from Matthew Hale's pre-Revolutionary treatise (Opp.10)—but to the "crimes as are now [in 1870] felonies at common law." Virginia's reception statute (quoted at Opp.11) adopts English "common law" as a starting point for Virginia law; it too says nothing about the "felonies at common law" recognized in 1870, and nothing in it purports to freeze the common law as it "existed in England at the time the reception statutes were enacted," Opp. 12.

Defendants' citations to five treatises (at 12-14) spanning 231 years in England and America establish, if anything, *consensus* as to the core set of felonies at common law in 1870. The most relevant treatise cited (at 14), an American treatise from 1900, lists *only* offenses subsumed within Plaintiffs' list. *See* William Clark & William Marshall, *A Treatise on the Law of Crimes* 12 (1900), https://tinyurl.com/4rrvxd6a. The rest differ in some terminology, but in actuality refer to the same crimes. For instance, Edward Coke's 17th Century English treatise lists

types of homicide (e.g., parricide, poisoning, killing of a prisoner) and other offenses that—while broken out by Defendants to suggest divergence—fall squarely within Plaintiffs' list. *See, e.g.*, 3 Edward Coke, *The Third Part of the Institutes of the Laws of England* 118 (4th ed. 1669), https://tinyurl.com/mrduhfh5 (treating "maiming" and "mayhem" as synonyms). Defendants also outright misstate the treatise. Coke identifies "stealing a hawk" as a statutory felony—not a common law felony, *see id.* at 97-99 (in any event, Professor Hessick lists larceny of animals as a common-law felony, Hessick Rep. at 63). And it does not appear to mention "castration" (an error Plaintiffs managed to identify even though Defendants cite to no specific pages in any of these large treatises). Defendants' treatment of the Dalton (1746), Hawkins (1762), and Hening (1810) treatises suffer from similar defects.[2] And Defendants make no effort to explain how these treatises—the latest of which precedes the Readmission Act by more than half a century—shed any light on the common law felonies ***in 1870***.

Even if Defendants' sources showed any disagreement as to the proper scope of common law felonies, the Fourth Circuit confirmed that any such disagreement would not preclude Plaintiffs' requested relief, holding that "decid[ing] … if a particular crime was a 'felon[y] at common law,'" falls "within the heartland of what federal courts do every day." Dkt. 99 at 14, *cert. denied*, 145 S. Ct. 2815 (2025). Indeed, courts have been doing so since the nineteenth

---

[2] For instance, Dalton suggests that the act of a juror "discover[ing] the King's Council" is not sufficiently serious to be a common-law crime. *See* Michael Dalton, *The Country Justice* 325 (1746), https://tinyurl.com/yexx589w. Defendants break out various forms of rescuing an arrested or imprisoned person, all of which are included in Professor Hessick's list under "escape." Defendants are also wrong that the various forms of "draw[ing a] Sword" create tension; Hawkins identifies these as "hav[ing] always been look[ed] upon as very high Misprisons," and Hawkins explains that a misprision is not a felony. 1 William Hawkins, *Treatise on the Pleas of the Crown* 55-57 (1762), https://tinyurl.com/mha2jt5s. Most of the offenses ascribed to Hening are contained in Plaintiffs' list, including "robbery on the highway" (robbery), "killing someone during a duel" (homicide), and "stealing a hawk" (larceny). *See* William Hening, *The New Virginia Justice* 320, 366 (1810), https://tinyurl.com/39ekhttk.

century.  *See* Hessick Report ¶29 (listing cases).  Absolute "consensus" (Opp.9) is not required to ascertain the common law.  Courts regularly derive an "appropriate … rule" from "the best-reasoned decisions in the general common law," *Gamewell Mfg., Inc. v. HVAC Supply, Inc.*, 715 F.2d 112, 116 (4th Cir. 1983), and may "draw upon all the sources of the common law" where necessary, *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 472 (1942) (Jackson, J., concurring).

Finally, Defendants invoke for the first time (at 14) the inapposite presumption against preemption to argue "felonies at common law" should be "as expansive as possible."  But despite two years of litigation, Defendants notably fail to identify *a single offense* purportedly missing from Plaintiffs' list.  In any case, Defendants concede the doctrine applies only when "federal law purportedly displaces the 'historic *police* powers of the States,'" Opp.14 (quoting *Altria Grp. v. Good*, 555 U.S. 70, 77 (2008)); "the regulation of [federal] elections is not a subject of state police power nor one that is traditionally the province of the states," *Fish v. Kobach*, 840 F.3d 710, 727 (10th Cir. 2016).  Defendants' cited cases (*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) and *Altria*) address "police powers" in the context of federal regulation of cigarettes, which is irrelevant here.  Their only voting-related case *distinguishes* "the States' 'historic police powers'" from "the States' role in regulating congressional elections," which remains "subject to the express qualification that it terminates according to federal law.'" *Arizona v. Inter Tribal Council of Az., Inc.*, 570 U.S. 1, 14-15 (2013), *cited at* Opp.14.  Congress has broad authority to prohibit states from limiting the franchise, *see Oregon v. Mitchell*, 400 U.S. 112, 122 (1970), and its "power to interfere with state voter qualifications" is granted by a "variety of constitutional provisions," *id.* at 192 (Harlan, J., concurring in part and dissenting in part).

Moreover, if a presumption against preemption applied to elections at all, it could only apply to resolve ambiguity about whether the federal statute preempts Virginia state law.  *See*

*Altria Grp.*, 555 U.S. at 77.  Here, there is no "plausible reading" of the Virginia Readmission Act that "disfavors pre-emption," *id.*, since the fundamental condition's entire point is to prevent Virginia from using the criminal law to disenfranchise otherwise eligible voters.  Because "Congress has made clear its desire for pre-emption," *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001), *quoted in League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 718-719 (N.D. Ohio 2024), the Court was right to hold that the canon (and the anticommandeering doctrine) do not apply, Dkt.18 at 11 n.3.  Defendants cite no case suggesting that the canon can negate an equitable remedy once a court has determined that federal law preempts conflicting state law.  Because the Virginia Readmission Act clearly preempts Defendants' conduct, the Court is "obligated to grant the most complete relief possible" to address their ongoing violation of federal law.  *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 498-99 (4th Cir. 1981).

### B. The Virginia Readmission Act Permits Disenfranchisement For A Limited Set of Present-Day Felonies, Not Any Crime Punishable By Incarceration

Despite this Court's directive that Defendants "offer a list of disqualifying modern felonies" (Dkt.182), Defendants offer no answer to the 96 Virginia state offenses that Professor Hessick determined would have been felonies at common law in 1870.  Indeed, ***at no point in this litigation have Defendants identified any present-day felony that they contend should be added to the Hessick List.***  Accordingly, the Court should incorporate the Hessick List (Exhibit A to the Proposed Order, Dkt. 151-1 at 3-11) as the exclusive set of Virginia offenses for which federal law permits Virginians to be disenfranchised.  Nor do Defendants contest (at 15-17) that if the remedial order includes Plaintiffs' proposed clause identifying disqualifying out-of-state and federal convictions by comparing them to those attached to Plaintiffs' Proposed Order, the resulting framework would be comparable to that in nearly a dozen other states.  *See* Br.15-18.

Instead, Defendants attempt (at 14-19) to distort the Virginia Readmission Act into a

license for the General Assembly to disenfranchise for every current felony and any offense it ever decides to codify as a felony—i.e., an "offense[] … punishable with confinement in a state correctional facility," Va. Code §18.2-8.  But Defendants' latest rationalization for their unlawful disenfranchisement is no more than a thinly veiled attempt to reargue their flawed merits-stage incorporation-by-reference theory.  *See* Dkt. 173 at 4-15; Dkt. 165 at 4-22.  As with that theory, Defendants' recent iteration cannot be squared with the Virginia Readmission Act's text, structure, or history.

As explained (and as Defendants' quotation reveals), Blackstone considered "forfeiture of land or goods" or the imposition of "capital punishment"—not punishment in the penitentiary; it then applied that rubric to identify a nearly identical list of common-law felonies as Wharton; and Plaintiffs' list reflects both approaches.  *Supra* p.2.  Defendants' definition appears nowhere in Blackstone and warps both the historical evidence and controlling case law.  In 1870, the term "felony at common law" was understood as a fixed, historical category, including by Blackstone, who looked to the "species of crime which occasioned *at common law* the forfeiture of land or goods."  Hessick Report ¶27 (quoting Blackstone); *see also id.* ¶¶28-29.  As explained, Dkt.165 at 15, although statutes sometimes categorized felonies by their punishment, the Supreme Court also expressly distinguished such statutory felonies from common law felonies, which were defined based on *historic* punishments.  It was by "*statute* in some of the states" that the word felony "mean[t] offenses for which the offender, on conviction, may be punished by death or imprisonment in the state prison or penitentiary; but, in the absence of such statute, the word is used to designate such serious offenses as *were formerly punishable* by death, or by forfeiture of the lands or goods of the offender."  *Bannon v. United States*, 156 U.S. 464, 468 (1895).  When not referring to a statutory definition (as here, given Congress's express reference to "common

law"), the term "felony" "designate[d] such serious offenses as were formerly punishable" by death or forfeiture (not by imprisonment). *Reagan v. United States*, 157 U.S. 301, 303 (1895). This understanding of common law felonies as a fixed historical category is entirely consistent with Congress's choice to anchor future disenfranchisement to those "crimes as are ***now*** felonies at common law."

Against these authorities, Defendants cite ***nothing*** for their bald assertion that "the punishment-based approach to common law felonies would mean that 'felonies at common law' in 1870 would have included all felonies serious enough to result in a penitentiary sentence" in 1870, let alone ***today***. Opp.15. Indeed, this argument is foreclosed by *Bannon*, which identifies potential punishment by "imprisonment in the state prison or penitentiary" as defining ***statutory felonies***. 156 U.S. at 468. The two legal dictionaries Defendants cite (at 15) further reinforce the distinction between statutory and common law felonies. Burrill (1850) principally defines "felony" to occasion "forfeiture of land or goods," not imprisonment; its secondary definition referring to "imprisonment in a state prison" cites a New York ***statute*** and makes no reference to the common law. Dkt. 165-4 at 7. Black (1891) even more expressly links imprisonment to statutory felonies. *See* Dkt. 162 at 6 ("The ***statutes or codes of several of the states*** define felony as any public offense on conviction of which the offender is liable to be sentenced to death or to imprisonment in a penitentiary or state prison.").

Apparently acknowledging that their definition is ahistorical, Defendants pivot (Opp.15 & n.10) to arguing that "a modern statute need only be analogous to a historical one." This is no reason to reject Plaintiffs' list. *United States v. Rahimi* (and Defendants' cited Fourth Circuit decision applying it) is inapposite. *Rahimi* sanctions resort to analogy when applying the Second Amendment, given that text's silence as to how it should apply in the future. 602 U.S. 680, 692

(2024); *see also Bianchi v. Brown*, 111 F.4th 438, 462 (4th Cir. 2024) (same).  But here, Congress made clear it would not accept any such resort to analogy; it codified the phrase "as are **now** felonies at common law" in the Virginia Readmission Act's text as a reaction to nefarious state efforts to impose disenfranchisement with modern criminal regulations.  *See* Dkt. 152 at 3-6.  The Reconstruction Congress, unlike the drafters of the Second Amendment, **did** "mean[] to suggest a law trapped in amber," *Rahimi*, 602 U.S. at 691; *Bianchi*, 111 F.4th at 462.[3]

Plaintiffs' list of common-law felonies honors the Act's text and history, and adopting it would introduce none of the "pitfalls" Defendants suggest, Opp.17.[4]  It does not include Defendants' cited arson statute, because a person convicted under that statute should not be automatically disqualified, for reasons such as those Defendants state (Opp.17)—*i.e.*, she may not have committed a common-law felony.  And the list does include Defendants' cited rape statute (Va. Code §18.2-61), because contrary to Defendants' assertion (which cites a lone 1736 treatise), a person convicted under that statute would have been convicted of a felony at common law, *see* Hessick Report ¶¶ 25, 27, 31, 44; *see also id.* at 60, 66, 67, as any asserted "exception" for marital rape "was not law, common or otherwise," *Weishaupt*, 315 S.E.2d at 850.  If Defendants' any-felony approach is "simple" (Opp.16), that is only because it fails to offer any remedy at all.

## II.    DEFENDANTS HAVE IDENTIFIED NO PRACTICAL OR LEGAL BARRIER TO PLAINTIFFS' PROPOSED REMEDY

Plaintiffs' proposed prospective relief barring unlawful disenfranchisement would not

---

[3] Defendants' rhetorical resort here and throughout (Opp.1-2 & nn.1-2, 16-17) to crimes they believe "make[] sense" as a basis for disenfranchisement is irrelevant.  Whether the Act is the right "policy choice is a 'matte[r] for Congress, not this Court, to resolve.'"  *Soto v. United States*, 605 U.S. 360, 375 (2025).

[4] Although Defendants refer to registrars (Opp.18), they do not dispute that registrars need not make initial determinations about which felonies qualify, because **state** officials build and maintain the prohibited table and instruct registrars as to its application in particular cases.  *See* Br.20-22.

require significant changes to the work of registrars or other Virginia election officials.  Rather, to comply with the proposed prospective injunction, Defendants can merely update a question on the Commonwealth's registration form and repopulate the VERIS "prohibited table" to include only those individuals who were convicted of one of the disqualifying Virginia offenses set forth in Exhibit A to the Proposed Order.  *See* Br.20-23.  Defendants dispute none of this; nor do they identify any change that the proposed remedy would require Virginia to make to its election laws.  Indeed, Defendants concede (at 20) that they could comply with the proposed remedy by implementing procedures similar to those employed by nearly a dozen other states, including Alaska and Alabama, none of which have experienced "administrability problems."

Defendants argue only (at 19) that this Court cannot "command[] Virginia's courts to implement [its] injunctive order."  But this argument is absurd.  Plaintiffs have never asked this Court to command any specific election administration procedure, let alone to "set up a system of appeals with itself sitting at the apex of state courts," Opp.19.  Plaintiffs merely explained (at Br.23) how Virginia's ***existing*** state-law provisions for appealing denial or cancelation of a voter registration would enable courts to determine whether a registration application was properly denied or registration properly canceled—just as such courts do under the current regime.  While Plaintiffs explained the existing statutory appeals processes arising from such proceedings, they never suggested that ***this Court*** would entertain further appeals from those state-court petitions for review, so Defendants' hypothesized *Rooker-Feldman* issue does not exist.  Nor is there anything unusual about state courts applying a federal rule of decision.[5]  State-court adjudication of a voter's

---

[5] *See, e.g.*, *Hampton Roads Bankshares, Inc. v. Harvard*, 291 Va. 42 (2016) (applying federal statute to contract dispute); *Heard Constr., Inc. v. Waterfront Marine Constr. Co.*, 98 Va. Cir. 67, 70 (Chesapeake Cir. Ct. 2018) (applying "well-recognized presumption of concurrent jurisdiction over Federal claims or claims involving the interpretation and application of Federal law").

appeal does not implicate anti-commandeering concerns. *See Hathorn v. Lovorn*, 457 U.S. 255 (1982). Nor does Plaintiffs' Proposed Order run afoul of Federal Rule of Civil Procedure 65; it "describe[s] in reasonable detail" the "acts restrained or required," R. 65(d)(1)(C), namely prohibiting disenfranchisement other than for a specified set of offenses.

## III.    DEFENDANTS' CONSTITUTIONAL OBJECTIONS ARE PROCEDURALLY IMPROPER AND WRONG ON THE MERITS

### A.    Defendants' Constitutional Objections Are Not Properly Before This Court

Ignoring the Court's supplemental briefing order, Dkt. 182 at 1, Defendants start their brief with a kitchen sink of constitutional objections that they argue preclude enforcement of the Virginia Readmission Act. Defendants had ample opportunity to raise—and with one exception, did raise (albeit in cursory form)—these arguments in the parties' extensive briefing on cross-motions for summary judgment. The Court should thus disregard this portion of Defendants' brief and consider these constitutional arguments only in the form raised in their motion for summary judgment or opposition to Plaintiffs' motion for summary judgment. To the extent the Court considers these arguments, it should deny them as contrary to law of the case or waived.

1.    A unanimous Fourth Circuit panel already rejected Defendants' argument (at 4-6) that the Virginia Readmission Act is unenforceable because it is like "a contract" that is not privately enforceable. *See* Br. of Appellants, No. 24-1265, Dkt.17 at 31, 39 (4th Cir.). The Fourth Circuit held that Congress is not the "sole or express" enforcer of the Act and concluded that the Act "differs in every material respect," from the "federal-state ... agreement" at-issue in *Armstrong v. Exceptional Child Center Inc.*, 575 U.S. 320, 332 (2015) (holding that "intended beneficiaries" could not enforce this "contract"). Dkt. 99 at 12. The Fourth Circuit's mandate is law of the case that precludes Defendants' reasserted argument. *See United States v. Aramony*,

- 11 -

166 F.3d 655, 661 (4th Cir. 1999).[6]

2.    Defendants' objection (Opp.5) that the "equal footing doctrine" precludes enforcement of the Act is improper because it was waived thrice-over. First, Defendants failed to plead anything related to this affirmative constitutional defense in their operative answer. *See generally* Dkt. 103 ("Answer") ¶¶157-161. Second, Plaintiffs served Interrogatory No. 5 seeking "all legal and factual bases" for Defendants' "contention that the Felony Voting Provision does not violate the Virginia Readmission Act," and this Court compelled Defendants to respond, *see* Dkt. 138. But Defendants nonetheless declined to disclose any factual basis upon which they could now assert an "equal footing" defense to enforcement, Dkt. 153-1 at 7-9, and that failure to disclose warrants wholesale rejection of the argument, *see Harford Cas. Ins. Co. v. MCJ Clothiers, Inc.*, 54 Fed. App'x 384, 388 (4th Cir. 2002) (per curiam). Third, "the issue is waived" because their prior drive-by references to the doctrine—a single sentence in their summary judgment motion, *see* Dkt. 148 at 11, and a footnote in their opposition to Plaintiffs' motion, Dkt. 162 at 22 n.4—"fail[ed] to develop this argument to any extent," *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 152 n.4 (4th Cir. 2012). This Court should thus exercise its discretion to find that Defendants "waive[d this] argument … by failing to develop" it timely in merits briefing; a "brief tak[ing] a passing shot at the issue" or "only assert[ing a position], without argument or explanation," does not save a party from waiver. *See Grayson O Co. v. Agadir Int'l, LLC*, 856 F.3d 307, 316 (4th Cir. 2017). Parties cannot "add new constitutional claims as" they go "along, simply because" they argued some other constitutional objection. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 (2008).

3.    Defendants' last-ditch void for vagueness argument (at 7) was never properly raised

---

[6] The Supreme Court denied certiorari only after Defendants again presented both arguments to that Court too. *See* Petition for Writ of Certiorari at 19-20, *O'Bannon v. King*, 145 S.Ct. 2815 (2025) (raising contract argument); *id.* at 13 (raising anticommandeering argument).

at *any* stage of this litigation, and it has been forfeited. *See Exxon Shipping Co.*, 554 U.S. at 487. There is no mention of it in Defendants' answer, motion to dismiss, or motion for summary judgment. But to the extent this argument was preserved, the Fourth Circuit already rejected it in holding that there is "no basis for concluding the Virginia Readmission Act lacks judicially manageable standards." Dkt. 99 at 13. Defendants acknowledge as much (at 8) and seek to evade the mandate by pointing out that the Fourth Circuit did not consider Professor Hessick's analysis. But the Fourth Circuit's conclusion *before discovery* that the Virginia Readmission Act articulates a manageable standard is hardly diminished because an expert later articulated a framework that Defendants have not managed to substantively dispute. *See supra* pp.2-6.

## B. Defendants' Constitutional Objections Are Wrong On The Merits

Should the Court look past waiver and the mandate rule to reach the merits of Defendants' constitutional objections, they should be rejected on the merits.

1. The Fourth Circuit squarely held that Congress did not "foreclose[]" the Act's equitable enforcement. *See* Dkt. 99 at 11 & n.2. Nothing about the Act gives rise to the inference that Congress "limit[ed]" the "power of federal courts of equity to enjoin unlawful executive action," and the Act "has no clear enforcement mechanism—much less a 'sole' or express one." *Id.* at 11-12 (quoting *Armstrong*, 575 U.S. at 328). There appear to be no limits to Defendants' contract theory; adopting it would throw into question even federal statutes the Fourth Circuit has held are enforceable at equity despite their containing no private enforcement mechanism and being "much in the nature of a contract" between Congress and the states. *See Constantine v. Rectors & Visitors of Geo. Mason Univ.*, 411 F.3d 474, 497 (4th Cir. 2005).

None of Defendants' cases justifies revisiting the Fourth Circuit's detailed treatment of Defendants' *Armstrong*-based argument (at 4) that the Act is "in the nature of a contract," 575 U.S. at 332. *Butler v. Thompson* is a Jim Crow-era district court decision upholding the

- 13 -

disenfranchisement of a Black citizen for her failure to pay a poll tax; Defendants rely on dicta suggesting that the Act may not be enforceable. 97 F. Supp. 17, 19 (E.D. Va. 1951), (cited at Opp.4). *Merritt v. Jones* is a state-court decision that mentioned private enforcement of the Arkansas Readmission Act only in brief dicta. 259 Ark. 380, 389 (1976). The Fourth Circuit's mandate squarely rejects *Merritt's* supposition that if "the Act has some force and effect, its enforcement is the exclusive domain of Congress." *Id.*; Dkt. 99 at 11-12. The Virginia Readmission Act is not "Spending Clause legislation" in which Virginia agreed to enforce a program in exchange for a federal benefit. *Armstrong*, 575 U.S. at 332. Such legislation appeared "rarely" if at all until after "the New Deal." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 372-373 (2025), *cited in* Opp.4. The Act, by contrast, was a means of preserving the gains made during the Civil War and Union troops' post-war occupation. *See* Dkt. 146-1 ("Ayers Report") ¶¶50-58. Its history and context confirm that Congress understood it to be judicially enforceable; as one legislator explained, "the courts will furnish redress for [its] violation." *Id.* ¶56.

2.     This Court and the Fourth Circuit were also correct to reject Defendants' anti-commandeering argument (at 6). As this Court correctly concluded at the motion to dismiss stage, "[t]he anticommandeering doctrine is similarly inapplicable here: the plaintiffs ask the Court to enjoin the defendants from enforcing Article II, Section 1 of Virginia's Constitution, and they have not asked the Court to compel the defendants' action." Dkt. 88 at 11-12 n.3. Unlike all the legislation at issue in Defendants' cited cases (Opp.6), the Virginia Readmission Act does not require that Virginia's legislature "enact and enforce" or "administer" any regulatory program. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473-75 (2018) (prohibiting New Jersey from "authoriz[ing] by law" sports betting); *see also New York v. United States*, 505 U.S. 144, 154 (1992) (requiring New York to "enact[] legislation" to create radioactive waste disposal

- 14 -

site).  The Virginia Readmission Act imposes no such mandate; it directly protects voting rights by preempting any state law that would unlawfully disenfranchise Virginians.  Enforcement of federal voting-rights legislation does not "run[] afoul of any anticommandeering principles" because it "regulates" only a State's federal obligations to its voters, placing no "statutory obligation on the state legislatures."  *Branch v. Smith*, 538 U.S. 254, 280 (2003) (Scalia, J.) (plurality op.); *see also, e.g.*, *Republican Nat'l Comm. v. N. C. State Bd. of Elections*, 120 F.4th 390, 408 (4th Cir. 2024) (enforcement of National Voting Rights Act and Help America Vote Act "respects the federal-state balance"); *League of Women Voters of Ohio*, 741 F.Supp.3d at 719 ("State Defendants misapprehend the anti-commandeering doctrine... Section 208 [of the Voting Rights Act] does not conscript the states to enact legislation nor promulgate regulation.").  As Plaintiffs' opening remedies brief explained (at 17-23), the proposed remedy requires ***no change*** to Virginia's election laws, and Defendants have not disputed that.  The Court need not order the General Assembly to do ***anything***, let alone "pass new laws" or "alter[] old ones," Opp.6.

3.     Defendants' belated attempt to challenge Congress's authority to enact the Virginia Readmission Act under the equal footing doctrine is meritless.  Defendants rely (at 5-6) solely on cases that "concerned the admission of new States."  *Coyle v. Smith*, 221 U.S. 559, 563, 568 (1911) (invalidating provisions of enabling act "under which the state was admitted to the Union"); *see also Pollard's Lessee v. Hagan*, 44 U.S. 212, 212 n.5 (1845) (holding that Alabama possessed the same rights over navigable waters as other states, following admission to the Union).  And the Supreme Court has long limited *Coyle's* "doctrine of the equality of States" to "only to the terms upon which States are ***admitted to the Union***," *South Carolina v. Katzenbach*, 383 U.S. 301, 323–329(1966), and it has "rejected the notion that the principle operated as a bar on differential treatment outside that context," *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013).

- 15 -

The Virginia Readmission Act did not admit Virginia as a new state; it restored Virginia's Congressional delegation to full membership following the Civil War.  Thus, *Coyle* and its progeny—which involved congressional attempts to dictate ordinary decisions like the location of a state's capital—simply do not apply.  In any event, *Coyle* bars only those conditions on state admission that are "not plainly within the regulating power of Congress."  221 U.S. at 574.  And Defendants have repeatedly conceded Congress's authority to pass the Act, *see, e.g.*, Dkt. 183 at 51:15-5:16; Answer at ¶¶5, 52, 54; Dkt. 77 at 12 (citing *Texas v. White*, 74 U.S. 700, 727 (1885)). Defendants' *Coyle* claim therefore fails for this independent reason.

*Shelby County v. Holder* remains the only case outside the state admission context in which the Supreme Court invalidated a federal statute for violating the "equal footing" (or "equal sovereignty") doctrine.  Defendants tellingly do not cite it, because *Shelby County* provides them no support.  It concerned the 2006 reauthorization of Section 5 of the Voting Rights Act, which "suspend[ed] ***all*** changes to state election law—however innocuous until they [were] precleared by federal authorities in Washington D.C."  570 U.S. at 544.  The Court described this preclearance regime as an "uncommon exercise of congressional power" that "could be justified [only] by 'exceptional conditions."  *Id*. at 544-545.  Critically, Section 5 was "intended to be temporary," and was "set to expire after five years."  *Id.* at 538.  The Court "upheld … against constitutional challenge" three short-term reauthorizations—each of which had been amended to reflect Congress's latest fact-finding.  *Id.* at 538-39.  It invalidated only the 2006 reauthorization, holding that in reauthorizing the expiring preclearance system, Congress relied solely "on decades-old data relevant to decades-old problems, rather than current data reflecting current needs."  *Id.* at 553.

Congress's enactment of the Virginia Readmission Act bears no similarity to the facts of *Shelby County*.  Congress passed the Act to address the legacy of Virginia's secession, rebellion,

- 16 -

and its ongoing resistance to allowing equality under Reconstruction—a set of "exceptional and unique conditions" that eclipsed even the "insidious and pervasive evil" that the Court held justified Section 5's preclearance system, *Shelby County*, 570 U.S. at 535, 555. *See* Ayers Report at ¶¶15-17, 50-58. The Act was supported by extensive factfinding (discussed in Dr. Ayers' expert report and Plaintiffs' summary judgment briefing) that specifically fashioned the Act's "fundamental condition" as a countermeasure to Virginia's manipulation of its criminal codes as a means of stripping Black citizens of political power. *See id.* ¶¶12, 17, 50, 54, 56; Dkt. 152 at 5-6, 17-20. Congress also expressly made the "fundamental condition" permanent, unlike Section 5, so the Virginia Readmission Act has never been and need never be reauthorized. *See* 16 Stat. 62, 63 ("[T]he Constitution of Virginia shall ***never*** be so amended or changed[.]").[7] Accordingly, the Act's "disparate geographic coverage is sufficiently related to the problem" that Congress enacted it to address. *Shelby County*, 570 U.S. at 542. That is why the only court to expressly address *Shelby County* in the context of a Readmission Act, *Hopkins v. Hosemann*, held that "reading the [Mississippi] Readmission Act to impose limits on Mississippi's power to disenfranchise" would not "violate the principle of 'equal sovereignty[]'" after *Shelby County*, because that decision "expressly recognized that Congress 'may draft' a law imposing burdens and limitations on some states and not others" and merely invalidated the Voting Rights Act's coverage formula as an improper means of achieving that end. 76 F.4th 378, 403-404 (5th Cir. 2023), *vacated and reversed en banc on other grounds*, 108 F.4th 371 (5th Cir. 2024).

Defendants identify no other case applying the equal footing doctrine in the context of a Readmission Act. To the contrary, and consistent with *Hopkins*, the Supreme Court and several

---

[7] *See also* Cong. Globe, 40th Cong., 2d Sess. 2601 (1868) (statement of Sen. Trumbull) (recognizing the "shall never be amended" language as a binding, enduring condition).

circuits have analyzed Readmission Acts without ever suggesting that they were unenforceable as violating the "equal footing" or "equal sovereignty" principles. *See, e.g.*, Dkt. 99 at 11-14; *Richardson v. Ramirez*, 418 U.S. 24, 48 (1974); *Williams On Behalf of J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020) (permitting enforcement of Mississippi Readmission Act to preempt amendment to Mississippi Constitution); *Underwood v. Hunter,* 730 F.2d 614, 616 n.3 (11th Cir. 1984) (noting "[Alabama] Readmission Act claim" "proceeded to trial" following appeal), *aff'd*, 471 U.S. 222 (1985); *see also, e.g.*, *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1218-1219 (11th Cir. 2005).  Neither of Defendants' cited articles (Opp.6) salvage their position; one asserts without explanation that readmission acts "would hardly be enforcible [sic]," James Q. Dealey, *Growth of American State Constitutions* 70-71 (1915); the other parrots Jim Crow-era dicta from *Butler*, 97 F. Supp. at 20-21, and postbellum southern courts, Eric Biber, *The Price of Admission*, 46 Am. J. Legal Hist. 119, 190 (2004).  Defendants' unpreserved and underdeveloped argument is no reason for this Court to dramatically extend *Shelby County*.[8]

     4.      Defendants' new void-for-vagueness argument (Opp.7-8) is inapposite because that doctrine applies to the Fifth Amendment Due Process rights of "ordinary people" (*i.e.*, regulated parties and criminal defendants), *see United States v. Johnson*, 576 U.S. 591, 595 (2015), not state defendants.  Defendants cite no case to the contrary.  Neither the Act nor this lawsuit threatens to "tak[e] away [Defendants'] life, liberty, or property under a criminal law" or civil enforcement process that imposes "fines or forfeitures," so the doctrine does not apply.  *Id*. at 595, 612 n.1.

---

[8] Neither *Shelby County* nor any other case suggests that a court must conduct a "current needs" analysis to simply enforce a validly enacted statute.  570 U.S. at 536.  In any event, Defendants have never challenged whether conditions in 2025 continue to justify the Virginia Readmission Act's disparate geographic coverage, and indeed expressly waived any defense to enforcement of the Act that would require such analysis.  *See* Dkt. 174-1 at 3-4.  And even were "current needs" relevant here, there is no question enforcement of the Act remains justified.  *See* Dkt. 78 at 17-19; Dkt. 152 at 11; Dkt. 162 at 4 (conceding Plaintiffs' undisputed facts).

States cannot lodge void-for-vagueness claims to escape their obligation to abide by federal law—let alone one that imposes a mandate as clear as the Act's fundamental condition.

### C.     The Court Should Disregard Defendants' Baseless, Untimely, And Prejudicial Rule 5.1 Notice

Defendants' Rule 5.1 Notice is legally unsound and prejudicial, not only for the reasons described in Part III.A (this case presents a question of statutory interpretation, not a constitutional challenge warranting a Rule 5.1 notice), but also because it violates Rule 5.1's "prompt[]" filing requirement and severely prejudices Plaintiffs.  The defect in Defendants' Notice provides further reason to reject Defendants' constitutional arguments as procedurally improper and any arguments the United States presents as a result of the faulty notice.  And because no constitutional questions are properly raised, the Court should also reject any future attempt by the United States to intervene in this lawsuit, which Plaintiffs reserve the right to oppose if and when sought.  *See, e.g.*, *Horizon Shipbuilding, Inc. v. Jackson*, 2025 WL 2167913, at \*5 (11th Cir. July 31, 2025); *Gillispie v. City of Miami Twp.*, 2023 WL 11922094, at \*7 (S.D. Ohio Nov. 8, 2023), *aff'd*, 2025 WL 1276900 (6th Cir. May 2, 2025); *League of Women Voters of Ohio*, 741 F. Supp. 3d at 720 & n.8.

1.      Rule 5.1 applies only when a party "draw[s] into question the constitutionality of a federal or state statute," R. 5.1(a), and acts to offer the United States "a chance to intervene to defend the constitutionality of a statute before the Court declares it unconstitutional," *Marquez v. KBMS Hosp. Corp.*, 492 F. Supp. 3d 1058, 1066 (C.D. Cal. 2020).  This lawsuit—which seeks to *enforce* federal law—poses no such risk.  *See Henley v. Sunier*, 2018 WL 6268297, at \*4 (S.D. Ind. Nov. 30, 2018).  Defendants instead argue (Opp.4-5) that the Court should interpret the statute to *avoid* their constitutional "questions."  But invoking the canon of constitutional avoidance does not create a constitutional question warranting  Rule 5.1 notice or the United States's intervention, because a Court does not adjudicate a statute's constitutionality when it *avoids* such a question by

applying the canon.  *See Clark v. Suarez Martinez*, 543 U.S. 371, 381–382 (2005); *United States v. Lynch*, 137 U.S. 280, 285 (1890); *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 834 (M.D. La. 2024), *aff'd*, 151 F.4th 666 (5th Cir. 2025).  Defendants also cannot rest their notice on their "forfeited" equal-footing and void-for-vagueness arguments.  *See, e.g.*, *Gillispie*, 2023 WL 11922094, at *8; *supra* §III.A.2, III.A.3.  And if the Court rejects Defendants' "constitutional" arguments, the federal government has no interest in intervening (and no right to do so), because intervention is permitted only to ***defend*** a federal statute's constitutionality.  *See* 28 U.S.C. §2403(a).

2.      Even if a constitutional issue existed, Defendants' eleventh-hour notice is untimely and prejudicial.  Rule 5.1 requires "prompt[]" notice at the earliest possible point.  Fed. R. Civ. P. 5.1(a); Advisory Comm. Notes to 2006 Amendment; *e.g.*, *Atl. Recording Corp. v. Anderson*, 2008 WL 2316551, at *5 (S.D. Tex. Mar. 12, 2008).   Although Defendants raised alleged "constitutional" arguments in their motion to dismiss more than two years ago, *supra* §III.A.1, they strategically filed their notice only ***after*** this Court indicated its inclination to grant Plaintiffs' requested relief.  Drawing the United States into the case at the eleventh hour, after years of litigation, distorts the adversarial process and seriously prejudices Plaintiffs' ability to obtain prompt relief.  The Court should not reward Defendants' delay tactics and should instead reject Defendants' constitutional arguments as improperly raised or lacking in merit, and deny any future attempt by the United States to intervene based on questions not before the Court.

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' pending motions for summary judgment and class certification, deny Defendants' pending *Daubert* and summary judgment motions, and accordingly: (1) enter Plaintiffs' proposed order and (2) adopt Exhibit A to the proposed order as the exclusive list of disqualifying Virginia offenses.

Dated: December 4, 2025

Respectfully submitted,

/s/ Brittany Blueitt Amadi

Vishal Agraharkar (VSB No. 93265)
Eden Heilman (VSB No. 93554)
ACLU FOUNDATION OF VIRGINIA
P.O. Box 26464
Richmond, VA 23261
(804) 523-2151
vagraharkar@acluva.org
eheilman@acluva.org

Brittany Blueitt Amadi (VSB No. 80078)
Medha Gargeya*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave NW
Washington, DC 20037
(202) 663-6000
brittany.amadi@wilmerhale.com

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
(202) 579-4582
jared.davidson@protectdemocracy.org

Robert Kingsley Smith*
Jason H. Liss*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
robert.smith@wilmerhale.com

Benjamin L. Berwick*
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Nicholas Werle*
Brandon Roul*
Dylan S. Reichman*
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
nick.werle@wilmerhale.com

Beau C. Tremitiere*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave NW, Suite 153
Washington, DC 20006
(202) 579-4582
beau.tremitiere@protectdemocracy.org

Nitisha Baronia*
WILMER CUTLER PICKERING
HALE AND DORR LLP
50 California Street, St # 3600
San Francisco, CA 94111
(202) 718-6494
nitisha.baronia@wilmerhale.com

Counsel for Plaintiffs
*admitted pro hac vice

- 21 -

## <u>CERTIFICATE OF SERVICE</u>

THIS IS TO CERTIFY that on December 4, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically e-mail notification of such filing to all counsel of record.

<u>*/s/ Brittany Blueitt Amadi*</u>
Brittany Blueitt Amadi (VSB No. 80078)
*Counsel for Plaintiffs*