IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TATI ABU KING, *et al.*,

                    Plaintiffs,

v.                                            Civil Action No. 3:23cv408

JOHN O'BANNON, in his official
capacity as Chairman of the State Board
of Elections for the Commonwealth of
Virginia, *et al.*,

                    Defendants.

## OPINION

For well over a century, the Commonwealth of Virginia has disobeyed a federal law designed to protect the right of former enslaved people to vote. When the United States started to readmit the rebellious slave states after the Civil War, Congress feared that the former Confederate powers would invent new crimes with which they could disenfranchise Black Americans. To help ensure the right to vote across the Commonwealth, Congress passed the Virginia Readmission Act of 1870. That Act prevents Virginia from changing its constitution to deprive any citizen of the right to vote, "except as a punishment for such crimes as are now felonies at common law." Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870).

Several times, Virginia has rewritten its constitution contrary to the statute. Each new version has disenfranchised people for offenses other than felonies at common law, and Virginia now automatically disqualifies all felons from the ballot box.[1] The plaintiffs, Tati Abu King and Toni Heath Johnson, have lost their right to vote under this provision. They now bring the instant

---

[1] The latest version of the disenfranchisement provision is Article II, § 1 of the Virginia Constitution.

class action under *Ex Parte Young*, 209 U.S. 123 (1908), to enjoin election officials from enforcing Virginia's felon disenfranchisement provision.

Article II, § 1 runs afoul of the Virginia Readmission Act by allowing the Commonwealth to disenfranchise people for crimes that were not "felonies at common law" as defined in 1870. The Court will enjoin its enforcement in ways contrary to the Readmission Act.

## I. <u>INTRODUCTION</u>

Five motions now pend before the Court. First, pursuant to Federal Rule of Civil Procedure 23, the plaintiffs ask to certify a class of current and future Virginia citizens disqualified from voting due to convictions for crimes that were not common-law felonies in 1870. (Pls.' Mot. to Certify Class, ECF No. 149.)  Second, the defendants, a group of election officials,[2] move to

---

[2] The original defendants sued in this matter include: Glenn Youngkin, in his official capacity as Governor of the Commonwealth of Virginia; Kay Cole James, in her official capacity as the Secretary of the Commonwealth of Virginia; John O'Bannon, in his official capacity as Chairman of the State Board of Elections for the Commonwealth of Virginia; Rosalyn R. Dance, in her official capacity as Vice Chair of the State Board of Elections for the Commonwealth of Virginia; Georgia Alvis-Long, in her official capacity as Secretary of the State Board of Elections for the Commonwealth of Virginia; Donald W. Merricks, in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia; Matthew Weinstein, in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia; Susan Beals, in her official capacity as Commissioner of the Department of Elections for the Commonwealth of Virginia; Angie Maniglia Turner, in her official capacity as the General Registrar of Alexandria, Virginia; Taylor Yowell, in her official capacity as the General Registrar of Charlottesville, Virginia; and Shannon Williams, in her official capacity as the General Registrar of Smyth County, Virginia. (Compl., ECF No. 1.)

Due to changes in politically held offices and substitution of parties, the defendants remaining in the case are O'Bannon; Dance; Alvis-Long; Christopher P. Stolle, in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia; J. Chapman Petersen, in his official capacity as a member of the State Board of Elections for the Commonwealth of Virginia; Beals; Eric Spicer, in his official capacity as the General Registrar of Fairfax County, Virginia; and Sandy C. Elswick, in her official capacity as the General Registrar of Smyth County, Virginia. (Second Amend. Compl., ECF No. 96.); *see* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending."). As discussed within this opinion,

exclude two expert witnesses that King and Johnson offer under Federal Rule of Evidence 702. (Defs.' Mots. to Exclude Expert Test., ECF Nos. 143, 145.) Finally, both parties have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Pls.' Mot. for Summ. J., ECF No. 151, and Defs.' Mot. for Summ. J., ECF No. 147.)

For the reasons stated below, the Court will rule on these motions as follows: First, the Court will certify the plaintiffs' cohesive class because it satisfies Rule 23's requirements. Second, the Court will deny the defendants' motions to exclude because the plaintiffs' experts offer reliable evidence, and the Court can easily determine what weight to give such evidence. Finally, the Court will grant summary judgment in favor of the plaintiffs because the Virginia Constitution's felon disenfranchisement provision conflicts with the Virginia Readmission Act.

Accordingly, the Court will enter an injunction prohibiting the defendants from disenfranchising anyone unless they have a conviction for a common-law felony as defined in 1870: (1) arson; (2) burglary; (3) escape and rescue from a prison or jail; (4) larceny; (5) manslaughter; (6) mayhem; (7) murder; (8) rape; (9) robbery; (10) sodomy; and (11) suicide.[3]

## II. BACKGROUND

### A. Factual Background

After its military victory in the Civil War, the federal government sought to politically reunite the Union and former Confederacy. But Southern states resisted assuring rights for Black

---

defendants Governor Youngkin and Secretary of the Commonwealth of Virginia Kelly Gee were dismissed from the suit.

[3] This list does not suggest that Virginia can or still does punish all these crimes. For example, the Supreme Court has struck down laws against consensual sodomy as unconstitutional. *See Lawrence v. Texas*, 539 U.S. 558 (2003). Although suicide remains a common-law crime in Virginia, the Commonwealth no longer punishes it with "forfeiture of estate." Va. Code § 55.1-103. Nor does this list *require* Virginia to disenfranchise anyone for these crimes. Instead, this list simply reflects what "felonies at common law" meant in 1870.

Americans. *See* Joint Comm. on Reconstruction, H.R. Rep. No. 39-30, 39th Cong., 1st Sess., pt. II, at 35 (1866). As a Virginia sheriff testified in 1866, state legislators were "passing vagrant laws on purpose to oppress" Black people. *Id.*

Against this backdrop, Congress passed the Military Reconstruction Act ("the MRA") on March 2, 1867. Reconstruction Act of March 2, 1867, ch. 153, 14 Stat. 428, 428–29 (1867). That Act mandated that former Confederate states, like Virginia, comply with certain conditions before Congress would readmit them. *Id.* at 429. One condition required that the "rebel States" form a republican constitution drafted by elected delegates. *Id.* The MRA set out exacting qualifications for who could elect delegates: "male citizens of said State, twenty-one years old and upward, of whatever race, color, or previous condition, who have been resident in said State for one year." *Id.* Even if a person had all these qualifications, a state could still "disenfranchise[]" him "for participation in the rebellion *or for felony at common law*." *Id.* (emphasis added). Another condition required that the state's new constitution allow the "elective franchise" for "all such persons as have the qualifications herein stated for the electors of delegates." *Id.*

By 1869, Virginia adopted a new Constitution. That Constitution granted the franchise to "every male citizen" who had lived in Virginia for a requisite period. Va. Const. of 1869, art. III, § 1. The Constitution also allowed the disenfranchisement of (1) "Idiots and lunatics"; (2) "Persons convicted of bribery in any election, embezzlement of public funds, treason or felony"; (3) persons who participated in dueling; and (4) certain officials in the former Confederacy. *Id.*

On December 6, 1869, President Ulysses S. Grant informed Congress that Virginia's new constitution complied with the MRA. *See* Cong. Globe, 41st Cong., 2nd Sess. 325 (1870). In

4

1870, Congress passed the Virginia Readmission Act, which became law.[4]    That Act certified

that Virginia's Constitution upheld the republican ideals of the nation.  *Id.*  It further readmitted

Virginia to Congress dependent on certain "fundamental conditions."  *Id.*  For purposes of this

case, the most relevant condition reads as follows:

> First, That the Constitution of Virginia shall never be so amended or changed as to
> deprive any citizen or class of citizens of the United States of the right to vote who
> are entitled to vote by the Constitution herein recognized, except as a punishment
> for such crimes as are now felonies at common law, whereof they shall have been
> duly convicted under laws equally applicable to all the inhabitants of said State.

*Id.*

Over the years, Virginia amended its Constitution.  The amendments of 1876 sought to

dilute the voting strength of former slaves by adding a poll tax and disenfranchising those

convicted of petit larceny.  *See* Acts and Joint Resolutions Passed by the General Assembly of the

State of Virginia at the Session of 1875–76, at 88 (1876).

In 1902, Virginia again restricted the class of people entitled to vote.  The new 1902

Constitution disenfranchised "persons convicted after the adoption of this Constitution, either

within or without this State, of treason, or of any felony, bribery, petit larceny, obtaining money

or property under false pretenses, embezzlement, forgery, or perjury." Va. Const. of 1902, art. II,

§ 23.  The members of the Constitutional Convention made clear their discriminatory purpose.

One leading member of the Convention said the 1902 Constitution aimed at "the elimination of

every negro voter who can be gotten rid of, legally, without materially impairing the numerical

strength of the white electorate."  2 Report of the Proceedings and Debates of the Constitutional

Convention: State of Virginia 3076–77 (J.H. Lindsay ed., 1906).  And when Virginia overhauled

---

[4] The official name of the Virginia Readmission Act is "An Act to Admit the State of
Virginia to Representation in the Congress of the United States."  Act of Jan. 26, 1870, ch. 10, 16
Stat. 62, 63 (1870).

its Constitution in 1928, it largely retained the 1902 disenfranchisement provision. *See* Va. Const. of 1928, art. II, § 23.

The last change to Virginia's felon-disenfranchisement clause occurred in 1971. That year, Virginians approved a new constitution with the broadest possible language:

> No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority.

Va. Const. art. II, § 1. The 1971 provision remains the law.

In short, Virginia prohibits all federal and state felons from voting unless the Governor or other appropriate authority restores their rights. (Defs.' Resps. to Second Reqs. for Admis., ECF No. 153-5, at 2–9.) To accomplish this, Virginia election officials maintain a "prohibited table" that contains 300,000 individuals.[5] The Virginia State Police and the U.S. Attorneys' Offices report all people recently convicted of felonies to these election officials. (Decl. of Commissioner of Elections, ECF No. 153-6, at 1.) Based on these records, local registrars cancel the voter registration of any person who lives in their jurisdiction and was convicted of a felony. (*Id.*, at 2.) If a person on the prohibited table attempts to register, registrars "will deny the registration." (*Id.*)

In determining what convictions prohibit registration, these officials "do not make any distinction between 'common law' felonies or non-'common law felonies.'" (Defs.' Resps. to First Interrogs., ECF No. 153-1, at 1.) Instead, officials define "felony" as the Virginia Code and United States Code define it. (*See* Defs.' Resps. to Second Reqs. for Admis., ECF No. 153-5, at 2–9.)

---

[5] (Decl. of Commissioner of Elections, ECF No. 153-6, at 1–2; Defs.' Resps. to First Reqs. for Admis., ECF No. 150-7, at 5.) Although they admit that the prohibited table includes 300,000 records, the defendants contest that this means 300,000 current residents cannot vote due to felon disenfranchisement. (Defs.' Resps. to First Reqs. for Admis., ECF No. 150-7, at 5.)

The plaintiffs cannot vote because of Virginia's felon disenfranchisement provision. In 2018, King was convicted of possession of a controlled substance with intent to distribute, in violation of Va. Code § 18.2-248. (King Decl., ECF No. 152-3, at 1.) Although otherwise eligible and willing to vote, King's felony conviction prevents him from doing so. (*Id.*) In 2021, Johnson briefly re-gained the right to vote when the Governor restored her franchise after a previous felony conviction. (Johnson Decl., ECF No. 152-2, at 1.) That same year, though, Johnson again lost the right to vote after three statutory felony convictions: (1) possession of a controlled substance with intent to distribute, in violation of Va. Code § 18.2-248; (2) distribution of a controlled substance, in violation of Va. Code § 18.2-248; and (3) neglect of a child in relation to the controlled substance offenses just described, "for presence of a teen-aged minor in the vicinity of such substances," in violation of Va. Code § 18.2-371.1. (Johnson Decl., ECF No. 152-2, at 1.)

Virginia has around 6.3 million people of voting age, and Black Virginians make up about one-fifth of the voting aged population. (*See* The Sentencing Project Report, ECF No. 153-9, at 65–66.) Despite these demographics, Black people comprise 46% of the total 264,292 disenfranchised Virginians, according to a leading estimate.[6] That estimate also states that the Commonwealth disenfranchises nearly 10% of voting-aged Black Virginians.[7]

### B. Procedural Background

On June 26, 2023, Tati Abu King, Melvin Lewis Wingate, Toni Heath Johnson, and Bridging the Gap in Virginia sued the defendants for violations of the Virginia Readmission Act

---

[6] (*See id.*) The Sentencing Project estimates that 120,606 of the 264,292 disenfranchised Virginians are Black.

[7] (*Id.*, at 66.) The Sentencing Project estimates that 1,226,106 Black Virginians are old enough to vote, but that 120,606 may not do so because of a felony conviction.

under 42 U.S.C. § 1983 (Count One) and under principles of federal equity and *Ex Parte Young* (Count Two). (Compl., ECF No. 1 ¶¶ 89–117.) On August 17, 2023, the defendants filed a motion to dismiss for failure to state a claim and for lack of jurisdiction. (Defs.' First Mot. to Dismiss, ECF No. 53.)

King, Johnson, and Bridging the Gap[8] filed an amended complaint on August 31, 2023. (*Id.*) In their amended complaint, the plaintiffs asserted that the defendants violated the Virginia Readmission Act under 42 U.S.C. § 1983 (Count One); the Virginia Readmission Act under principles of federal equity and *Ex Parte Young* (Count Two); the Eighth Amendment under 42 U.S.C. § 1983 (Count Three); and the Eighth Amendment under principles of federal equity and *Ex Parte Young* (Count Four). (First Amend. Compl., ECF No. 58 ¶¶ 89–147.) The defendants filed another motion to dismiss for failure to state a claim and lack of jurisdiction. (Defs.' Second Mot. to Dismiss, ECF No. 76.)

On March 18, 2024, the Court granted in part and denied in part the second motion to dismiss. (Op. and Order, ECF Nos. 88, 89.) It dismissed Bridging the Gap from the suit for lack of standing and dismissed Counts One, Three, and Four entirely. (Order, ECF No. 89, at 2.) Accordingly, King and Johnson's claim in Count Two—the claim for equitable relief under *Ex Parte Young* against all defendants—survived. (*See id.*) The plaintiffs then filed their second amended complaint. (Second Amend. Compl., ECF No. 96.)

On March 27, 2024, the defendants appealed the Court's partial denial of the motion to dismiss. (Transmission of Notice of Appeal, ECF No. 95.) On December 5, 2024, the United States Court of Appeals for the Fourth Circuit affirmed the Court's Order allowing Count Two to

---

[8] Wingate did not join the first amended complaint, and the Clerk terminated him from the case. (First Amend. Compl., ECF No. 58.)

proceed as to all defendants but Governor Youngkin and Secretary Gee.[9]  The Fourth Circuit instead concluded that Youngkin and Gee lacked enforcement responsibility for the felon disenfranchisement provision and, therefore, should have been dismissed.  (Op. of the Fourth Circuit, ECF No. 99, at 17.)

On July 18, 2025, the defendants moved to exclude the evidence of the plaintiffs' two expert witnesses, (Defs.' Mots. to Exclude Expert Test., ECF Nos. 143, 145), and filed a motion for summary judgment, (Defs.' Mot. for Summ. J., ECF No. 147).  That same day, the plaintiffs filed their motions for class certification, (Pls.' Mot. to Certify Class, ECF No. 149), and summary judgment, (Pls.' Mot. for Summ. J., ECF No. 151).  These motions are ripe.

On October 23, 2025, the Court held a hearing on the instant motions.  (Min. Entry, Hr'g, ECF No. 181.)  Following that hearing, the Court ordered the parties to file briefs addressing what crimes are disqualifying felonies at common law and what form an injunction should take in this case.  (Order, ECF No. 182.)  The parties filed their supplemental briefs by December 6, 2025.[10]

---

[9] The defendants appealed this decision to the Supreme Court, which denied certiorari. (Appeal Remark, ECF No. 139.)

[10] When responding to the Court's Order, the defendants filed a Notice of Constitutional Questions pursuant to Federal Rule of Civil Procedure 5.1.  (Notice, ECF No. 200.)  This document noticed the United States that a "paper" in a lawsuit had challenged the constitutionality of a federal statute. *See* Fed. R. Civ. P. 5.1(a).

Per Rule 5.1, the Court certified the question to the Attorney General of the United States without deciding whether the questions were timely raised, whether the questions were earlier waived, or whether the questions were otherwise lost.  At the time, the Court expressed no opinion on the validity of these constitutional claims.  (Order, ECF No. 202); *see* Fed. R. Civ. P. 5.1(b).

The United States had 60 days, or until January 20, 2026, to intervene.  Fed. R. Civ. P. 5.1(c).  The United States, however, did not move to intervene.  Instead, the federal government filed an "acknowledgement" stating it had not determined whether to intervene and requesting an additional 60 days to decide on intervention pending the Court's ruling on the constitutional questions raised.  (Notice, ECF No. 221.)  Because the United States did not move to intervene

9

## III. CLASS CERTIFICATION

King and Johnson seek to certify the following class:

> All citizens of the Commonwealth of Virginia who are currently, or in the future will be, disqualified from voting under Article II, Section 1 of the Virginia Constitution because they were convicted of a crime that was not a felony at common law in 1870.

(Pls.' Mot. to Certify Class, ECF No. 149, at 2.)  The defendants, in turn, ask the Court to deny certification because individualized issues allegedly overrun the efficiencies of this class action. (Defs.' Mem. in Opp'n to Mot. to Certify Class, ECF No. 161, at 1.)  Because the proposed class satisfies all Rule 23 requirements, the Court will certify the class as the plaintiffs define it.

### A. Legal Standard for Class Actions

A class action serves as a vehicle to resolve cases where the large "number of those interested in the subject of the litigation" renders the "usual rules of procedure . . . impracticable." *Hansberry v. Lee*, 311 U.S. 32, 41 (1940).  Given the difficulties of joining many interested plaintiffs, class actions allow "a representative party to prosecute his own claims and the claims of those who present similar issues." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006).  Allowing a named plaintiff to represent absent parties "is an exception to the general rule that a party . . . may vindicate only his own interests." *Id.* (citation omitted).  Because named plaintiffs can bind the rights of many absent class members at defendants' great expense, a class action may proceed only when it adheres to the rigorous requirements of Federal Rule of Civil Procedure 23. *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011).

Rule 23 permits an action to proceed if it (a) satisfies certain enumerated prerequisites and (b) falls into a category of lawsuit for which a group remedy most neatly resolves the alleged harm.

---

within the time period prescribed by the Federal Rules, *see* Fed. R. Civ. P. 5.1(c), the Court need not take further action on the defendants' Notice of Constitutional Questions.

*See* Fed. R. Civ. P. 23(a), (b). Rule 23(a) imposes four prerequisites: (1) A group so numerous that joinder is impracticable; (2) questions of fact or law common to the class; (3) class representatives with claims or defenses typical of the class; and (4) named plaintiffs who can fairly and adequately protect the class's interests. Fed. R. Civ. P. 23(a)(1)–(4).

Even if an action satisfies Rule 23(a), a court may not certify the class unless the case falls into a category described in Rule 23(b). Two categories are relevant to the instant case. The first consists of cases which would risk "inconsistent or varying adjudications . . . that would establish incompatible standards" for opponents of the class if individual class members brought separate suits. Fed. R. Civ. P. 23(b)(1)(A). The second category consists of cases in which "a single injunction or declaratory judgment would provide relief to each member of the class."[11]

The Fourth Circuit sometimes requires an overarching, implied Rule 23 prerequisite—"ascertainability." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (collecting cases) (citations omitted). "Ascertainability" means "that the members of a proposed class be 'readily identifiable'" through objective criteria.[12]

---

[11] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011); *see* Fed. R. Civ. P. 23(b)(2).

[12] *Id.* (citations omitted). As explained below, the parties dispute whether ascertainability even applies in this case. Indeed, the Fourth Circuit has said that an ascertainability requirement does not apply in cases that seek "only declaratory and injunctive relief" from government action. *Kadel v. Folwell*, 100 F.4th 122, 161 (4th Cir. 2024) (en banc), *cert. granted, judgment vacated, and remanded on other grounds*, 145 S. Ct. 2838 (2025) (Mem.). Although the defendants contend that *Kadel* no longer has force, the Court need not reach that issue because it finds the class ascertainable regardless.

### B. Rule 23 Discussion

#### 1. Rule 23(a) Analysis

Here, the parties agree that the number of class members exceeds the number that renders joinder impracticable.[13]  The parties diverge on the remaining three prerequisites: commonality, typicality, and adequacy.  As explained below, the proposed class satisfies the Rule 23(a) factors.

#### a. Commonality

A certified class must have common questions of law or fact.  Fed. R. Civ. P. 23(a)(2).  A class satisfies commonality when its members "have suffered the same injury" and present a common "question" central to the validity of the class's claims.  *Dukes*, 564 U.S. at 350, 359.  Accordingly, commonality does not preclude the existence of questions particular to each class member.  Indeed, a "single common question will suffice" when the question "will resolve an issue that is central to the validity of each one of the claims in one stroke." *EQT Prod.*, 764 F.3d at 360 (citation omitted).

Here, commonality exists.  The class has suffered the same alleged injury—disenfranchisement.  Further, members' claims succeed or fail on at least one common legal

---

[13] (Joint Stipulation Regarding Fed. R. Civ. P. 23(a)(1), ECF No. 137, at 2); Fed. R. Civ. P. 23(a)(1).  King and Johnson contend that the class contains at least 300,000 members, but the defendants dispute whether all those individuals fall into the class.  *Compare* (Pls.' Mem. in Supp. of Mot. to Certify Class, ECF No. 150, at 2) (describing the number), *with* (Defs.' Mem. in Opp'n to Mot. to Certify Class, ECF No. 161, at 12 n.1) (disputing that number).  The defendants concede, however, that classes "of one hundred or less have been held to satisfy the numerosity requirement." (Defs.' Mem. in Opp'n to Mot. to Certify Class, ECF No. 161, at 12 n.1) (citing *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984)).

Whatever the true number of class members, the class satisfies the numerosity requirement.  First, the defendants admit that Virginia's table of prohibited voters has over "300,000 individuals," suggesting a large number of disenfranchised individuals may fall into the class. (Defs.' Resps. to First Reqs. for Admis, ECF No. 150-7, at 5.)  More importantly, though, the defendants have admitted that "the Class contains at least 100 members." (*Id.*)  The Court, therefore, focuses its analysis on the three remaining, disputed factors.

question: whether the Virginia Readmission Act prevents Virginia from disenfranchising voters convicted of crimes that were not felonies at common law in 1870. Accordingly, resolving that legal question will result in "common *answers*" for the whole class. *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 780 (4th Cir. 2023) (emphasis in original) (citation omitted).

Further, the defendants' contention that the class contains multiple discrete questions does not preclude commonality. As discussed, a "single common question" central to the resolution of a claim "will suffice." *EQT Prod.*, 764 F.3d at 360 (citation omitted). Here, the question related to the Virginia Readmission Act clearly cuts to the center of the class's claims. Commonality needs nothing more.

### b. Typicality

Typicality requires that the representative plaintiffs have claims or defenses typical of the proposed class. Fed. R. Civ. P. 23(a)(3). This means "only that the resolution of the common questions affect all or a substantial number of the class members."[14] It does not mean that "the plaintiff's claim and the claims of class members [must] be perfectly identical or perfectly aligned." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006) (alteration added). Accordingly, a representative's claims satisfy typicality when they merely "tend to advance the interests of the absent class members." *Id.* at 466.

Here, King and Johnson have brought claims typical of the class. The representatives' core claim concerns their inability to vote "in Virginia because they were convicted of crimes that were not felonies at common law in 1870." (Second Amend. Compl., ECF No. 96 ¶ 117.) Likewise, the proposed class includes all those who are or will be "disqualified from voting under Article II,

---

[14] *Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009) (quoting *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir. 1993)).

Section 1 of the Virginia Constitution because they were convicted of a crime that was not a felony at common law in 1870." (Pls.' Mot. to Certify Class, ECF No. 149, at 2.) Thus, determining the effect of the Virginia Readmission Act on King and Johnson's disenfranchisement will clearly "affect all or a substantial number of the class members." *Brown*, 576 F.3d at 153. After all, if the Act prohibits Virginia from disenfranchising King and Johnson based on convictions for crimes that were not felonies at common law in 1870, then the Act prevents Virginia from disenfranchising *any* class member on that same basis.

The defendants, however, contend that typicality does not exist because King and Johnson's convictions do not cover every possible felony in the class. The defendants believe all crimes "require *their own* determination as to whether they qualify as common-law felonies." (Defs.' Mem. in Opp'n to Mot. to Certify Class, ECF No. 161, at 9 (emphasis in original).) Under the defendants' theory, King and Johnson's claim does not advance others' claims because proof that the representatives' "three crimes" are or are not common-law felonies proves nothing about other crimes. (*Id.*, at 10.)

This argument misses the mark. As a general matter, class members' claims need not "be perfectly identical." *Deiter*, 436 F.3d at 467. Further, King and Johnson's claim can "advance the interests of the absent class members" if the plaintiffs can show that "felonies at common law" has one meaning to which Virginia must adhere when implementing its disenfranchisement policy as to all class members. *See id.* Accordingly, all class members share an interest in having Virginia define "felonies at common law" and comply with the Virginia Readmission Act.

### c. Adequacy

Adequacy requires that the "representative parties fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). When the named plaintiffs "possess the same

interest and suffer the same injury" as other class members, and when the plaintiffs' counsel can ably represent the class, Rule 23(a)(4) is satisfied. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citation omitted). "To defeat the adequacy requirement of Rule 23, a conflict [of interest] must be more than merely speculative or hypothetical." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (cleaned up) (citation omitted). Indeed, the conflict "must be fundamental" and "go to the heart of their roles as class representatives." *Id.* at 430, 431 (citation omitted).

King and Johnson adequately represent the class. The plaintiffs' lawyers have demonstrated their competence by surviving a motion to dismiss, litigating an interlocutory appeal, and defeating certiorari at the Supreme Court. (*See* Pls.' Mem. in Supp. of Mot. to Certify Class, ECF No. 150, at 7.) More importantly, though, the named plaintiffs and absent class members suffer the same alleged injury: disenfranchisement under Article II, § 1 of the Virginia Constitution. Consequently, they "possess the same interest" in assuring Virginia adhere to any limitations that the Virginia Readmission Act imposes on the Commonwealth's felon disenfranchisement provision. *See Amchem*, 521 U.S. at 625 (citation omitted).

The defendants again argue that the named plaintiffs—"who are subject only to three relevant crimes of conviction on their theory—will not adequately represent all those convicted of *other* crimes." (Defs.' Mem. in Opp'n to Mot. to Certify Class, ECF No. 161, at 11 (emphasis in original).) In essence, the defendants argue that the named plaintiffs lack the incentive to assure as narrow a list of "felonies at common law" as possible, thus sacrificing some class members' franchise for the sake of efficiency. (*See id.*)

This conflict is entirely hypothetical. The plaintiffs have argued for a narrow list of common-law felonies, aligning their interests with absent class members. Put simply, the

15

defendants have pointed to nothing more than a "speculative [and] hypothetical conflict" insufficient to defeat adequacy. *See Gunnells*, 348 F.3d at 430 (cleaned up) (citation omitted).

### 2. *Rule 23(b) Analysis*

Next the Court must assess whether the class falls into one of Rule 23(b)'s categories. Because a single injunction would ensure relief for all class members, the Court will certify the class under Rule 23(b)(2).

### a. *Rule 23(b)(2)*

The plaintiffs believe all class members will benefit from an injunction preventing Virginia from disenfranchising them due to convictions for crimes "that were not felonies at common law" in 1870. (Pls.' Mem. in Supp. of Mot. to Certify Class, ECF No. 150, at 9.) Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Supreme Court has explained that the "key to the (b)(2) class is . . . the notion that the [defendants'] conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (citation omitted). Courts generally find Rule 23(b)(2) most applicable in civil rights litigation. *See Amchem*, 521 U.S. at 614 (citation omitted).

The defendants oppose certification under Rule 23(b)(2). They argue that the class lacks "cohesion" because the requested injunctive relief would require the defendants to engage in "thousands" of discrete inquiries to determine which modern felonies were also felonies at common law in 1870. (Defs.' Mem. in Opp'n to Mot. to Certify Class, ECF No. 161, at 13–14.) The defendants also claim the requested injunctive relief is too abstract to satisfy the specificity

16

that an injunction must have under Federal Rule of Civil Procedure 65. (Defs.' Mem. in Opp'n to Mot. to Certify Class, ECF No. 161, at 13–14.)

The plaintiffs correctly apply the law. First, King and Johnson have shown that "the proposed class consists of people affected by the defendants' challenged conduct." *Fraser v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 3:22cv410, 2023 WL 5616011, at *4 (E.D. Va. Aug. 30, 2023). Every class member cannot vote because the Virginia Constitution presently obligates the defendants to disenfranchise all felons. (*See* Va. Dep't of Elections Handbook, ECF No. 150-9, at 10–11 (describing registrars' obligation to remove voters convicted of felonies).) Second, a single injunction would apply "as to all of the class members" by remedying a harm—disenfranchisement based on a conviction of a crime that was not a felony at common law in 1870—that each class member suffered. *Dukes*, 564 U.S. at 360. This satisfies Rule 23(b)(2)'s requirements that the defendants act generally as to the class and that an injunction would affect the whole class.

Further, the Court finds the defendants' arguments concerning a lack of cohesion and specificity unpersuasive. The injunctive nature of the (b)(2) action renders a class "sufficiently cohesive" so long as the class satisfies (b)(2)'s textual requirements. *Thorn*, 445 F.3d at 330 (citation omitted). Courts tend to require a cohesion analysis when a class seeks monetary relief and, therefore, "likely consist[s] of members with divergent interests."[15] In money-based class actions, cohesion protects individual class members by assuring an easy way to discern who must receive "notice and the opportunity to opt-out." *Thorn*, 445 F.3d at 330 n.25 (citation omitted). But because injunctive relief would apply to all class members regardless of notice or their opting

---

[15] *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 413 (5th Cir. 1998); *see Thorn*, 445 F.3d at 330 (quoting *Allison*, 151 F.3d at 412–15).

out, a (b)(2) class is "assumed to be a homogenous and cohesive group with few conflicting interests among its members." *Berry v. Schulman*, 807 F.3d 600, 608–09 (4th Cir. 2015) (quoting *Allison*, 151 F.3d at 413–15). Accordingly, the Court finds the proposed class cohesive because an injunction or declaratory relief would provide a remedy to all class members.[16]

The Court next turns to the defendants' claim that the plaintiffs defined the proposed class at too "high a level of abstraction." (Defs.' Mem. in Opp'n to Mot. to Certify Class, ECF No. 161, at 13, 14.) Federal Rule of Civil Procedure 65(d)(1) requires every injunction to "state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail . . . the act or acts restrained or required." Rule 65's specificity requirements guard against loose injunctions that "are neither easily obeyed nor strictly enforceable, and are apt to be oppressive." *Alberti v. Cruise*, 383 F.2d 268, 272 (4th Cir. 1967) (citation omitted). The defendants describe the proposed class as too vague because "uncertainty" remains "about what crimes qualify" as felonies at common law. (Defs.' Mem. in Opp'n to Mot. to Certify Class, ECF No. 161, at 14.)

---

[16] Relying on a Tenth Circuit case, the defendants further argue that a court should not certify under 23(b)(2) when "redressing the class members' injuries requires time-consuming inquiry into individual circumstances." *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008). Even assuming the Tenth Circuit properly recognized a mandatory cohesion requirement in Rule 23(b)(2), the Court can distinguish *Shook* from the instant case. In *Shook*, a putative class of inmates sued officials to address "a variety" of jail conditions, including "claims for denial of medication, some for lack of supervision, and others for use of excessive force." *Id.* at 602–03. Ultimately, the district court denied class certification under (b)(2) because "there was no single policy or procedure to which [all class members] were subject." *Id.* at 603.

In the instant case, the plaintiffs identify one straightforward policy: felon disenfranchisement. Virginia does not have one policy to disenfranchise murderers and another to disenfranchise drug dealers. Instead, Virginia disenfranchises all felons using the same criteria, a modern definition of "felony." Accordingly, to grant relief to the whole class, the Court needs to impose only one injunction to stop this single policy.

18

The plaintiffs' proposed class, however, is plenty specific. The class includes all current and future Virginians disenfranchised because of a conviction "under a crime that was not a felony at common law in 1870." (Pls.' Mot. to Certify Class, ECF No. 149, at 2.) Of course, the parties dispute the meaning of "felony at common law," but that dispute alone does not render the proposed class abstract or vague. In fact, the Court will define that expression in concrete terms, solving any problem of specificity. *See infra* Part V.B.1.a.ii.

### 3. *Ascertainability*

Finally, the proposed class does not pose an ascertainability problem. In some Rule 23 cases, the Fourth Circuit has recognized "an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *See EQT Prod.*, 764 F.3d at 358 (citations omitted). Under this "ascertainability requirement," a court may certify a class when it can identify class members by referring to "objective criteria." *Id.* (citations omitted). In analyzing ascertainability, a court aims "not to identify every class member at the time of certification, but to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member at some point.'" *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019) (quoting *EQT Prod.*, 764 F.3d at 358).

The parties dispute whether ascertainability applies at all in this case. Regardless, the proposed class meets that requirement. The Fourth Circuit has stated that ascertainability simply requires "objective criteria" through which someone can identify the class. *EQT Prod.*, 764 F.3d at 358 (citations omitted). Here, if the Court arrives at a set definition of what crimes were common-law felonies in 1870, one can objectively determine who falls into the class by comparing modern felonies with the common-law felonies of 1870.

For these reasons, the Court will certify the class under Rule 23(b)(2).[17]

## IV. <u>EXPERT WITNESS EVIDENCE</u>

The plaintiffs proffer two expert witnesses, Prof. Carissa Hessick and Prof. Edward Ayers. The defendants move to exclude both. For the reasons stated from the bench and discussed below, the Court will deny the defendants' motions to exclude and accept both proffered expert witnesses.

A finding of admissibility, however, does not mean that the Court must give the expert's opinion any weight; after all, this case presents few, if any, factual disputes. The core question involves the legal effect of the Virginia Readmission Act. The Court's decision on that issue does not depend on any factual evidence offered by the expert witnesses, but rather on the Court's independent legal analysis.

### A. Legal Standard for Admitting Experts

Courts have "great flexibility with regard to the evidence that may be used on a [summary judgment] proceeding." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (alteration in original) (citation omitted). Federal Rule of Evidence 702 governs the admissibility of expert witnesses. Rule 702 permits expert evidence "in the form of an opinion or otherwise" by—

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education . . . if:

---

[17] The plaintiffs alternatively move for certification under Rule 23(b)(1)(A). Because the class satisfies (b)(2), the Court need not provide a fulsome analysis of why the class satisfies (b)(1)(A). Nevertheless, the Court also concludes that the class meets these requirements. That Rule requires that individual lawsuits "would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Here, multiple suits concerning the Virginia Readmission Act could result in inconsistent judgments for the defendants. If two people with the same felony conviction brought the same preemption claim to different courts, different judgments could create inconsistent obligations.

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A court may admit accordingly an expert report "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury *or other trier of fact* to understand or resolve a fact at issue." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999) (emphasis added) (citation omitted). Because "[e]xpert witnesses have the potential to 'be both powerful and quite misleading,'" Rule 702 "imposes a special gatekeeping obligation on the trial judge."[18]

In fulfilling this gatekeeping function, the Court must "ensure that [expert] testimony is not only relevant, but reliable."[19] "Relevant evidence, of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Nease*, 848 F.3d at 229 (citation omitted). The Fourth Circuit has outlined a detailed framework for assessing the reliability of expert evidence:

> Reliability is a "flexible" inquiry that focuses on "the principles and methodology" employed by the expert. . . . [F]our, non-exhaustive "guideposts" [] aid in the required reliability analysis: (1) whether the expert's theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of expertise. . . . But this list "neither necessarily nor exclusively applies to all experts or in every case," as the relevance of some factors

---

[18] *Brainchild Surgical Devices, LLC v. CPA Global Lmtd.*, 144 F.4th 238, 245 (4th Cir. 2025) (citing *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017), and *Westberry*, 178 F.3d at 261).

[19] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 137, 147 (1999); *see also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021) ("To satisfy its gatekeeping duty . . . , the court must make an explicit reliability finding") (citation omitted).

can "depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony."

*Sardis*, 10 F.4th at 281 (cleaned up) (citations omitted).

Ultimately, the court possesses "broad latitude" to consider any "factors bearing on validity that the court finds to be useful," *Westberry*, 178 F.3d at 261, and the scope of the gatekeeping inquiry "depend[s] upon the particular expert testimony and facts of the case," *E.E.O.C. v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015) (citation omitted).

But the Rule 702 standard relaxes when a judge serves as the trier of fact in a bench trial. Because the central concern of Rule 702—keeping unreliable expert testimony from the jury—vanishes in a bench trial, the trial court's gatekeeping function in such a setting "is much less critical . . . because there is little danger of prejudicing the judge, who can, after hearing the expert's testimony or opinion, determine what, if any, weight it deserves."[20]

### B. Expert Evidence Discussion

#### 1. Hessick

Carissa Hessick, a professor at the University of North Carolina School of Law, describes herself as an "expert on the history of common law crimes and substantive criminal law." (Hessick Decl., ECF No. 153-3, at 2.) Hessick analyzes the history of Reconstruction and concludes that the law of the Reconstruction Era distinguished between common law felonies and statutory ones. (*Id.*, at 3.) From this premise, Hessick offers a definition of "felonies at common law" and compiles a list of such felonies at the time of Reconstruction. (*Id.*) Hessick then uses comparative

---

[20] *Trauernicht v. Genworth Fin., Inc.*, No. 3:22cv532, 2024 WL 3996019, at *3 (E.D. Va. Aug. 29, 2024) (cleaned up) (citations omitted); *see also Herndon v. Huntington Ingalls Indus., Inc.*, No. 4:19cv52, 2020 WL 5809965, at *4 (E.D. Va. Aug. 28, 2020) ("Rule 702 still applies in bench trials, but 'the Court has increased discretion in how to perform its gatekeeping role'" (citations omitted)).

techniques to categorize Virginia's modern felonies as common law felonies or not common law felonies, according to whether today's crimes descend from Reconstruction Era common law felonies. (*Id.*)

The defendants dispute the relevancy and reliability of Hessick's evidence.[21]  First, the defendants argue that the Court must exclude Hessick's evidence because she offers an inadmissible legal conclusion by defining the phrase "felonies at common law" in the Virginia Readmission Act. (Defs.' Mem. in Supp. of Mot. to Exclude, ECF No. 144, at 5.)  Second, the defendants argue that Hessick used an unreliable methodology in her report because she could not classify some modern felonies, and her first-of-its-kind analysis made peer review difficult. (*Id.*, at 10–14.) The plaintiffs dispute all of this. (*See generally* Pls.' Resp. in Opp'n to Mot. to Exclude, ECF No. 164.)

The defendants' concerns come to naught.  Hessick offers a reliable analysis generated largely by traditional, primary-source historical research. (Hessick Decl., ECF No. 153-3 ¶¶ 8–17.) Moreover, Hessick's conclusions do not affect the result in this case: The Court has reached its own conclusion about the law.  Again, the Rule 702 inquiry here "is much less critical . . . because there is little danger of prejudicing" the Court sitting as both trier of fact and law—and the Court, which has now heard "the expert's testimony or opinion," has determined it has no effect on the Court's legal analysis. *See Trauernicht*, 2024 WL 3996019, at *3 (cleaned up) (citation omitted).  Accordingly, the Court accepts Hessick as an expert witness.

---

[21] The defendants also challenge Hessick's qualifications to testify as an expert in legal history because she serves as "a law professor, not a history professor," and does not have a history degree. (Defs. Mem. in Supp. of Mot. to Exclude, ECF No. 144, at 9.)  Because Hessick's academic publications establish her expertise in the history of criminal law, (Hessick Decl., ECF No. 153–3, Ex. A (Hessick *curriculum vitae*)), and because the Federal Rules explicitly allow an expert to be qualified based on knowledge or education, *see* Fed. R. Evid. 702, the Court finds this line of argument unpersuasive.

## 2. *Ayers*

Edward Ayers, a professor at the University of Richmond, describes himself as an "expert in American history, including the history of Reconstruction." (Ayers Decl., ECF No. 153-2, at 2.) His expert report asserts that the Virginia Readmission Act reflected Congress's intent to stop Virginia from modifying its criminal code to disenfranchise Black Virginians. Ayers examines Virginia's past Constitutions and details the motivations behind legislatures' amendatory efforts. Through this analysis, Ayers opines that the word "felony" in Virginia's 1869 Constitution meant "felonies at common law." (*Id.*, at 3–4.)

As with Hessick, the defendants contend that Ayers presents an inappropriate legal conclusion on the meaning of the disenfranchisement provision in Virginia's Constitution. (Defs.' Mem. in Supp. of Mot. to Exclude, ECF No. 146, at 5.) The defendants further label Ayers's evidence irrelevant because it focuses on "racial discrimination in the south," and "[p]laintiffs are not bringing a racial-discrimination claim" or claims involving other states' regimes. (*Id.*, at 1, 3.) The defendants also question Ayers's methodology. (*Id.*, at 6.) As with Hessick, the plaintiffs defend Ayers's methodology and maintain he "provides relevant historical expert testimony" "widely recognized as valuable" to courts. (Pls.' Resp. in Opp'n to Mot. to Exclude, ECF No. 163, at 1, 5, 10.)

The Court's analysis of Hessick's relevance applies with equal force here. To the extent the Court has relied on Ayers's offerings, they have merely provided a largely undisputed context of Congress's concerns about the expected legal shenanigans of the readmitted states: Ayers comments on the legal and political regime in place during the Reconstruction Era, colored by unsurprising discriminatory motivations. An expert may meet Rule 702's relevancy requirement even if he or she offers a legal conclusion. *See United States v. Offill*, 666 F.3d 168, 175 (4th Cir.

2011). The Court acknowledges that Ayers considers racial history in and beyond the Commonwealth's borders. (*See, e.g.*, Defs.' Mem. in Supp. of Mot. to Exclude, ECF No. 146-1 ¶¶ 46, 81.) But again, "because there [is] 'little danger' of prejudicing the judge," the Court can determine what weight this portion of Ayers's evidence deserves in resolving any factual disputes. *See Trauernicht*, 2024 WL 3996019, at *3.

Finally, the Court rejects the defendants' allegations that Ayers departed from his "normal methodology" in preparing for this case. Ayers consulted with and cited to a variety of historical sources. Ayers further detailed his reliable methodology, at length, during a deposition.[22] The defendants could have offered their own expert criticizing Ayers's methods and objecting to his conclusions, but chose not to do so. The absence of any rebuttal speaks worlds about the validity of the defendants' quibbles.

The Court will overrule the objections to the declarations of both Hessick and Ayers.

## V. <u>SUMMARY JUDGMENT</u>

Finally, both sides move for summary judgment in this case. King and Johnson argue that Virginia's Constitution violates the Virginia Readmission Act by disenfranchising people for non-common law felonies. The defendants contend that Virginia's Constitution exists in harmony with the Readmission Act.[23] Because the plaintiffs correctly interpret the Virginia Readmission Act,

---

[22] *See, e.g.*, (Ayers Dep., ECF No. 146-2, at 26:1–38:1 (describing the preparation of his report, the form of historical research undertaken, and the primary and secondary sources surveyed), 138:16–147:16 (describing Ayers's "normal method" for determining the definition of an unknown term, and how that method does not apply to familiar, known terms).)

[23] The defendants also re-assert several arguments previously rejected by this Court: (1) that the political question doctrine bars the plaintiffs' claim; (2) that *Ex Parte Young* does not provide the plaintiffs a legitimate cause of action; and (3) that sovereign immunity bars the plaintiffs' claim. *See King v. Youngkin*, 3:23cv408, 2024 WL 1158366, at *4–*9 (E.D. Va. Mar. 18, 2024) (rejecting these various arguments). The Court will not revisit its prior analysis in depth. Rather, the Court rejects those arguments for the reasons set forth in its previous opinion. *Id.*

and the law entitles them to injunctive relief, the Court will grant the plaintiffs' motion for summary judgment; deny the defendants' motion for summary judgment; and enter an injunction permitting the defendants to disenfranchise people only for the following felonies at common law: (1) arson; (2) burglary; (3) escape and rescue from a prison or jail; (4) larceny; (5) manslaughter; (6) mayhem; (7) murder; (8) rape; (9) robbery; (10) sodomy; and (11) suicide.

### A. Legal Standard for Summary Judgment

Courts grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding summary judgment motions, courts must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where parties file cross-motions for summary judgment, courts consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Capitol Prop. Mgmt. Corp. v. Nationwide Prop. & Cas. Ins. Co.*, 261 F. Supp. 3d 680, 687 (E.D. Va. 2017) (cleaned up).

Here, the plaintiffs seek equitable relief under *Ex Parte Young*. *King*, 122 F.4th at 543. On such a claim, courts may grant relief from state-level regulation conflicting with federal law. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326 (2015). Accordingly, to prevail on

---

Curiously, the defendants also contend that "the Fourth Circuit did not rule on whether Plaintiffs have a cause of action to proceed on their remaining claim." (Defs.' Mem. in Supp. of Mot. for Summ. J., ECF No. 148, at 9.) But the Fourth Circuit acknowledged that the plaintiffs may properly seek injunctive relief under *Ex Parte Young*. *King v. Youngkin*, 122 F.4th 539, 544 n.1 (4th Cir. 2024) ("[T]he Supreme Court has since clarified that *Ex Parte Young* is a 'judge-made remedy' that stems from courts' power to grant equitable relief." (citation omitted)); *id.* at 546–47 ("'The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.' . . . *We conclude, however, that the Virginia Readmission Act creates no such limitations.*" (emphasis added) (citation omitted)).

summary judgment, King and Johnson must demonstrate (1) that Virginia's felon disenfranchisement policy conflicts with the federal Virginia Readmission Act and (2) that they are entitled to an injunction.

Federal law prevails when state and federal law conflict. U.S. Const. art. VI, cl. 2. A state law conflicting with federal law "is 'without effect'" under the Constitution's Supremacy Clause. *AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120, 125 (4th Cir. 2008) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)). Most relevant here,[24] a conflict occurs when Congress specifies its intent to supersede state law or when "compliance with both federal and state regulations is impossible." *N. Va. Hemp and Ag., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025). Finding a conflict is a matter of statutory interpretation. *See Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981) (citing *Perez v. Campbell*, 402 U.S. 637, 644 (1971)).

Even if the Virginia Readmission Act preempts the Virginia Constitution, the plaintiffs may secure relief only if the law entitles them to an injunction. To secure a permanent injunction, the plaintiffs must demonstrate "(1) that [they have] suffered an irreparable injury; (2) that

---

[24] Federal and state law can conflict in at least three ways: express preemption, field preemption, and conflict preemption. *See Decohen v. Capital One, N.A.*, 703 F.3d 216, 223 (4th Cir. 2012). Congress expressly preempts by explicitly stating its intent to supersede state law. *Id.* Field preemption occurs when Congress so thoroughly regulates a certain area "that there is no room left for the states to supplement federal law." *Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir. 1997) (citation omitted). Finally, conflict preemption occurs when a person cannot obey both state and federal law at once. *Decohen*, 703 F.3d at 223.

King and Johnson do not specify a theory of preemption on which they rely. Their second amended complaint alleges that the "Virginia Readmission Act explicitly and unambiguously forbids Defendants from enforcing Article II, Section 1 of the Virginia Constitution." (Second Amend. Compl., ECF No. 96 ¶ 119.) Based on this language, the Court understands their claim as one either of express preemption or conflict preemption. The plaintiffs succeed on either theory.

remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### B. Discussion

To resolve the summary judgment motions, the Court must first consider whether the Virginia Readmission Act conflicts with Virginia's Constitution. The Court then must consider whether the law entitles the plaintiffs to injunctive relief. Finally, the Court must determine whether it may constitutionally order injunctive relief in this case. The Court addresses each of these analyses in turn.

#### 1. *Supremacy of the Virginia Readmission Act*

The Virginia Readmission Act means what it says: Virginia cannot amend its Constitution to disenfranchise citizens except as "punishment for such crimes as" were then "felonies at common law" in 1870. Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870). If its amended Constitution disenfranchises someone for any other reason, the Commonwealth violates the Act. Any other reading ignores ordinary meaning and contravenes statutory structure. Virginia has amended its constitutional disenfranchisement provision, or adopted entirely new constitutions, at least four times. Each change disenfranchised people for reasons other than common-law felonies. Consequently, insofar as Article II, § 1 of the Virginia Constitution disenfranchises people for crimes that were not felonies at common law in 1870, it contravenes the Virginia Readmission Act's text.

### a. Interpreting the Virginia Readmission Act

As relevant here, the Virginia Readmission Act provides that:

> [T]he State of Virginia is admitted to representation in Congress as one of the States of the Union upon the following fundamental conditions: First, That the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the [Virginia] Constitution [of 1869], except as a punishment for such crimes as are now felonies at common law . . . .

Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870) (alterations added) .

As always, the Court starts its interpretation with "the language of the statute itself." *Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012) (citation omitted). Such language generally carries a plain meaning "fixed at the time of enactment." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). And although the text's plain meaning usually controls, that meaning cannot "contradict legislative intent or purpose." *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) (citing Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012)). Accordingly, the Court may consider the Virginia Readmission Act's text, structure, and purpose.

### i. Limiting Virginia's Authority to Amend its Constitution

The Virginia Readmission Act plainly states that the Commonwealth's Constitution "shall never be so amended or changed" as to take away the franchise from anyone who had the right to vote in 1869, "except as a punishment for such crimes as are now [in 1870] felonies at common law." Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870) (alteration added). In 1902 and 1971, Virginia adopted entirely new constitutions. These constitutions disenfranchised all felons, not just those convicted of felonies at common law as they existed in 1870. Accordingly, those amendments deprived citizens of the right to vote in contravention of the Virginia Readmission Act.

29

Plain textual analysis underscores this point. Congress's use of the phrase "as are *now felonies at common law*" confirms that this statute meant to place a ceiling on Virginia's authority over the franchise. *Id.* (emphasis added). First, Congress placed a temporal limitation on Virginia's authority, suggesting a curtailment on the Commonwealth's power to disenfranchise. Further, the text opts for a more restrictive number of felonies—those only at common law—for which Virginia may disenfranchise citizens. By 1870, the law had long recognized at least two categories of felony: the statutory felony and the common-law felony.[25] Accordingly, Congress could have opted for a more expansive meaning by allowing disenfranchisement for all felonies. Instead, the legislature only permitted disenfranchisement for a narrower subset. Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870). Generally, the use of a narrow term over "more open-ended formulations" indicates a narrower reading. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001).

The defendants read the "except" clause as conferring a power on Virginia. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J., ECF No. 148, at 14.) They contend that Congress approved Virginia's Constitution of 1869, which allowed the disenfranchisement of "persons convicted of . . . [a] felony." Va. Const. of 1869, art. III, § 1 (alteration added). From this approval, the defendants infer that Congress adopted *Virginia's* definition of a felony that could disenfranchise

---

[25] American law explicitly recognized this distinction by the 1850s. *See United States v. Staats*, 49 U.S. 41, 45 (1850) (describing that the law requires "the averment of a felonious intent in all indictments for felony at common law; and, also, *in many cases when made so by statute*" (emphasis added)). Further, this distinction appears even before the American Revolution. For instance, Blackstone recognized a difference between judge-made and Parliament-made felonies. *See, e.g.*, 4 William Blackstone, Commentaries on the Laws of England 205–07 (1770) (describing distinctions between mayhem as a common-law felony and statutory felony).

citizens.[26]  According to the defendants, the "operative term 'felony[]' was defined at the time as '[a]n offence punishable by death, or by imprisonment in the state prison.'" (Defs.' Mem. in Supp. of Mot. for Summ. J., ECF No. 148, at 14 (quoting 2 Alexander Burrill, A New Law Dictionary and Glossary 478 (1850).)  On that theory, the defendants read the Virginia Readmission Act to "permit[] Virginia to disenfranchise" people convicted of a crime punishable by death or time in the state penitentiary *and* "to disenfranchise 'any citizen or class of citizens' convicted of a crime that was a felony at common law." (*Id.* (quoting Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870)).)

The defendants' reading, however, misses a crucial piece of context: the Military Readmission Act.  When reading any statute, the Court must read the words of that statute "in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (citation omitted).  The MRA provides critical context in the statutory scheme to readmit Southern states into the Union.  Indeed, the MRA detailed the conditions that former Confederate states needed to satisfy before Congress would admit them through a Readmission Act.  *See* Reconstruction Act of March 2, 1867, ch. 153, 14 Stat. 428, 428–29 (1867).  One such condition was that the state constitution could disenfranchise people *only* "for participation in the rebellion or for felony at common law."[27]

---

[26] (Defs.' Mem. in Supp. of Mot. for Summ. J., ECF No. 148, at 14–15.)  The defendants argue that, in Virginia, a felony was any crime "punishable with death or confinement in the penitentiary," regardless of whether that crime came from the common law or the state legislature. *See* Lucian Minor, *The Criminal Code of Virginia*, 14 S. Literary Messenger 543–45 (1848).

[27] *Id.* at 429.  To be precise, the MRA required Virginia's constitution to allow the "elective franchise" for "all such persons as have the qualifications herein stated for the electors of delegates." *Id.*  Male citizens twenty-one and older, except those "disenfranchised for participation in the rebellion or for felony at common law," could elect constitutional delegates. *Id.*

The Virginia Readmission Act, therefore, acknowledges that Virginia complied with the MRA's limitation on its powers. The MRA told Virginia not to disenfranchise anyone besides rebels and common-law felons. The Virginia Readmission Act confirmed that Virginia listened. In this way, the Court reads these two statutes concerning the readmission of former Confederate states into one "harmonious whole."[28]

As evident from the statute itself, Congress set out to assure that Virginia adhered to "the [F]ourteenth and [F]ifteenth [A]mendments to the Constitution of the United States," which legally assured Black men an equal right to vote. Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 62 (1870) (alterations added). Further, congressional members spoke openly about their concerns that the former Confederate states would narrow the franchise to exclude newly freed Black citizens.[29] Indeed, Senator Jacob Howard of Michigan feared that, without limiting Virginia's ability to shrink the franchise, the state could "strike out of the hands of the colored men in that old Commonwealth the right to vote, and it would affect very few white people." Cong. Globe, 41st Cong., 2d Sess. 600 (1870). In other words, Congress sought to assure that the South would honor the hard-won rights of Black Americans. Guaranteeing them the right to vote, and limiting the state's ability to deprive them of that right, became a central congressional purpose of the Virginia Readmission Act. Accordingly, the Act's plain meaning fulfills Congress's clear purposes.

---

[28] *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959) (citation omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("Similarly, the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." (citations omitted)).

[29] Looking to legislative history can often feel like "walking into a crowded cocktail party and looking over the heads of the guests to pick out your friends." Scalia & Garner, *Reading the Law* 377. Still, the frequency with which congressional lawmakers brought up Black citizens' right to vote suggests that one need not cherry-pick statements to determine congressional purpose here. *See, e.g.*, Cong. Globe, 40th Cong., 2d Sess. 597–600 (1870).

*ii. Felony at Common Law*

Next, the Court must determine what authority Virginia retains to disenfranchise individuals. Congress clearly allowed Virginia to amend its Constitution to disenfranchise people convicted of a "felony at common law" as defined in 1870. Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870). The question remains, then, what "felony at common law" meant when Congress passed the Virginia Readmission Act. *See id.*

The Court "begin[s], as always in deciding questions of statutory interpretation, with the text." *Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013) (citation omitted) (alteration added). In assessing a "legal term of art," the Court assumes that, "when Congress 'borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word.'" *Lackey v. Stinnie*, 604 U.S. 192, 199, 200 (2025) (quoting *United States v. Hansen*, 599 U.S. 762, 774 (2023)). Accordingly, the Court can look to contemporaneous legal sources to help identify "accumulated . . . legal tradition" in such a legal term. *See id.* (using Black's Law Dictionary to define a legal term).

A survey of the prevailing sources around 1870 reveals two primary ways of defining the term "felony at common law."[30] Under the first, more "historical" approach, felony meant "every species of crime, which occasioned at common law the forfeiture of lands and goods."[31]

---

[30] The Court considered a variety of treatises in determining the meaning of "felony" at common law. *See, e.g.*, 4 Blackstone, *supra* note 25; Matthew Hale, The History of the Pleas of the Crown (Robert H. Small ed., 1st American ed. 1847); William Hawkins, A Treatise of the Pleas of the Crown; or, A System of the Principal Matters Relating to That Subject, Digested Under Proper Heads (London, S. Sweet 1824); 1 Francis Wharton, A Treatise on the Criminal Law of the United States (Kay and Brothers ed. 1868).

[31] 4 Blackstone, *supra* note 25, at 94. Although Blackstone recognized a correlation between "capital punishment" and "felonies," he found that, historically, the fundamental

Accordingly, under this approach, one would have to determine whether the law historically punished a particular crime with forfeiture. The second approach, however, offers discrete lists of felonies. For example, a leading commentator wrote, "At common law, in addition to the crimes more strictly under the head of treasons, the chief, if not the only felonies, were murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny." 1 Wharton, *supra* note 30, § 2.

The defendants contend that these distinct approaches show that "there was no consensus regarding a full list of" felonies at common law in 1870. (Defs.' Resp. to Pls.' Br. in Supp. of Mot. for Summ. J., ECF No. 199, at 9.) Instead, they argue that, if the Court must interpret "felonies at common law," it should define the term "by reference to their punishment." (*Id.*) In other words, the defendants argue for something analogous to the historical approach. Unlike the historical approach, though, the defendants ask the Court to define "felonies" as all crimes "serious enough to result in a [state] penitentiary sentence."[32]

The defendants' suggestion fails. It seeks to graft onto "felonies at common law" a gloss that better suits statutory felonies. Although some state codes, like Virginia's, defined "felonies" by reference to those crimes "punishable with death or confinement in the penitentiary," those

---

distinction between felonious and non-felonious crimes rested in forfeiture. *Id.* at 97. Other commentators agree. *See Felony*, Black's Law Dictionary (1st ed. 1891).

[32] (*Id.*, at 15 (alteration added).) The defendants contend that their position resembles the "historical analogue" approach that the Supreme Court has taken in the context of the Second Amendment. (*Id.*); *see also United States v. Rahimi*, 602 U.S. 680, 699–700 (2024). The Supreme Court has used that approach to assure that the Second Amendment is not "a law trapped in amber." *Rahimi*, 602 U.S. at 691. Here, however, Congress *meant* to trap the definition of "felonies at common law" in amber: Congress expressly limited the meaning to those crimes as "are *now* [in 1870] felonies at common law." Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870) (emphasis and alteration added). This suggests that the term carries a temporally defined meaning.

codes clarified the term's meaning in the context of statutes, not the common law. *See* 1848 Va. Acts 121. The leading legal commentators, though, defined common-law felonies either through a discrete list or by referring to forfeiture as punishment.

Accordingly, the "legal tradition" around the term in 1870 settled around the leading commentators' two approaches. *See Lackey*, 604 U.S. at 200. Any definition of the term, therefore, must account for both methods. By surveying sources that use both approaches, the Court has found that the legal tradition considered the following crimes as "felonies at common law" in 1870:

1. Arson[33]

2. Burglary[34]

3. Escape and rescue from a prison or jail[35]

4. Larceny[36]

5. Manslaughter[37]

6. Mayhem[38]

---

[33] 4 Blackstone, *supra* note 25, at 220–23; 1 Hale, *supra* note 30, at 566; 1 Hawkins, *supra* note 30, at 137 ("Arson is a felony at common law."); 1 Wharton, *supra* note 30, § 2.

[34] 4 Blackstone, *supra* note 25, at 223–28; 1 Wharton, *supra* note 30, § 2.

[35] 4 Blackstone, *supra* note 25, at 130–31; 1 Hale, *supra* note 30, 590–611. According to Blackstone, escape or rescue amounted to a felony only if "the offence of which the prisoner was guilty" was also a felony. 4 Blackstone, *supra* note 25, at 130.

[36] 4 Blackstone, *supra* note 25, at 229–43; 1 Wharton, *supra* note 30, § 2.

[37] 4 Blackstone, *supra* note 25, at 191–94; 1 Hawkins, *supra* note 30, at 89; 1 Wharton, *supra* note 30, § 2.

[38] 4 Blackstone, *supra* note 25, at 205–07; Wharton, *supra* note 30, § 2. This crime amounts to the "maiming" of another. *See* 1 Hawkins, *supra* note 30, at 107.

7. Murder[39]

8. Rape[40]

9. Robbery[41]

10. Sodomy[42]

11. Suicide[43]

As the mainstream legal sources available in 1870 indicate, the preceding crimes indicate the extent of what people ordinarily meant by "felonies at common law." Accordingly, when the Virginia Readmission Act used the phrase "crimes as are now felonies at common law," it included that list of crimes. Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870). This approach recognizes that the statute intended to give concrete meaning to "centuries of practice" by using a legal term of art.[44]

### c. Conflict Between the Virginia Readmission Act and the Virginia Constitution

The Virginia Readmission Act and the Virginia Constitution conflict. As discussed above, the Act prevents Virginia from amending its constitution to disenfranchise anyone save those

---

[39] 4 Blackstone, *supra* note 25, at 195; 1 Hawkins, *supra* note 30, at 76; 1 Wharton, *supra* note 30, § 2.

[40] 4 Blackstone, *supra* note 25, at 97, 211–15; 1 Wharton, *supra* note 30, § 2.

[41] 4 Blackstone, *supra* note 25, 241–43, at 97; 1 Wharton, *supra* note 30, § 2.

[42] 1 Hawkins, *supra* note 30, at 357; 1 Wharton, *supra* note 30, § 2. Blackstone refers to sodomy as the "crime against nature," which refers not only to same-sex intimacy but to bestiality. 4 Blackstone, *supra* note 25, at 215.

[43] 4 Blackstone, *supra* note 25, at 97, 189–90; 1 Hale, *supra* note 30, 411.

[44] *See Lackey*, 604 U.S. at 200. The Court declines to include only those felonies on which both approaches agree because that approach risks ignoring certain crimes that ordinary legal meaning might have included in defining "felonies at common law."

convicted of a narrow list of common-law felonies. *See* Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870). Virginia's current Constitution, ratified in 1971, automatically disqualifies anyone "who has been convicted of a felony." Va. Const. art. II, § 1. The defendants admit "that they do not make any distinction between 'common law' felonies or non-'common law' felonies in practice." (Defs.' Resps. to First Interrogs., ECF No. 153-1, at 1.) This contravenes Congress's express command that Virginia cannot disenfranchise a wider group of people than those convicted of felonies at common law, as defined in 1870. *See* Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 63 (1870). Or, at the very least, "compliance with both federal and state regulations is impossible" under the defendants' interpretation of the Virginia Constitution. *See N. Va. Hemp*, 125 F.4th at 493.

Further, this conflict has directly affected the named plaintiffs. Although their felonies do not fall into "felonies at common law," neither King nor Johnson may vote because of these convictions. (*See* Johnson Decl., ECF No. 152-2; King Decl., ECF No. 152-3.) Accordingly, the plaintiffs prevail on their claim that Virginia's felon disenfranchisement provision violates the Virginia Readmission Act.

### 2. *Injunctive Relief*

King and Johnson satisfy the requirements to obtain a permanent injunction.

They ask the Court to permanently enjoin the defendants "from disenfranchising [the p]laintiffs, members of the class they represent[,] . . . or any otherwise eligible Virginia voter under color of the Felony Disenfranchisement Provision, except for conviction for an offense that would have been a felony at common law in 1870." (Pls.' Mem. in Supp. of Mot. for Summ. J., ECF No. 152, at 7 (alterations added).) To secure such an injunction, the plaintiffs must show (1) irreparable

injury, (2) inadequacy of alternative remedies like damages, (3) a balance in hardships favoring the plaintiffs, and (4) a lack of disservice to the public interest. *eBay Inc.*, 547 U.S. at 391.

The plaintiffs satisfy these elements with ease.[45] First, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citations omitted). Second, the plaintiffs may not receive money damages in this case due to sovereign immunity principles. *See King*, 122 F.4th at 543. Third, the balance of equities tips in the plaintiffs' favor because issuing an injunction provides the plaintiffs with the re-enfranchisement they seek, while still allowing the defendants to decline re-enfranchisement of criminals convicted of particularly serious felonies. Lastly, the Supreme Court has repeatedly recognized the right to vote as a "fundamental political right" of which the public has a strong interest in exercising. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)).

---

[45] The defendants do not contest that the factors as traditionally applied entitle the class to an injunction, but instead contend that the *Purcell* principle should prevent the Court from entering an injunction too close to an election. (Defs.' Mem. in Opp'n to Pls.' Motion for Summ. J., ECF No. 162, at 26.) This principle stops courts from issuing injunctions affecting electoral procedures shortly before election day because doing so risks creating "voter confusion and consequent incentive to remain away from the polls" as "an election draws closer." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). Determining how close to an election is too close, though, proves more art than science. The timing "may depend in part on the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring).

The *Purcell* principle does not give the Court pause in this case. Here, the Court's injunction will become effective in May 2026, well before the Commonwealth's upcoming primaries for the 2026 midterms. Further, the injunction will require election officials to permit all people, save for those convicted of felonies at common law as defined in 1870, to register to vote. A forward-looking injunction on this timeline should not result in such "voter confusion" as to dissuade people from going to the polls. *See Purcell*, 549 U.S. at 4–5. The effective date will allow the Commonwealth to adjust its election procedures consistent with this opinion. Of course, nothing prevents the Commonwealth from implementing the holding of this case before May 1, 2026.

### C. *Constitutionality of the Court's Injunction*

After briefing and oral argument on the parties' motions for summary judgment, the defendants shifted their strategy to raise new challenges to the Court's ability to constitutionally enter relief in this case. The defendants now insist that "judicial enforcement of the Virginia Readmission Act renders the statute unconstitutional" by violating "the equal footing doctrine, the anticommandeering doctrine, and [the void-for-vagueness doctrine]."[46] The plaintiffs assert that the defendants' argument errs both procedurally and substantively. (*See* Pls.' Reply Br. in Supp. of Mot. for Summ. J., ECF No. 206.)

To be sure, the defendants' constitutional arguments come at an unusual, and untimely, procedural point in the litigation. Despite passing references to the anticommandeering and equal footing doctrines in earlier briefs,[47] the defendants only detail their arguments in supplemental briefing that the Court ordered after a hearing on summary judgment. (*See* Defs.' Resp. to Pls.' Br. in Supp. of Mot. for Summ. J., ECF No. 199.) Generally, a party waives an issue "by failing

---

[46] (Defs.' Resp. to Pls.' Br. in Supp. of Mot. for Summ. J., ECF No. 199, at 3 (alteration added).) The defendants also renew an argument that a private party cannot enforce the Virginia Readmission Act because the statute is "in the nature of a contract between Virginia and Congress," enforceable only by a party to the quasi-contract. (*Id.*, at 4.) The defendants argued this at the Fourth Circuit, and a unanimous panel found that "the Virginia Readmission Act creates no such limitations" on private enforcement. *King*, 122 F.4th at 546. Accordingly, this Court again finds that King and Johnson may constitutionally seek private enforcement of the Virginia Readmission Act.

[47] In discussing the concept of constitutional avoidance, the defendants referred to the "anticommandeering doctrine" at both the motion to dismiss and summary judgment stages of this litigation. (*See* Defs.' Mem. in Supp. of Second Mot. to Dismiss, ECF No. 77, at 26–31; Defs.' Mem. in Supp. of Mot. for Summ. J., ECF No. 148, at 11.) Further, they mention the "equal footing doctrine" once in a memorandum supporting their summary judgment motion. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J., ECF No. 148, at 11.)

to develop its argument—even if its brief takes a passing shot at the issue."[48]  Further, the Supreme Court has stopped a party from "add[ing] new constitutional claims as he went along" simply because he raised an earlier constitutional objection.  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 (2008) (citing *Yee v. Escondido,* 503 U.S. 519, 534 (1992)).

Accordingly, the Court rejects the defendants' arguments as untimely.  Still, even if timely raised, they fail on the merits.

### a. Equal Footing Doctrine

Under the equal footing doctrine, "all States are admitted to the Union with the same attributes of sovereignty (*i.e.,* on equal footing) as the original 13 States."  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 203 (1999) (citing *Coyle v. Smith*, 221 U.S. 559 (1911)).  Generally, Congress may not deprive a new state of its equal sovereignty.  *See Coyle*, 221 U.S. at 579 (holding that Congress cannot prevent a state from determining the location of its capital).  But this is only a general rule.  Congress may depart from "the fundamental principle of equal sovereignty" upon "a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets."  *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).  "[T]he blight of racial discrimination in voting" has justified such a departure before.[49]

According to the defendants, the Virginia Readmission Act, as interpreted by this Court, violates the equal footing doctrine because "it imposes restrictions on Virginia that do not apply

---

[48] *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (cleaned up); *see also DZ Bank AG Deutsche Zentral-Genossenschaftsbank v. Connect Ins. Agency, Inc.*, No. C14-5880JLR, 2016 WL 631574, at *25 (W.D. Wash. Feb. 16, 2016) ("A party waives or abandons an argument at the summary judgment stage by failing to provide more than a passing remark in support of its position." (citation omitted)).

[49] *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966) (upholding the Voting Rights Act of 1965); *see also Shelby Cnty. v. Holder*, 570 U.S. 529, 545 (2013).

equally to all its sister States." (Defs.' Resp. to Pls.' Br. in Supp. of Mot. for Summ. J., ECF No. 199, at 5.)   But Congress embraces different rules for different states when the legislature determines "disparate geographic coverage [is] sufficiently related to the problem that it targets." *See Nw. Austin*, 557 U.S. at 203.   In 1870, Congress clearly saw the Virginia Readmission Act as targeting the problem of the disenfranchisement of newly freed Black Americans.   *See* Cong. Globe, 41st Cong., 2nd Sess. 598 (1870).   Further, this problem had a direct nexus to Virginia and the South at large.   Some congressional leaders noted that the Commonwealth passed vagrancy laws to disadvantage Black Virginians or imposed overly harsh sentences for "trivial offense[s]." *Id.* at 442.   And Congress passed this bill less than a decade after the slaveholding South seceded in rebellion against the Union.   Accordingly, Congress had reason to believe that "racial discrimination in voting" would justify laws placing unique restrictions on former Confederate states. *See Katzenbach*, 383 U.S. at 308.

Congress did not point to phantom concerns.   Thirty-two years after the Virginia Readmission Act, anti-Black sentiment remained so strong that Virginia amended its felon disenfranchisement provision to "cut from the existing electorate four-fifths of the negro voters" without removing "a single white man." 2 Report of the Proceedings and Debates of the Constitutional Convention: State of Virginia 3076 (J.H. Lindsay ed., 1906).   When asked whether the 1902 Constitution would deprive Black voters of their rights by fraud and discrimination, a leading supporter of the new constitution replied:

> By fraud, no; by discrimination, yes. But it will be discrimination within the letter of the law, and not in violation of the law. Discrimination! Why, that is precisely what we propose; that, exactly, is what this Convention was elected for—to discriminate to the very extremity of permissible action under the limitations of the Federal Constitution, with a view to the elimination of every negro voter who can be gotten rid of, legally, without materially impairing the numerical strength of the white electorate. As has been said, we have accomplished our purpose strictly within the limitations of the Federal Constitution by legislating against the

characteristics, and not against the "race, color or previous condition" of the people themselves. It is a fine discrimination, indeed, that we have practiced in the fabrication of this plan; and now, Mr. President, we ask the Convention to confirm our work and emancipate Virginia.

*Id.* at 3076–77 (statement of Sen. Carter Glass).[50] This shows the real threat to enfranchisement that Congress sought to extinguish.

Finally, others have found Readmission Acts privately enforceable without implicating state sovereignty concerns. *See, e.g.*, *Williams on behalf of J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020) (noting that allowing the Mississippi Readmission Act to preempt the Mississippi Constitution would not violate "special sovereignty interests"). Accordingly, the Virginia Readmission Act complies with the equal footing doctrine.

#### b. Anticommandeering Doctrine

The anticommandeering doctrine recognizes that the Constitution "withhold[s] from Congress the power to issue orders directly to the States." *Murphy v. NCAA*, 584 U.S. 453, 470 (2018). In other words, Congress "may not conscript state governments as its agents" in enforcing federal policy. *New York v. United States*, 505 U.S. 144, 178 (1992).

The Court has already rejected the defendants' argument that the Virginia Readmission Act runs afoul of the anticommandeering doctrine. As before, "[t]he anticommandeering doctrine is similarly inapplicable here: the plaintiffs ask the Court to enjoin the defendants from enforcing Article II, Section 1 of Virginia's Constitution, and they have not asked the Court to compel the defendants' action." *King*, 2024 WL 1158366, at *6 n.3. In other words, the Virginia Readmission

---

[50] The Court does not cite this language to accuse any defendant of conspicuously disenfranchising voters on the basis of race. Rather, these statements demonstrate that the Reconstruction Congress held legitimate concerns about granting Virginia broad felon disenfranchisement authority—concerns that did not disappear upon Virginia's re-gaining congressional representation.

Act does not require the General Assembly to adopt or refrain from enacting a regulatory scheme. This suit merely asks the Court to enter an injunction.

### c. Void-for-Vagueness Doctrine

Under the void-for-vagueness doctrine, a legislature violates due process by passing "a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)).

The defendants argue that the Virginia Readmission Act fails to give fair notice of what it requires of them for two reasons. First, they believe "there was no generally accepted 'list' of felonies at common law in 1870." (Defs.' Resp. to Pls.' Br. in Supp. of Mot. for Summ. J., ECF No. 199, at 7.) "Second, even if there were a universally accepted list of common-law felonies in 1870, Plaintiffs have offered no judicially administrable test for classifying every modern felony." (*Id.*, at 8.)

The defendants' argument fails for several reasons. As King and Johnson point out, void-for-vagueness arises out of due process concerns relating to "*ordinary*" *defendants* in the criminal law. *See Johnson*, 576 U.S. at 595 (emphasis added). The Court knows of no authority which supports the idea that a state has a valid life, liberty, or property interest that would implicate the same due process concerns. Further, even if Virginia has analogous concerns that trigger void-for-vagueness protections, the statute here has a plain, nonvague meaning. As explained above, the Virginia Readmission Act uses a phrase—"felonies at common law"—backed by centuries of legal tradition that explains Virginia's obligation under the Act. *See supra* Part V.B.1.a.i–ii.

Accordingly, the Court may constitutionally enter an injunction in this case.

43

## VI. **CONCLUSION**

Nearly one hundred and twenty-five years after Senator Glass pleaded to "emancipate Virginia" from Black voters, a class of would-be voters appears before this Court asking for true emancipation at the Commonwealth's ballot boxes. For the foregoing reasons, the Court will deny the defendants' two motions to exclude expert evidence, (ECF Nos. 143, 145). The Court will grant King and Johnson's motion for class certification, (ECF No. 149). Finally, the Court will grant the plaintiffs' motion for summary judgment, (ECF No. 151), and deny the defendants' motion for summary judgment, (ECF No. 147).

The Court will enter an appropriate Order and Injunction.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: <u>22 January 2026</u>
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

44